**IN THE UNITED STATES DISTRICT COURT**

**FOR THE SOUTHERN DISTRICT OF OHIO**

BREANNE MAGGIO, KEVIN MCCARTHY, MELISSA LOWRY, ADAM ALZAIDI, MELISSA CUEVAS, PAMELA GIARRIZZO, CAROLE GRANT, CYNTHIA MEUSE, LATRONYA WILLIAMS, LISA KOPECKI, MICHAEL DUNN, PATRICIA DEAN, CATHERINE DUPONT, TERETTA WILLIS, SHARON BECK, DAWN VAN DER STEEG, KELLEY RIVERS, ERNEST EASTER, JUBIN KWON, ANGELA BRYANT, GIA PASCARELLI, SHANNON WEISMAN, STUART BERGMAN, BRIAN HYMAS, TRISHA NADEAU, LESLIE SULLIVAN, ROBERT TREPPER, ERIC LEMONS, SR., REBEKAH KLEMM, and NATALIA STORK, individually and on behalf of all others similarly situated,

Plaintiffs,

v.

PROCTER & GAMBLE COMPANY,

Defendant.

Case No. 2:25-md-03157-DRC-KAJ

**JURY TRIAL DEMANDED**

**CONSOLIDATED CLASS ACTION COMPLAINT**

## TABLE OF CONTENTS

**Page**

I. INTRODUCTION ..... 1

II. JURISDICTION AND VENUE ..... 11

III. PARTIES ..... 12

A. Plaintiffs ..... 12

1. California Plaintiffs ..... 12

a. Adam Alzaidi ..... 12

b. Melissa Cuevas ..... 15

c. Kevin McCarthy ..... 18

2. Connecticut Plaintiffs ..... 20

a. Stuart Bergman ..... 20

b. Gia Pascarelli ..... 23

3. Florida Plaintiffs ..... 26

a. Kelley Rivers ..... 26

b. Dawn van der Steeg ..... 28

4. Georgia Plaintiff ..... 31

a. Angela Bryant ..... 31

5. Illinois Plaintiffs ..... 34

a. Patricia Dean ..... 34

b. Carole Grant ..... 36

c. LaTronya Williams ..... 39

6. Maine Plaintiff ..... 42

a. Leslie Sullivan ..... 42

7. Maryland Plaintiff ..... 44

a. Shannon Weisman ........ 44

8. Massachusetts Plaintiffs ........ 47

a. Pamela Giarrizzo ........ 47

b. Cynthia Meuse ........ 50

9. Michigan Plaintiff ........ 52

a. Trisha Nadeau ........ 52

10. Minnesota Plaintiff ........ 55

a. Catherine DuPont ........ 55

11. New York Plaintiffs ........ 58

a. Sharon Beck ........ 58

b. Breanne Maggio ........ 61

c. Teretta Willis ........ 61

12. North Carolina Plaintiff ........ 64

a. Robert Trepper ........ 64

13. Ohio Plaintiffs ........ 66

a. Rebekah Klemm ........ 66

b. Natalia Stork ........ 69

14. Pennsylvania Plaintiffs ........ 72

a. Ernest Easter ........ 72

b. Jubin Kwon ........ 74

15. Utah Plaintiffs ........ 77

a. Brian Hymas ........ 77

b. Eric Lemons, Sr. ........ 80

16. Washington Plaintiffs ........ 82

a. Melissa Lowry ........ 82

b. Michael Dunn ... 85

c. Lisa Kopecki ... 88

B. Defendant ... 90

1. Procter & Gamble Company ... 90

IV. FACTUAL ALLEGATIONS ... 91

A. Environmental stewardship is a material attribute to consumers. ... 91

B. P&G knows that its environmental stewardship claims are material to consumers. ... 94

C. Companies have developed sophisticated greenwashing campaigns to leverage the growth opportunities in environmental claims. ... 95

D. The FTC's "Green Guides" provide critical information to consumers, companies, and courts about deceptive environmental claims. ... 96

E. P&G touts its environmental stewardship via its Keep Forests as Forests campaign. ... 101

1. P&G's Keep Forests as Forests is a multilayered marketing campaign which conveys a consistent and unified message of environmental stewardship. ... 101

2. P&G makes three Deceptive Claims via its Protect-Grow-Restore messaging and logo. ... 103

3. P&G makes two additional Deceptive Claims via its use of the third-party FSC logo and RA logo. ... 104

4. P&G communicates the Deceptive Claims consistently and pervasively at point-of-sale for all P&G Paper Products. ... 105

a. Charmin packaging uniformly includes the Deceptive Claims. ... 105

b. Puffs Tissues packaging also uniformly displays the same Deceptive Claims. ... 106

5. P&G also supplies identical iterations of the Deceptive Claims to national retailers to use at their digital point-of-sale locations. ... 107

a. Kroger Point-of-Sale Listing for Charmin Ultra Strong Toilet Paper ... 107

b. Walmart Point-of-Sale Listing for Charmin Ultra Strong Toilet Paper ... 108

c. Costco Point-of-Sale Listing for Charmin Ultra Soft Toilet Paper ... 109

d. Lowe's Point-of-Sale Listing for Charmin Ultra Soft Toilet Paper ... 110

e. Amazon's Point-of-Sale Listing for Charmin Ultra Gentle Toilet Paper ... 111

f. Charmin.com Point-of-Sale Listing for Charmin Ultra Soft Mega XL Roll ... 113

g. Puffs Tissues digital point-of-sale listings also contain the same logos and environmental representations. ... 114

6. The net impression of the Deceptive Claims is that a P&G Paper Product represents an environmentally sustainable choice. ... 116

F. P&G also directs consumers to its Sustainability Promise websites which reiterates the Deceptive Claims because P&G knows these claims are material to consumers. ... 116

1. The "Protect" video depicts FSC-certified forests in the United States that are owned by small landowners who follow FSC responsible forest management guidance. ... 118

2. The "Grow" video prominently displays the unqualified FSC logo, the RA Certified logo, and reiterates P&G's promise to replant at least 1-2 new trees for every tree used in P&G Paper Products. ... 118

3. The "Restore" video promises that P&G will help plant 1 million trees between 2020 and 2025 in areas devastated by natural disasters. ... 119

4. P&G also maintains an additional Sustainability Promise website for its Puffs Tissues products with the identical Deceptive Claims. ... 119

5. P&G also produced a viral Protect-Grow-Restore YouTube video repeating the Deceptive Claims. ... 121

G. P&G also touts its environmental messaging and enforcement promises to investors.......... 121

H. P&G's Keep Forests as Forests campaign, and the Deceptive Claims, are misleading due to certain Common Omissions. .......... 122

1. P&G's "Protect" promise misleads consumers because P&G does not disclose that its Paper Products are sourced from harvests that rely on devastatingly harmful industrial logging practices. .......... 123

a. P&G sources most of its wood pulp Canada's boreal forest, an ecological jewel and one of the Earth's untouched old-growth forests. .......... 123

b. Deforestation practices and Forest Degradation practices each incorporate the same industrial logging activities that permanently devastate the health of Canada's boreal forest.......... 126

c. P&G promises "no deforestation" while also misleading consumers as to the extent of the harm caused by the Forest Degradation practices in the Paper Products supply chain. .......... 128

2. P&G's "Grow" promise is misleading because P&G's suppliers are systematically converting untouched old growth forests into industrial tree crops.......... 129

3. P&G's "Restore" promise is misleading as P&G intends to replace less than 1% of lands harvested in Canada's boreal forests. .......... 131

4. P&G also misleads consumers at point-of-sale with improper use of the FSC logo. .......... 132

a. P&G's statement that its Paper Products pulp is 100% FSC certified is false. .......... 132

b. P&G's use and placement of the FSC Mix logo is also misleading. .......... 134

5. P&G continues to misuse and mislead consumers regarding its RA logos.......... 135

I. P&G's Keep Forests as Forests campaign and Paper Products packaging violates the FTC Green Guides. .......... 138

J. P&G has repeatedly promised to fulfill its promises, or to stop making misleading claims, but has failed to do so. .......... 142

K. P&G has actively concealed the truth about its environmental claims from consumers. .......... 144

L. P&G's competitors demonstrate that more sustainable practices are possible. .......... 147

V. TOLLING OF THE STATUTE OF LIMITATIONS .......... 148

A. Discovery Rule Tolling .......... 148

B. Fraudulent Concealment Tolling .......... 149

C. Estoppel .......... 150

VI. CLASS ALLEGATIONS .......... 150

VII. CLAIMS FOR RELIEF .......... 155

A. Claims brought on behalf of the California Class .......... 155

COUNT I VIOLATION OF THE CALIFORNIA CONSUMERS LEGAL REMEDIES ACT (Cal. Civ. Code § 1750, *et seq.*) .......... 155

COUNT II VIOLATION OF THE CALIFORNIA UNFAIR COMPETITION LAW (Cal. Bus. & Prof. Code § 17200, *et seq.*) .......... 157

COUNT III VIOLATION OF THE CALIFORNIA FALSE ADVERTISING LAW (Cal. Bus. & Prof. Code § 17500, *et seq.*) .......... 159

COUNT IV FRAUDULENT CONCEALMENT (Based on California Law) .......... 161

COUNT V VIOLATION OF THE ENVIRONMENTAL MARKETING CLAIMS ACT (Cal. Bus. & Prof. Code §§ 17580.5 and 17580(a)) .......... 163

B. Claims brought on behalf of the Connecticut Class .......... 166

COUNT VI VIOLATION OF THE CONNECTICUT UNFAIR TRADE PRACTICES ACT (Conn. Gen. Stat. § 42-110A, *et seq.*) .......... 166

COUNT VII FRAUDULENT CONCEALMENT (Based on Connecticut Law) .......... 166

C. Claims brought on behalf of the Florida Class .......... 169

COUNT VIII VIOLATION OF THE FLORIDA'S UNFAIR & DECEPTIVE TRADE PRACTICES ACT (Fla. Stat. § 501.201, *et seq.*) .......... 169

COUNT IX FRAUDULENT CONCEALMENT (Based on Florida Law)................................ 171

D. Claims brought on behalf of the Georgia Class ................................................ 173

COUNT X VIOLATION OF THE GEORGIA FAIR BUSINESS PRACTICES ACT (Ga. Code Ann. § 10-1-390, *et seq.*) ................................................................... 173

COUNT XI FRAUDULENT CONCEALMENT (Based on Georgia Law) ............................. 175

E. Claims brought on behalf the Illinois Class ...................................................... 177

COUNT XII VIOLATION OF THE ILLINOIS CONSUMER FRAUD AND DECEPTIVE BUSINESS PRACTICES ACT (815 ILCS 505/1, *et seq.* and 720 ILCS 295/1A)....................................................................................... 177

COUNT XIII FRAUD BY CONCEALMENT (Based on Illinois Law).................................. 179

F. Claims brought on behalf of the Maine Class.................................................... 181

COUNT XIV VIOLATION OF THE MAIN UNFAIR TRADE PRACTICES ACT (Me. Rev. Stat. Ann. tit. 5, § 205-A, *et seq.*) ....................................................... 181

COUNT XV FRAUDULENT CONCEALMENT (Based on Maine Law) .............................. 182

G. Claims brought on behalf of the Maryland Class .............................................. 184

COUNT XVI VIOLATION OF THE MARYLAND CONSUMER PROTECTION ACT (Md. Code, Com. Law § 13-101, *et seq.*) .................................. 184

COUNT XVII FRAUDULENT CONCEALMENT (Based on Maryland Law) ...................... 185

H. Claim brought on behalf of the Massachusetts Class ........................................ 187

COUNT XVIII VIOLATION OF THE MASSACHUSETTS GENERAL LAW CHAPTER 93(A) (Mass. Gen. Laws Ch. 93A § 1, *et seq.*).......................................... 187

COUNT XIX FRAUD BY CONCEALMENT (Based on Massachusetts Law)....................... 188

I. Claim brought on behalf of the Michigan Class ............................................... 191

COUNT XX VIOLATION OF THE MICHIGAN CONSUMER PROTECTION ACT (Mich. Comp. Laws § 445.903, *et seq.*)............................................................ 191

COUNT XXI FRAUDULENT CONCEALMENT (Based on Michigan Law)......................... 192

J. Claims brought on behalf of the Minnesota Class............................................. 194

COUNT XXII VIOLATION OF MINNESOTA UNIFORM DECEPTIVE TRADE PRACTICES ACT (Minn. Stat. § 325D.43-.48)............................................ 194

COUNT XXIII VIOLATION OF MINNESOTA DECEPTIVE TRADE PRACTICES ACT; ENVIRONMENTAL MARKETING CLAIMS (Minn. Stat. § 325E.41, *et seq.*) ........ 198

COUNT XXIV VIOLATION OF MINNESOTA FALSE STATEMENT IN ADVERTISING ACT (Minn. Stat. § 325F.67) ........ 200

COUNT XXV VIOLATION OF MINNESOTA PREVENTION OF CONSUMER FRAUD ACT Minn. Stat. § 325F.68-70 ........ 203

COUNT XXVI FRAUDULENT CONCEALMENT (Based on Minnesota Law) ........ 204

K. Claims brought on behalf of the New York Class ........ 207

COUNT XXVII VIOLATION OF NEW YORK GENERAL BUSINESS LAW §§ 349-350 (N.Y. Gen. Bus. Law §§ 349-350) ........ 207

COUNT XXVIII FRAUDULENT CONCEALMENT (Based on New York Law) ........ 208

L. Claims brought on behalf of the North Carolina Class ........ 210

COUNT XXIX VIOLATION OF THE NORTH CAROLINA UNFAIR AND DECEPTIVE ACTS AND PRACTICES ACT (N.C. Gen. Stat. § 75-1.1 *et seq.*) ........ 210

COUNT XXX FRAUDULENT CONCEALMENT (Based on North Carolina Law) ........ 212

M. Claims brought on behalf of the Ohio Class ........ 214

COUNT XXXI VIOLATION OF THE OHIO CONSUMER SALES PRACTICES ACT (Ohio Rev. Code Ann. § 1345.01, *et seq.*) ........ 214

COUNT XXXII FRAUDULENT CONCEALMENT (Based on Ohio Law) ........ 220

N. Claims brought on behalf of the Pennsylvania Class ........ 222

COUNT XXXIII VIOLATION OF THE PENNSYLVANIA UNFAIR TRADE PRACTICES AND CONSUMER PROTECTION LAW (73 Pa. Cons. Stat. § 201-1, *et seq.*) ........ 222

COUNT XXXIV FRAUDULENT CONCEALMENT (Based on Pennsylvania Law) ........ 223

O. Claims brought on behalf of the Utah Class ........ 225

COUNT XXXV VIOLATION OF THE UTAH CONSUMER SALE PRACTICES ACT (Utah Code Ann. § 13-11-1, *et seq.*) ........ 225

COUNT XXXVI FRAUDULENT CONCEALMENT (Based on Utah Law) .......................... 226

P. Claims brought on behalf of the Washington Class .......................................... 229

COUNT XXXVII VIOLATION OF THE WASHINGTON CONSUMER PROTECTION ACT (Wash. Rev. Code Ann. § 19.86.010, *et seq.*) ............................ 229

COUNT XXXVIII FRAUDULENT CONCEALMENT (Based on Washington Law) ............................................................................................................ 229

PRAYER FOR RELIEF ........................................................................................... 232

DEMAND FOR JURY TRIAL ................................................................................. 232

CERTIFICATE OF SERVICE ..................................................................................234

Plaintiffs allege the following based on personal knowledge and investigation by their counsel, as to themselves, and as to all other matters, upon information and belief:

## I. INTRODUCTION

1. This is a consumer protection case against one of the biggest companies in the world who, for years, has been complicit in the clearcutting of previously untouched old-growth forests in order to sell billions of dollars of single-use tissue products—all while reassuring consumers with false claims to "protect", "grow", and "restore" these unique forests.

2. Defendant Procter & Gamble Company[1] sources the wood pulp used in its flagship Charmin Toilet Paper and Puffs Tissue brands[2] from the boreal forest in Canada. Canada's boreal forest is one of the last untouched old-growth forests left on Earth. Below is an area where P&G has sourced its Paper Products[3] via devastating industrial harvesting practices, such as clearcutting and burning, that are completely at odds with the environmental stewardship claims P&G makes to consumers at point-of-sale and elsewhere:



[1] "P&G" or "PGC" means Procter & Gamble Company.

[2] Charmin Toilet Paper means tissue products made by P&G under the brands Charmin Ultra Soft, Charmin Ultra Strong, Charmin Ultra Gentle, Charmin Essentials Soft, Charmin Essential Strong. Puffs Tissues means tissue products made by P&G under the brands Puffs Ultra Soft & Strong, Puffs Plus Lotion, and Simple Softness or Basic brands. "P&G Paper Products" or "Paper Products" refers collectively to Charmin Toilet Paper and Puffs Tissues brands.

[3] Courtenay Lewis & Ashley Jordan, *By a Thousand Cuts: How Powerful Companies' Wood Sourcing is Degrading Canada's Boreal Forest*, NRDC (Apr. 2021), https://www.nrdc.org/sites/default/files/thousand-cuts-wood-sourcing-canadas-boreal-report.pdf.

3. P&G sells around $2 billion of Charmin a year and enjoys around 25% of the North American market share for toilet paper.[4] According to U.S. Census data, more than 86 million Americans used Charmin Ultra in the year 2020 alone. Similarly, P&G sells around $1 billion of Puffs Tissues a year and ranks in the top three brands sold in the United States.[5]

4. P&G's success in selling billions of dollars of Paper Products is due in part to its environmental stewardship claims. A large portion of consumers increasingly care about the environmental impact of products when making purchasing decisions, with many stating that they are willing to pay more for sustainable options and are prioritizing brands with environmentally conscious practices. According to a joint study by McKinsey & Company and NielsenIQ entitled "Consumers Care About Sustainability and Back it Up with Their Wallets" (hereinafter "McKinsey study"), around 60% of U.S. consumers disclosed that they care about buying environmentally and ethically sustainable products.[6] The McKinsey study also found that "a wide range of consumers across incomes, life stages, ages, races, and geographies are buying products bearing ESG[7]-related labels." Moreover, multiple studies show that consumers are willing to pay a premium between 9 to 12% for sustainable goods—even when facing cost-of-living headwinds. *See* § IV.A., *infra*.

---

[4] *Sales of the leading 10 toilet tissue brands of the United States in 2017*, STATISTA, https://www.statista.com/statistics/188710/top-toilet-tissue-brands-in-the-united-states/.

[5] Puffs Tissues annual revenue is estimated assuming that the facial tissue market size is $5.4 billion and that Puffs retains a market share of around 15 to 20%. *Facial Tissue Paper Market*, FMI, https://www.futuremarketinsights.com/reports/facial-tissue-paper-market.

[6] *Consumers care about sustainability—and back it up with their wallets*, MCKINSEY & COMPANY (Feb. 6, 2023), https://www.mckinsey.com/industries/consumer-packaged-goods/our-insights/consumers-care-about-sustainability-and-back-it-up-with-their-wallets#/.

[7] ESG-related labels mean labels that connote a company's claims or philosophy regarding environmental, social, or governance issues.

5. Considering these trends, companies are increasingly marketing their products and supply chains as environmentally responsible—and P&G is no exception with its umbrella marketing campaign, entitled "Keep Forests as Forests". *See* §§ IV.B., IV.E.1., *infra*.

6. The "Keep Forests as Forests" marketing campaign centers around five key claims ("Deceptive Claims"), which are summarized in the bullet points below. The Deceptive Claims are each prominently displayed on the product packaging, and at digital points of sale, for all of P&G's Paper Products. The Deceptive Claims are also reinforced to consumers via P&G's own "Protect-Grow-Restore" logo, the Forest Stewardship Council ("FSC") logo, and the Rainforest Alliance ("RA") logo.

- In its "Protect" or "Protects" message, set forth below, P&G claims to only source pulp certified by the FSC, a third-party organization that administers a forest certification program. A reasonable consumer's net impression of this claim is that P&G actively safeguards forests from harm by sourcing pulp only from suppliers that meaningfully take actions to preserve the ecological value and integrity of the forests harvested. Reasonable consumers also understand this claim to mean that P&G's supply chain takes concrete and measurable actions to exclude suppliers actively engaged in unnecessarily destructive practices such as clearcutting and burning.




**FSC™ Certified**

We only use pulp certified by the Forest Stewardship Council® and support FSC® in their work to increase adoption of FSC products. These standards ensure that we are protecting wildlife and contributing to thriving local communities.



- In its "Grow" or "Regrows" message, set forth below, P&G claims that for every tree used by P&G, at least two are regrown in its place. A reasonable consumer's net impression of this claim is that P&G mitigates the environmental harm caused by its suppliers' harvesting via replanting efforts that eventually replace (or even improve upon) the ecological value of the forests that were harvested. Reasonable consumers also understand this message to mean that P&G not only offsets its tree use but also creates a net positive impact on the forests harvested for P&G Paper Products.







- In its "Restore" message, set forth below, P&G touts its partnership with the Arbor Day Foundation to plant one million trees in forests affected by natural disasters. A reasonable consumer's  net impression of this claim is that P&G is restoring not only the forests it harvests (which P&G does not do) but also goes one step further by *adding* new trees in sensitive areas. Reasonable consumers also understand this to mean that P&G goes beyond just neutralizing harm from its harvests, but also creates a net positive impact by taking extra actions to grow the global tree canopy.




**Forest Restoration**

P&G and Charmin are partnering with the Arbor Day Foundation to plant 1 million trees in forests affected by natural disasters, like wildfires or hurricanes.

- P&G's use of the unqualified FSC logo, as set forth below, in a prominent location on the front package of P&G Paper Products unambiguously conveys to a reasonable consumer a net impression that *all* the pulp used to manufacture P&G Paper Products is not only FSC certified, but also derived from FSC-certified forests.




- P&G's use of the Rainforest Alliance logos as set forth below conveys to a reasonable consumer a net impression that its supply chain for P&G Paper Products has been recently reviewed and/or actively certified by credible, independent, third parties according to rigorous sustainability standards.

7. Collectively, P&G's "Keep Forests as Forests" campaign and its five key messages create a net impression that P&G is taking measurable steps towards minimizing, neutralizing, or even reversing the environmental impact of harvesting wood pulp for use in P&G Paper Products. In turn, reasonable consumers are led to believe that purchasing single-use P&G Paper Products does not unnecessarily harm forests. Instead, a P&G Paper Product purchase can help to protect, grow, and restore a forest's ecological value. *See* § IV.E.2-3.

8. To reinforce this net impression to consumers at point-of-sale, P&G consistently includes a uniform Protect-Grow-Restore logo on all its Paper Products physically sold in stores. P&G also prints the logo of third-party certifiers, like the FSC and Rainforest Alliance, on all of its Paper Products. P&G claims that these third parties evaluate, support, and certify P&G's forest management practices.

9. P&G also extends the reach of its Keep Forests as Forests messaging with consistent displays at digital points of sale via a robust network of retailers like Kroger, Costco, Amazon, Walmart, and others. P&G provides these digital retailers with the Protect-Grow-Restore logos and Keep Forests as Forests messages, with the expectation that they will be displayed along with the P&G Paper Products, as P&G knows that these claims are material to consumers. Below is an example[8] of these types of representations:

**Product Details**




Get sparkly clean with Charmin Ultra Strong. Its 4X stronger when wet and has a diamond-weave texture. Its woven like a washcloth and holds up when you wipe. It even cleans better so you can use less and go longer without changing the roll. We also made it MEGA in size, so you get mega value. Thats right, our Charmin Ultra Strong Mega Roll is way bigger, equals 4 regular rolls, and its more bang for your behind so youll be running back to the store less and less (based on number of sheets in Charmin Regular Roll bath tissue). Our Charmin Ultra Strong toilet paper is also 2-ply and designed to be clog-safe and septic-safe so you can flush confidentially and keep clean. And at Charmin, we love trees so we work hard to protect, grow and restore forests. Its why all our pulp used is 100% FSC certified. Its why we plant two trees for every one used. And its why we help to restore forests devastated by natural disaster through the Arbor Day Foundation. Thats how were helping keep forests, forests. We all go, why not Enjoy The Go with Americas favorite toilet paper.

[8] Kroger, https://www.kroger.com/p/charmin-ultra-strong-toilet-paper-231-sheets-roll-32-rolls-/0003077208632 (last accessed Jan. 15, 2025).

**Charmin Beyond The Roll**




**FSC™ Certified**

We only use pulp certified by the Forest Stewardship Council® and support FSC® in their work to increase adoption of FSC products. These standards ensure that we are protecting wildlife and contributing to thriving local communities.




**Protect, Grow and Restore**

At Charmin, we are committed to making our toilet paper work hard to make a sustainable difference. 100% of our paper comes from responsibly managed forests.




**Forest Restoration**

P&G and Charmin are partnering with the Arbor Day Foundation to plant 1 million trees in forests affected by natural disasters, like wildfires or hurricanes.

10. Unfortunately, P&G's promise to "Keep Forests as Forests" is misleading and amounts to nothing more than greenwashing**.** Greenwashing occurs when a company misleads consumers about the environmental practices of its operations or products, either by exaggerating benefits, or by concealing harmful practices that contradict, or impede against, its stated commitments. Here, P&G uses the Deceptive Claims to position its tissue products as environmentally responsible when, in reality, P&G omits critical facts to materially mislead consumers as to the true impact of the P&G's supply chain on one of the earth's last untouched old-growth forests. P&G's deception can be summarized in the following Common Omissions:

11. ***First:*** P&G's "Protect" or "Protects" promise is misleading because P&G fails to disclose that P&G Paper Products are made with virgin forest fiber harvested by suppliers who employ industrial logging practices (such as clearcutting and burning) which do not in any sense

protect the forest—they actually destroy the forest. *See* Section IV.H.1, *infra.* Below are some examples[9] of P&G's "protected" forests via which P&G sources its wood pulp:





12. ***Second:*** The "Grow" or "Regrows" promise is misleading because P&G provides no public substantiation that, for every tree harvested, two trees are regrown in the same place. And even if P&G could substantiate this claim, this claim conceals the fact that P&G's replanting practices do not aim to recreate the ecological value of the diverse, old-growth forests that were cut. Instead, P&G's suppliers intentionally plant new trees as they would crops on a farm—and then harvest them after only twenty years of growth (but at peak value for logging). Most experts agree that twenty years is far too short of a timeframe to replace the ecological value of the centuries-old trees that P&G's suppliers eliminated. For example, a single 200-year-old tree stores about 10–30 times more carbon than two 20-year-old trees, and a 500-year-old tree has about 40–100 times more carbon than two 20-year-old trees.[10] *See* Section IV.H.2., *infra.* Below are examples of how P&G's "Grow" efforts are effectively turning old-growth forests into tree farms with only a fraction of their ecological value:

---

[9] *A Tale of Two Forests: A Tour Through Canada's Boreal*, NRDC (Aug. 26, 2019), https://www.nrdc.org/stories/tale-two-forests-tour-through-canadas-boreal.

[10] *See* Jenkins, Jennifer C.; Chojnacky, David C.; Heath, Linda S.; Birdsey, Richard A. 2003. *National scale biomass estimators for United States tree species*. Forest Science. 49: 12-35. https://research.fs.usda.gov/treesearch/6996 (last accessed Sept. 8, 2025).





13. ***Third:*** P&G does not disclose that its much touted "Restore" efforts are negligible and will never meaningfully restore the ecosystem value that was destroyed via the industrial logging practices used to create the pulp for P&G Paper Products. This is because P&G and its partners have pledged to restore only the equivalent of 1% of boreal forest harvested every year in Canada. *See* Section IV.H.3., *infra.*

14. ***Fourth:*** P&G's use of an unqualified FSC logo in a prominent location on the front of the package, coupled with claims that 100% of its wood pulp is FSC-certified, misleads consumers because a substantial portion of the pulp used in P&G Paper Products is *not* FSC certified at all. And even for pulp that is FSC Mix certified, P&G fails to disclose to consumers this type of pulp not only contains very little to no FSC forest-certified material, but was also likely harvested via industrial methods like clearcutting and burning. *See* Section IV.H.4., *infra.*

15. ***Fifth:*** P&G's current use of the "Rainforest Alliance Certified" logo on its website, and near-identical "Rainforest Alliance: Forest Allies" logo on its Paper Product packaging, is misleading because P&G does not disclose that the "Certified" seal is now obsolete. Indeed, the Rainforest Alliance ceased its forest certification program more than seven years ago (in 2018). *See* Section IV.H.5., *infra.* P&G also hides from consumers that the "Forest Allies" program does not certify any forest in the boreal, does not perform any audits, and has no

connection with P&G Paper Products or their sourcing whatsoever, rendering the logo essentially meaningless as an environmental or certification claim.

16. Simply put, P&G uses the Deceptive Claims to convey to consumers that it can be trusted to "Keep Forests as Forests". But these five Common Omissions show that P&G has no real intention of restoring the boreal forest areas it harvests to the same level of biodiversity and ecological value that existed before P&G's harvesting (*i.e.*, Keep *the Boreal* Forest as *the Boreal* Forest). And because consumers increasingly make purchasing decisions based on environmental claims, these five Common Omissions are highly likely to influence whether a reasonable consumer would purchase a P&G Product and/or alter the price that they are willing to pay for it. P&G's use of the Deceptive Claims without the disclosure of the Common Omissions misleads reasonable consumers in a material way, constituting deceptive and unfair trade practices.

17. The Deceptive Claims are also clear violations of the Green Guides. Developed by the Federal Trade Commission ("FTC"), the Green Guides are designed to help marketers avoid making environmental marketing claims that are unfair or deceptive under Section 5 of the FTC Act, 15 U.S.C. § 45. The Green Guides also play a large role in state consumer protection law. At least twelve states[11] have laws that directly incorporate the standards set forth in the Green Guides as the legal standard for lawfully making certain marketing claims[12] and twenty-seven states and territories[13] have laws designating the FTC's interpretation in the Green Guides

---

[11] These states are Alabama, California, Florida, Indiana, Maine, Maryland, Michigan, Minnesota, New Mexico, New York, Pennsylvania, Rhode Island, and Washington.

[12] Comments to the FTC regarding Green Guides Review from the attorneys general of California, Connecticut, Delaware, Illinois, Maryland, Michigan, Minnesota, New Jersey, New Mexico, New York, Oregon, Rhode Island, and Wisconsin (Apr. 24, 2023), https://oag.ca.gov/system/files/attachments/press-docs/Comments%20to%20FTC%20re%20Green%20Guides%204.24.23.pdf.

[13] These are Alabama, Alaska, Arizona, Connecticut, District of Columbia, District of Guam, Florida, Idaho, Georgia, Illinois, Maine, Maryland, Massachusetts, Michigan, Montana, New

as persuasive authority for courts. As explained below, P&G's Keep Forests as Forests Campaign and packaging practices violate multiple sections of the FTC Green Guides. *See* Section IV.I., *infra.*

18. To date, P&G refuses to conform its environmental practices to be consistent with what it is conveying to consumers—or admit to its reliance on environmentally devastating activities. Section IV.J-K., *infra*. And while there has been some activity at the shareholder level—even the descendants of the Procter and Gamble families have strongly criticized P&G's practices—P&G continues to mislead consumers even though its competitors demonstrate that more sustainable options exist. *See* Section IV.L., *infra.*

19. Plaintiffs bring this case as a set of proposed classes on behalf of themselves, and those similarly situated, seeking both injunctive relief under Rule 23(b)(2), forcing P&G to make accurate corrective disclosure, and under Rule 23(b)(3) for damages.

## II. JURISDICTION AND VENUE

20. On August 8, 2025, the Judicial Panel on Multidistrict Litigation entered a transfer order transferring the seven related actions to the U.S. District Court for the Southern District of Ohio for coordinated or consolidated pretrial proceedings before Judge Douglas Cole. This Complaint incorporates the previous complaints from the seven related actions and serves as the operative administrative complaint for MDL purposes in Case No. 2:25-md-03157-DRC-KAJ, but not as the operative pleading for the individual cause numbers listed below. The seven related actions are *Alzaidi, et al. v. Procter & Gamble Co*., No. 4:25-cv-04519 (N.D. Cal.) (Chesney, J.); *Dean, et al. v. Procter & Gamble Co*., No. 1:25-cv-05977 (N.D. Ill.) (Jenkins, J.);

---

Hampshire, New Mexico, Ohio, South Carolina, Rhode Island, Texas Tennessee, Utah, Vermont, Washington, and West Virginia.

*Giarrizzo, et al. v. Procter & Gamble Co.*, No. 1:25-cv-11524 (D. Mass.) (Sorokin, J.); *Willis, et al. v. Procter & Gamble Co*., No. 1:25-cv-04461 (S.D.N.Y.) (Cronan, J.); *DuPont v. Procter & Gamble Co*., No. 0:25-cv-02260 (D. Minn.) (Tostrud, J.); *Maggio v. Procter & Gamble and Rainforest Alliance* No. 1:25-cv-02667 (S.D.N.Y. filed Mar. 31, 2025); and *Lowry v. Procter & Gamble Co*., 2:25-cv-00108-JHC (W.D. Wash.) (Chun, J.). Plaintiffs expressly reserve all rights under *Lexecon Inc. v. Milberg Weiss Bershad Hynes & Lerach*, 523 U.S. 26 (1998), including the right to trial in the original transferor courts. Nothing in this Consolidated Complaint shall be construed as consent to trial of these seven related actions in the transferee court.

21. Plaintiff Rebekah Klemm and Plaintiff Natalia Stork purchased P&G Paper Products in this District. The Southern District of Ohio has jurisdiction over the Ohio Plaintiffs only.

## III. PARTIES

### A. Plaintiffs

#### 1. California Plaintiffs

##### a. Adam Alzaidi

22. Plaintiff Adam Alzaidi ("Plaintiff" for the purpose of this section) is a citizen of California and a resident of Santa Rosa, California. From around October 2019 to January 2024, Plaintiff routinely purchased Charmin Toilet Paper ("Paper Products" for purposes of this section) from Amazon and Safeway stores in California. At point of sale, Plaintiff saw and relied on the Deceptive Claims contained on Charmin's packaging (at Safeway) and/or the Charmin product details webpage[14] (at Amazon).

[14] The Amazon product details page states that product information is "From the Manufacturer", *i.e.,* supplied by P&G. *See* ¶¶ 255, 258 *infra.* Plaintiffs also allege that the product details information on any retailer webpage for a P&G Paper was supplied by P&G. *See* § IV.E.5 & n.37, *infra.*

23. The Deceptive Claims exposed to Plaintiff at time of purchase included the Protect-Grow-Restore messaging, the FSC logo, and the RA logo and were substantially similar to the examples included in § IV.E. of this Complaint. These Deceptive Claims created the net impression that P&G is currently taking meaningful steps to substantially mitigate the environmental impact of manufacturing single-use tissue paper. In turn, Plaintiff reasonably understood that the purchase of a P&G Paper Product represented a more environmentally responsible choice compared to other, cheaper, tissue paper brands that did not make the same type of claims.

24. At no point at time of purchase did Plaintiff notice any disclaimer or other explanatory statement on the packaging or product detail page that limited or otherwise qualified the prominent Deceptive Claims in a manner that would be understood by a reasonable consumer. For example, nowhere at point-of-sale did Defendant disclose the following Common Omissions: (1) P&G is not protecting forests as its P&G Paper Products are made with virgin forest fiber derived from the industrial clearcutting and burning of previously untouched old-growth forests; (2) P&G is not growing forests as its replanting efforts are designed to convert these old-growth forests into industrial tree crops that are ultimately capable of reproducing but a small fraction of the original ecological value; (3) P&G is not restoring forests as its total restoration efforts impact an area representing less than 1% of untouched old-growth forest lost each year in the boreal from industrial logging practices; (4) a large portion of the pulp used in P&G Paper Products is *not* FSC-certified at all, and even for pulp that is FSC Mix-certified, that pulp actually contains very little to no FSC forest-certified material; and, (5) the Rainforest Alliance "Forest Allies" logo does not convey any type of third-party certification reflective of responsible forestry standards. Because Defendant conceals this information from consumers,

Plaintiff had no knowledge of the Common Omissions at the time Plaintiff purchased the Paper Products.

25. By uniformly communicating the prominent Deceptive Claims at point of sale—while also withholding the information reflected in the Common Omissions—Defendant deceived and misled consumers into thinking that P&G's has a viable method for substantially mitigating or neutralizing the harm its Paper Products' supply chain causes to the environment. When, in reality, P&G Paper Products are fundamentally unsustainable because P&G has no intention of altering its old-growth forest supply chains or manufacturing processes to meaningfully reduce its environmental footprint. Had Defendant disclosed the truth about its damaging environmental practices, Plaintiff would not have purchased the Paper Products or would have paid less for them.

26. Defendant's unfair, unlawful, and deceptive conduct in manufacturing, marketing, and selling Paper Products has caused Plaintiff out-of-pocket loss. Defendant knew of the Common Omissions but did not disclose such facts or their effects to Plaintiff, so Plaintiff purchased the products on the reasonable belief created by Defendant's point-of-sale representations that because P&G was taking meaningful steps towards to substantially mitigate the environmental harm associated with manufacturing tissue paper, and that its Paper Products represented a more environmentally responsible choice as compared to other, cheaper, tissue brands that did not contain the Deceptive Claims.

27. Plaintiff is a typical consumer who is not sophisticated in the formulation, cross-border sourcing, and manufacturing of tissue paper and has no personal knowledge of these practices. And at no point during the Class Period did Plaintiff know of—or had any reasonable basis to discover—the Common Omissions and/or that the Deceptive Claims were false and

misleading. In contrast, P&G had substantial knowledge that the Deceptive Claims were false and misleading because P&G had access to the information reflected in the Common Omissions, as well as the relevant supply chain practices and information.

28. Plaintiff intends to purchase sustainably sourced tissue in the future and continues to see P&G Paper Products available for purchase with the same Deceptive Claims at issue in this Complaint. Plaintiff desires to purchase P&G Paper Products again if Plaintiff can be assured if the Deceptive Claims were in fact true. However, currently, Plaintiff is deprived of the ability to rely on the Deceptive Claims in deciding to purchase P&G Paper Products. Similarly, Plaintiff is also at risk of future harm of being unable to rely on whether the Deceptive Claims are, in fact, true.

**b. Melissa Cuevas**

29. Plaintiff Melissa Cuevas ("Plaintiff" for purposes of this section) is a citizen of California and a resident of Colton, California. From approximately 2014 to December 2024, Plaintiff routinely purchased Charmin Toilet Paper and Puffs Plus with Lotion ("Paper Products" for purposes of this section) from Walmart and Stater Brothers stores in California. At point of sale, Plaintiff saw and relied on the Deceptive Claims contained on the packaging of the Paper Products.

30. The Deceptive Claims exposed to Plaintiff at time of purchase included the Protect-Grow-Restore messaging, the FSC logo, and the RA logo and were substantially similar to the examples included in § IV.E. of this Complaint. These Deceptive Claims created the net impression that P&G is currently taking meaningful steps to substantially mitigate the environmental impact of manufacturing single-use tissue paper. In turn, Plaintiff reasonably understood that the purchase of a P&G Paper Product represented a more environmentally

responsible choice compared to other, cheaper, tissue paper brands that did not make the same type of claims.

31. At no point at time of purchase did Plaintiff notice any disclaimer or other explanatory statement on the packaging or product detail page that limited or otherwise qualified the prominent Deceptive Claims in a manner that would be understood by a reasonable consumer. For example, nowhere at point-of-sale did Defendant disclose the following Common Omissions: (1) P&G is not protecting forests as its P&G Paper Products are made with virgin forest fiber derived from the industrial clearcutting and burning of previously untouched old-growth forests; (2) P&G is not growing forests as its replanting efforts are designed to convert these old-growth forests into industrial tree crops which are ultimately capable of reproducing but a small fraction of the original ecological value; (3) P&G is not restoring forests as its total restoration efforts impact an area less than 1% of untouched old-growth forest lost each year to industrial logging practices; (4) a large portion of the pulp used in P&G Paper Products is *not* FSC-certified at all, and even for pulp that is FSC Mix-certified, that pulp actually contains very little to no FSC forest-certified material; and, (5) the Rainforest Alliance "Forest Allies" logo does not convey any type of third-party certification reflective of responsible forestry standards. Because Defendant conceals this information from consumers, Plaintiff had no knowledge of the Common Omissions at the time Plaintiff purchased the Paper Products.

32. By uniformly communicating the prominent Deceptive Claims at point of sale—while also withholding the information reflected in the Common Omissions—Defendant deceived and misled consumers into thinking that P&G's current actions represent a viable method for substantially mitigating or neutralizing the harm the Paper Products' supply chain causes to the environment. When, in reality, P&G Paper Products are fundamentally

unsustainable because P&G has no current intentions to alter its old-growth forest supply chains or manufacturing processes to meaningfully reduce its environmental footprint. Had Defendant disclosed the truth about its damaging environmental practices, Plaintiff would not have purchased the Paper Products or would have paid less for them.

33. Defendant's unfair, unlawful, and deceptive conduct in manufacturing, marketing, and selling Paper Products has caused Plaintiff out-of-pocket loss. Defendant knew of the Common Omissions but did not disclose such facts or their effects to Plaintiff, so Plaintiff purchased the products on the reasonable belief created by Defendant's point-of-sale representations that because P&G was taking meaningful steps towards to substantially mitigate the environmental harm associated with manufacturing tissue paper, and that its Paper Products represented a more environmentally responsible choice as compared to other, cheaper, tissue brands that did not contain the Deceptive Claims.

34. Plaintiff is a typical consumer who is not sophisticated in the formulation, cross-border sourcing, and manufacturing of tissue paper and has no personal knowledge of these practices. And at no point during the Class Period did Plaintiff know—or had any reasonable basis to discover—of the Common Omissions and/or that the Deceptive Claims were false and misleading. In contrast, P&G had substantial knowledge that the Deceptive Claims were false and misleading because P&G had access to the information reflected in the Common Omissions, as well as the relevant supply chain practices and information.

35. Plaintiff intends to purchase sustainably sourced tissue in the future and continues to see P&G Paper Products available for purchase with the same Deceptive Claims at issue in this Complaint. Plaintiff desires to purchase P&G Paper Products again if Plaintiff can be assured if the Deceptive Claims were in fact true. However, currently, Plaintiff is deprived of the

ability to rely on the Deceptive Claims in deciding to purchase P&G Paper Products. Similarly, Plaintiff is also at risk of future harm of being unable to rely on whether the Deceptive Claims are, in fact, true.

**c. Kevin McCarthy**

36. Plaintiff Kevin McCarthy (Plaintiff" for purposes of this section) is a citizen of California and a resident of California. Plaintiff regularly purchased Charmin Toilet Paper ("Paper Products" for purposes of this section) during the Class Period at a Safeway store located at 2020 Market Street, San Francisco, CA 94114. At point of sale, Plaintiff saw and relied on the Deceptive Claims contained on Charmin's packaging.

37. The Deceptive Claims exposed to Plaintiff at time of purchase included the Protect-Grow-Restore messaging, the FSC logo, and the RA logo and were substantially similar to the examples included in § IV.E. of this Complaint. These Deceptive Claims created the net impression that P&G is currently taking meaningful steps to substantially mitigate the environmental impact of manufacturing single-use tissue paper. In turn, Plaintiff reasonably understood that the purchase of a P&G Paper Product represented a more environmentally responsible choice compared to other, cheaper, tissue paper brands that did not make the same type of claims.

38. Also, at time of purchase, Plaintiff did not notice any disclaimer or other explanatory statement on the packaging or product detail page that limited or otherwise qualified the prominent Deceptive Claims in a manner that would be understood by a reasonable consumer. For example, nowhere at point-of-sale did Defendant disclose the following Common Omissions: (1) P&G is not protecting forests as its P&G Paper Products are made with virgin forest fiber derived from the industrial clearcutting and burning of previously untouched old-growth forests; (2) P&G is not growing forests as its replanting efforts are designed to convert

these old-growth forests into industrial tree crops which are ultimately capable of reproducing but a small fraction of the original ecological value; (3) P&G is not restoring forests as its total restoration efforts impact an area less than 1% of untouched old-growth forest lost each year to industrial logging practices; (4) a large portion of the pulp used in P&G Paper Products is *not* FSC-certified at all, and even for pulp that is FSC Mix-certified, that pulp actually contains very little to no FSC forest-certified material; and, (5) the Rainforest Alliance "Forest Allies" logo does not convey any type of third-party certification reflective of responsible forestry standards. Because Defendant conceals this information from consumers, Plaintiff had no knowledge of the Common Omissions at the time Plaintiff purchased the Paper Products.

39. By uniformly communicating the prominent Deceptive Claims at point of sale—while also withholding the information reflected in the Common Omissions—Defendant deceived and misled consumers into thinking that P&G's current actions represent a viable method for substantially mitigating or neutralizing the harm the Paper Products' supply chain causes to the environment. When, in reality, P&G Paper Products are fundamentally unsustainable because P&G has no current intentions to alter its old-growth forest supply chains or manufacturing processes to meaningfully reduce its environmental footprint. Had Defendant disclosed the truth about its damaging environmental practices, Plaintiff would not have purchased the Paper Products or would have paid less for them.

40. Defendant's unfair, unlawful, and deceptive conduct in manufacturing, marketing, and selling Paper Products has caused Plaintiff out-of-pocket loss. Defendant knew of the Common Omissions but did not disclose such facts or their effects to Plaintiff, so Plaintiff purchased the products on the reasonable belief created by Defendant's point-of-sale representations that because P&G was taking meaningful steps towards to substantially mitigate

the environmental harm associated with manufacturing tissue paper, and that its Paper Products represented a more environmentally responsible choice as compared to other, cheaper, tissue brands that did not contain the Deceptive Claims.

41. Plaintiff is a typical consumer who is not sophisticated in the formulation, cross-border sourcing, and manufacturing of tissue paper and has no personal knowledge of these practices. And at no point during the Class Period did Plaintiff know—or had any reasonable basis to discover—of the Common Omissions and/or that the Deceptive Claims were false and misleading. In contrast, P&G had substantial knowledge that the Deceptive Claims were false and misleading because P&G had access to the information reflected in the Common Omissions, as well as the relevant supply chain practices and information.

42. Plaintiff intends to purchase sustainably sourced tissue in the future and continues to see P&G Paper Products available for purchase with the same Deceptive Claims at issue in this Complaint. Plaintiff desires to purchase P&G Paper Products again if Plaintiff can be assured if the Deceptive Claims were in fact true. However, currently, Plaintiff is deprived of the ability to rely on the Deceptive Claims in deciding to purchase P&G Paper Products. Similarly, Plaintiff is also at risk of future harm of being unable to rely on whether the Deceptive Claims are, in fact, true.

**2. Connecticut Plaintiffs**

**a. Stuart Bergman**

43. Plaintiff Stuart Bergman ("Plaintiff" for purposes of this section) is a citizen of Connecticut and a resident of Farmington, Connecticut. Over approximately the past 15 years, Plaintiff routinely purchased Charmin Toilet Paper (Paper Products" for purposes of this section) from Stop & Shop and Walmart stores in Connecticut. At point of sale, Plaintiff saw and relied on the Deceptive Claims contained on Charmin's packaging.

44. The Deceptive Claims exposed to Plaintiff at time of purchase included the Protect-Grow-Restore messaging, the FSC logo, and the RA logo and were substantially similar to the examples included in § IV.E. of this Complaint. These Deceptive Claims created the net impression that P&G is currently taking meaningful steps to substantially mitigate the environmental impact of manufacturing single-use tissue paper. In turn, Plaintiff reasonably understood that the purchase of a P&G Paper Product represented a more environmentally responsible choice compared to other, cheaper, tissue paper brands that did not make the same type of claims.

45. Also, at time of purchase, Plaintiff did not notice any disclaimer or other explanatory statement on the packaging or product detail page that limited or otherwise qualified the prominent Deceptive Claims in a manner that would be understood by a reasonable consumer. For example, nowhere at point-of-sale did Defendant disclose the following Common Omissions: (1) P&G is not protecting forests as its P&G Paper Products are made with virgin forest fiber derived from the industrial clearcutting and burning of previously untouched old-growth forests; (2) P&G is not growing forests as its replanting efforts are designed to convert these old-growth forests into industrial tree crops which are ultimately capable of reproducing but a small fraction of the original ecological value; (3) P&G is not restoring forests as its total restoration efforts impact an area less than 1% of untouched old-growth forest lost each year to industrial logging practices; (4) a large portion of the pulp used in P&G Paper Products is *not* FSC-certified at all, and even for pulp that is FSC Mix-certified, that pulp actually contains very little to no FSC forest-certified material; and, (5) the Rainforest Alliance "Forest Allies" logo does not convey any type of third-party certification reflective of responsible forestry standards.

Because Defendant conceals this information from consumers, Plaintiff had no knowledge of the Common Omissions at the time Plaintiff purchased the Paper Products.

46. By uniformly communicating the prominent Deceptive Claims at point of sale—while also withholding the information reflected in the Common Omissions—Defendant deceived and misled consumers into thinking that P&G's current actions represent a viable method for substantially mitigating or neutralizing the harm the Paper Products' supply chain causes to the environment. When, in reality, P&G Paper Products are fundamentally unsustainable because P&G has no current intentions to alter its old-growth forest supply chains or manufacturing processes to meaningfully reduce its environmental footprint. Had Defendant disclosed the truth about its damaging environmental practices, Plaintiff would not have purchased the Paper Products or would have paid less for them.

47. Defendant's unfair, unlawful, and deceptive conduct in manufacturing, marketing, and selling Paper Products has caused Plaintiff out-of-pocket loss. Defendant knew of the Common Omissions but did not disclose such facts or their effects to Plaintiff, so Plaintiff purchased the products on the reasonable belief created by Defendant's point-of-sale representations that because P&G was taking meaningful steps towards to substantially mitigate the environmental harm associated with manufacturing tissue paper, and that its Paper Products represented a more environmentally responsible choice as compared to other, cheaper, tissue brands that did not contain the Deceptive Claims.

48. Plaintiff is a typical consumer who is not sophisticated in the formulation, cross-border sourcing, and manufacturing of tissue paper and has no personal knowledge of these practices. And at no point during the Class Period did Plaintiff know—or had any reasonable basis to discover—of the Common Omissions and/or that the Deceptive Claims were false and

misleading. In contrast, P&G had substantial knowledge that the Deceptive Claims were false and misleading because P&G had access to the information reflected in the Common Omissions, as well as the relevant supply chain practices and information.

49. Plaintiff intends to purchase sustainably sourced tissue in the future and continues to see P&G Paper Products available for purchase with the same Deceptive Claims at issue in this Complaint. Plaintiff desires to purchase P&G Paper Products again if Plaintiff can be assured if the Deceptive Claims were in fact true. However, currently, Plaintiff is deprived of the ability to rely on the Deceptive Claims in deciding to purchase P&G Paper Products. Similarly, Plaintiff is also at risk of future harm of being unable to rely on whether the Deceptive Claims are, in fact, true.

**b. Gia Pascarelli**

50. Plaintiff Gia Pascarelli ("Plaintiff" for purposes of this section) is a citizen of Connecticut and a resident of Newington, Connecticut. Between approximately September 2024 and February 2025, Plaintiff routinely purchased Charmin Toilet Paper from Stop & Shop stores in Connecticut. At point of sale, Plaintiff saw and relied on the Deceptive Claims contained on Charmin's packaging.

51. The Deceptive Claims exposed to Plaintiff at the time of purchase included the Protect-Grow-Restore messaging, the FSC logo, and the RA logo and were substantially similar to the examples included in § IV.E. of this Complaint. These Deceptive Claims created the net impression that P&G is currently taking meaningful steps to substantially mitigate the environmental impact of manufacturing single-use tissue paper. In turn, Plaintiff reasonably understood that the purchase of a P&G Paper Product represented a more environmentally responsible choice compared to other, cheaper, tissue paper brands that did not make the same type of claims.

52. Also, at time of purchase, Plaintiff did not notice any disclaimer or other explanatory statement on the packaging or product detail page that limited or otherwise qualified the prominent Deceptive Claims in a manner that would be understood by a reasonable consumer. For example, nowhere at point-of-sale did Defendant disclose the following Common Omissions: (1) P&G is not protecting forests as its P&G Paper Products are made with virgin forest fiber derived from the industrial clearcutting and burning of previously untouched old-growth forests; (2) P&G is not growing forests as its replanting efforts are designed to convert these old-growth forests into industrial tree crops which are ultimately capable of reproducing but a small fraction of the original ecological value; (3) P&G is not restoring forests as its total restoration efforts impact an area less than 1% of untouched old-growth forest lost each year to industrial logging practices; (4) a large portion of the pulp used in P&G Paper Products is *not* FSC-certified at all, and even for pulp that is FSC Mix-certified, that pulp actually contains very little to no FSC forest-certified material; and, (5) the Rainforest Alliance "Forest Allies" logo does not convey any type of third-party certification reflective of responsible forestry standards. Because Defendant conceals this information from consumers, Plaintiff had no knowledge of the Common Omissions at the time Plaintiff purchased the Paper Products.

53. By uniformly communicating the prominent Deceptive Claims at point of sale—while also withholding the information reflected in the Common Omissions—Defendant deceived and misled consumers into thinking that P&G's current actions represent a viable method for substantially mitigating or neutralizing the harm the Paper Products' supply chain causes to the environment. When, in reality, P&G Paper Products are fundamentally unsustainable because P&G has no current intentions to alter its old-growth forest supply chains or manufacturing processes to meaningfully reduce its environmental footprint. Had Defendant

disclosed the truth about its damaging environmental practices, Plaintiff would not have purchased the Paper Products or would have paid less for them.

54. Defendant's unfair, unlawful, and deceptive conduct in manufacturing, marketing, and selling Paper Products has caused Plaintiff out-of-pocket loss. Defendant knew of the Common Omissions but did not disclose such facts or their effects to Plaintiff, so Plaintiff purchased the products on the reasonable belief created by Defendant's point-of-sale representations that because P&G was taking meaningful steps towards to substantially mitigate the environmental harm associated with manufacturing tissue paper, and that its Paper Products represented a more environmentally responsible choice as compared to other, cheaper, tissue brands that did not contain the Deceptive Claims.

55. Plaintiff is a typical consumer who is not sophisticated in the formulation, cross-border sourcing, and manufacturing of tissue paper and has no personal knowledge of these practices. And at no point during the Class Period did Plaintiff know—or had any reasonable basis to discover—of the Common Omissions and/or that the Deceptive Claims were false and misleading. In contrast, P&G had substantial knowledge that the Deceptive Claims were false and misleading because P&G had access to the information reflected in the Common Omissions, as well as the relevant supply chain practices and information.

56. Plaintiff intends to purchase sustainably sourced tissue in the future and continues to see P&G Paper Products available for purchase with the same Deceptive Claims at issue in this Complaint. Plaintiff desires to purchase P&G Paper Products again if Plaintiff can be assured if the Deceptive Claims were in fact true. However, currently, Plaintiff is deprived of the ability to rely on the Deceptive Claims in deciding to purchase P&G Paper Products. Similarly,

Plaintiff is also at risk of future harm of being unable to rely on whether the Deceptive Claims are, in fact, true.

**3. Florida Plaintiffs**

**a. Kelley Rivers**

57. Plaintiff Kelley Rivers ("Plaintiff" for purposes of this section) is a citizen of Florida and a resident of Fort Lauderdale, Florida. Between January 2021 and January 2025, Plaintiff routinely purchased Charmin Toilet Paper ("Paper Products" for purposes of this section) from Publix, CVS, and Winn-Dixie stores in Florida. At point of sale, Plaintiff saw and relied on the Deceptive Claims contained on Charmin's packaging.

58. The Deceptive Claims exposed to Plaintiff at time of purchase included the Protect-Grow-Restore messaging, the FSC logo, and the RA logo and were substantially similar to the examples included in § IV.E. of this Complaint. These Deceptive Claims created the net impression that P&G is currently taking meaningful steps to substantially mitigate the environmental impact of manufacturing single-use tissue paper. In turn, Plaintiff reasonably understood that the purchase of a P&G Paper Product represented a more environmentally responsible choice compared to other, cheaper, tissue paper brands that did not make the same type of claims.

59. Also, at time of purchase, Plaintiff did not notice any disclaimer or other explanatory statement on the packaging or product detail page that limited or otherwise qualified the prominent Deceptive Claims in a manner that would be understood by a reasonable consumer. For example, nowhere at point-of-sale did Defendant disclose the following Common Omissions: (1) P&G is not protecting forests as its P&G Paper Products are made with virgin forest fiber derived from the industrial clearcutting and burning of previously untouched old-growth forests; (2) P&G is not growing forests as its replanting efforts are designed to convert

these old-growth forests into industrial tree crops which are ultimately capable of reproducing but a small fraction of the original ecological value; (3) P&G is not restoring forests as its total restoration efforts impact an area less than 1% of untouched old-growth forest lost each year to industrial logging practices; (4) a large portion of the pulp used in P&G Paper Products is *not* FSC-certified at all, and even for pulp that is FSC Mix-certified, that pulp actually contains very little to no FSC forest-certified material; and, (5) the Rainforest Alliance "Forest Allies" logo does not convey any type of third-party certification reflective of responsible forestry standards. Because Defendant conceals this information from consumers, Plaintiff had no knowledge of the Common Omissions at the time Plaintiff purchased the Paper Products.

60. By uniformly communicating the prominent Deceptive Claims at point of sale—while also withholding the information reflected in the Common Omissions—Defendant deceived and misled consumers into thinking that P&G's current actions represent a viable method for substantially mitigating or neutralizing the harm the Paper Products' supply chain causes to the environment. When, in reality, P&G Paper Products are fundamentally unsustainable because P&G has no current intentions to alter its old-growth forest supply chains or manufacturing processes to meaningfully reduce its environmental footprint. Had Defendant disclosed the truth about its damaging environmental practices, Plaintiff would not have purchased the Paper Products or would have paid less for them.

61. Defendant's unfair, unlawful, and deceptive conduct in manufacturing, marketing, and selling Paper Products has caused Plaintiff out-of-pocket loss. Defendant knew of the Common Omissions but did not disclose such facts or their effects to Plaintiff, so Plaintiff purchased the products on the reasonable belief created by Defendant's point-of-sale representations that because P&G was taking meaningful steps towards to substantially mitigate

the environmental harm associated with manufacturing tissue paper, and that its Paper Products represented a more environmentally responsible choice as compared to other, cheaper, tissue brands that did not contain the Deceptive Claims.

62. Plaintiff is a typical consumer who is not sophisticated in the formulation, cross-border sourcing, and manufacturing of tissue paper and has no personal knowledge of these practices. And at no point during the Class Period did Plaintiff know—or had any reasonable basis to discover—of the Common Omissions and/or that the Deceptive Claims were false and misleading. In contrast, P&G had substantial knowledge that the Deceptive Claims were false and misleading because P&G had access to the information reflected in the Common Omissions, as well as the relevant supply chain practices and information.

63. Plaintiff intends to purchase sustainably sourced tissue in the future and continues to see P&G Paper Products available for purchase with the same Deceptive Claims at issue in this Complaint. Plaintiff desires to purchase P&G Paper Products again if Plaintiff can be assured if the Deceptive Claims were in fact true. However, currently, Plaintiff is deprived of the ability to rely on the Deceptive Claims in deciding to purchase P&G Paper Products. Similarly, Plaintiff is also at risk of future harm of being unable to rely on whether the Deceptive Claims are, in fact, true.

**b. Dawn van der Steeg**

64. Plaintiff Dawn van der Steeg ("Plaintiff" for purposes of this section) is a citizen of Florida and a resident of Tamarac, Florida. Over approximately the past 15 years, Plaintiff routinely purchased Charmin Toilet Paper ("Paper Products" for purposes of this section) from Amazon, Target, and Publix in Florida. At point of sale, Plaintiff saw and relied on the Deceptive Claims contained on Charmin's packaging (at Target and Publix) and/or the Charmin product details page (at Amazon).

65. The Deceptive Claims exposed to Plaintiff at time of purchase included the Protect-Grow-Restore messaging, the FSC logo, and the RA logo and were substantially similar to the examples included in § IV.E. of this Complaint. These Deceptive Claims created the net impression that P&G is currently taking meaningful steps to substantially mitigate the environmental impact of manufacturing single-use tissue paper. In turn, Plaintiff reasonably understood that the purchase of a P&G Paper Product represented a more environmentally responsible choice compared to other, cheaper, tissue paper brands that did not make the same type of claims.

66. Also, at time of purchase, Plaintiff did not notice any disclaimer or other explanatory statement on the packaging or product detail page that limited or otherwise qualified the prominent Deceptive Claims in a manner that would be understood by a reasonable consumer. For example, nowhere at point-of-sale did Defendant disclose the following Common Omissions: (1) P&G is not protecting forests as its P&G Paper Products are made with virgin forest fiber derived from the industrial clearcutting and burning of previously untouched old-growth forests; (2) P&G is not growing forests as its replanting efforts are designed to convert these old-growth forests into industrial tree crops which are ultimately capable of reproducing but a small fraction of the original ecological value; (3) P&G is not restoring forests as its total restoration efforts impact an area less than 1% of untouched old-growth forest lost each year to industrial logging practices; (4) a large portion of the pulp used in P&G Paper Products is not FSC-certified at all, and even for pulp that is FSC Mix-certified, that pulp actually contains very little to no FSC forest-certified material; and, (5) the Rainforest Alliance "Forest Allies" logo does not convey any type of third-party certification reflective of responsible forestry standards.

Because Defendant conceals this information from consumers, Plaintiff had no knowledge of the Common Omissions at the time Plaintiff purchased the Paper Products.

67. By uniformly communicating the prominent Deceptive Claims at point of sale—while also withholding the information reflected in the Common Omissions—Defendant deceived and misled consumers into thinking that P&G's current actions represent a viable method for substantially mitigating or neutralizing the harm the Paper Products' supply chain causes to the environment. When, in reality, P&G Paper Products are fundamentally unsustainable because P&G has no current intentions to alter its old-growth forest supply chains or manufacturing processes to meaningfully reduce its environmental footprint. Had Defendant disclosed the truth about its damaging environmental practices, Plaintiff would not have purchased the Paper Products or would have paid less for them.

68. Defendant's unfair, unlawful, and deceptive conduct in manufacturing, marketing, and selling Paper Products has caused Plaintiff out-of-pocket loss. Defendant knew of the Common Omissions but did not disclose such facts or their effects to Plaintiff, so Plaintiff purchased the products on the reasonable belief created by Defendant's point-of-sale representations that because P&G was taking meaningful steps towards to substantially mitigate the environmental harm associated with manufacturing tissue paper, and that its Paper Products represented a more environmentally responsible choice as compared to other, cheaper, tissue brands that did not contain the Deceptive Claims.

69. Plaintiff is a typical consumer who is not sophisticated in the formulation, cross-border sourcing, and manufacturing of tissue paper and has no personal knowledge of these practices. And at no point during the Class Period did Plaintiff know—or had any reasonable basis to discover—of the Common Omissions and/or that the Deceptive Claims were false and

misleading. In contrast, P&G had substantial knowledge that the Deceptive Claims were false and misleading because P&G had access to the information reflected in the Common Omissions, as well as the relevant supply chain practices and information.

70. Plaintiff intends to purchase sustainably sourced tissue in the future and continues to see P&G Paper Products available for purchase with the same Deceptive Claims at issue in this Complaint. Plaintiff desires to purchase P&G Paper Products again if Plaintiff can be assured if the Deceptive Claims were in fact true. However, currently, Plaintiff is deprived of the ability to rely on the Deceptive Claims in deciding to purchase P&G Paper Products. Similarly, Plaintiff is also at risk of future harm of being unable to rely on whether the Deceptive Claims are, in fact, true.

**4. Georgia Plaintiff**

**a. Angela Bryant**

71. Plaintiff Angela Bryant ("Plaintiff" for purposes of this section) is a citizen of Georgia and a resident of Waycross, Georgia. For more than 20 years, Plaintiff routinely purchased Charmin Toilet Paper ("Paper Products" for purposes of this section) from Amazon and Walmart stores in Georgia. At point of sale, Plaintiff saw and relied on the Deceptive Claims contained on Charmin's packaging (at Walmart) and/or Charmin's product details page (at Amazon).

72. The Deceptive Claims exposed to Plaintiff at time of purchase included the Protect-Grow-Restore messaging, the FSC logo, and the RA logo and were substantially similar to the examples included in § IV.E. of this Complaint. These Deceptive Claims created the net impression that P&G is currently taking meaningful steps to substantially mitigate the environmental impact of manufacturing single-use tissue paper. In turn, Plaintiff reasonably understood that the purchase of a P&G Paper Product represented a more environmentally

responsible choice compared to other, cheaper, tissue paper brands that did not make the same type of claims.

73. Also, at time of purchase, Plaintiff did not notice any disclaimer or other explanatory statement on the packaging or product detail page that limited or otherwise qualified the prominent Deceptive Claims in a manner that would be understood by a reasonable consumer. For example, nowhere at point-of-sale did Defendant disclose the following Common Omissions: (1) P&G is not protecting forests as its P&G Paper Products are made with virgin forest fiber derived from the industrial clearcutting and burning of previously untouched old-growth forests; (2) P&G is not growing forests as its replanting efforts are designed to convert these old-growth forests into industrial tree crops which are ultimately capable of reproducing but a small fraction of the original ecological value; (3) P&G is not restoring forests as its total restoration efforts impact an area less than 1% of untouched old-growth forest lost each year to industrial logging practices; (4) a large portion of the pulp used in P&G Paper Products is *not* FSC-certified at all, and even for pulp that is FSC Mix-certified, that pulp actually contains very little to no FSC forest-certified material; and, (5) the Rainforest Alliance "Forest Allies" logo does not convey any type of third-party certification reflective of responsible forestry standards. Because Defendant conceals this information from consumers, Plaintiff had no knowledge of the Common Omissions at the time Plaintiff purchased the Paper Products.

74. By uniformly communicating the prominent Deceptive Claims at point of sale—while also withholding the information reflected in the Common Omissions—Defendant deceived and misled consumers into thinking that P&G's current actions represent a viable method for substantially mitigating or neutralizing the harm the Paper Products' supply chain causes to the environment. When, in reality, P&G Paper Products are fundamentally

unsustainable because P&G has no current intentions to alter its old-growth forest supply chains or manufacturing processes to meaningfully reduce its environmental footprint. Had Defendant disclosed the truth about its damaging environmental practices, Plaintiff would not have purchased the Paper Products or would have paid less for them.

75. Defendant's unfair, unlawful, and deceptive conduct in manufacturing, marketing, and selling Paper Products has caused Plaintiff out-of-pocket loss. Defendant knew of the Common Omissions but did not disclose such facts or their effects to Plaintiff, so Plaintiff purchased the products on the reasonable belief created by Defendant's point-of-sale representations that because P&G was taking meaningful steps towards to substantially mitigate the environmental harm associated with manufacturing tissue paper, and that its Paper Products represented a more environmentally responsible choice as compared to other, cheaper, tissue brands that did not contain the Deceptive Claims.

76. Plaintiff is a typical consumer who is not sophisticated in the formulation, cross-border sourcing, and manufacturing of tissue paper and has no personal knowledge of these practices. And at no point during the Class Period did Plaintiff know—or had any reasonable basis to discover—of the Common Omissions and/or that the Deceptive Claims were false and misleading. In contrast, P&G had substantial knowledge that the Deceptive Claims were false and misleading because P&G had access to the information reflected in the Common Omissions, as well as the relevant supply chain practices and information.

77. Plaintiff intends to purchase sustainably sourced tissue in the future and continues to see P&G Paper Products available for purchase with the same Deceptive Claims at issue in this Complaint. Plaintiff desires to purchase P&G Paper Products again if Plaintiff can be assured if the Deceptive Claims were in fact true. However, currently, Plaintiff is deprived of the

ability to rely on the Deceptive Claims in deciding to purchase P&G Paper Products. Similarly, Plaintiff is also at risk of future harm of being unable to rely on whether the Deceptive Claims are, in fact, true.

**5. Illinois Plaintiffs**

**a. Patricia Dean**

78. Plaintiff Patricia Dean ("Plaintiff" for purposes of this section) is a citizen of Illinois and a resident of Homewood, Illinois. From May 2021 to January 2025, Plaintiff routinely purchased Charmin Toilet Paper and Puffs Ultra Soft tissue ("Paper Products" for purposes of this section) from Walmart stores in Illinois. At point of sale, Plaintiff saw and relied on the Deceptive Claims contained on the Charmin packaging and Puffs packaging.

79. The Deceptive Claims exposed to Plaintiff at time of purchase included the Protect-Grow-Restore messaging, the FSC logo, and the RA logo and were substantially similar to the examples included in § IV.E. of this Complaint. These Deceptive Claims created the net impression that P&G is currently taking meaningful steps to substantially mitigate the environmental impact of manufacturing single-use tissue paper. In turn, Plaintiff reasonably understood that the purchase of a P&G Paper Product represented a more environmentally responsible choice compared to other, cheaper, tissue paper brands that did not make the same type of claims.

80. Also, at time of purchase, Plaintiff did not notice any disclaimer or other explanatory statement on the packaging or product detail page that limited or otherwise qualified the prominent Deceptive Claims in a manner that would be understood by a reasonable consumer. For example, nowhere at point-of-sale did Defendant disclose the following Common Omissions: (1) P&G is not protecting forests as its P&G Paper Products are made with virgin forest fiber derived from the industrial clearcutting and burning of previously untouched old-

growth forests; (2) P&G is not growing forests as its replanting efforts are designed to convert these old-growth forests into industrial tree crops which are ultimately capable of reproducing but a small fraction of the original ecological value; (3) P&G is not restoring forests as its total restoration efforts impact an area less than 1% of untouched old-growth forest lost each year to industrial logging practices; (4) a large portion of the pulp used in P&G Paper Products is not FSC-certified at all, and even for pulp that is FSC Mix-certified, that pulp actually contains very little to no FSC forest-certified material; and, (5) the Rainforest Alliance "Forest Allies" logo does not convey any type of third-party certification reflective of responsible forestry standards. Because Defendant conceals this information from consumers, Plaintiff had no knowledge of the Common Omissions at the time Plaintiff purchased the Paper Products.

81. By uniformly communicating the prominent Deceptive Claims at point of sale—while also withholding the information reflected in the Common Omissions—Defendant deceived and misled consumers into thinking that P&G's current actions represent a viable method for substantially mitigating or neutralizing the harm the Paper Products' supply chain causes to the environment. When, in reality, P&G Paper Products are fundamentally unsustainable because P&G has no intention to alter its old-growth forest supply chains or manufacturing processes to meaningfully reduce its environmental footprint. Had Defendant disclosed the truth about its damaging environmental practices, Plaintiff would not have purchased the Paper Products or would have paid less for them.

82. Defendant's unfair, unlawful, and deceptive conduct in manufacturing, marketing, and selling Paper Products has caused Plaintiff out-of-pocket loss. Defendant knew of the Common Omissions but did not disclose such facts or their effects to Plaintiff, so Plaintiff purchased the products on the reasonable belief created by Defendant's point-of-sale

representations that because P&G was taking meaningful steps towards to substantially mitigate the environmental harm associated with manufacturing tissue paper, and that its Paper Products represented a more environmentally responsible choice as compared to other, cheaper, tissue brands that did not contain the Deceptive Claims.

83. Plaintiff is a typical consumer who is not sophisticated in the formulation, cross-border sourcing, and manufacturing of tissue paper and has no personal knowledge of these practices. And at no point during the Class Period did Plaintiff know—or had any reasonable basis to discover—of the Common Omissions and/or that the Deceptive Claims were false and misleading. In contrast, P&G had substantial knowledge that the Deceptive Claims were false and misleading because P&G had access to the information reflected in the Common Omissions, as well as the relevant supply chain practices and information.

84. Plaintiff intends to purchase sustainably sourced tissue in the future and continues to see P&G Paper Products available for purchase with the same Deceptive Claims at issue in this Complaint. Plaintiff desires to purchase P&G Paper Products again if Plaintiff can be assured if the Deceptive Claims were in fact true. However, currently, Plaintiff is deprived of the ability to rely on the Deceptive Claims in deciding to purchase P&G Paper Products. Similarly, Plaintiff is also at risk of future harm of being unable to rely on whether the Deceptive Claims are, in fact, true.

**b. Carole Grant**

85. Plaintiff Carole Grant ("Plaintiff" for purposes of this section) is a citizen of Illinois and a resident of Chicago, Illinois. For approximately more than 20 years, Plaintiff has routinely purchased Charmin Toilet Paper from Walmart and Walgreens stores in Illinois and Puffs Ultra Soft from Walmart stores in Illinois ("Paper Products" for purposes of this section).

At point of sale, Plaintiff saw and relied on the Deceptive Claims on Charmin's packaging and Puffs' packaging.

86. The Deceptive Claims exposed to Plaintiff at time of purchase included the Protect-Grow-Restore messaging, the FSC logo, and the RA logo and were substantially similar to the examples included in § IV.E. of this Complaint. These Deceptive Claims created the net impression that P&G is currently taking meaningful steps to substantially mitigate the environmental impact of manufacturing single-use tissue paper. In turn, Plaintiff reasonably understood that the purchase of a P&G Paper Product represented a more environmentally responsible choice compared to other, cheaper, tissue paper brands that did not make the same type of claims.

87. Also, at time of purchase, Plaintiff did not notice any disclaimer or other explanatory statement on the packaging or product detail page that limited or otherwise qualified the prominent Deceptive Claims in a manner that would be understood by a reasonable consumer. For example, nowhere at point-of-sale did Defendant disclose the following Common Omissions: (1) P&G is not protecting forests as its P&G Paper Products are made with virgin forest fiber derived from the industrial clearcutting and burning of previously untouched old-growth forests; (2) P&G is not growing forests as its replanting efforts are designed to convert these old-growth forests into industrial tree crops which are ultimately capable of reproducing but a small fraction of the original ecological value; (3) P&G is not restoring forests as its total restoration efforts impact an area less than 1% of untouched old-growth forest lost each year to industrial logging practices; (4) a large portion of the pulp used in P&G Paper Products is not FSC-certified at all, and even for pulp that is FSC Mix-certified, that pulp actually contains very little to no FSC forest-certified material; and, (5) the Rainforest Alliance "Forest Allies" logo

does not convey any type of third-party certification reflective of responsible forestry standards. Because Defendant conceals this information from consumers, Plaintiff had no knowledge of the Common Omissions at the time Plaintiff purchased the Paper Products.

88. By uniformly communicating the prominent Deceptive Claims at point of sale—while also withholding the information reflected in the Common Omissions—Defendant deceived and misled consumers into thinking that P&G's current actions represent a viable method for substantially mitigating or neutralizing the harm the Paper Products' supply chain causes to the environment. When, in reality, P&G Paper Products are fundamentally unsustainable because P&G has no current intentions to alter its old-growth forest supply chains or manufacturing processes to meaningfully reduce its environmental footprint. Had Defendant disclosed the truth about its damaging environmental practices, Plaintiff would not have purchased the Paper Products or would have paid less for them.

89. Defendant's unfair, unlawful, and deceptive conduct in manufacturing, marketing, and selling Paper Products has caused Plaintiff out-of-pocket loss. Defendant knew of the Common Omissions but did not disclose such facts or their effects to Plaintiff, so Plaintiff purchased the products on the reasonable belief created by Defendant's point-of-sale representations that because P&G was taking meaningful steps towards to substantially mitigate the environmental harm associated with manufacturing tissue paper, and that its Paper Products represented a more environmentally responsible choice as compared to other, cheaper, tissue brands that did not contain the Deceptive Claims.

90. Plaintiff is a typical consumer who is not sophisticated in the formulation, cross-border sourcing, and manufacturing of tissue paper and has no personal knowledge of these practices. And at no point during the Class Period did Plaintiff know—or had any reasonable

basis to discover—of the Common Omissions and/or that the Deceptive Claims were false and misleading. In contrast, P&G had substantial knowledge that the Deceptive Claims were false and misleading because P&G had access to the information reflected in the Common Omissions, as well as the relevant supply chain practices and information.

91. Plaintiff intends to purchase sustainably sourced tissue in the future and continues to see P&G Paper Products available for purchase with the same Deceptive Claims at issue in this Complaint. Plaintiff desires to purchase P&G Paper Products again if Plaintiff can be assured if the Deceptive Claims were in fact true. However, currently, Plaintiff is deprived of the ability to rely on the Deceptive Claims in deciding to purchase P&G Paper Products. Similarly, Plaintiff is also at risk of future harm of being unable to rely on whether the Deceptive Claims are, in fact, true.

**c. LaTronya Williams**

92. Plaintiff LaTronya Williams ("Plaintiff" for purposes of this section) is a citizen of Illinois domiciled in Chicago, Illinois. From approximately 2015 to January 2025, Plaintiff routinely purchased Charmin Toilet Paper from Walmart, Walgreens, Target, Family Dollar, and Dollar General and purchased Puffs Plus with Lotion from Walmart and Target in 2022 ("Paper Products" for purposes of this section). The Walmart, Walgreens, Target, Family Dollar, and Dollar General stores were all located in Illinois. At point of sale, Plaintiff saw and relied on the Deceptive Claims on Charmin's packaging and Puffs' packaging.

93. The Deceptive Claims exposed to Plaintiff at time of purchase included the Protect-Grow-Restore messaging, the FSC logo, and the RA logo and were substantially similar to the examples included in § IV.E. of this Complaint. These Deceptive Claims created the net impression that P&G is currently taking meaningful steps to substantially mitigate the environmental impact of manufacturing single-use tissue paper. In turn, Plaintiff reasonably

understood that the purchase of a P&G Paper Product represented a more environmentally responsible choice compared to other, cheaper, tissue paper brands that did not make the same type of claims.

94. Also, at time of purchase, Plaintiff did not notice any disclaimer or other explanatory statement on the packaging or product detail page that limited or otherwise qualified the prominent Deceptive Claims in a manner that would be understood by a reasonable consumer. For example, nowhere at point-of-sale did Defendant disclose the following Common Omissions: (1) P&G is not protecting forests as its P&G Paper Products are made with virgin forest fiber derived from the industrial clearcutting and burning of previously untouched old-growth forests; (2) P&G is not growing forests as its replanting efforts are designed to convert these old-growth forests into industrial tree crops which are ultimately capable of reproducing but a small fraction of the original ecological value; (3) P&G is not restoring forests as its total restoration efforts impact an area less than 1% of untouched old-growth forest lost each year to industrial logging practices; (4) a large portion of the pulp used in P&G Paper Products is *not* FSC-certified at all, and even for pulp that is FSC Mix-certified, that pulp actually contains very little to no FSC forest-certified material; and, (5) the Rainforest Alliance "Forest Allies" logo does not convey any type of third-party certification reflective of responsible forestry standards. Because Defendant conceals this information from consumers, Plaintiff had no knowledge of the Common Omissions at the time Plaintiff purchased the Paper Products.

95. By uniformly communicating the prominent Deceptive Claims at point of sale—while also withholding the information reflected in the Common Omissions—Defendant deceived and misled consumers into thinking that P&G's current actions represent a viable method for substantially mitigating or neutralizing the harm the Paper Products' supply chain

causes to the environment. When, in reality, P&G Paper Products are fundamentally unsustainable because P&G has no current intentions to alter its old-growth forest supply chains or manufacturing processes to meaningfully reduce its environmental footprint. Had Defendant disclosed the truth about its damaging environmental practices, Plaintiff would not have purchased the Paper Products or would have paid less for them.

96. Defendant's unfair, unlawful, and deceptive conduct in manufacturing, marketing, and selling Paper Products has caused Plaintiff out-of-pocket loss. Defendant knew of the Common Omissions but did not disclose such facts or their effects to Plaintiff, so Plaintiff purchased the products on the reasonable belief created by Defendant's point-of-sale representations that because P&G was taking meaningful steps towards to substantially mitigate the environmental harm associated with manufacturing tissue paper, and that its Paper Products represented a more environmentally responsible choice as compared to other, cheaper, tissue brands that did not contain the Deceptive Claims.

97. Plaintiff is a typical consumer who is not sophisticated in the formulation, cross-border sourcing, and manufacturing of tissue paper and has no personal knowledge of these practices. And at no point during the Class Period did Plaintiff know—or had any reasonable basis to discover—of the Common Omissions and/or that the Deceptive Claims were false and misleading. In contrast, P&G had substantial knowledge that the Deceptive Claims were false and misleading because P&G had access to the information reflected in the Common Omissions, as well as the relevant supply chain practices and information.

98. Plaintiff intends to purchase sustainably sourced tissue in the future and continues to see P&G Paper Products available for purchase with the same Deceptive Claims at issue in this Complaint. Plaintiff desires to purchase P&G Paper Products again if Plaintiff can be

assured if the Deceptive Claims were in fact true. However, currently, Plaintiff is deprived of the ability to rely on the Deceptive Claims in deciding to purchase P&G Paper Products. Similarly, Plaintiff is also at risk of future harm of being unable to rely on whether the Deceptive Claims are, in fact, true.

**6. Maine Plaintiff**

**a. Leslie Sullivan**

99. Plaintiff Leslie Sullivan ("Plaintiff" for purposes of this section) is a citizen of Maine and a resident of Freeport, Maine. From approximately July 1984 to September 2025, Plaintiff routinely purchased Charmin Toilet Paper and Puffs Ultra Soft tissue ("Paper Products" for purposes of this section) from Shaw's, Hannaford, and Walmart in Maine. At point of sale, Plaintiff saw and relied on the Deceptive Claims contained on the Charmin packaging and Puffs packaging.

100. The Deceptive Claims exposed to Plaintiff at time of purchase included the Protect-Grow-Restore messaging, the FSC logo, and the RA logo and were substantially similar to the examples included in § IV.E. of this Complaint. These Deceptive Claims created the net impression that P&G is currently taking meaningful steps to substantially mitigate the environmental impact of manufacturing single-use tissue paper. In turn, Plaintiff reasonably understood that the purchase of a P&G Paper Product represented a more environmentally responsible choice compared to other, cheaper tissue paper brands that did not make the same type of claims.

101. Also, at time of purchase, Plaintiff did not notice any disclaimer or other explanatory statement on the packaging or product detail page that limited or otherwise qualified the prominent Deceptive Claims in a manner that would be understood by a reasonable consumer. For example, nowhere at point-of-sale did Defendant disclose the following Common

Omissions: (1) P&G is not protecting forests as its P&G Paper Products are made with virgin forest fiber derived from the industrial clearcutting and burning of previously untouched old-growth forests; (2) P&G is not growing forests as its replanting efforts are designed to convert these old-growth forests into industrial tree crops which are ultimately capable of reproducing but a small fraction of the original ecological value; (3) P&G is not restoring forests as its total restoration efforts impact an area less than 1% of untouched old-growth forest lost each year to industrial logging practices; (4) a large portion of the pulp used in P&G Paper Products is not FSC-certified at all, and even for pulp that is FSC Mix-certified, that pulp actually contains very little to no FSC forest-certified material; and, (5) the Rainforest Alliance "Forest Allies" logo does not convey any type of third-party certification reflective of responsible forestry standards. Because Defendant conceals this information from consumers, Plaintiff had no knowledge of the Common Omissions at the time Plaintiff purchased the Paper Products.

102. By uniformly communicating the prominent Deceptive Claims at point of sale—while also withholding the information reflected in the Common Omissions—Defendant deceived and misled consumers into thinking that P&G's current actions represent a viable method for substantially mitigating or neutralizing the harm the Paper Products' supply chain causes to the environment. When, in reality, P&G Paper Products are fundamentally unsustainable because P&G has no current intentions to alter its old-growth forest supply chains or manufacturing processes to meaningfully reduce its environmental footprint. Had Defendant disclosed the truth about its damaging environmental practices, Plaintiff would not have purchased the Paper Products or would have paid less for them.

103. Defendant's unfair, unlawful, and deceptive conduct in manufacturing, marketing, and selling Paper Products has caused Plaintiff out-of-pocket loss. Defendant knew of the

Common Omissions but did not disclose such facts or their effects to Plaintiff, so Plaintiff purchased the products on the reasonable belief created by Defendant's point-of-sale representations that because P&G was taking meaningful steps towards to substantially mitigate the environmental harm associated with manufacturing tissue paper, and that its Paper Products represented a more environmentally responsible choice as compared to other, cheaper, tissue brands that did not contain the Deceptive Claims.

104. Plaintiff is a typical consumer who is not sophisticated in the formulation, cross-border sourcing, and manufacturing of tissue paper and has no personal knowledge of these practices. And at no point during the Class Period did Plaintiff know—or had any reasonable basis to discover—of the Common Omissions and/or that the Deceptive Claims were false and misleading. In contrast, P&G had substantial knowledge that the Deceptive Claims were false and misleading because P&G had access to the information reflected in the Common Omissions, as well as the relevant supply chain practices and information.

105. Plaintiff intends to purchase sustainably sourced tissue in the future and continues to see P&G Paper Products available for purchase with the same Deceptive Claims at issue in this Complaint. Plaintiff desires to purchase P&G Paper Products again if Plaintiff can be assured if the Deceptive Claims were in fact true. However, currently, Plaintiff is deprived of the ability to rely on the Deceptive Claims in deciding to purchase P&G Paper Products. Similarly, Plaintiff is also at risk of future harm of being unable to rely on whether the Deceptive Claims are, in fact, true.

**7. Maryland Plaintiff**

**a. Shannon Weisman**

106. Plaintiff Shannon Weisman ("Plaintiff" for purposes of this section) is a citizen of Maryland a resident of Baltimore, Maryland. From 2019-2024, Plaintiff routinely purchased

Charmin Toilet Paper ("Paper Products") from Harris Teeter stores in Maryland. At point of sale, Plaintiff saw and relied on the Deceptive Claims on Charmin's packaging.

107. The Deceptive Claims exposed to Plaintiff at time of purchase included the Protect-Grow-Restore messaging, the FSC logo, and the RA logo and were substantially similar to the examples included in § IV.E. of this Complaint. These Deceptive Claims created the net impression that P&G is currently taking meaningful steps to substantially mitigate the environmental impact of manufacturing single-use tissue paper. In turn, Plaintiff reasonably understood that the purchase of a P&G Paper Product represented a more environmentally responsible choice compared to other, cheaper, tissue paper brands that did not make the same type of claims.

108. Also, at time of purchase, Plaintiff did not notice any disclaimer or other explanatory statement on the packaging or product detail page that limited or otherwise qualified the prominent Deceptive Claims in a manner that would be understood by a reasonable consumer. For example, nowhere at point-of-sale did Defendant disclose the following Common Omissions: (1) P&G is not protecting forests as its P&G Paper Products are made with virgin forest fiber derived from the industrial clearcutting and burning of previously untouched old-growth forests; (2) P&G is not growing forests as its replanting efforts are designed to convert these old-growth forests into industrial tree crops which are ultimately capable of reproducing but a small fraction of the original ecological value; (3) P&G is not restoring forests as its total restoration efforts impact an area less than 1% of untouched old-growth forest lost each year to industrial logging practices; (4) a large portion of the pulp used in P&G Paper Products is *not* FSC-certified at all, and even for pulp that is FSC Mix-certified, that pulp actually contains very little to no FSC forest-certified material; and, (5) the Rainforest Alliance "Forest Allies" logo

does not convey any type of third-party certification reflective of responsible forestry standards. Because Defendant conceals this information from consumers, Plaintiff had no knowledge of the Common Omissions at the time Plaintiff purchased the Paper Products.

109. By uniformly communicating the prominent Deceptive Claims at point of sale—while also withholding the information reflected in the Common Omissions—Defendant deceived and misled consumers into thinking that P&G's current actions represent a viable method for substantially mitigating or neutralizing the harm the Paper Products' supply chain causes to the environment. When, in reality, P&G Paper Products are fundamentally unsustainable because P&G has no current intentions to alter its old-growth forest supply chains or manufacturing processes to meaningfully reduce its environmental footprint. Had Defendant disclosed the truth about its damaging environmental practices, Plaintiff would not have purchased the Paper Products or would have paid less for them.

110. Defendant's unfair, unlawful, and deceptive conduct in manufacturing, marketing, and selling Paper Products has caused Plaintiff out-of-pocket loss. Defendant knew of the Common Omissions but did not disclose such facts or their effects to Plaintiff, so Plaintiff purchased the products on the reasonable belief created by Defendant's point-of-sale representations that because P&G was taking meaningful steps towards to substantially mitigate the environmental harm associated with manufacturing tissue paper, and that its Paper Products represented a more environmentally responsible choice as compared to other, cheaper, tissue brands that did not contain the Deceptive Claims.

111. Plaintiff is a typical consumer who is not sophisticated in the formulation, cross-border sourcing, and manufacturing of tissue paper and has no personal knowledge of these practices. And at no point during the Class Period did Plaintiff know—or had any reasonable

basis to discover—of the Common Omissions and/or that the Deceptive Claims were false and misleading. In contrast, P&G had substantial knowledge that the Deceptive Claims were false and misleading because P&G had access to the information reflected in the Common Omissions, as well as the relevant supply chain practices and information.

112. Plaintiff intends to purchase sustainably sourced tissue in the future and continues to see P&G Paper Products available for purchase with the same Deceptive Claims at issue in this Complaint. Plaintiff desires to purchase P&G Paper Products again if Plaintiff can be assured if the Deceptive Claims were in fact true. However, currently, Plaintiff is deprived of the ability to rely on the Deceptive Claims in deciding to purchase P&G Paper Products. Similarly, Plaintiff is also at risk of future harm of being unable to rely on whether the Deceptive Claims are, in fact, true.

**8. Massachusetts Plaintiffs**

**a. Pamela Giarrizzo**

113. Plaintiff Pamela Giarrizzo (Plaintiff" for purposes of this section) is a citizen of Massachusetts and a resident in Lakeville, Massachusetts. From approximately 2012 to January 2025, Plaintiff routinely purchased Charmin Toilet Paper and Puffs Ultra Soft ("Paper Products" for purposes of this section) from Walgreens stores in Massachusetts. At point of sale, Plaintiff saw and relied on the Deceptive Claims contained on Charmin packaging and Puffs packaging.

114. The Deceptive Claims exposed to Plaintiff at time of purchase included the Protect-Grow-Restore messaging, the FSC logo, and the RA logo and were substantially similar to the examples included in § IV.E. of this Complaint. These Deceptive Claims created the net impression that P&G is currently taking meaningful steps to substantially mitigate the environmental impact of manufacturing single-use tissue paper. In turn, Plaintiff reasonably understood that the purchase of a P&G Paper Product represented a more environmentally

responsible choice compared to other, cheaper, tissue paper brands that did not make the same type of claims.

115. Also, at time of purchase, Plaintiff did not notice any disclaimer or other explanatory statement on the packaging or product detail page that limited or otherwise qualified the prominent Deceptive Claims in a manner that would be understood by a reasonable consumer. For example, nowhere at point-of-sale did Defendant disclose the following Common Omissions: (1) P&G is not protecting forests as its P&G Paper Products are made with virgin forest fiber derived from the industrial clearcutting and burning of previously untouched old-growth forests; (2) P&G is not growing forests as its replanting efforts are designed to convert these old-growth forests into industrial tree crops which are ultimately capable of reproducing but a small fraction of the original ecological value; (3) P&G is not restoring forests as its total restoration efforts impact an area less than 1% of untouched old-growth forest lost each year to industrial logging practices; (4) a large portion of the pulp used in P&G Paper Products is *not* FSC-certified at all, and even for pulp that is FSC Mix-certified, that pulp actually contains very little to no FSC forest-certified material; and, (5) the Rainforest Alliance "Forest Allies" logo does not convey any type of third-party certification reflective of responsible forestry standards. Because Defendant conceals this information from consumers, Plaintiff had no knowledge of the Common Omissions at the time Plaintiff purchased the Paper Products.

116. By uniformly communicating the prominent Deceptive Claims at point of sale—while also withholding the information reflected in the Common Omissions—Defendant deceived and misled consumers into thinking that P&G's current actions represent a viable method for substantially mitigating or neutralizing the harm the Paper Products' supply chain causes to the environment. When, in reality, P&G Paper Products are fundamentally

unsustainable because P&G has no current intentions to alter its old-growth forest supply chains or manufacturing processes to meaningfully reduce its environmental footprint. Had Defendant disclosed the truth about its damaging environmental practices, Plaintiff would not have purchased the Paper Products or would have paid less for them.

117. Defendant's unfair, unlawful, and deceptive conduct in manufacturing, marketing, and selling Paper Products has caused Plaintiff out-of-pocket loss. Defendant knew of the Common Omissions but did not disclose such facts or their effects to Plaintiff, so Plaintiff purchased the products on the reasonable belief created by Defendant's point-of-sale representations that because P&G was taking meaningful steps towards to substantially mitigate the environmental harm associated with manufacturing tissue paper, and that its Paper Products represented a more environmentally responsible choice as compared to other, cheaper, tissue brands that did not contain the Deceptive Claims.

118. Plaintiff is a typical consumer who is not sophisticated in the formulation, cross-border sourcing, and manufacturing of tissue paper and has no personal knowledge of these practices. And at no point during the Class Period did Plaintiff know—or had any reasonable basis to discover—of the Common Omissions and/or that the Deceptive Claims were false and misleading. In contrast, P&G had substantial knowledge that the Deceptive Claims were false and misleading because P&G had access to the information reflected in the Common Omissions, as well as the relevant supply chain practices and information.

119. Plaintiff intends to purchase sustainably sourced tissue in the future and continues to see P&G Paper Products available for purchase with the same Deceptive Claims at issue in this Complaint. Plaintiff desires to purchase P&G Paper Products again if Plaintiff can be assured if the Deceptive Claims were in fact true. However, currently, Plaintiff is deprived of the

ability to rely on the Deceptive Claims in deciding to purchase P&G Paper Products. Similarly, Plaintiff is also at risk of future harm of being unable to rely on whether the Deceptive Claims are, in fact, true.

**b. Cynthia Meuse**

120. Plaintiff Cynthia Meuse ("Plaintiff" for purposes of this section) is a citizen of Massachusetts and a resident in Middlesex, Massachusetts. From approximately 2018 to January 2025, Plaintiff routinely purchased Charmin Toilet Paper and Puffs Plus with Lotion ("Paper Products" for purposes of this section) from Target stores in Massachusetts. At point of sale, Plaintiff saw and relied on the Deceptive Claims contained on Charmin's packaging and Puffs' packaging.

121. The Deceptive Claims exposed to Plaintiff at time of purchase included the Protect-Grow-Restore messaging, the FSC logo, and the RA logo and were substantially similar to the examples included in § IV.E. of this Complaint. These Deceptive Claims created the net impression that P&G is currently taking meaningful steps to substantially mitigate the environmental impact of manufacturing single-use tissue paper. In turn, Plaintiff reasonably understood that the purchase of a P&G Paper Product represented a more environmentally responsible choice compared to other, cheaper, tissue paper brands that did not make the same type of claims.

122. Also, at time of purchase, Plaintiff did not notice any disclaimer or other explanatory statement on the packaging or product detail page that limited or otherwise qualified the prominent Deceptive Claims in a manner that would be understood by a reasonable consumer. For example, nowhere at point-of-sale did Defendant disclose the following Common Omissions: (1) P&G is not protecting forests as its P&G Paper Products are made with virgin forest fiber derived from the industrial clearcutting and burning of previously untouched old-

growth forests; (2) P&G is not growing forests as its replanting efforts are designed to convert these old-growth forests into industrial tree crops which are ultimately capable of reproducing but a small fraction of the original ecological value; (3) P&G is not restoring forests as its total restoration efforts impact an area less than 1% of untouched old-growth forest lost each year to industrial logging practices; (4) a large portion of the pulp used in P&G Paper Products is *not* FSC-certified at all, and even for pulp that is FSC Mix-certified, that pulp actually contains very little to no FSC forest-certified material; and, (5) the Rainforest Alliance "Forest Allies" logo does not convey any type of third-party certification reflective of responsible forestry standards. Because Defendant conceals this information from consumers, Plaintiff had no knowledge of the Common Omissions at the time Plaintiff purchased the Paper Products.

123. By uniformly communicating the prominent Deceptive Claims at point of sale—while also withholding the information reflected in the Common Omissions—Defendant deceived and misled consumers into thinking that P&G's current actions represent a viable method for substantially mitigating or neutralizing the harm the Paper Products' supply chain causes to the environment. When, in reality, P&G Paper Products are fundamentally unsustainable because P&G has no current intentions to alter its old-growth forest supply chains or manufacturing processes to meaningfully reduce its environmental footprint. Had Defendant disclosed the truth about its damaging environmental practices, Plaintiff would not have purchased the Paper Products or would have paid less for them.

124. Defendant's unfair, unlawful, and deceptive conduct in manufacturing, marketing, and selling Paper Products has caused Plaintiff out-of-pocket loss. Defendant knew of the Common Omissions but did not disclose such facts or their effects to Plaintiff, so Plaintiff purchased the products on the reasonable belief created by Defendant's point-of-sale

representations that because P&G was taking meaningful steps towards to substantially mitigate the environmental harm associated with manufacturing tissue paper, and that its Paper Products represented a more environmentally responsible choice as compared to other, cheaper, tissue brands that did not contain the Deceptive Claims.

125. Plaintiff is a typical consumer who is not sophisticated in the formulation, cross-border sourcing, and manufacturing of tissue paper and has no personal knowledge of these practices. And at no point during the Class Period did Plaintiff know—or had any reasonable basis to discover—of the Common Omissions and/or that the Deceptive Claims were false and misleading. In contrast, P&G had substantial knowledge that the Deceptive Claims were false and misleading because P&G had access to the information reflected in the Common Omissions, as well as the relevant supply chain practices and information.

126. Plaintiff intends to purchase sustainably sourced tissue in the future and continues to see P&G Paper Products available for purchase with the same Deceptive Claims at issue in this Complaint. Plaintiff desires to purchase P&G Paper Products again if Plaintiff can be assured if the Deceptive Claims were in fact true. However, currently, Plaintiff is deprived of the ability to rely on the Deceptive Claims in deciding to purchase P&G Paper Products. Similarly, Plaintiff is also at risk of future harm of being unable to rely on whether the Deceptive Claims are, in fact, true.

**9. Michigan Plaintiff**

**a. Trisha Nadeau**

127. Plaintiff Trisha Nadeau ("Plaintiff" for purposes of this section) is a citizen of Michigan and a resident of Dansville, Michigan. Over approximately the past six years, Plaintiff routinely purchased Charmin Toilet Paper ("Paper Products" for purposes of this section) from

Dollar General, Walmart, and Sam's Club stores in Michigan. At point of sale, Plaintiff saw and relied on the Deceptive Claims contained on Charmin's packaging.

128. The Deceptive Claims exposed to Plaintiff at time of purchase included the Protect-Grow-Restore messaging, the FSC logo, and the RA logo and were substantially similar to the examples included in § IV.E. of this Complaint. These Deceptive Claims created the net impression that P&G is currently taking meaningful steps to substantially mitigate the environmental impact of manufacturing single-use tissue paper. In turn, Plaintiff reasonably understood that the purchase of a P&G Paper Product represented a more environmentally responsible choice compared to other, cheaper, tissue paper brands that did not make the same type of claims.

129. Also, at time of purchase, Plaintiff did not notice any disclaimer or other explanatory statement on the packaging or product detail page that limited or otherwise qualified the prominent Deceptive Claims in a manner that would be understood by a reasonable consumer. For example, nowhere at point-of-sale did Defendant disclose the following Common Omissions: (1) P&G is not protecting forests as its P&G Paper Products are made with virgin forest fiber derived from the industrial clearcutting and burning of previously untouched old-growth forests; (2) P&G is not growing forests as its replanting efforts are designed to convert these old-growth forests into industrial tree crops which are ultimately capable of reproducing but a small fraction of the original ecological value; (3) P&G is not restoring forests as its total restoration efforts impact an area less than 1% of untouched old-growth forest lost each year to industrial logging practices; (4) a large portion of the pulp used in P&G Paper Products is *not* FSC-certified at all, and even for pulp that is FSC Mix-certified, that pulp actually contains very little to no FSC forest-certified material; and, (5) the Rainforest Alliance "Forest Allies" logo

does not convey any type of third-party certification reflective of responsible forestry standards. Because Defendant conceals this information from consumers, Plaintiff had no knowledge of the Common Omissions at the time Plaintiff purchased the Paper Products.

130. By uniformly communicating the prominent Deceptive Claims at point of sale—while also withholding the information reflected in the Common Omissions—Defendant deceived and misled consumers into thinking that P&G's current actions represent a viable method for substantially mitigating or neutralizing the harm the Paper Products' supply chain causes to the environment. When, in reality, P&G Paper Products are fundamentally unsustainable because P&G has no current intentions to alter its old-growth forest supply chains or manufacturing processes to meaningfully reduce its environmental footprint. Had Defendant disclosed the truth about its damaging environmental practices, Plaintiff would not have purchased the Paper Products or would have paid less for them.

131. Defendant's unfair, unlawful, and deceptive conduct in manufacturing, marketing, and selling Paper Products has caused Plaintiff out-of-pocket loss. Defendant knew of the Common Omissions but did not disclose such facts or their effects to Plaintiff, so Plaintiff purchased the products on the reasonable belief created by Defendant's point-of-sale representations that because P&G was taking meaningful steps towards to substantially mitigate the environmental harm associated with manufacturing tissue paper, and that its Paper Products represented a more environmentally responsible choice as compared to other, cheaper, tissue brands that did not contain the Deceptive Claims.

132. Plaintiff is a typical consumer who is not sophisticated in the formulation, cross-border sourcing, and manufacturing of tissue paper and has no personal knowledge of these practices. And at no point during the Class Period did Plaintiff know—or had any reasonable

basis to discover—of the Common Omissions and/or that the Deceptive Claims were false and misleading. In contrast, P&G had substantial knowledge that the Deceptive Claims were false and misleading because P&G had access to the information reflected in the Common Omissions, as well as the relevant supply chain practices and information.

133. Plaintiff intends to purchase sustainably sourced tissue in the future and continues to see P&G Paper Products available for purchase with the same Deceptive Claims at issue in this Complaint. Plaintiff desires to purchase P&G Paper Products again if Plaintiff can be assured if the Deceptive Claims were in fact true. However, currently, Plaintiff is deprived of the ability to rely on the Deceptive Claims in deciding to purchase P&G Paper Products. Similarly, Plaintiff is also at risk of future harm of being unable to rely on whether the Deceptive Claims are, in fact, true.

**10. Minnesota Plaintiff**

**a. Catherine DuPont**

134. Plaintiff Catherine DuPont ("Plaintiff" for purposes of this section) is a citizen of Minnesota domiciled in Stillwater, Minnesota. From approximately 2021 to January 2025, Plaintiff routinely purchased Charmin Toilet Paper from Target, Costco, and Walgreens stores in Minnesota. She also previously purchased Puffs Plus with Lotion tissues from Target stores in Minnesota in 2024 and 2025. For purposes of this section, "Paper Products" refers to Charmin Toilet Paper and Puffs Plus with Lotion. At point of sale, Plaintiff saw and relied on the Deceptive Claims contained on Charmin's packaging and Puffs' packaging.

135. The Deceptive Claims exposed to Plaintiff at time of purchase included the Protect-Grow-Restore messaging, the FSC logo, and the RA logo and were substantially similar to the examples included in § IV.E. of this Complaint. These Deceptive Claims created the net impression that P&G is currently taking meaningful steps to substantially mitigate the

environmental impact of manufacturing single-use tissue paper. In turn, Plaintiff reasonably understood that the purchase of a P&G Paper Product represented a more environmentally responsible choice compared to other, cheaper, tissue paper brands that did not make the same type of claims.

136. Also, at time of purchase, Plaintiff did not notice any disclaimer or other explanatory statement on the packaging or product detail page that limited or otherwise qualified the prominent Deceptive Claims in a manner that would be understood by a reasonable consumer. For example, nowhere at point-of-sale did Defendant disclose the following Common Omissions: (1) P&G is not protecting forests as its P&G Paper Products are made with virgin forest fiber derived from the industrial clearcutting and burning of previously untouched old-growth forests; (2) P&G is not growing forests as its replanting efforts are designed to convert these old-growth forests into industrial tree crops which are ultimately capable of reproducing but a small fraction of the original ecological value; (3) P&G is not restoring forests as its total restoration efforts impact an area less than 1% of untouched old-growth forest lost each year to industrial logging practices; (4) a large portion of the pulp used in P&G Paper Products is *not* FSC-certified at all, and even for pulp that is FSC Mix-certified, that pulp actually contains very little to no FSC forest-certified material; and, (5) the Rainforest Alliance "Forest Allies" logo does not convey any type of third-party certification reflective of responsible forestry standards. Because Defendant conceals this information from consumers, Plaintiff had no knowledge of the Common Omissions at the time Plaintiff purchased the Paper Products.

137. By uniformly communicating the prominent Deceptive Claims at point of sale—while also withholding the information reflected in the Common Omissions—Defendant deceived and misled consumers into thinking that P&G's current actions represent a viable

method for substantially mitigating or neutralizing the harm the Paper Products' supply chain causes to the environment. When, in reality, P&G Paper Products are fundamentally unsustainable because P&G has no current intentions to alter its old-growth forest supply chains or manufacturing processes to meaningfully reduce its environmental footprint. Had Defendant disclosed the truth about its damaging environmental practices, Plaintiff would not have purchased the Paper Products or would have paid less for them.

138. Defendant's unfair, unlawful, and deceptive conduct in manufacturing, marketing, and selling Paper Products has caused Plaintiff out-of-pocket loss. Defendant knew of the Common Omissions but did not disclose such facts or their effects to Plaintiff, so Plaintiff purchased the products on the reasonable belief created by Defendant's point-of-sale representations that because P&G was taking meaningful steps towards to substantially mitigate the environmental harm associated with manufacturing tissue paper, and that its Paper Products represented a more environmentally responsible choice as compared to other, cheaper, tissue brands that did not contain the Deceptive Claims.

139. Plaintiff is a typical consumer who is not sophisticated in the formulation, cross-border sourcing, and manufacturing of tissue paper and has no personal knowledge of these practices. And at no point during the Class Period did Plaintiff know—or had any reasonable basis to discover—of the Common Omissions and/or that the Deceptive Claims were false and misleading. In contrast, P&G had substantial knowledge that the Deceptive Claims were false and misleading because P&G had access to the information reflected in the Common Omissions, as well as the relevant supply chain practices and information.

140. Plaintiff intends to purchase sustainably sourced tissue in the future and continues to see P&G Paper Products available for purchase with the same Deceptive Claims at issue in

this Complaint. Plaintiff desires to purchase P&G Paper Products again if Plaintiff can be assured if the Deceptive Claims were in fact true. However, currently, Plaintiff is deprived of the ability to rely on the Deceptive Claims in deciding to purchase P&G Paper Products. Similarly, Plaintiff is also at risk of future harm of being unable to rely on whether the Deceptive Claims are, in fact, true.

**11. New York Plaintiffs**

**a. Sharon Beck**

141. Plaintiff Sharon Beck ("Plaintiff" for purposes of this section) is a citizen of New York and a resident of Hamburg, New York. For more than 20 years, Plaintiff routinely purchased Charmin Toilet Paper, Puffs Plus with Lotion, and Puffs Ultra Soft tissue ("Paper Products" for purposes of this section) from Tops Markets and BJ's Wholesale Club stores in New York state. At point of sale, Plaintiff saw and relied on the Deceptive Claims contained on Charmin's packaging and Puffs' packaging.

142. The Deceptive Claims exposed to Plaintiff at time of purchase included the Protect-Grow-Restore messaging, the FSC logo, and the RA logo and were substantially similar to the examples included in § IV.E. of this Complaint. These Deceptive Claims created the net impression that P&G is currently taking meaningful steps to substantially mitigate the environmental impact of manufacturing single-use tissue paper. In turn, Plaintiff reasonably understood that the purchase of a P&G Paper Product represented a more environmentally responsible choice compared to other, cheaper, tissue paper brands that did not make the same type of claims.

143. Also, at time of purchase, Plaintiff did not notice any disclaimer or other explanatory statement on the packaging or product detail page that limited or otherwise qualified the prominent Deceptive Claims in a manner that would be understood by a reasonable

consumer. For example, nowhere at point-of-sale did Defendant disclose the following Common Omissions: (1) P&G is not protecting forests as its P&G Paper Products are made with virgin forest fiber derived from the industrial clearcutting and burning of previously untouched old-growth forests; (2) P&G is not growing forests as its replanting efforts are designed to convert these old-growth forests into industrial tree crops which are ultimately capable of reproducing but a small fraction of the original ecological value; (3) P&G is not restoring forests as its total restoration efforts impact an area less than 1% of untouched old-growth forest lost each year to industrial logging practices; (4) a large portion of the pulp used in P&G Paper Products is *not* FSC-certified at all, and even for pulp that is FSC Mix-certified, that pulp actually contains very little to no FSC forest-certified material; and, (5) the Rainforest Alliance "Forest Allies" logo does not convey any type of third-party certification reflective of responsible forestry standards. Because Defendant conceals this information from consumers, Plaintiff had no knowledge of the Common Omissions at the time Plaintiff purchased the Paper Products.

144. By uniformly communicating the prominent Deceptive Claims at point of sale—while also withholding the information reflected in the Common Omissions—Defendant deceived and misled consumers into thinking that P&G's current actions represent a viable method for substantially mitigating or neutralizing the harm the Paper Products' supply chain causes to the environment. When, in reality, P&G Paper Products are fundamentally unsustainable because P&G has no current intentions to alter its old-growth forest supply chains or manufacturing processes to meaningfully reduce its environmental footprint. Had Defendant disclosed the truth about its damaging environmental practices, Plaintiff would not have purchased the Paper Products or would have paid less for them.

145. Defendant's unfair, unlawful, and deceptive conduct in manufacturing, marketing, and selling Paper Products has caused Plaintiff out-of-pocket loss. Defendant knew of the Common Omissions but did not disclose such facts or their effects to Plaintiff, so Plaintiff purchased the products on the reasonable belief created by Defendant's point-of-sale representations that because P&G was taking meaningful steps towards to substantially mitigate the environmental harm associated with manufacturing tissue paper, and that its Paper Products represented a more environmentally responsible choice as compared to other, cheaper, tissue brands that did not contain the Deceptive Claims.

146. Plaintiff is a typical consumer who is not sophisticated in the formulation, cross-border sourcing, and manufacturing of tissue paper and has no personal knowledge of these practices. And at no point during the Class Period did Plaintiff know—or had any reasonable basis to discover—of the Common Omissions and/or that the Deceptive Claims were false and misleading. In contrast, P&G had substantial knowledge that the Deceptive Claims were false and misleading because P&G had access to the information reflected in the Common Omissions, as well as the relevant supply chain practices and information.

147. Plaintiff intends to purchase sustainably sourced tissue in the future and continues to see P&G Paper Products available for purchase with the same Deceptive Claims at issue in this Complaint. Plaintiff desires to purchase P&G Paper Products again if Plaintiff can be assured if the Deceptive Claims were in fact true. However, currently, Plaintiff is deprived of the ability to rely on the Deceptive Claims in deciding to purchase P&G Paper Products. Similarly, Plaintiff is also at risk of future harm of being unable to rely on whether the Deceptive Claims are, in fact, true.

**b. Breanne Maggio**

148. Plaintiff Breanne Maggio ("Plaintiff" for purposes of this section) is a citizen of New York and a resident of Valley Stream, New York. During the Class Period, Plaintiff purchased Charmin Toilet Paper and Puffs Tissues ("Paper Products" for purposes of this section) approximately every month BJ's locations at 125 Green Acres Rd S, Valley Stream, New York 11581, 711 Stewart Ave, Garden City, New York 11530, and 50 Daniel St. Farmingdale, New York 11735, and also at Costco locations at 625 Broadhollow Road, Melville, New York 11747 and 3705 Hampton Road, Oceanside, New York 11572.. At point of sale, Plaintiff saw and relied on the Deceptive Claims contained on Charmin's packaging and Puffs' packaging.

**c. Teretta Willis**

149. Plaintiff Teretta Willis ("Plaintiff" for purposes of this section) is a citizen of New York and a resident of Brooklyn, New York. Since 2020, Plaintiff routinely purchased Charmin Toilet Paper ("Paper Products" for purposes of this section) from Home Depot, Walmart, BJ's, and ShopRite in New York state. At point of sale, Plaintiff saw and relied on the Deceptive Claims contained on Charmin's packaging.

150. The Deceptive Claims exposed to Plaintiff at time of purchase included the Protect-Grow-Restore messaging, the FSC logo, and the RA logo and were substantially similar to the examples included in § IV.E. of this Complaint. These Deceptive Claims created the net impression that P&G is currently taking meaningful steps to substantially mitigate the environmental impact of manufacturing single-use tissue paper. In turn, Plaintiff reasonably understood that the purchase of a P&G Paper Product represented a more environmentally responsible choice compared to other, cheaper, tissue paper brands that did not make the same type of claims.

151. Also, at time of purchase, Plaintiff did not notice any disclaimer or other explanatory statement on the packaging or product detail page that limited or otherwise qualified the prominent Deceptive Claims in a manner that would be understood by a reasonable consumer. For example, nowhere at point-of-sale did Defendant disclose the following Common Omissions: (1) P&G is not protecting forests as its P&G Paper Products are made with virgin forest fiber derived from the industrial clearcutting and burning of previously untouched old-growth forests; (2) P&G is not growing forests as its replanting efforts are designed to convert these old-growth forests into industrial tree crops which are ultimately capable of reproducing but a small fraction of the original ecological value; (3) P&G is not restoring forests as its total restoration efforts impact an area less than 1% of untouched old-growth forest lost each year to industrial logging practices; (4) a large portion of the pulp used in P&G Paper Products is *not* FSC-certified at all, and even for pulp that is FSC Mix-certified, that pulp actually contains very little to no FSC forest-certified material; and, (5) the Rainforest Alliance "Forest Allies" logo does not convey any type of third-party certification reflective of responsible forestry standards. Because Defendant conceals this information from consumers, Plaintiff had no knowledge of the Common Omissions at the time Plaintiff purchased the Paper Products.

152. By uniformly communicating the prominent Deceptive Claims at point of sale—while also withholding the information reflected in the Common Omissions—Defendant deceived and misled consumers into thinking that P&G's current actions represent a viable method for substantially mitigating or neutralizing the harm the Paper Products' supply chain causes to the environment. When, in reality, P&G Paper Products are fundamentally unsustainable because P&G has no current intentions to alter its old-growth forest supply chains or manufacturing processes to meaningfully reduce its environmental footprint. Had Defendant

disclosed the truth about its damaging environmental practices, Plaintiff would not have purchased the Paper Products or would have paid less for them.

153. Defendant's unfair, unlawful, and deceptive conduct in manufacturing, marketing, and selling Paper Products has caused Plaintiff out-of-pocket loss. Defendant knew of the Common Omissions but did not disclose such facts or their effects to Plaintiff, so Plaintiff purchased the products on the reasonable belief created by Defendant's point-of-sale representations that because P&G was taking meaningful steps towards to substantially mitigate the environmental harm associated with manufacturing tissue paper, and that its Paper Products represented a more environmentally responsible choice as compared to other, cheaper, tissue brands that did not contain the Deceptive Claims.

154. Plaintiff is a typical consumer who is not sophisticated in the formulation, cross-border sourcing, and manufacturing of tissue paper and has no personal knowledge of these practices. And at no point during the Class Period did Plaintiff know—or had any reasonable basis to discover—of the Common Omissions and/or that the Deceptive Claims were false and misleading. In contrast, P&G had substantial knowledge that the Deceptive Claims were false and misleading because P&G had access to the information reflected in the Common Omissions, as well as the relevant supply chain practices and information.

155. Plaintiff intends to purchase sustainably sourced tissue in the future and continues to see P&G Paper Products available for purchase with the same Deceptive Claims at issue in this Complaint. Plaintiff desires to purchase P&G Paper Products again if Plaintiff can be assured if the Deceptive Claims were in fact true. However, currently, Plaintiff is deprived of the ability to rely on the Deceptive Claims in deciding to purchase P&G Paper Products. Similarly,

Plaintiff is also at risk of future harm of being unable to rely on whether the Deceptive Claims are, in fact, true.

**12. North Carolina Plaintiff**

**a. Robert Trepper**

156. Plaintiff Robert Trepper ("Plaintiff" for purposes of this section) is a citizen of North Carolina and a resident of Cary, North Carolina. From June 1994 to September 2025, Plaintiff routinely purchased Charmin Toilet Paper ("Paper Products" for purposes of this section) from BJ's in North Carolina. At point of sale, Plaintiff saw and relied on the Deceptive Claims contained on the Charmin packaging.

157. The Deceptive Claims exposed to Plaintiff at time of purchase included the Protect-Grow-Restore messaging, the FSC logo, and the RA logo and were substantially similar to the examples included in § IV.E. of this Complaint. These Deceptive Claims created the net impression that P&G is currently taking meaningful steps to substantially mitigate the environmental impact of manufacturing single-use tissue paper. In turn, Plaintiff reasonably understood that the purchase of a P&G Paper Product represented a more environmentally responsible choice compared to other, cheaper, tissue paper brands that did not make the same type of claims.

158. Also, at time of purchase, Plaintiff did not notice any disclaimer or other explanatory statement on the packaging or product detail page that limited or otherwise qualified the prominent Deceptive Claims in a manner that would be understood by a reasonable consumer. For example, nowhere at point-of-sale did Defendant disclose the following Common Omissions: (1) P&G is not protecting forests as its P&G Paper Products are made with virgin forest fiber derived from the industrial clearcutting and burning of previously untouched, old-growth, forests; (2) P&G is not growing forests as its replanting efforts are designed to convert

these old-growth forests into industrial tree crops which are ultimately capable of reproducing but a small fraction of the original ecological value; (3) P&G is not restoring forests as its total restoration efforts impact an area less than 1% of untouched, old-growth, forest lost each year to industrial logging practices; (4) a large portion of the pulp used in P&G Paper Products is not FSC-certified at all, and even for pulp that is FSC Mix-certified, that pulp actually contains very little to no FSC forest-certified material; and, (5) the Rainforest Alliance "Forest Allies" logo does not convey any type of third party certification reflective of responsible forestry standards. Because Defendant conceals this information from consumers, Plaintiff had no knowledge of the Common Omissions at the time Plaintiff purchased the Paper Products.

159. By uniformly communicating the prominent Deceptive Claims at point of sale—while also withholding the information reflected in the Common Omissions—Defendant deceived and misled consumers into thinking that P&G's current actions represent a viable method for substantially mitigating or neutralizing the harm the Paper Products' supply chain causes to the environment. When, in reality, P&G Paper Products are fundamentally unsustainable because P&G has no current intentions to alter its old-growth forest supply chains or manufacturing processes to meaningfully reduce its environmental footprint. Had Defendant disclosed the truth about its damaging environmental practices, Plaintiff would not have purchased the Paper Products or would have paid less for them.

160. Defendant's unfair, unlawful, and deceptive conduct in manufacturing, marketing, and selling Paper Products has caused Plaintiff out-of-pocket loss. Defendant knew of the Common Omissions but did not disclose such facts or their effects to Plaintiff, so Plaintiff purchased the products on the reasonable belief created by Defendant's point-of-sale representations that because P&G was taking meaningful steps towards to substantially mitigate

the environmental harm associated with manufacturing tissue paper, and that its Paper Products represented a more environmentally responsible choice as compared to other, cheaper, tissue brands that did not contain the Deceptive Claims.

161. Plaintiff is a typical consumer who is not sophisticated in the formulation, cross-border sourcing, and manufacturing of tissue paper and has no personal knowledge of these practices. And at no point during the Class Period did Plaintiff know—or had any reasonable basis to discover—of the Common Omissions and/or that the Deceptive Claims were false and misleading. In contrast, P&G had substantial knowledge that the Deceptive Claims were false and misleading because P&G had access to the information reflected in the Common Omissions, as well as the relevant supply chain practices and information.

162. Plaintiff intends to purchase sustainably sourced tissue in the future and continues to see P&G Paper Products available for purchase with the same Deceptive Claims at issue in this Complaint. Plaintiff desires to purchase P&G Paper Products again if Plaintiff can be assured if the Deceptive Claims were in fact true. However, currently, Plaintiff is deprived of the ability to rely on Deceptive Claims in deciding to purchase P&G Paper Products. Similarly, Plaintiff is also at risk of future harm of being unable to rely on whether the Deceptive Claims are, in fact, true.

**13. Ohio Plaintiffs**

**a. Rebekah Klemm**

163. Plaintiff Rebekah Klemm ("Plaintiff" for purposes of this section) is a citizen of Ohio and a resident of Cleveland, Ohio. From March 2022 to September 2025 Plaintiff routinely purchased Charmin Toilet paper and Puffs Plus Lotion tissue ("Paper Products" for purposes of this section) from Walgreens, Family Dollar, Dollar General, and Walmart in Ohio. At point of

sale, Plaintiff saw and relied on the Deceptive Claims contained on the Charmin packaging and Puffs packaging.

164. The Deceptive Claims exposed to Plaintiff at time of purchase included the Protect-Grow-Restore messaging, the FSC logo, and the RA logo and were substantially similar to the examples included in § IV.E. of this Complaint. These Deceptive Claims created the net impression that P&G is currently taking meaningful steps to substantially mitigate the environmental impact of manufacturing single-use tissue paper. In turn, Plaintiff reasonably understood that the purchase of a P&G Paper Product represented a more environmentally responsible choice compared to other, cheaper, tissue paper brands that did not make the same type of claims.

165. Also, at time of purchase, Plaintiff did not notice any disclaimer or other explanatory statement on the packaging or product detail page that limited or otherwise qualified the prominent Deceptive Claims in a manner that would be understood by a reasonable consumer. For example, nowhere at point-of-sale did Defendant disclose the following Common Omissions: (1) P&G is not protecting forests as its P&G Paper Products are made with virgin forest fiber derived from the industrial clearcutting and burning of previously untouched old-growth forests; (2) P&G is not growing forests as its replanting efforts are designed to convert these old-growth forests into industrial tree crops which are ultimately capable of reproducing but a small fraction of the original ecological value; (3) P&G is not restoring forests as its total restoration efforts impact an area less than 1% of untouched old-growth forest lost each year to industrial logging practices; (4) a large portion of the pulp used in P&G Paper Products is *not* FSC-certified at all, and even for pulp that is FSC Mix-certified, that pulp actually contains very little to no FSC forest-certified material; and, (5) the Rainforest Alliance “Forest Allies” logo

does not convey any type of third-party certification reflective of responsible forestry standards. Because Defendant conceals this information from consumers, Plaintiff had no knowledge of the Common Omissions at the time Plaintiff purchased the Paper Products.

166. By uniformly communicating the prominent Deceptive Claims at point of sale—while also withholding the information reflected in the Common Omissions—Defendant deceived and misled consumers into thinking that P&G's current actions represent a viable method for substantially mitigating or neutralizing the harm the Paper Products' supply chain causes to the environment. When, in reality, P&G Paper Products are fundamentally unsustainable because P&G has no current intentions to alter its old-growth forest supply chains or manufacturing processes to meaningfully reduce its environmental footprint. Had Defendant disclosed the truth about its damaging environmental practices, Plaintiff would not have purchased the Paper Products or would have paid less for them.

167. Defendant's unfair, unlawful, and deceptive conduct in manufacturing, marketing, and selling Paper Products has caused Plaintiff out-of-pocket loss. Defendant knew of the Common Omissions but did not disclose such facts or their effects to Plaintiff, so Plaintiff purchased the products on the reasonable belief created by Defendant's point-of-sale representations that because P&G was taking meaningful steps towards to substantially mitigate the environmental harm associated with manufacturing tissue paper, and that its Paper Products represented a more environmentally responsible choice as compared to other, cheaper, tissue brands that did not contain the Deceptive Claims.

168. Plaintiff is a typical consumer who is not sophisticated in the formulation, cross-border sourcing, and manufacturing of tissue paper and has no personal knowledge of these practices. And at no point during the Class Period did Plaintiff know—or had any reasonable

basis to discover—of the Common Omissions and/or that the Deceptive Claims were false and misleading. In contrast, P&G had substantial knowledge that the Deceptive Claims were false and misleading because P&G had access to the information reflected in the Common Omissions, as well as the relevant supply chain practices and information.

169. Plaintiff intends to purchase sustainably sourced tissue in the future and continues to see P&G Paper Products available for purchase with the same Deceptive Claims at issue in this Complaint. Plaintiff desires to purchase P&G Paper Products again if Plaintiff can be assured if the Deceptive Claims were in fact true. However, currently, Plaintiff is deprived of the ability to rely on the Deceptive Claims in deciding to purchase P&G Paper Products. Similarly, Plaintiff is also at risk of future harm of being unable to rely on whether the Deceptive Claims are, in fact, true.

**b. Natalia Stork**

170. Plaintiff Natalia Stork ("Plaintiff" for purposes of this section) is a citizen of Ohio and a resident of Bellbrook, Ohio. Between 2020 and August 2025, Plaintiff routinely purchased Charmin toilet paper and Puffs Plus Lotion tissue ("Paper Products" for purposes of this section) from Amazon, Target, Kroger, and Costco stores in Ohio. At point of sale, Plaintiff saw and relied on the Deceptive Claims contained on Charmin's product details webpage (at Amazon) and/or Charmin's packaging (at remaining stores).

171. The Deceptive Claims exposed to Plaintiff at time of purchase included the Protect-Grow-Restore messaging, the FSC logo, and the RA logo and were substantially similar to the examples included in § IV.E. of this Complaint. These Deceptive Claims created the net impression that P&G is currently taking meaningful steps to substantially mitigate the environmental impact of manufacturing single-use tissue paper. In turn, Plaintiff reasonably understood that the purchase of a P&G Paper Product represented a more environmentally

responsible choice compared to other, cheaper, tissue paper brands that did not make the same type of claims.

172. Also, at time of purchase, Plaintiff did not notice any disclaimer or other explanatory statement on the packaging or product detail page that limited or otherwise qualified the prominent Deceptive Claims in a manner that would be understood by a reasonable consumer. For example, nowhere at point-of-sale did Defendant disclose the following Common Omissions: (1) P&G is not protecting forests as its P&G Paper Products are made with virgin forest fiber derived from the industrial clearcutting and burning of previously untouched old-growth forests; (2) P&G is not growing forests as its replanting efforts are designed to convert these old-growth forests into industrial tree crops which are ultimately capable of reproducing but a small fraction of the original ecological value; (3) P&G is not restoring forests as its total restoration efforts impact an area less than 1% of untouched old-growth forest lost each year to industrial logging practices; (4) a large portion of the pulp used in P&G Paper Products is *not* FSC-certified at all, and even for pulp that is FSC Mix-certified, that pulp actually contains very little to no FSC forest-certified material; and, (5) the Rainforest Alliance "Forest Allies" logo does not convey any type of third-party certification reflective of responsible forestry standards. Because Defendant conceals this information from consumers, Plaintiff had no knowledge of the Common Omissions at the time Plaintiff purchased the Paper Products.

173. By uniformly communicating the prominent Deceptive Claims at point of sale—while also withholding the information reflected in the Common Omissions—Defendant deceived and misled consumers into thinking that P&G's current actions represent a viable method for substantially mitigating or neutralizing the harm the Paper Products' supply chain causes to the environment. When, in reality, P&G Paper Products are fundamentally

unsustainable because P&G has no current intentions to alter its old-growth forest supply chains or manufacturing processes to meaningfully reduce its environmental footprint. Had Defendant disclosed the truth about its damaging environmental practices, Plaintiff would not have purchased the Paper Products or would have paid less for them.

174. Defendant's unfair, unlawful, and deceptive conduct in manufacturing, marketing, and selling Paper Products has caused Plaintiff out-of-pocket loss. Defendant knew of the Common Omissions but did not disclose such facts or their effects to Plaintiff, so Plaintiff purchased the products on the reasonable belief created by Defendant's point-of-sale representations that because P&G was taking meaningful steps towards to substantially mitigate the environmental harm associated with manufacturing tissue paper, and that its Paper Products represented a more environmentally responsible choice as compared to other, cheaper, tissue brands that did not contain the Deceptive Claims.

175. Plaintiff is a typical consumer who is not sophisticated in the formulation, cross-border sourcing, and manufacturing of tissue paper and has no personal knowledge of these practices. And at no point during the Class Period did Plaintiff know—or had any reasonable basis to discover—of the Common Omissions and/or that the Deceptive Claims were false and misleading. In contrast, P&G had substantial knowledge that the Deceptive Claims were false and misleading because P&G had access to the information reflected in the Common Omissions, as well as the relevant supply chain practices and information.

176. Plaintiff intends to purchase sustainably sourced tissue in the future and continues to see P&G Paper Products available for purchase with the same Deceptive Claims at issue in this Complaint. Plaintiff desires to purchase P&G Paper Products again if Plaintiff can be assured if the Deceptive Claims were in fact true. However, currently, Plaintiff is deprived of the

ability to rely on the Deceptive Claims in deciding to purchase P&G Paper Products. Similarly, Plaintiff is also at risk of future harm of being unable to rely on whether the Deceptive Claims are, in fact, true.

**14. Pennsylvania Plaintiffs**

**a. Ernest Easter**

177. Plaintiff Ernest Easter ("Plaintiff" for purposes of this section) is a citizen of Pennsylvania and a resident of Lansdale, Pennsylvania. Between approximately 2005-2024, Plaintiff routinely purchased Charmin Toilet Paper ("Paper Products" for purposes of this section) from Amazon, Walmart, CVS, Rite-Aid, Weis Food Market, Giant Food Market, Walgreens, Shop Rite, Food Lion, and Kroger stores in Pennsylvania. At point of sale, Plaintiff saw and relied on the Deceptive Claims contained on Charmin's product details webpage (at Amazon) and/or Charmin's packaging (at remaining stores).

178. The Deceptive Claims exposed to Plaintiff at time of purchase included the Protect-Grow-Restore messaging, the FSC logo, and the RA logo and were substantially similar to the examples included in § IV.E. of this Complaint. These Deceptive Claims created the net impression that P&G is currently taking meaningful steps to substantially mitigate the environmental impact of manufacturing single-use tissue paper. In turn, Plaintiff reasonably understood that the purchase of a P&G Paper Product represented a more environmentally responsible choice compared to other, cheaper, tissue paper brands that did not make the same type of claims.

179. Also, at time of purchase, Plaintiff did not notice any disclaimer or other explanatory statement on the packaging or product detail page that limited or otherwise qualified the prominent Deceptive Claims in a manner that would be understood by a reasonable consumer. For example, nowhere at point-of-sale did Defendant disclose the following Common

Omissions: (1) P&G is not protecting forests as its P&G Paper Products are made with virgin forest fiber derived from the industrial clearcutting and burning of previously untouched old-growth forests; (2) P&G is not growing forests as its replanting efforts are designed to convert these old-growth forests into industrial tree crops which are ultimately capable of reproducing but a small fraction of the original ecological value; (3) P&G is not restoring forests as its total restoration efforts impact an area less than 1% of untouched old-growth forest lost each year to industrial logging practices; (4) a large portion of the pulp used in P&G Paper Products is *not* FSC-certified at all, and even for pulp that is FSC Mix-certified, that pulp actually contains very little to no FSC forest-certified material; and, (5) the Rainforest Alliance "Forest Allies" logo does not convey any type of third-party certification reflective of responsible forestry standards. Because Defendant conceals this information from consumers, Plaintiff had no knowledge of the Common Omissions at the time Plaintiff purchased the Paper Products.

180. By uniformly communicating the prominent Deceptive Claims at point of sale—while also withholding the information reflected in the Common Omissions—Defendant deceived and misled consumers into thinking that P&G's current actions represent a viable method for substantially mitigating or neutralizing the harm the Paper Products' supply chain causes to the environment. When, in reality, P&G Paper Products are fundamentally unsustainable because P&G has no current intentions to alter its old-growth forest supply chains or manufacturing processes to meaningfully reduce its environmental footprint. Had Defendant disclosed the truth about its damaging environmental practices, Plaintiff would not have purchased the Paper Products or would have paid less for them.

181. Defendant's unfair, unlawful, and deceptive conduct in manufacturing, marketing, and selling Paper Products has caused Plaintiff out-of-pocket loss. Defendant knew of the

Common Omissions but did not disclose such facts or their effects to Plaintiff, so Plaintiff purchased the products on the reasonable belief created by Defendant's point-of-sale representations that because P&G was taking meaningful steps towards to substantially mitigate the environmental harm associated with manufacturing tissue paper, and that its Paper Products represented a more environmentally responsible choice as compared to other, cheaper, tissue brands that did not contain the Deceptive Claims.

182. Plaintiff is a typical consumer who is not sophisticated in the formulation, cross-border sourcing, and manufacturing of tissue paper and has no personal knowledge of these practices. And at no point during the Class Period did Plaintiff know—or had any reasonable basis to discover—of the Common Omissions and/or that the Deceptive Claims were false and misleading. In contrast, P&G had substantial knowledge that the Deceptive Claims were false and and misleading because P&G had access to the information reflected in the Common Omissions, as well as the relevant supply chain practices and information.

183. Plaintiff intends to purchase sustainably sourced tissue in the future and continues to see P&G Paper Products available for purchase with the same Deceptive Claims at issue in this Complaint. Plaintiff desires to purchase P&G Paper Products again if Plaintiff can be assured if the Deceptive Claims were in fact true. However, currently, Plaintiff is deprived of the ability to rely on the Deceptive Claims in deciding to purchase P&G Paper Products. Similarly, Plaintiff is also at risk of future harm of being unable to rely on whether the Deceptive Claims are, in fact, true.

**b. Jubin Kwon**

184. Plaintiff Jubin Kwon ("Plaintiff" for purposes of this section) is a citizen of Pennsylvania and a resident of Bryn Mawr, Pennsylvania. Between approximately June 2015 to March 2024, Plaintiff routinely purchased Charmin Toilet Paper ("Paper Products" for purposes

of this section) from Costco and ACME Supermarkets stores in Pennsylvania. At point of sale, Plaintiff saw and relied on the Deceptive Claims contained on Charmin's packaging.

185. The Deceptive Claims exposed to Plaintiff at time of purchase included the Protect-Grow-Restore messaging, the FSC logo, and the RA logo and were substantially similar to the examples included in § IV.E. of this Complaint. These Deceptive Claims created the net impression that P&G is currently taking meaningful steps to substantially mitigate the environmental impact of manufacturing single-use tissue paper. In turn, Plaintiff reasonably understood that the purchase of a P&G Paper Product represented a more environmentally responsible choice compared to other, cheaper, tissue paper brands that did not make the same type of claims.

186. Also, at time of purchase, Plaintiff did not notice any disclaimer or other explanatory statement on the packaging or product detail page that limited or otherwise qualified the prominent Deceptive Claims in a manner that would be understood by a reasonable consumer. For example, nowhere at point-of-sale did Defendant disclose the following Common Omissions: (1) P&G is not protecting forests as its P&G Paper Products are made with virgin forest fiber derived from the industrial clearcutting and burning of previously untouched old-growth forests; (2) P&G is not growing forests as its replanting efforts are designed to convert these old-growth forests into industrial tree crops which are ultimately capable of reproducing but a small fraction of the original ecological value; (3) P&G is not restoring forests as its total restoration efforts impact an area less than 1% of untouched old-growth forest lost each year to industrial logging practices; (4) a large portion of the pulp used in P&G Paper Products is *not* FSC-certified at all, and even for pulp that is FSC Mix-certified, that pulp actually contains very little to no FSC forest-certified material; and, (5) the Rainforest Alliance "Forest Allies" logo

does not convey any type of third-party certification reflective of responsible forestry standards. Because Defendant conceals this information from consumers, Plaintiff had no knowledge of the Common Omissions at the time Plaintiff purchased the Paper Products.

187. By uniformly communicating the prominent Deceptive Claims at point of sale—while also withholding the information reflected in the Common Omissions—Defendant deceived and misled consumers into thinking that P&G's current actions represent a viable method for substantially mitigating or neutralizing the harm the Paper Products' supply chain causes to the environment. When, in reality, P&G Paper Products are fundamentally unsustainable because P&G has no current intentions to alter its old-growth forest supply chains or manufacturing processes to meaningfully reduce its environmental footprint. Had Defendant disclosed the truth about its damaging environmental practices, Plaintiff would not have purchased the Paper Products or would have paid less for them.

188. Defendant's unfair, unlawful, and deceptive conduct in manufacturing, marketing, and selling Paper Products has caused Plaintiff out-of-pocket loss. Defendant knew of the Common Omissions but did not disclose such facts or their effects to Plaintiff, so Plaintiff purchased the products on the reasonable belief created by Defendant's point-of-sale representations that because P&G was taking meaningful steps towards to substantially mitigate the environmental harm associated with manufacturing tissue paper, and that its Paper Products represented a more environmentally responsible choice as compared to other, cheaper, tissue brands that did not contain the Deceptive Claims.

189. Plaintiff is a typical consumer who is not sophisticated in the formulation, cross-border sourcing, and manufacturing of tissue paper and has no personal knowledge of these practices. And at no point during the Class Period did Plaintiff know—or had any reasonable

basis to discover—of the Common Omissions and/or that the Deceptive Claims were false and misleading. In contrast, P&G had substantial knowledge that the Deceptive Claims were false and misleading because P&G had access to the information reflected in the Common Omissions, as well as the relevant supply chain practices and information.

190. Plaintiff intends to purchase sustainably sourced tissue in the future and continues to see P&G Paper Products available for purchase with the same Deceptive Claims at issue in this Complaint. Plaintiff desires to purchase P&G Paper Products again if Plaintiff can be assured if the Deceptive Claims were in fact true. However, currently, Plaintiff is deprived of the ability to rely on the Deceptive Claims in deciding to purchase P&G Paper Products. Similarly, Plaintiff is also at risk of future harm of being unable to rely on whether the Deceptive Claims are, in fact, true.

**15. Utah Plaintiffs**

**a. Brian Hymas**

191. Plaintiff Brian Hymas ("Plaintiff" for purposes of this section) is a citizen of Utah a resident of Orem, Utah. For the past ten years, Plaintiff routinely purchased Charmin Toilet Paper ("Paper Products" for purposes of this section) via Charmin.com. At point of sale, Plaintiff saw and relied on the Deceptive Claims contained on Charmin's packaging and the Charmin product details page at Charmin.com.

192. The Deceptive Claims exposed to Plaintiff at time of purchase included the Protect-Grow-Restore messaging, the FSC logo, and the RA logo and were substantially similar to the examples included in § IV.E. of this Complaint. These Deceptive Claims created the net impression that P&G is currently taking meaningful steps to substantially mitigate the environmental impact of manufacturing single-use tissue paper. In turn, Plaintiff reasonably understood that the purchase of a P&G Paper Product represented a more environmentally

responsible choice compared to other, cheaper, tissue paper brands that did not make the same type of claims.

193. Also, at time of purchase, Plaintiff did not notice any disclaimer or other explanatory statement on the packaging or product detail page that limited or otherwise qualified the prominent Deceptive Claims in a manner that would be understood by a reasonable consumer. For example, nowhere at point-of-sale did Defendant disclose the following Common Omissions: (1) P&G is not protecting forests as its P&G Paper Products are made with virgin forest fiber derived from the industrial clearcutting and burning of previously untouched old-growth forests; (2) P&G is not growing forests as its replanting efforts are designed to convert these old-growth forests into industrial tree crops which are ultimately capable of reproducing but a small fraction of the original ecological value; (3) P&G is not restoring forests as its total restoration efforts impact an area less than 1% of untouched old-growth forest lost each year to industrial logging practices; (4) a large portion of the pulp used in P&G Paper Products is *not* FSC-certified at all, and even for pulp that is FSC Mix-certified, that pulp actually contains very little to no FSC forest-certified material; and, (5) the Rainforest Alliance "Forest Allies" logo does not convey any type of third-party certification reflective of responsible forestry standards. Because Defendant conceals this information from consumers, Plaintiff had no knowledge of the Common Omissions at the time Plaintiff purchased the Paper Products.

194. By uniformly communicating the prominent Deceptive Claims at point of sale—while also withholding the information reflected in the Common Omissions—Defendant deceived and misled consumers into thinking that P&G's current actions represent a viable method for substantially mitigating or neutralizing the harm the Paper Products' supply chain causes to the environment. When, in reality, P&G Paper Products are fundamentally

unsustainable because P&G has no current intentions to alter its old-growth forest supply chains or manufacturing processes to meaningfully reduce its environmental footprint. Had Defendant disclosed the truth about its damaging environmental practices, Plaintiff would not have purchased the Paper Products or would have paid less for them.

195. Defendant's unfair, unlawful, and deceptive conduct in manufacturing, marketing, and selling Paper Products has caused Plaintiff out-of-pocket loss. Defendant knew of the Common Omissions but did not disclose such facts or their effects to Plaintiff, so Plaintiff purchased the products on the reasonable belief created by Defendant's point-of-sale representations that because P&G was taking meaningful steps towards to substantially mitigate the environmental harm associated with manufacturing tissue paper, and that its Paper Products represented a more environmentally responsible choice as compared to other, cheaper, tissue brands that did not contain the Deceptive Claims.

196. Plaintiff is a typical consumer who is not sophisticated in the formulation, cross-border sourcing, and manufacturing of tissue paper and has no personal knowledge of these practices. And at no point during the Class Period did Plaintiff know—or had any reasonable basis to discover—of the Common Omissions and/or that the Deceptive Claims were false and misleading. In contrast, P&G had substantial knowledge that the Deceptive Claims were false and misleading because P&G had access to the information reflected in the Common Omissions, as well as the relevant supply chain practices and information.

197. Plaintiff intends to purchase sustainably sourced tissue in the future and continues to see P&G Paper Products available for purchase with the same Deceptive Claims at issue in this Complaint. Plaintiff desires to purchase P&G Paper Products again if Plaintiff can be assured if the Deceptive Claims were in fact true. However, currently, Plaintiff is deprived of the

ability to rely on the Deceptive Claims in deciding to purchase P&G Paper Products. Similarly, Plaintiff is also at risk of future harm of being unable to rely on whether the Deceptive Claims are, in fact, true.

**b. Eric Lemons, Sr.**

198. Plaintiff Eric Lemons, Sr. ("Plaintiff" for purposes of this section) is a citizen of Utah a resident of Salt Lake City, Utah. From March 2022 to September 2025, Plaintiff routinely purchased Charmin Toilet Paper ("Paper Products" for purposes of this section) from Walmart and Smith Grocery Store in Utah. At point of sale, Plaintiff saw and relied on the Deceptive Claims on Charmin's packaging.

199. The Deceptive Claims exposed to Plaintiff at time of purchase included the Protect-Grow-Restore messaging, the FSC logo, and the RA logo and were substantially similar to the examples included in § IV.E. of this Complaint. These Deceptive Claims created the net impression that P&G is currently taking meaningful steps to substantially mitigate the environmental impact of manufacturing single-use tissue paper. In turn, Plaintiff reasonably understood that the purchase of a P&G Paper Product represented a more environmentally responsible choice compared to other, cheaper, tissue paper brands that did not make the same type of claims.

200. Also, at time of purchase, Plaintiff did not notice any disclaimer or other explanatory statement on the packaging or product detail page that limited or otherwise qualified the prominent Deceptive Claims in a manner that would be understood by a reasonable consumer. For example, nowhere at point-of-sale did Defendant disclose the following Common Omissions: (1) P&G is not protecting forests as its P&G Paper Products are made with virgin forest fiber derived from the industrial clearcutting and burning of previously untouched old-growth forests; (2) P&G is not growing forests as its replanting efforts are designed to convert

these old-growth forests into industrial tree crops which are ultimately capable of reproducing but a small fraction of the original ecological value; (3) P&G is not restoring forests as its total restoration efforts impact an area less than 1% of untouched old-growth forest lost each year to industrial logging practices; (4) a large portion of the pulp used in P&G Paper Products is *not* FSC-certified at all, and even for pulp that is FSC Mix-certified, that pulp actually contains very little to no FSC forest-certified material; and, (5) the Rainforest Alliance "Forest Allies" logo does not convey any type of third-party certification reflective of responsible forestry standards. Because Defendant conceals this information from consumers, Plaintiff had no knowledge of the Common Omissions at the time Plaintiff purchased the Paper Products.

201. By uniformly communicating the prominent Deceptive Claims at point of sale—while also withholding the information reflected in the Common Omissions—Defendant deceived and misled consumers into thinking that P&G's current actions represent a viable method for substantially mitigating or neutralizing the harm the Paper Products' supply chain causes to the environment. When, in reality, P&G Paper Products are fundamentally unsustainable because P&G has no current intentions to alter its old-growth forest supply chains or manufacturing processes to meaningfully reduce its environmental footprint. Had Defendant disclosed the truth about its damaging environmental practices, Plaintiff would not have purchased the Paper Products or would have paid less for them.

202. Defendant's unfair, unlawful, and deceptive conduct in manufacturing, marketing, and selling Paper Products has caused Plaintiff out-of-pocket loss. Defendant knew of the Common Omissions but did not disclose such facts or their effects to Plaintiff, so Plaintiff purchased the products on the reasonable belief created by Defendant's point-of-sale representations that because P&G was taking meaningful steps towards to substantially mitigate

the environmental harm associated with manufacturing tissue paper, and that its Paper Products represented a more environmentally responsible choice as compared to other, cheaper, tissue brands that did not contain the Deceptive Claims.

203. Plaintiff is a typical consumer who is not sophisticated in the formulation, cross-border sourcing, and manufacturing of tissue paper and has no personal knowledge of these practices. And at no point during the Class Period did Plaintiff know—or had any reasonable basis to discover—of the Common Omissions and/or that the Deceptive Claims were false and misleading. In contrast, P&G had substantial knowledge that the Deceptive Claims were false and misleading because P&G had access to the information reflected in the Common Omissions, as well as the relevant supply chain practices and information.

204. Plaintiff intends to purchase sustainably sourced tissue in the future and continues to see P&G Paper Products available for purchase with the same Deceptive Claims at issue in this Complaint. Plaintiff desires to purchase P&G Paper Products again if Plaintiff can be assured if the Deceptive Claims were in fact true. However, currently, Plaintiff is deprived of the ability to rely on the Deceptive Claims in deciding to purchase P&G Paper Products. Similarly, Plaintiff is also at risk of future harm of being unable to rely on whether the Deceptive Claims are, in fact, true.

**16. Washington Plaintiffs**

**a. Melissa Lowry**

205. Plaintiff Melissa Lowry ("Plaintiff" for purposes of this section) is a citizen of Washington and a resident of Eastsound, Washington. Over approximately the past 20 years, Plaintiff has routinely purchased Charmin Toilet Paper ("Paper Products" for purposes of this section) from Costco stores in Washington. At point of sale, Plaintiff saw and relied on the Deceptive Claims contained on Charmin's packaging.

206. The Deceptive Claims exposed to Plaintiff at time of purchase included the Protect-Grow-Restore messaging, the FSC logo, and the RA logo and were substantially similar to the examples included in § IV.E. of this Complaint. These Deceptive Claims created the net impression that P&G is currently taking meaningful steps to substantially mitigate the environmental impact of manufacturing single-use tissue paper. In turn, Plaintiff reasonably understood that the purchase of a P&G Paper Product represented a more environmentally responsible choice compared to other, cheaper, tissue paper brands that did not make the same type of claims.

207. Also, at time of purchase, Plaintiff did not notice any disclaimer or other explanatory statement on the packaging or product detail page that limited or otherwise qualified the prominent Deceptive Claims in a manner that would be understood by a reasonable consumer. For example, nowhere at point-of-sale did Defendant disclose the following Common Omissions: (1) P&G is not protecting forests as its P&G Paper Products are made with virgin forest fiber derived from the industrial clearcutting and burning of previously untouched old-growth forests; (2) P&G is not growing forests as its replanting efforts are designed to convert these old-growth forests into industrial tree crops which are ultimately capable of reproducing but a small fraction of the original ecological value; (3) P&G is not restoring forests as its total restoration efforts impact an area less than 1% of untouched old-growth forest lost each year to industrial logging practices; (4) a large portion of the pulp used in P&G Paper Products is *not* FSC-certified at all, and even for pulp that is FSC Mix-certified, that pulp actually contains very little to no FSC forest-certified material; and, (5) the Rainforest Alliance "Forest Allies" logo does not convey any type of third-party certification reflective of responsible forestry standards.

Because Defendant conceals this information from consumers, Plaintiff had no knowledge of the Common Omissions at the time Plaintiff purchased the Paper Products.

208. By uniformly communicating the prominent Deceptive Claims at point of sale—while also withholding the information reflected in the Common Omissions—Defendant deceived and misled consumers into thinking that P&G's current actions represent a viable method for substantially mitigating or neutralizing the harm the Paper Products' supply chain causes to the environment. When, in reality, P&G Paper Products are fundamentally unsustainable because P&G has no current intentions to alter its old-growth forest supply chains or manufacturing processes to meaningfully reduce its environmental footprint. Had Defendant disclosed the truth about its damaging environmental practices, Plaintiff would not have purchased the Paper Products or would have paid less for them.

209. Defendant's unfair, unlawful, and deceptive conduct in manufacturing, marketing, and selling Paper Products has caused Plaintiff out-of-pocket loss. Defendant knew of the Common Omissions but did not disclose such facts or their effects to Plaintiff, so Plaintiff purchased the products on the reasonable belief created by Defendant's point-of-sale representations that because P&G was taking meaningful steps towards to substantially mitigate the environmental harm associated with manufacturing tissue paper, and that its Paper Products represented a more environmentally responsible choice as compared to other, cheaper, tissue brands that did not contain the Deceptive Claims.

210. Plaintiff is a typical consumer who is not sophisticated in the formulation, cross-border sourcing, and manufacturing of tissue paper and has no personal knowledge of these practices. And at no point during the Class Period did Plaintiff know—or had any reasonable basis to discover—of the Common Omissions and/or that the Deceptive Claims were false and

misleading. In contrast, P&G had substantial knowledge that the Deceptive Claims were false and misleading because P&G had access to the information reflected in the Common Omissions, as well as the relevant supply chain practices and information.

211. Plaintiff intends to purchase sustainably sourced tissue in the future and continues to see P&G Paper Products available for purchase with the same Deceptive Claims at issue in this Complaint. Plaintiff desires to purchase P&G Paper Products again if Plaintiff can be assured if the Deceptive Claims were in fact true. However, currently, Plaintiff is deprived of the ability to rely on the Deceptive Claims in deciding to purchase P&G Paper Products. Similarly, Plaintiff is also at risk of future harm of being unable to rely on whether the Deceptive Claims are, in fact, true.

**b. Michael Dunn**

212. Plaintiff Michael Dunn ("Plaintiff" for purposes of this section) is a citizen of Washington and a resident of Port Orchard, Washington. Over approximately the past 20 years, Plaintiff routinely purchased Charmin Toilet Paper ("Paper Products for purposes of this section) from Walmart and Costco stores in Washington. At point of sale, Plaintiff saw and relied on the Deceptive Claims contained on Charmin's packaging.

213. The Deceptive Claims exposed to Plaintiff at time of purchase included the Protect-Grow-Restore messaging, the FSC logo, and the RA logo and were substantially similar to the examples included in § IV.E. of this Complaint. These Deceptive Claims created the net impression that P&G is currently taking meaningful steps to substantially mitigate the environmental impact of manufacturing single-use tissue paper. In turn, Plaintiff reasonably understood that the purchase of a P&G Paper Product represented a more environmentally responsible choice compared to other, cheaper, tissue paper brands that did not make the same type of claims.

214. Also, at time of purchase, Plaintiff did not notice any disclaimer or other explanatory statement on the packaging or product detail page that limited or otherwise qualified the prominent Deceptive Claims in a manner that would be understood by a reasonable consumer. For example, nowhere at point-of-sale did Defendant disclose the following Common Omissions: (1) P&G is not protecting forests as its P&G Paper Products are made with virgin forest fiber derived from the industrial clearcutting and burning of previously untouched old-growth forests; (2) P&G is not growing forests as its replanting efforts are designed to convert these old-growth forests into industrial tree crops which are ultimately capable of reproducing but a small fraction of the original ecological value; (3) P&G is not restoring forests as its total restoration efforts impact an area less than 1% of untouched old-growth forest lost each year to industrial logging practices; (4) a large portion of the pulp used in P&G Paper Products is *not* FSC-certified at all, and even for pulp that is FSC Mix-certified, that pulp actually contains very little to no FSC forest-certified material; and, (5) the Rainforest Alliance “Forest Allies” logo does not convey any type of third-party certification reflective of responsible forestry standards. Because Defendant conceals this information from consumers, Plaintiff had no knowledge of the Common Omissions at the time Plaintiff purchased the Paper Products.

215. By uniformly communicating the prominent Deceptive Claims at point of sale—while also withholding the information reflected in the Common Omissions—Defendant deceived and misled consumers into thinking that P&G’s current actions represent a viable method for substantially mitigating or neutralizing the harm the Paper Products’ supply chain causes to the environment. When, in reality, P&G Paper Products are fundamentally unsustainable because P&G has no current intentions to alter its old-growth forest supply chains or manufacturing processes to meaningfully reduce its environmental footprint. Had Defendant

disclosed the truth about its damaging environmental practices, Plaintiff would not have purchased the Paper Products or would have paid less for them.

216. Defendant's unfair, unlawful, and deceptive conduct in manufacturing, marketing, and selling Paper Products has caused Plaintiff out-of-pocket loss. Defendant knew of the Common Omissions but did not disclose such facts or their effects to Plaintiff, so Plaintiff purchased the products on the reasonable belief created by Defendant's point-of-sale representations that because P&G was taking meaningful steps towards to substantially mitigate the environmental harm associated with manufacturing tissue paper, and that its Paper Products represented a more environmentally responsible choice as compared to other, cheaper, tissue brands that did not contain the Deceptive Claims.

217. Plaintiff is a typical consumer who is not sophisticated in the formulation, cross-border sourcing, and manufacturing of tissue paper and has no personal knowledge of these practices. And at no point during the Class Period did Plaintiff know—or had any reasonable basis to discover—of the Common Omissions and/or that the Deceptive Claims were false and misleading. In contrast, P&G had substantial knowledge that the Deceptive Claims were false and misleading because P&G had access to the information reflected in the Common Omissions, as well as the relevant supply chain practices and information.

218. Plaintiff intends to purchase sustainably sourced tissue in the future and continues to see P&G Paper Products available for purchase with the same Deceptive Claims at issue in this Complaint. Plaintiff desires to purchase P&G Paper Products again if Plaintiff can be assured if the Deceptive Claims were in fact true. However, currently, Plaintiff is deprived of the ability to rely on the Deceptive Claims in deciding to purchase P&G Paper Products. Similarly,

Plaintiff is also at risk of future harm of being unable to rely on whether the Deceptive Claims are, in fact, true.

**c. Lisa Kopecki**

219. Plaintiff Lisa Kopecki ("Plaintiff" for purposes of this section) is a citizen of Washington a resident of Lake Stevens, Washington. Throughout 2024, Plaintiff routinely purchased Charmin Toilet Paper ("Paper Products" for purposes of this section) from Walmart stores in Washington. At point of sale, Plaintiff saw and relied on the Deceptive Claims contained on Charmin's packaging.

220. The Deceptive Claims exposed to Plaintiff at time of purchase included the Protect-Grow-Restore messaging, the FSC logo, and the RA logo and were substantially similar to the examples included in § IV.E. of this Complaint. These Deceptive Claims created the net impression that P&G is currently taking meaningful steps to substantially mitigate the environmental impact of manufacturing single-use tissue paper. In turn, Plaintiff reasonably understood that the purchase of a P&G Paper Product represented a more environmentally responsible choice compared to other, cheaper, tissue paper brands that did not make the same type of claims.

221. Also, at time of purchase, Plaintiff did not notice any disclaimer or other explanatory statement on the packaging or product detail page that limited or otherwise qualified the prominent Deceptive Claims in a manner that would be understood by a reasonable consumer. For example, nowhere at point-of-sale did Defendant disclose the following Common Omissions: (1) P&G is not protecting forests as its P&G Paper Products are made with virgin forest fiber derived from the industrial clearcutting and burning of previously untouched old-growth forests; (2) P&G is not growing forests as its replanting efforts are designed to convert these old-growth forests into industrial tree crops which are ultimately capable of reproducing

but a small fraction of the original ecological value; (3) P&G is not restoring forests as its total restoration efforts impact an area less than 1% of untouched old-growth forest lost each year to industrial logging practices; (4) a large portion of the pulp used in P&G Paper Products is *not* FSC-certified at all, and even for pulp that is FSC Mix-certified, that pulp actually contains very little to no FSC forest-certified material; and, (5) the Rainforest Alliance "Forest Allies" logo does not convey any type of third-party certification reflective of responsible forestry standards. Because Defendant conceals this information from consumers, Plaintiff had no knowledge of the Common Omissions at the time Plaintiff purchased the Paper Products.

222. By uniformly communicating the prominent Deceptive Claims at point of sale—while also withholding the information reflected in the Common Omissions—Defendant deceived and misled consumers into thinking that P&G's current actions represent a viable method for substantially mitigating or neutralizing the harm the Paper Products' supply chain causes to the environment. When, in reality, P&G Paper Products are fundamentally unsustainable because P&G has no current intentions to alter its old-growth forest supply chains or manufacturing processes to meaningfully reduce its environmental footprint. Had Defendant disclosed the truth about its damaging environmental practices, Plaintiff would not have purchased the Paper Products or would have paid less for them.

223. Defendant's unfair, unlawful, and deceptive conduct in manufacturing, marketing, and selling Paper Products has caused Plaintiff out-of-pocket loss. Defendant knew of the Common Omissions but did not disclose such facts or their effects to Plaintiff, so Plaintiff purchased the products on the reasonable belief created by Defendant's point-of-sale representations that because P&G was taking meaningful steps towards to substantially mitigate the environmental harm associated with manufacturing tissue paper, and that its Paper Products

represented a more environmentally responsible choice as compared to other, cheaper, tissue brands that did not contain the Deceptive Claims.

224. Plaintiff is a typical consumer who is not sophisticated in the formulation, cross-border sourcing, and manufacturing of tissue paper and has no personal knowledge of these practices. And at no point during the Class Period did Plaintiff know—or had any reasonable basis to discover—of the Common Omissions and/or that the Deceptive Claims were false and misleading. In contrast, P&G had substantial knowledge that the Deceptive Claims were false and misleading because P&G had access to the information reflected in the Common Omissions, as well as the relevant supply chain practices and information.

225. Plaintiff intends to purchase sustainably sourced tissue in the future and continues to see P&G Paper Products available for purchase with the same Deceptive Claims at issue in this Complaint. Plaintiff desires to purchase P&G Paper Products again if Plaintiff can be assured if the Deceptive Claims were in fact true. However, currently, Plaintiff is deprived of the ability to rely on the Deceptive Claims in deciding to purchase P&G Paper Products. Similarly, Plaintiff is also at risk of future harm of being unable to rely on whether the Deceptive Claims are, in fact, true.

## B. Defendant

### 1. Procter & Gamble Company

226. Procter & Gamble Company is an American consumer goods corporation doing business in all 50 states and the District of Columbia. It is organized under the laws of the state of Ohio, with its principal place of business in Cincinnati, Ohio. At all times relevant to this action, P&G manufactured and made available for sale P&G Paper Products throughout the United States.

227. P&G is one of the biggest consumer goods companies in the world. In 2016, the company generated net sales worth about $65.3 billion U.S. dollars. And according to P&G's 2024 Annual Report, Charmin Toilet Paper represents approximately 25% of the North American market for toilet paper. Charmin Toilet Paper is also routinely found in the top 10 sales of the leading toilet paper brands in the United States, with typical sales of over $2 billion a year.[15] According to U.S. Census data and the Simmons National Consumer Survey, 86.27 million Americans used Charmin Ultra in 2020 alone.

228. Similarly, Puffs Tissue Paper is routinely found in the top three brands for disposable tissues and retains approximately 15-20% of the $5 billion tissue paper market.

## IV. FACTUAL ALLEGATIONS

### A. Environmental stewardship is a material attribute to consumers.

229. A large portion of consumers increasingly care about the environmental impact of products when making purchasing decisions, with many stating that they are willing to pay more for sustainable options and will prioritize brands with environmentally conscious practices. According to the McKinsey study, 78% of U.S. consumers say that a sustainable lifestyle is important to them, and more than 60% of U.S. consumers disclosed that they care about buying environmentally and ethically sustainable products.[16] According to the study's authors, "the research shows that a wide range of consumers across incomes, life stages, ages, races, and geographies are buying products bearing ESG-related labels."

---

[15] *Sales of the leading 10 toilet tissue brands of the United States in 2017*, STATISTA, https://www.statista.com/statistics/188710/top-toilet-tissue-brands-in-the-united-states/.

[16] *Consumers care about sustainability—and back it up with their wallets*, MCKINSEY & COMPANY (Feb. 6, 2023), https://www.mckinsey.com/industries/consumer-packaged-goods/our-insights/consumers-care-about-sustainability-and-back-it-up-with-their-wallets#/.

230. It is also well documented that consumers are willing to pay a premium for products from supply chains that are less environmentally damaging. For example, PricewaterhouseCoopers recently published a survey that found that consumers were willing to spend 9.7% more, on average, for sustainably produced or sourced goods, despite inflation and cost-of-living concerns.[17] Similarly, a 2023 study conducted by Bain & Company concluded that consumers are willing to pay at least 12% more for sustainable products.[18]

231. If one used 10 percent as a value of overpayment in this case based on the Deceptive Claims and Common Omissions and assumed that P&G sells approximately two billion dollars of Charmin Toilet Paper and one billion dollars of Puffs facial tissue per year, then the minimum overpayment is roughly $300 million per year[19] or $1.2 billion over a four-year class period. But again, this measure is conservative given the materiality of the Deceptive Claims and Common Omissions.

232. In light of these trends, companies are increasingly allocating time, attention, and resources to position their products and supply chains as environmentally responsible. For example, the McKinsey study reviewed actual consumer purchasing behavior over a five-year period to compare products that made one or more ESG-related claims on their packaging

---

[17] *Consumers willing to pay 9.7% sustainability premium, even as cost-of-living and inflationary concerns weigh: PwC 2024 Voice of the Consumer Survey*, PRICEWATERHOUSECOOPERS (May 15, 2024), https://www.pwc.com/gx/en/news-room/press-releases/2024/pwc-2024-voice-of-consumer-survey.html.

[18] *See, e.g.*, *Consumers Say Their Environmental Concerns are Increasing Due to Extreme Weather; Study Shows They're Willing to Change Behavior, Pay 12% More for Sustainable Products*, BAIN & COMPANY (Nov. 13, 2023), https://www.bain.com/about/media-center/press-releases/2023/consumers-say-their-environmental-concerns-are-increasing-due-to-extreme-weather-study-shows-theyre-willing-to-change-behavior-pay-12-more-for-sustainable-products/.

[19] Damages estimate is $200 million for Charmin (9.7% multiplied by $2 billion in annual sales) and $100 million for Puffs (9.7% multiplied by $1 billion annual sales) for a total of $300 million of damages per year.

against similar products that made no ESG-related claims. The McKinsey study found that the packages with the ESG-related claims outperformed products that made none, and that there was "a clear and material link between ESG-related claims and consumer spending." The McKinsey study's conclusion was especially true in the Household Paper and Plastics (Category 24 below), which boasted significant increases in growth and market share for products with ESG labels.[20]




[20] *Consumers care about sustainability—and back it up with their wallets*, McKINSEY & COMPANY (Feb. 6, 2023), https://www.mckinsey.com/industries/consumer-packaged-goods/our-insights/consumers-care-about-sustainability-and-back-it-up-with-their-wallets#/.

**B. P&G knows that its environmental stewardship claims are material to consumers.**

233. P&G also understands the materiality and growth-maximizing value of environmental claims. Accordingly, P&G dedicates considerable resources[21] to position itself as committed to sustainable forestry practices. For example, the shareholder letter attached to P&G's 2024 Annual Report explains that the Company is "putting additional focus" on "improving the environmental sustainability profile of our brands" in order to "create [a] competitive advantage that can drive shareowner value creation."[22]

234. Examples of this renewed focus includes highlighting P&G's commitment to sustainability in its Keep Forests as Forests campaign, which includes a wide variety of paid social media activity, in-store signage, packaging, digital storytelling, virtual reality experiences, and various NGO partnerships. According to P&G Vice President Tonia Elrod, P&G closely monitors and evaluates its environmental and sustainability messaging to consumers and ultimately concluded that the Keep Forests as Forests campaign succeeded in conveying a "sustainability message" to consumers. P&G also confirmed that consumers had developed a higher purchase intent from Charmin as a direct result of the environmental claims included in this campaign (in contrast to other attributes such as tissue softness or strength).[23]

---

[21] P&G spent more than $150 million on advertising and marketing Charmin Toilet Paper in 2021 and over $119 million in 2022. *See Procter & Gamble's advertising spending on Charmin in the United States from 2011 to 2022*, STATISTA, https://www.statista.com/statistics/314871/charmin-ad-spend-usa/.

[22] P&G 2024 Annual Report, https://assets.ctfassets.net/oggad6svuzkv/1axqmYoGvExvpVj5ndTYld/dca130713c7612ea84bc4d425752f1cb/2024_annual_report.pdf, at pp. vi–vii.

[23] *Webinar on Promoting Consumer Engagement with Forest Sustainability*, FSC INTERNATIONAL (Nov. 19, 2021), https://www.youtube.com/watch?v=BFB0J3jQlkw, at 27:00.




C. **Companies have developed sophisticated greenwashing campaigns to leverage the growth opportunities in environmental claims.**

235. "Greenwashing" is the act of misleading consumers regarding the environmental practices of a company or a product. Greenwashing occurs when a company positions itself (or a specific product) as having a positive influence on environmental issues, when, in reality, the company (or product) is either exaggerating its influence and/or actively engaging in negative environmental practices that do not align with it previously touted green goals.

236. Product-level greenwashing refers to the act of misleading consumers about the environmental benefits of a specific product and can include tactics such as labeling products with false or misleading information regarding their composition.[24] Firm-level greenwashing arises when a company makes false or misleading claims about its overall environmental practices, polices, or performance, rather than just its individual products. According to academic researchers from Pace University's Sustainable Business Law Hub, firm-level greenwashing

[24] Barbara Ballan & Jason J. Czarnezki, *Disclosure, Greenwashing and the Future of ESG Litigation*, 81 WAS. & LEE L. REV. 545, 555-60 (2024).

"involves creating a false image of the company as environmentally responsible, even though its actual practices may be environmental harmful or unsustainable. This form of greenwashing can be particularly damaging as it misleads consumers and investors into thinking that the entire company is environmentally friendly, when in fact only a small portion of its practices may be achieving the stated sustainability goals."

**D. The FTC's "Green Guides" provide critical information to consumers, companies, and courts about deceptive environmental claims.**

237. Increasingly, what companies think their "green" marketing claims mean and what consumers think they mean may not be the same. Regulators have also acknowledged that consumers can be especially mislead by vague "green" marketing efforts.[25] As such, the FTC monitors environmentally themed marketing for potentially deceptive claims, and publishes guidelines to help develop uniform national standards for environmental advertising. Known as the "Guides for the Use of Environmental Marketing Claims"—or more colloquially as the FTC "Green Guides"—this guidance is designed to help marketers avoid making environmental marketing claims that are unfair or deceptive under Section 5 of the FTC Act, 15 U.S.C. § 45.[26] Section 5 of the FTC Act prohibits "unfair or deceptive acts and practices in or affecting commerce[.]" A representation, omission, or practice is deceptive if it is likely to mislead consumers acting reasonably under the circumstances and is material to consumers' decisions.[27]

238. More specifically, the Green Guides address environmental claims by explaining: (1) general principles that apply to all environmental marketing claims; (2) how consumers are

---

[25] FTC Green Guides 16 C.F.R. part 260.4(b).

[26] FTC, Green Guides, 16 C.F.R. part 260, https://www.ftc.gov/news-events/topics/truth-advertising/green-guides.

[27] *See* FTC Policy Statement on Deception, 103 F.T.C. 174 (1983), https://www.ftc.gov/system/files/documents/public_statements/410531/831014deceptionstmt.pdf.

likely to interpret particular claims and how marketers can substantiate these claims; and (3) how marketers can qualify their claims to avoid deceiving consumers. According to the FTC, "marketers must ensure that *all* reasonable interpretations of their claims are truthful, not misleading, and supported by a reasonable basis *before* they make the claims" (emphasis added) and "a firm's failure to possess and rely upon a reasonable basis for objective claims constitutes an unfair and deceptive act or practice in violation of Section 5 of the FTC Act."

239. The Green Guides also play a large role in state consumer protection law. At least twelve states[28] have laws that directly incorporate the standards set forth in the Green Guides as the legal standard for lawfully making certain marketing claims.[29] Additionally, twenty-seven states and territories[30] have laws providing that the FTC's interpretation in the Green Guides shall serve as persuasive authority for courts when interpreting a particular state's consumer protection law. The Green Guides have also been used as evidence in court proceedings involving false advertising litigation.[31]

240. The FTC Green Guides expressly describe a marketer's responsibilities when making environmental claims. Some of these include:

---

[28] These states are Alabama, California, Florida, Indiana, Maine, Maryland, Michigan, Minnesota, New Mexico, New York, Pennsylvania, Rhode Island, and Washington.

[29] Comments to the FTC regarding Green Guides Review from the attorneys general of California, Connecticut, Delaware, Illinois, Maryland, Michigan, Minnesota, New Jersey, New Mexico, New York, Oregon, Rhode Island, and Wisconsin (Apr. 24, 2023), https://oag.ca.gov/system/files/attachments/press-docs/Comments%20to%20FTC%20re%20Green%20Guides%204.24.23.pdf.

[30] These are Alabama, Alaska, Arizona, Connecticut, District of Columbia, District of Guam, Florida, Idaho, Georgia, Illinois, Maine, Maryland, Massachusetts, Michigan, Montana, New Hampshire, New Mexico, Ohio, South Carolina, Rhode Island, Texas Tennessee, Utah, Vermont, Washington, and West Virginia.

[31] Barbara Ballan & Jason J. Czarnezki, *Disclosure, Greenwashing and the Future of ESG Litigation*, 81 WAS. & LEE L. REV. 545, 565 (2024).

**§ 260.2 Interpretation and substantiation of environmental marketing claims.** A representation, omission, or practice is deceptive if it is likely to mislead consumers acting reasonably under the circumstances and is material to consumers' decisions. To determine if an advertisement is deceptive, marketers must identify all express and implied claims that the advertisement reasonably conveys. Marketers must ensure that all reasonable interpretations of their claims are truthful, not misleading, and supported by a reasonable basis before they make the claims. In the context of environmental marketing claims, a reasonable basis often requires competent and reliable scientific evidence [created] in an objective manner by qualified persons. (emphasis added) (citation omitted)

**§ 260.3 (a) Qualifications & disclosures.** To prevent deceptive claims, qualifications and disclosures should be clear, prominent, and understandable.

**§ 260.3 (c) Overstatement of environmental attribute.** An environmental marketing claim should not overstate, directly or by implication, an environmental attribute or benefit. Marketers should not state or imply environmental benefits if the benefits are negligible.

*Example 1*: An area rug is labeled "50% more recycled content than before" [but] the manufacturer increased the recycled content of its rug from 2% recycled fiber to 3%. Although the claim is technically true, it likely conveys the false impression that the manufacturer has increased significantly the use of recycled fiber.

. . .

**§ 260.4 General environmental benefit claims.** (a) It is deceptive to misrepresent, directly or by implication, that a product, package or service offers a general environmental benefit. (b) Unqualified general environmental benefit claims are difficult to interpret and likely convey a wide range of meanings. In many cases, such claims likely convey that the product, package, or service has specific and far-reaching environmental benefits that may convey that the item or service has no negative environmental impact. Because it is highly unlikely that marketers can substantiate all reasonable interpretations of these claims, markets should not make unqualified general environmental benefit claims.

*Example 3:* A marketer's advertisement features a laser printer in a bird's nest balancing on a tree branch, surrounded by dense forest. In green type, the marketer states, "Buy our printer. Make a

change." Although the advertisement does not expressly claim that the product has environmental benefits, the featured images, in combination with the text, likely convey that the product has far reaching environmental benefits and may convey that the product has no negative environmental impact. Because it is highly unlikely that a marketer can substantiate these claims, this advertisement is deceptive.

. . .

**§ 260.6 Certifications and seals of approval**: (a) It is deceptive to misrepresent, directly or by implication, that a product, package has been endorsed or certified by an independent third party. (b) A marketers use of the name, logo, or seal of approval of a third party certifier or organization may be an endorsement, which should meet the criteria of the FTC's Endorsement Guides . . . (c) Third-party certification does not eliminate a marketers' obligation to ensure that it has substantiation for all claims reasonably communicated by the certification. (d) A marketer's use of an environmental certification or seal of approval likely conveys that the product offers a general environmental benefit .Because it is highly unlikely that marketers can substantiate general environmental benefit claims, marketers should not use environmental certifications or seals that do not convey the basis for the certification. (e) . . . To avoid deception, marketers should use clear and prominent qualifying language that clearly conveys that the certification or seal refers only specific and limited benefits.

*Example 2:* A manufacturer advertises its product as "certified by the American Institute of Degradable Materials." Because the advertisement does not mention that the American Institute of Degradable Materials ("AIDM") is an industry trade association, the certification likely conveys that it was awarded by an independent certifier. To be certified, marketers must meet standards that have been developed and maintained by a voluntary consensus standard body. […] A voluntary consensus standards body is defined by the following attributes: (i) Openness, (ii) balance of interest, (iii) due process, (iv) an appeals process, (v) consensus, which is defined as general agreement, but not necessarily unanimity, and includes a process for attempting to resolve objections by interested parties, as long as all comments have been fairly considered, each objector is advised of the disposition of his or her objection(s) and the reasons why, and the consensus members are given an opportunity to change their votes after reviewing the comments.

*Example 4*: A marketer's package features a seal of approval with the text “Certified Non-Toxic.” The seal is awarded by a certifier with appropriate expertise in evaluating ingredient safety and potential toxicity. It applies standards developed by a voluntary consensus standard body. Although non-industry members comprise a majority of the certifier's board, an industry veto could override any proposed changes to the standards. This certification likely conveys that the product is certified by an independent organization. This claim would be deceptive because industry members can veto any proposed changes to the standards.

*Example 6:* product label contains an environmental seal, either in the form of a globe icon or a globe icon with the text “EarthSmart.” EarthSmart is an independent, third-party certifier with appropriate expertise in evaluating chemical emissions of products. While the marketer meets EarthSmart's standards for reduced chemical emissions during product usage, the product has no other specific environmental benefits. Either seal likely conveys that the product has far-reaching environmental benefits, and that EarthSmart certified the product for all of these benefits. If the marketer cannot substantiate these claims, the use of the seal would be deceptive. The seal would not be deceptive if the marketer accompanied it with clear and prominent language clearly conveying that the certification refers only to specific and limited benefits. For example, the marketer could state next to the globe icon: “EarthSmart certifies that this product meets EarthSmart standards for reduced chemical emissions during product usage.” Alternatively, the claim would not be deceptive if the EarthSmart environmental seal itself stated: “EarthSmart Certified for reduced chemical emissions during product usage.”

*Example 7*: A one-quart bottle of window cleaner features a seal with the text “Environment Approved,” granted by an independent, third-party certifier with appropriate expertise. The certifier granted the seal after evaluating 35 environmental attributes. This seal likely conveys that the product has far-reaching environmental benefits and that Environment Approved certified the product for all of these benefits and therefore is likely deceptive. The seal would likely not be deceptive if the marketer accompanied it with clear and prominent language clearly conveying that the seal refers only to specific and limited benefits.

For example, the seal could state: “Virtually all products impact the environment. For details on which attributes we evaluated, go to [a Web site that discusses this product].” The referenced Web page provides a detailed summary of the examined environmental attributes. A reference to a Web site is appropriate because the

> additional information provided on the Web site is not necessary to prevent the advertisement from being misleading. As always, the marketer also should ensure that the advertisement does not imply other deceptive claims, and that the certifier's criteria are sufficiently rigorous to substantiate all material claims reasonably communicated by the certification.

241. The Green Guides also provide guidance regarding the use of terms such as "sustainability" as this term likely implies certain environmental benefits. Although the Green Guides do not define sustainability per se, "this does not mean unscrupulous marketers are free to deceive consumers."[32] Indeed, according to the FTC, "marketers still are responsible for substantiating consumers' reasonable understanding of these claims." For example, "if in context reasonable consumers perceive a sustainable claim as a general environmental benefit claim, the marketer must be able to substantiate that claim and all attendant reasonably implied claims" and that, typically, a generic sustainability claim "presents substantiation challenges." For that reason, the FTC has admonished companies not to use unqualified claims due to its determination that it is highly unlikely that they can substantiate all reasonable interpretations of these claims.[33]

## E. P&G touts its environmental stewardship via its Keep Forests as Forests campaign.

### 1. P&G's Keep Forests as Forests is a multilayered marketing campaign which conveys a consistent and unified message of environmental stewardship.

242. P&G employs a multitude of layered and integrated marketing practices, such as paid social media activity, in-store signage, packaging, digital storytelling, virtual reality

[32] *The Green Guides Statement of Basis and Purpose*, FTC, https://www.ftc.gov/sites/default/files/attachments/press-releases/ftc-issues-revised-green-guides/greenguidesstatement.pdf, at 258.

[33] *FTC Sends Warning Letters to Companies Regarding Diamond Ad Disclosures*, FTC (Apr. 2, 2019), https://www.ftc.gov/news-events/news/press-releases/2019/04/ftc-sends-warning-letters-companies-regarding-diamond-ad-disclosures.

experiences, and various NGO partnerships, to consistently position Paper Products as an environmentally sustainable choice for consumers. Layered and integrated marketing are strategies that use multiple channels to promote a brand or convey a net impression or message. These channels, or "vehicles," can include packaging, social media, ads, content, and digital or live events. Layered and integrated marketing practices are especially effective in establishing credibility and conveying a consistent and unified message to consumers over time.

243. Below, Vice President of Family Care Communications and P&G Responsible Sourcing, Tonia Elrod, explains that P&G relies on the "Charmin Brand Ambition" to consistently disseminate the Deceptive Claims under the umbrella of Keep Forests as Forests.[34]




[34] *Webinar on Promoting Consumer Engagement with Forest Sustainability*, FSC INTERNATIONAL (Nov. 19, 2021), https://www.youtube.com/watch?v=BFB0J3jQlkw.

**2. P&G makes three Deceptive Claims via its Protect-Grow-Restore messaging and logo.**

244. A key part of the Keep Forests as Forests campaign consists of three promises P&G makes to consumers via the Protect-Grow-Restore logo. The Protect-Grow-Restore logo is uniformly printed in a prominent place on all P&G Paper Products. For its "Protect" promise, P&G conveys the net impression that P&G actively safeguards forests from harm by sourcing pulp only from suppliers that preserve forest integrity. Reasonable consumers understand this to mean that P&G's supply chain excludes suppliers actively engaged in unnecessarily destructive practices such as clearcutting and burning. For its "Grow" promise, P&G promises that for every tree used by P&G, at least two are regrown in its place.[35] This conveys to reasonable consumers the net impression that the company is mitigating the environmental harm caused by its harvesting of wood pulp by eventually replacing the ecological value of the forest harvested via thoughtful and effective replanting efforts. For its "Restore" promise, P&G touts its partnership with the Arbor Day Foundation to plant one million trees in forests affected by natural disasters. This promise conveys to reasonable consumers the net impression that P&G supply chain is adding to the global tree canopy by planting trees in additional areas outside of its sourcing activities. This, in turn, implies to consumers that the purchase of a P&G Paper Product is either environmentally neutral or a net environmental benefit.

[35] *Friend of the Forest Award 2018 | Charmin & Arbor Day Foundation*, CHARMIN, https://youtu.be/DPMpB_ZmC4U, at 1:01.

**3. P&G makes two additional Deceptive Claims via its use of the third-party FSC logo and RA logo.**

245. Companies who work with the FSC are entitled to display various FSC logos to reflect the company's commitment to various levels of responsible forest management. The unqualified FSC logo looks like this:

246. The pictures below are from the front packaging for Charmin Ultra Strong toilet paper (upper left), Charmin Ultra Soft Mega size (upper right), Charmin Ultra Soft toilet paper standard size (bottom left), and Charmin Ultra Gentle (bottom right). The unqualified FSC logo[36] is prominently and unambiguously printed on the front of each Charmin package at point-of-sale:













[36] The front packaging images below show the FSC logo with a small symbol on the top right-hand side. This symbol is typically an "R" or "TM" symbol signifying that the FSC logo is subject to trademark rights. The symbol is, importantly, not an asterisk, nor is it any other type of symbol used to communicate a material qualification or limitation to consumers.

247. Reasonable consumers interpret the unqualified FSC logo on the front of Charmin Toilet Paper packaging as unambiguously representing that Charmin Toilet Paper is made from pulp exclusively derived from FSC-certified forests; and in turn, Charmin Toilet Paper is a more sustainable choice when compared to other brands that do not have the unqualified FSC logo. Moreover, there are no qualifications, disclaimers, or asterisks on the front of the package that would create any ambiguity as to the content of the wood pulp in Charmin Toilet Paper that would cause a reasonable consumer to necessarily review the back of the package for more information. But as explained more fully below, P&G's use of this logo and its associated meaning is deceptive, as only fraction of P&G's pulp is FSC-certified at all, and a still even smaller fraction of pulp is derived from FSC-certified forests.

**4. P&G communicates the Deceptive Claims consistently and pervasively at point-of-sale for all P&G Paper Products.**

**a. Charmin packaging uniformly includes the Deceptive Claims.**

248. The below pictures are from the back of Charmin Ultra Strong toilet paper (upper left), Charmin Ultra Soft Mega size (upper right), Charmin Ultra Soft toilet paper standard size (bottom left), and Charmin Ultra Gentle (bottom right). The Protect-Grow-Restore logo and Rainforest Alliance logos are included on each package at point-of-sale:











**b. Puffs Tissues packaging also uniformly displays the same Deceptive Claims.**

249. The below pictures show boxes of Puffs Plus Lotion and Puffs Ultra Soft tissues. The unqualified FSC logo is prominently displayed on the front of each of the packages. The Rainforest Alliance logo and the Protect-Grow-Restore logo are also uniformly displayed on each Puffs Tissues package. These messages and certifications on the Puffs Tissues packaging imply the same net impression as the messages and certifications on the Charmin Toilet Paper packaging.












**5. P&G also supplies identical iterations of the Deceptive Claims to national retailers to use at their digital point-of-sale locations.**

250. P&G also relies on a robust network of retailers to make Paper Products available for sale in all 50 states and territories via their online selling platforms. In so doing, P&G drastically increases the reach of its Protect-Grow-Restore and other Keep Forests as Forests messaging. According to the websites of these retailers, manufacturers like P&G are responsible for supplying the images, layout, "product detail", and "thumbnail" information to market the product on the retailer's webpage[37]. Below are examples from some of the nation's leading retailers consistently displaying these Protect-Grow-Restore and Keep Forests as Forests messages, which helps position P&G to be perceived as an environmental steward.

**a. Kroger Point-of-Sale Listing for Charmin Ultra Strong Toilet Paper[38]**

251. This Kroger listing depicts a listing for Charmin Ultra Strong Toilet Paper for sale on Kroger's website. As seen below, P&G continues to prominently show the unqualified FSC logo on the front of the package. And in the Product Details section, P&G reiterates its Protect-Grow-Restore message while also stating that "all our pulp used is 100% FSC-certified" and "we plant two trees for every one used." According to P&G "that's how we're helping keep forests, forests."

[37] For example, Wal-Mart states: "[M]anufacturers, suppliers, and others provide [product details] you see here" https://www.walmart.com/ip/Charmin-Toilet-Paper-Ultra-Strong-6-Mega-Rolls/6340416223?athcpid=6340416223&athpgid=AthenaItempage&athcgid=null&athznid=si&athieid=v0_eeMjAwLjQ0LDExNjI0Ljk4LDAuMDE2NDM2NjE5MTg0MjA0NzgsMC41Xw&athstid=CS055%7ECS004&athguid=xi94_WDdRt5RkEx6_lZOC15dXFqTRO13J0NL&athancid=6137370255&athposb=0&athena=true&athbdg=L1102&sid=9bf7f8a9-c91c-4fc2-8f7c-7ae18ae5e1bd (last accessed Sept. 8, 2025).

[38] Kroger, https://www.kroger.com/p/charmin-ultra-strong-toilet-paper-231-sheets-roll-32-rolls-/0003077208632 (last accessed Jan. 15, 2025).

**Product Details**




Get sparkly clean with Charmin Ultra Strong. Its 4X stronger when wet and has a diamond-weave texture. Its woven like a washcloth and holds up when you wipe. It even cleans better so you can use less and go longer without changing the roll. We also made it MEGA in size, so you get mega value. Thats right, our Charmin Ultra Strong Mega Roll is way bigger, equals 4 regular rolls, and its more bang for your behind so youll be running back to the store less and less (based on number of sheets in Charmin Regular Roll bath tissue). Our Charmin Ultra Strong toilet paper is also 2-ply and designed to be clog-safe and septic-safe so you can flush confidentially and keep clean. And at Charmin, we love trees so we work hard to protect, grow and restore forests. Its why all our pulp used is 100% FSC certified. Its why we plant two trees for every one used. And its why we help to restore forests devastated by natural disaster through the Arbor Day Foundation. Thats how were helping keep forests, forests. We all go, why not Enjoy The Go with Americas favorite toilet paper.

**b. Walmart Point-of-Sale Listing for Charmin Ultra Strong Toilet Paper[39]**

252. This Walmart listing depicts a listing for Charmin Ultra Strong Toilet Paper for sale on Walmart's website. It is almost identical to the Kroger listing above. Again, P&G continues to prominently show the unqualified FSC logo on the front of the package. And in the Product Details section, P&G reiterates its Protect-Grow-Restore message while also stating that "all our pulp used is 100% FSC-certified" and "we plant two trees for every one used." The claim that P&G is "helping keep forests, forests" is also reiterated.




Product details

Get sparkly clean with Charmin Ultra Strong. It's 4X stronger when wet* and has a diamond-weave texture. It's woven like a washcloth and holds up when you wipe. It even cleans better so you can use less* and go longer without changing the roll**.

We also made it MEGA in size, so you get mega value. That's right, our Charmin Ultra Strong Mega Roll is way bigger, equals 4 regular rolls, and it's more bang for your behind so you'll be running back to the store less and less (based on number of sheets in Charmin Regular Roll bath tissue). Our Charmin Ultra Strong toilet paper is also 2-ply and designed to be clog-safe and septic-safe so you can flush confidentially and keep clean.

And at Charmin, we love trees so we work hard to protect, grow and restore forests. It's why all our pulp used is 100% FSC certified. It's why we plant two trees for every one used. And it's why we help to restore forests devastated by natural disaster through the Arbor Day Foundation. That's how we're helping keep forests, forests. We all go, why not Enjoy The Go with America's favorite toilet paper***.

[39] Walmart, https://www.walmart.com/ip/Charmin-Ultra-Strong-Toilet-Paper-231-Sheets-Roll-32-Rolls/6137370255?wmlspartner=wlpa&selectedSellerId=102537451&sid=4818cbef-50ce-4890-a9f2-f1917941ff93 (last accessed Jan. 15, 2025).

**c. Costco Point-of-Sale Listing for Charmin Ultra Soft Toilet Paper[40]**

253. This Costco listing depicts a listing for Charmin Ultra Soft Toilet Paper for sale on Costco's website. As seen below, Charmin continues to prominently show the unqualified FSC logo on the front of the package. The back of the package also includes the Protect-Grow-Restore logo, which also directs consumers to Charmin's Sustainability Promise website. And as with the Kroger listing, this Costco listing makes the same Protect-Grow-Restore promises in the Product Details section of the listing. The visual thumbnails displayed next to a picture of Charmin Toilet Paper profiles the unqualified FSC logo, the Protect-Grow-Restore logo and a statement that "100% of our paper comes from responsibly managed forests."







[40] Costco, https://www.costco.com/charmin-ultra-soft-bath-tissue%2C-2-ply%2C-213-sheets%2C-30-rolls.product.4000221238.html (last accessed Jan. 15, 2025).




**d. Lowe's Point-of-Sale Listing for Charmin Ultra Soft Toilet Paper[41]**

254. This Lowe's website listing for Charmin Ultra Soft Toilet Paper contains the same unqualified FSC logo prominently displayed on the front of the package and includes the same Protect-Grow-Restore promises in the Product Features section of the listing. The thumbnails displayed next to the photograph of the product have the same FSC-certified claims and states that "100% of our paper comes from responsibly managed forests." In addition, this Lowe's listing also highlights P&G's promise to "regrow two trees for every one used."

[41] https://www.lowes.com/pd/Charmin-Ultra-Soft-Super-Mega-12-Pack-2-ply-Toilet-Paper/5014633869 (last accessed Jan. 15, 2025).







Charmin Beyond The Roll










**FSC™ Certified**

We only use pulp certified by the Forest Stewardship Council® and support FSC® in their work to increase adoption of FSC products. These standards ensure that we are protecting wildlife and contributing to thriving local communities.

**Protect, Grow and Restore**

At Charmin, we are committed to making our toilet paper work hard to make a sustainable difference. 100% of our paper comes from responsibly managed forests.

**Forest Restoration**

P&G and Charmin are partnering with the Arbor Day Foundation to plant 1 million trees in forests affected by natural disasters, like wildfires or hurricanes.

### e. Amazon's Point-of-Sale Listing for Charmin Ultra Gentle Toilet Paper[42]

255. This Amazon website listing for Charmin Ultra Gentle Toilet Paper contains the same unqualified FSC logo prominently displayed on the front of the package and the same FSC-certified thumbnails and includes the same Protect-Grow-Restore promises in the Product Features section of the listing.

[42] Amazon, https://a.co/d/2ldcVhu (last accessed Sept. 8, 2025).




## From the manufacturer

### Charmin Beyond The Roll




**FSC™ Certified**

We only use pulp certified by the Forest Stewardship Council® and support FSC® in their work to increase adoption of FSC products. These standards ensure that we are protecting wildlife and contributing to thriving local communities.




**Protect, Grow and Restore**

At Charmin, we are committed to making our toilet paper work hard to make a sustainable difference. 100% of our paper comes from responsibly managed forests.




**Forest Restoration**

P&G and Charmin are partnering with the Arbor Day Foundation to plant 1 million trees in forests affected by natural disasters, like wildfires or hurricanes.

### f. Charmin.com Point-of-Sale Listing for Charmin Ultra Soft Mega XL Roll

256. This listing is from the P&G controlled Charmin.com[43] contains the same unqualified FSC logo prominently displayed on the product details page and includes the same Protect-Grow-Restore promises in the selected thumbnail photographs. Charmin.com also directs consumers to purchase the Paper Products either online or in-store at national retailers:







43 https://www.charmin.com/en-us/shop-products/ultra-soft-toilet-paper-mega-xl-roll (last accessed on Sept. 9, 2025).

**g. Puffs Tissues digital point-of-sale listings also contain the same logos and environmental representations.**

257. P&G also makes available for sale Puffs Tissues products using the same robust network of storefront and digital retailers it uses for Charmin products. P&G also supplies information for Paper Products to these retailers, with the expectation that this information be included on the digital point-of-sale website. As with Charmin, the Puffs' point-of-sale listings for digital retailers also contain the same Deceptive Claims that help position Puffs Tissues to be perceived by consumers as an environmentally responsible product.

258. For example, this Amazon listing[44] for Puffs Ultra Soft facial tissues for sale on Amazon's website contains the same unqualified FSC logo prominently displayed on the front of the package. It also contains a Puffs Sustainability Promise:







[44] Amazon, https://a.co/d/7gRK2fP (last accessed Sept 8, 2025).

259. Similarly, below is Target's digital point-of-sale listing[45] for Puffs Plus Lotion. This listing also prominently shows the unqualified FSC logo on the front of the Puffs package. And under information supplied in the "By the Brand" section include thumbnails that articulate Puffs Sustainability Promise:







[45] Target, https://www.target.com/p/puffs-plus-lotion-facial-tissue/-/A-84780543?preselect=94370770#lnk=sametab (last accessed May 23, 2025).

### 6. The net impression of the Deceptive Claims is that a P&G Paper Product represents an environmentally sustainable choice.

260. P&G created the Keep Forests as Forests campaign to convey a net impression to consumers that P&G is taking measurable steps towards actively minimizing, neutralizing, if not reversing, the environmental harm associated with harvesting the pulp for Paper Products.

261. Charmin Toilet Paper and Puffs tissue products are substantially similar in that the pulp sourced for these products is derived from the same supply chain. They are also substantially similar as they are each premium, single-use, tissue products that emphasize softness and durability. And as described in detail below, these Paper Products are all substantially similar because all packaging for Charmin Toilet Paper and Puffs Tissue uniformly include the same Deceptive Claims while excluding the Common Omissions.

## F. P&G also directs consumers to its Sustainability Promise websites which reiterates the Deceptive Claims because P&G knows these claims are material to consumers.

262. P&G knows that the Deceptive Claims are material to reasonable consumers because P&G created and currently maintains a "Charmin Sustainability Promise website."[46] P&G's packaging also directs consumers to this website, which prominently features three videos with the Protect-Grow-Restore message:

[46] Charmin, https://www.charmin.com/en-us/sustainability (last accessed May 23, 2025).




## SUSTAINABILITY

We are committed to helping keep forests as forests.
That's why we:



### PROTECT

We only use pulp certified by the Forest Stewardship Council® and support FSC® in their work to increase adoption of FSC products. These standards ensure that we are protecting wildlife and contributing to thriving local communities.



### GROW

For every tree used, at least two are regrown in its place.




### RESTORE

P&G and Charmin are partnering with the Arbor Day Foundation to plant 1 million trees in forests affected by natural disasters, like wildfires or hurricanes.

**1. The "Protect" video depicts FSC-certified forests in the United States that are owned by small landowners who follow FSC responsible forest management guidance.**





263. The caption next to the "Protect Video" states that P&G only uses pulp certified by the FSC. The video also features P&G employee and Papermaking Materials Leader Lois Forde-Kohler, who states: "When you see an FSC logo on a Charmin package, you know that we are working with suppliers to bring their products to us in a sustainable, responsible way. They have foresters who have the best forest management plans, including replanting, in order to continue to 'Keep Forests as Forests.'"

**2. The "Grow" video prominently displays the unqualified FSC logo, the RA Certified logo, and reiterates P&G's promise to replant at least 1-2 new trees for every tree used in P&G Paper Products.**






264. The "Grow Video" on the Charmin Sustainability Promise website also depicts the FSC-certified label on the front of a Charmin package while stating that Charmin wood pulp

is sourced from "responsibly managed forests, which means for every tree [Charmin] uses in its products a new one is planted in its place."[47]

**3. The "Restore" video promises that P&G will help plant 1 million trees between 2020 and 2025 in areas devastated by natural disasters.**







265. The "Restore Video" also states: "replanting efforts must involve thinking into the future 20 years, 50 years, 100 years out so you are planting it for the next generation."

**4. P&G also maintains an additional Sustainability Promise website for its Puffs Tissues products with the identical Deceptive Claims.**

266. Like Charmin, P&G maintains a website for its Puffs products entitled "Puffs Sustainability Promise" which promises consumers that "we are committed to helping keep forests as forests" and reiterates the same Protect-Grow-Restore representations as is does with Charmin.[48] P&G maintains this website because it knows that the information contained therein in material to reasonable consumers. This webpage is depicted below:

---

[47] *Friend of the Forest Award 2018 | Charmin & Arbor Day Foundation*, CHARMIN, https://youtu.be/DPMpB_ZmC4U, at 1:01.

[48] *Puffs Sustainability Promise*, https://puffs.com/en-us/experience-main-section/sustainability (last accessed May 23, 2025).


Puffs
SAVE
BUY
DISCOVER
Home > Sustainability
Puffs Sustainability Promise
We are committed to helping keep forests as forests. That's why we:
Protect
We only use pulp certified by the Forest Stewardship Council® and support FSC® in their work to increase adoption of FSC products. These standards ensure that we are protecting wildlife and contributing to thriving local communities.
Grow
For every tree used, at least two are regrown in its place.
Restore
We are partnering with conservation organizations to help restore forests and protect wildlife.

**5. P&G also produced a viral Protect-Grow-Restore YouTube video repeating the Deceptive Claims.**




267. In 2022, Charmin also created a Protect-Grow-Restore YouTube video that, as of January 14, 2025, has been viewed over 58.3 million times.[49] While exclaiming that "we LOVE trees" P&G also reiterates the following claims to consumers: "we protect forests by using pulp certified by the Forest Stewardship Council"; "we regrow at least two trees for every tree we use"; and "Charmin helps restore trees through the Arbor Day Foundation, so you can enjoy the go, but forests remain forests." P&G created this video as it knows that this information is material to reasonable consumers.

**G. P&G also touts its environmental messaging and enforcement promises to investors.**

268. P&G also touts its environmental messaging in its investor relations materials. For example, in its 2023 Citizenship Report, P&G states: "We are committed to responsible sourcing

[49] Charmin, https://www.youtube.com/watch?v=9WARhjajugQ (last accessed Jan. 14, 2025).

of key commodities like wood pulp, palm oil and paper packaging together with respecting human, labor and land tenure rights in our supply chains. We are also going beyond responsible sourcing to help restore and protect landscapes near our existing supply chains and invest in natural climate solutions that can remove and store more carbon."[50] Similarly, on the "Mapping Our Impact" and "Environment – Pulp" webpages on P&G's investor relations website, P&G states that "[w]e are committed to no deforestation in our wood pulp, paper packaging, and palm supply chains and are delivering on our responsible sourcing goals."[51] And in P&G's 2022 Forestry Update, P&G stated that it was going to "hold[] our Suppliers to Higher Standards" by emphasizing that its "Wood Pulp Sourcing Policy does not allow deforestation or forest conversion."[52]

269. Finally, P&G maintains a "Wood Pulp Grievance Tracker," claiming it has "criteria related to the following topics: no illegal logging, conversion, deforestation, or degradation, protection of high conservation value areas, respect for human and labor rights, free, prior, and informed consent for Indigenous Peoples, and minimum forest certification."[53]

### H. P&G's Keep Forests as Forests campaign, and the Deceptive Claims, are misleading due to certain Common Omissions.

270. P&G statements about its environmental sustainability efforts mislead reasonable consumers because P&G does not disclose the following Common Omissions: (1) P&G is not protecting forests as its P&G Paper Products are made with virgin forest fiber derived from the

---

[50] P&G Environmental-Nature webpage, https://www.pginvestor.com/esg/environmental/forestry/default.aspx (last accessed Jan. 15, 2025).

[51] *Id.*

[52] *Procter & Gamble: Protecting Forests for Generations to Come* (Sept. 23, 2022), https://us.pg.com/blogs/pg-responsible-sourcing-2022/.

[53] *Id.*

industrial clearcutting and burning of previously untouched old-growth forests; (2) P&G is not growing forests as its replanting efforts are designed to convert these old-growth forests into industrial tree crops which are ultimately capable of reproducing but a small fraction of the original ecological value; (3) P&G is not restoring forests as its total restoration efforts impact an area less than 1% of untouched old-growth forest lost each year to industrial logging practices; (4) a large portion of the pulp used in P&G Paper Products is *not* FSC certified at all, and even for pulp that is FSC Mix certified, that pulp actually contains very little to no FSC forest-certified material; and, (5) the Rainforest Alliance "Forest Allies" logo does not convey any type of third-party certification reflective of responsible forestry standards.

**1. P&G's "Protect" promise misleads consumers because P&G does not disclose that its Paper Products are sourced from harvests that rely on devastatingly harmful industrial logging practices.**

**a. P&G sources most of its wood pulp Canada's boreal forest, an ecological jewel and one of the Earth's untouched old-growth forests.**

271. Canada's boreal forest is known as one of the Earth's last wild places—as it is only one of a handful of areas on the planet primarily populated by centuries-old trees and soils that have never been altered by human activity. Because of these unique characteristics, Canada's boreal forest provides refuge to a wide variety of wildlife, including keystone species such as salmon, black bears, caribou, and snowshoe hares.[54] The boreal is also critical to North America's bird population, serving as the nesting grounds for more than three billion birds, from songbirds to whooping cranes to the great gray owl.[55] The boreal forest is also home to an extensive range of mammals, insects, fungi, and microorganisms.

---

[54] *You've Heard Charmin's Spin, Now Here Are the Facts*, NRDC (Aug. 2020) https://www.nrdc.org/sites/default/files/pg-charmin-boreal-truths-fs.pdf.

[55] Dana Kobilinsky, *Forest Degradation in Canada Causes Bird Decline*, THE WILDLIFE SOCIETY (May 3, 2022), https://wildlife.org/forest-degradation-in-canada-causes-bird-decline/.



272. Primary forests are also responsible for storing around 30-40% of the earth's land-based carbon. Because of their cold climate and slow decomposition rates, boreal forests accumulate large amounts of carbon in their soil and peat, making them one of the largest terrestrial carbon sinks on Earth.[56] Indeed, the boreal forest can store twice as much carbon per acre as the Amazon rainforest. Thus, changes in the quality and biodiversity of Canada's boreal have significant impacts worldwide.

---

[56] Ronnie Drever, *Primer on Forest Carbon*, NATURE UNITED, https://www.natureunited.ca/what-we-do/our-priorities/innovating-for-climate-change/forest-carbon-boreal-forest/; Beverly Law & William Moomaw, *Old forests are critically important for slowing climate change and merit immediate protection from logging*, THE CONVERSATION (Jan. 19, 2024), https://theconversation.com/old-forests-are-critically-important-for-slowing-climate-change-and-merit-immediate-protection-from-logging-220771; Ian Austen and Vjosa Isai, *Canada's Logging Industry Devours Forests Crucial to Fighting Climate Change*, THE NEW YORK TIMES (Jan. 4, 2024), https://www.nytimes.com/2024/01/04/world/canada/canada-boreal-forest-logging.html.





273. Intact forest landscapes ("IFLs") represent areas of primary forests that are at least 500 km squared. According to scientists, primary forests, inclusive of IFL's, are recognized as being irreplaceable in terms of biodiversity, carbon storage, and provision of ecosystem services.[57]

274. Governmental and environmental researchers can measure and closely monitor the impact of industrial logging operations on the overall health of the boreal forest. For example, caribou habitat is used by environmental researchers as a reliable proxy for the overall health of the boreal forest, due to the caribou's dependence on mature, undisturbed forests and their sensitivity to environmental changes within this unique ecosystem. And studies show significantly reduced boreal caribou ranges within the forests being logged[58] to supply the mills in P&G's supply chain.[59]

---

[57] Julia E. Fa et al., *Importance of Indigenous Peoples' Lands for the Conservation of Intact Forest Landscapes*, 18 *Frontiers in Ecol. & Env't* 135 (2020), https://doi.org/10.1002/fee.2148.

[58] Courtenay Lewis & Ashley Jordan, *By a Thousand Cuts: How Powerful Companies' Wood Sourcing is Degrading Canada's Boreal Forest*, NRDC (Apr. 2021), https://www.nrdc.org/sites/default/files/thousand-cuts-wood-sourcing-canadas-boreal-report.pdf.

[59] P&G's suppliers include Aditya Birla's AV Terrace Bay mill, Domtar's Dryden mill, and Resolute Forest Products' Thunder Bay mill. Based on the most recent available Forest Management Unit (FMU) annual reports, these mills receive pulp from the following areas: Black Spruce Forest, English River Forest, Lac Seul Forest, Lake Nipigon Forest, Kenogami Forest, Red Lake Forest, Trout Lake Forest, and Whiskey Jack Forest. According to each of the Ontario Integrated Range Assessment Reports, these FMUs overlap with the Berens, Brightsand, Nipigon, and Sydney boreal caribou ranges, each of which is are declining according to Ontario

**b. Deforestation practices and Forest Degradation practices each incorporate the same industrial logging activities that permanently devastate the health of Canada's boreal forest.**

275. The terms "Deforestation" and "Forest Degradation" are often used interchangeably by consumers but are distinct terms. Understanding the difference is important because conflating them can be misleading when accurately assessing the health of forest ecosystems or the overall impact of certain logging activities.

276. Deforestation is a highly technical term that refers to the complete clearing of a forest in order to permanently permit something else in its place—like agricultural farming, urban development or mining operations.[60] Deforestation often also requires an official and permanent change in the land use classification by a governmental entity. Currently, most "Deforestation" occurs in the tropics where the forest is replaced with cattle ranges or industrial crops such as soy and palm oil.

277. In contrast, "Forest Degradation" involves slightly less tree removal than deforestation but still results in substantial declines in forest quality or ecosystem value. And because suppliers do not remove the entire forest, they do not have to petition the government to permanently change the land use classification for the area. Thus, Forest Degradation is

government reports. *See You've Heard Charmin's Spin, Now Here Are the Facts*, NRDC (Aug. 2020), https://www.nrdc.org/sites/default/files/pg-charmin-boreal-truths-fs.pdf (note 4).

[60] According to the United Nations' Food and Agricultural Organization, the term "deforestation" means "conversion of forest to other land use independently of whether human-induced or not." *The State of the World's Forests 2022*, Food and Agriculture Organization of the United Nations, https://openknowledge.fao.org/server/api/core/bitstreams/8f599970-661d-45f5-a598-2ea46ca1605f/content/src/html/deforestation-land-degradation.html.

prevalent in Canada's boreal forest and, according to researchers, is a dominant practice in the lands harvested for the wood pulp that P&G relies on to make its Paper Products.[61]

278. Importantly, Forest Degradation practices can be equally devastating to the ecosystem of a forest as Deforestation practices. For example, under a Forest Degradation practice, loggers are permitted to bulldoze roads into forests, extract as many high-value trees as possible, and drag the wood back out of the forest to sell. As such, forest degraded via unsustainable logging will have substantially similar characteristics as deforested forest, including: the existence of bare clearings, a spiderweb of roads, ravaged vegetation and undergrowth, and trenches carved into the forest floor. Below is a comparison between lands subject to Deforestation versus Forest Degradation.[62]




279. Although equally devastating to the long-term health of primary and old-growth forests, Forest Degradation unfortunately often goes underreported even though its long-term impacts on biodiversity, carbon storage, and ecosystem health can be just as severe. And

---

[61] *The State of the Forest in Canada: Seeing through the Spin* (January 2024), https://static1.squarespace.com/static/65979bff5ba3be76d68786da/t/65a798ffa51dad62eedc3657/1705482499707/State-of-the-Forest-in-Canada-Jan-2024.pdf.

[62] *Id.*

therefore, policies that ignore Degradation also overlook a major part of forest decline or give a false impression of progress. Forest Degradation is also a stepping-stone to deforestation. Once one logging company starts making roads deep into a forest, others follow.

280. As more than 100 scientists wrote to the signatories of the Glasgow Leaders' Declaration on Forests and Land Use:[63]

> Whether examining degradation through the lens of carbon storage, native species habitat, ecological complexity, water filtration and other services, or even future timber value, the industrial logging[, particularly clearcutting,][64] of primary forests invariably depletes or mars the forest's original characteristics, no matter the subsequent forest regeneration practices…As a clear and egregious example of forest degradation, the commercial logging of primary forests is incompatible with achieving the preservation of a safe climate and stable biodiversity.

**c. P&G promises "no deforestation" while also misleading consumers as to the extent of the harm caused by the Forest Degradation practices in the Paper Products supply chain.**

281. P&G consistently states that it is committed to no deforestation in its supply chain. For example, P&G publicly discloses its "Forest Commodities Policy" that it is "committed to no deforestation and no exploitation in our forest supply chains."[65] But, by relying on an extremely narrow technical definition of Deforestation P&G can skirt accountability for industrial practices such as clearcutting and burning, like those pictured below, as long as the area does not permanently change its land use designations.

---

[63] *Letter from Scientists to the Signatories of the Glasgow Leaders' Declaration on Forests and Land Use*, NRDC (Nov. 16, 2022), https://www.nrdc.org/sites/default/files/media-uploads/scientists_letter_to_glasgow_declaration_signatories_nov_2022_final.pdf.

[64] More than 90% of industrial logging in Canada is through clearcutting. *See Forest Area Harvested on Private and Crown Lands,* National Forestry Database, http://nfdp.ccfm.org/en/data/harvest.php, (last visited July 24, 2025).

[65] P&G's Forest Commodities Policy (May 2023), https://s1.q4cdn.com/695946674/files/doc_downloads/esg/2023/P-G-Forest-Commodities-Policy-May-2023.pdf.

282. Below are some documented results of harvesting practices that are consistent with P&G's "no deforestation" policy, although any reasonable consumer would understand these practices—which transform carbon-rich and old-growth forests into clearcuts and young tree plantations—are consistent with the colloquial meaning of deforestation as understood by the reasonable consumer.







**2. P&G's "Grow" promise is misleading because P&G's suppliers are systematically converting untouched old growth forests into industrial tree crops.**

283. P&G's Grow messaging about replanting 1-2 trees for every tree used in its products misleads reasonable consumers to believe that its Paper Products suppliers are replacing the specific boreal forest areas logged with replanting activities that will eventually recreate the same ecological value that was present before P&G's harvesting occurred. *See,* § IV.F.1-5, *supra*. But P&G fails to disclose that, in reality, its suppliers are replanting single-species conifers, evenly spaced, and with even ages. In other words, instead of an untouched old-growth

forest with an intact ecosystem, the boreal forest is being converted into monoculture tree crops. P&G's suppliers also spray chemical herbicides like aerial glyphosate spray (a key ingredient in Monsanto's Roundup product) to intentionally eliminate all growth other than just a handful of tree species most valuable for logging.[66] These tree crops degrade overall forest health, reduce biodiversity and alter the boreal forest's unique structure.[67] Moreover these tree crops have exponentially less carbon storage capability.[68]

284. Below are photographs of a Paper Products supplier's replanting efforts in the Waibigoon area in Northern Ontario after clearcutting the area several years ago. These photographs are a far cry from the lush, dense, forests depicted by P&G as part of its Grow promise. Even worse, this area has already been designated with a slash pile burn plan in 2025, which means that this permanently destructive cycle will begin again. For these reasons, P&G's commitment to Keep Forests as Forests is egregiously misleading.



[66] *How Glyphosate Herbicide is Used to Poison Forests – And What You Can Do*, GREENPEACE (July 29, 2021), https://www.greenpeace.org/canada/en/story/49427/how-glyphosate-herbicide-is-used-to-poison-forests-and-what-you-can-do/.

[67] Charlie Jaay, *Monoculture, for-profit plantations, and the health of forests*, AIR QUALITY NEWS (Dec. 1, 2022), https://airqualitynews.com/features-opinion/monoculture-for-profit-plantations-and-the-health-of-forests/.

[68] Sarah Ruiz, *What you should know about protecting the United States' old forests*, WOODWELL CLIMATE RESEARCH CTR. (June 1, 2023), https://www.woodwellclimate.org/protect-us-mature-and-old-growth-forests/.

285. Also below is an example of some of the trees ostensibly replanted as part of P&G's "Grow" promise. For the wildlife left behind after the clear-cutting activities, these saplings provide little use for years and won't provide the same ecological value or biodiversity benefits for at least a few more decades (unless, of course, P&G suppliers decide to clear cut the area again).



**3. P&G's "Restore" promise is misleading as P&G intends to replace less than 1% of lands harvested in Canada's boreal forests.**

286. Finally, regarding its "Restore" promise, P&G touts its partnership with the Arbor Day Foundation to plant a total of one million trees in forests affected by natural disasters. But studies show that one million **acres of trees** are clearcut from Canada's boreal forests each year.[69]

287. Assuming that there are approximately 100-200 trees per acre of boreal forest, that means that P&G's restoration efforts impact an area less than 1% of boreal forest lost each year to industrial logging practices.

---

[69] *Threatened by logging, the boreal forest needs our help*, ENVIRONMENT AMERICA (Sept. 27, 2022), https://environmentamerica.org/articles/threatened-by-logging-the-boreal-forest-needs-our-help.

**4. P&G also misleads consumers at point-of-sale with improper use of the FSC logo.**

288. Below is an infographic from the FSC showing which logos and statements a company should use to reflect the appropriate level of commitment to responsible for forest management:




289. As explained below, P&G makes two deceptive claims to consumers.

**a. P&G's statement that its Paper Products pulp is 100% FSC certified is false.**

290. P&G consistently and unambiguously uses the unqualified FSC logo on its front package, which leads reasonable consumers to believe that the entire product shares the same environmental benefit. P&G also claims 100% of its pulp is FSC certified:

**Product Details**




Get sparkly clean with Charmin Ultra Strong. Its 4X stronger when wet and has a diamond-weave texture. Its woven like a washcloth and holds up when you wipe. It even cleans better so you can use less and go longer without changing the roll. We also made it MEGA in size, so you get mega value. Thats right, our Charmin Ultra Strong Mega Roll is way bigger, equals 4 regular rolls, and its more bang for your behind so youll be running back to the store less and less (based on number of sheets in Charmin Regular Roll bath tissue). Our Charmin Ultra Strong toilet paper is also 2-ply and designed to be clog-safe and septic-safe so you can flush confidentially and keep clean. And at Charmin, we love trees so we work hard to protect, grow and restore forests. Its why all our pulp used is 100% FSC certified. Its why we plant two trees for every one used. And its why we help to restore forests devastated by natural disaster through the Arbor Day Foundation. Thats how were helping keep forests, forests. We all go, why not Enjoy The Go with Americas favorite toilet paper.

291. These statements are deceptive because P&G acknowledges in its own Forestry Practices report that "the availability of FSC-certified pulp [in Canada] is insufficient to meet the demands of our industry."[70]

292. And because it is impossible for 100% of Paper Products pulp to be derived from FSC-certified forests, P&G now relies on wood pulp certifications from other third-party certifiers such as the Sustainable Forestry Initiative ("SFI") and the Programme for the Endorsement of Forest Certification ("PEFEC"). SFI was founded in 1994 by the American Forest & Paper Association, a wood and paper products trade association, while PEFC was initially founded by forest owners.

293. SFI has been the target of multiple FTC complaints because it is substantially governed and financed by the timber industry and its ambiguous forestry standards are developed and approved by timber industry personnel in a closed process.[71] In addition, the Competition

[70] P&G Forestry Practices Report (Mar. 2021), https://s1.q4cdn.com/695946674/files/doc_downloads/esg/2021/ForestryPracticesReport_FINAL-TO-POST-MARCH-2021-Updated.pdf.

[71] *RELEASE: ForestEthics Files Complaint in Federal Trade Commission (FTC) Charging that the "Sustainable Forestry Initiative" Violates FTC's New Green Guides*, ENVIRONMENTAL PAPER NETWORK (May 28, 2013), https://environmentalpaper.org/2013/05/release-forestethics-

Bureau (an independent law enforcement agency established by the Government of Canada) launched an official investigation into the Sustainability Forestry Initiative in 2023 to determine whether SFI is falsely claiming its logging practices are sustainable.

294. Not surprisingly then, both SFI and PEFEC have been criticized as weak[72] and ineffective[73] at certifying and enforcing responsible forest management practices. Because of these issues, Defendant's reliance on SFI and PEFEC certifications to convey a net impression of independent certification of responsible forest management is deceptive.

**b. P&G's use and placement of the FSC Mix logo is also misleading.**

295. Due to the lack of FSC-certified forests in Canada's boreal, P&G also began to rely on the watered-down FSC "CW" (controlled wood) and "CoC" (chain of custody) designations. Both designations allow the use of FSC-certified forest *and* non-FSC-certified forest material in their supply chains. In other words, the CW and CoC designations allow the use of clearcutting and burning. According to both the FSC and section 260.6 of the FTC Green Guides, P&G should display the Mix logo in a clear and prominent place on the *front* of the packaging to not be deceptive. Instead, P&G displays a large unqualified FSC logo in a clear and prominent place on the *front* of Paper Products packaging, while displaying the FSC Mix logo in much smaller font *on the back and bottom* part of the packaging. Compare the prominent placing

---

files-complaint-in-federal-trade-commission-ftc-charging-that-the-sustainable-forestry-initiative-violates-ftcs-new-green-guides/.

[72] *Greenpeace, RAN warn of forest certification greenwash*, GREENPEACE (June 24, 2015), https://www.greenpeace.org/southeastasia/press/591/greenpeace-ran-warn-of-forest-certification-greenwash/.

[73] Dina Ni, *Competition Bureau launches investigation into greenwashing complaint against North America's largest forest certification scheme*, GREENPEACE (Jan. 31, 2023), https://www.greenpeace.org/canada/en/press-release/57244/competition-bureau-launches-investigation-into-greenwashing-complaint-against-north-americas-largest-forest-certification-scheme/.

and large font of the unqualified[74] FSC logo on the front label of Charmin Toilet Paper with the tiny, fine print, FSC Mix logo located on at the bottom of its back label:







296. Moreover, section 260.3(c) also requires claims to be understandable. This means that P&G is required to explain to consumers at point-of-sale that the FSC Mix or CoC designations permit the use of Controlled Wood sources, and that Controlled Wood and CoC designations include pulp that was harvested via clearcutting and burning.

**5. P&G continues to misuse and mislead consumers regarding its RA logos.**

297. In 2016, P&G began sourcing pulp from forests certified by the Rainforest Alliance and started featuring the “Rainforest Alliance Certified” seal on Charmin and Puffs Tissues packages. And even today, P&G continues to use the “Rainforest Alliance Certified” seal when referencing its Charmin and Puffs products on the Charmin Sustainability Promise website.[75] P&G’s continued use of this seal is misleading, however, because P&G does not disclose that the “Rainforest Alliance Certified” seal has been obsolete for years.

---

[74] The symbol on the top right-hand side of the FSC logo on the front of the package is an “R” or “TM” trademark, not an asterisk or any other symbol communicating a qualification or limitation to consumers. *See* note 36, *supra.*

[75] *Webinar on Promoting Consumer Engagement with Forest Sustainability*, FSC INTERNATIONAL (Nov. 19, 2021), https://www.youtube.com/watch?v=BFB0J3jQlkw, at 24:00.

298. According to the Rainforest Alliance, "Rainforest Alliance Certified" was a sustainability certification program and its seal indicated that a product had met rigorous sustainability standards. However, in 2018, the Rainforest Alliances' Certification Unit was acquired by Preferred by Nature and therefore Rainforest Alliance no longer directly certifies businesses against responsible forestry standards. And as of September 30, 2023, the license agreements terminated meaning that businesses are not able to use the Rainforest Alliance Certified seal on the certified products or related promotional materials. [76]

299. In contrast, the "Rainforest Alliance Forest Allies" seal has no certification process. The "Forest Allies" program also does not perform any audits of any parts of the Paper

[76] Kataryzyna Nagrodzka, *Rainforest Alliance Certified seal phase-out for old RA-Cert clients*, Preferred by Nature (Nov. 17, 2021), https://www.preferredbynature.org/news/rainforest-alliance-certifiedtm-seal-phase-out-old-ra-cert-clients.

Products supply chain. Instead, "Forest Allies" is simply a community of practice that supports forest communities located in the tropics.

300. Forest Allies was launched in 2021, and P&G is one of two founding members of this program. As a founding member of Forest Allies, P&G is required to pay annual dues to Rainforest Alliance . In exchange P&G can use a nearly identical seal, for three years at a cost of $250,000 a year.[77] The program materials do not specify how the funds are used, other than stating that the membership fees go towards "projects or locations around the world in need of resources."[78] Further, the Forest Allies program *does not* certify or even audit products. Instead, the program "aims to create long-lasting impact through people and partnerships," without enumerating any definitive actions that the organization takes beyond "annual membership dues" and "participation in bi-annual workshops."[79]

301. Yet P&G continues to use the Rainforest Alliance Certified seal on its Charmin Sustainability Promise website, in direct violation of the Rainforest Alliance policy[80] and uses the near-identical "Forest Allies" seal on its packaging. These practices violate section 260.2 of the FTC Green Guides and are likely deceptive and misleading to consumers.

302. Moreover, because P&G is one of only two founding members of the Rainforest Alliance Forest Allies program, it is unlikely that the program can meet the FTC Green Guide's

---

[77] Milana Nikolova, *P&G accused of "greenwashing" and "misleading" consumers with on-pack sustainability claims*, PACKAGING INSIGHTS (Jan. 22, 2025), https://www.packaginginsights.com/news/pg-accused-of-greenwashing-and-misleading-consumers-with-on-pack-sustainability-claims.html.

[78] *Forest Allies: Join Our Community of Practice*, Rainforest Alliance (Oct. 2020), https://www.rainforest-alliance.org/wp-content/uploads/2020/11/Forest-allies-twopager-final.pdf.

[79] *Id.*

[80] *Using our logo and seal*, Rainforest Alliance (Dec. 11, 2024), https://www.rainforest-alliance.org/business/marketing-sustainability/using-our-logo-and-seal/.

voluntary consensus standard bodies criteria[81] and therefore use of this seal to convey third-party certification is similar to Example 4 of section 260.6 of the FTC Green Guides and likely deceptive and misleading to consumers.

**I. P&G's Keep Forests as Forests campaign and Paper Products packaging violates the FTC Green Guides.**

303. Through packaging, storefront signage, and multilayered marketing practices, P&G's Keep Forests as Forests campaign creates a net impression of environmental stewardship that violates several portions of the FTC Green Guides. Below are some examples of P&G's unqualified environmental claims that convey broad ecological benefits to reasonable consumers without appropriate substantiation.

304. P&G makes the unqualified claim that it helps to "Protect" forests. But P&G does not limit the promise (*e.g.,* "only a portion of our pulp comes from certified sources") or provide definitions for technical terms like FSC Mix, FSC CoC, or Controlled Wood. Without these qualifications, P&G leaves consumers with the broad impression that *all* of its pulp sourcing protects forests. And in truth, only a small fraction of P&G pulp is FSC-certified at all, and the FSC Mix and Controlled Wood status allows for destructive practices such as clearcutting and burning that destroy forests. P&G's unqualified "Protect" claim therefore exaggerates environmental benefits and is deceptive under the FTC Green Guides sections 260.2 ("Interpretation and substantiation of environmental marketing claims"), 260.3(c) ("Overstatement of Environmental Attribute"), and 260.4 ("General Environmental Benefit Claims").

[81] Identified in FN 45 of the FTC Green Guides and originally found in Memorandum for Heads of Executive Departments and Agencies on Federal Participation in the Development and Use of Voluntary Consensus Assessment Activities (Feb. 10, 1998), Circular No. A-119 Revised, Office of Management and Budget, http://www.whitehouse.gov/omb/circulars_a119.

305. P&G's "Grow" or "Regrows" unqualified claim—promising that "for every tree used at least two are regrown in its place"—conveys to reasonable consumers that the company offsets the environmental harm of harvesting wood pulp by replacing the ecological value of the forests it exploits. But P&G does not qualify that the "trees" replanted consist of monoculture crops with only a fraction of the previous ecological value and a limited lifespan before the next harvest. Without these qualifications, consumers reasonably assume that P&G is referring to full ecological replacement over time. This claim parallels Example 3 of section 260.3(c) of the FTC Green Guides ("Overstatement of Environmental Attribute"). Moreover, P&G provides no verifiable evidence to support its promise of regrowing two trees for each one harvested: it does not disclose how or where regrowth occurs, how it is verified, or whether the trees survive to maturity to restore the ecological value lost. Accordingly, P&G's claims violate section 260.2 of the FTC Green Guides, which requires substantiation with scientific evidence *before* such claims are made to the public.

306. As for its "Restore" promise, P&G touts its partnership with the Arbor Day Foundation to plant one million trees in forests affected by natural disasters and conveys to reasonable consumers that P&G supply chain provides a net environmental benefit. But over one million acres of trees are clearcut from Canada's boreal each year. Assuming that there are approximately 100-200 trees per acre of boreal forest, that means that P&G's total 5-years-long promise to replant one million trees represents less than 1% of boreal forest lost to industrial logging practices each year. As such, P&G's "Restore" promise is similar to Example 1 of section 260.3(c) ("Overstatement of Environmental Attribute") and therefore likely to be deceptive and misleading. P&G's conduct also violates the FTC Green Guides sections 260.2

("Interpretation and substantiation of environmental marketing claims") and 260.4 ("General Environmental Benefit Claims").

307. P&G's use of the FSC logo also violates the Green Guides. For example, P&G uses the unqualified FSC logo in a prominent location on its front packaging, even though it acknowledges that only a fraction of Paper Products wood pulp is derived from FSC-certified forests. This is similar to Examples 2, 6, and 7 of section 260.6 ("Certifications and Seals of Approval") of the FTC Green Guides and therefore deceptive and misleading. P&G also delegates the qualifying FSC Mix logo language to the fine print at the bottom/back of Charmin and Puffs packaging. This violates the FSC's own instructions on logo use, as well as the Green Guide guidance at section 260.3(a) to publish any qualifications or disclosures in a clear and prominent area and with understandable language. P&G's certification claims also directly overstate the environmental attribute or benefit of using Paper Products and therefore violates section 260.3(c) ("Overstatement of environmental attribute").

308. P&G also uses the Rainforest Alliance certification logo on its Charmin Sustainability Promise website, and the near-identical Forest Allies logo on its Paper Products packaging, even though the Rainforest Alliance no longer certifies P&G Paper Products. Therefore P&G's claims directly overstate the environmental attribute or benefit of using Paper Products and therefore violates section 260.3(c) ("Overstatement of environmental attribute") of the FTC Green Guides. Similarly, by adopting substantially similar logos on its Paper Products packaging without qualification or disclosure that the Forest Allies programs provides no certification or auditing function, P&G violates section 260.3(a) ("Qualifications and disclosures") as well as section 260.6 ("Certifications and Seals of Approval") of the FTC Green Guides.

309. Collectively, P&G's "Keep Forests as Forests" marketing campaign creates a pattern of unqualified environmental claims that mislead consumers by overstating ecological benefits while omitting critical limitations. Each claim conveys broad assurances—that Charmin protects forests, regrows more trees than it harvests, and restores additional ecosystems completely outside of it supply chains through supplemental tree planting—without disclosing that only a small fraction of pulp is FSC-forest certified (and not derived from clearcutting or burning), that any regrowth consists of ecologically inferior monoculture plantations, or that its reforestation efforts are negligible compared to the ongoing industrial clearcutting P&G relies on to source its pulp. In other words, P&G promises consumers it is committed to "Keep Forests as Forests" but has no intention to "Keep *the Boreal* Forest as *the Boreal* Forest." Under the FTC Green Guides, these unqualified claims carry the highest substantiation burden—which P&G has not met—and therefore each is highly deceptive to reasonable consumers according to the FTC Green Guides.

310. Moreover, almost all of P&G's Greenwashing campaign claims are encompassed in the list of greenwashing tactics commonly used by deceptive marketers:[82]

[82] *What is Greenwashing? Exposing Deceptive Tactics*, FSC (Oct. 7, 2024), https://fsc.org/en/blog/what-is-greenwashing.




- *Vague or unsubstantiated claims*: P&G deceptively claims that it regrows two trees for every one it uses;

- *Hidden trade-offs*: P&G deceptively claims that it regrows two trees for every one it uses;

- *Untrustworthy certifications*: P&G's deceptive use of the obsolete Rainforest Alliance certification logo and the substantially similar logos of the FSC and Rainforest Alliance.

**J. P&G has repeatedly promised to fulfill its promises, or to stop making misleading claims, but has failed to do so.**

311. P&G was previously confronted with its environmentally devastating practices, but so far has refused to acknowledge any responsibility or take any concrete steps to remediate its supply chain practices so they align with P&G's environmental promises to consumers.

312. For example, in October 2019, after giving Charmin Toilet Paper and Puffs Tissues each an "F" for its environmental impact in its annual toilet paper and tissue

sustainability report, the National Resources Defense Council ("NRDC") protested a P&G shareholder meeting to urge the company to stop sourcing its wood pulp from Canada's boreal forest and instead increase its reliance on recycled fibers. Then, in 2020, Green Century Equity Fund called on the company to report on how and whether it can eliminate Deforestation and intact Forest Degradation.[83] According to the Green Century shareholder proposal, P&G "lags on implementing its existing no-deforestation commitment [and] lacks a comprehensive plan to mitigate exposure to deforestation and forest degradation throughout its operations." In response, about 67% of P&G's shareholders voted in favor of the proposal that asked P&G to "issue a report assessing if and how it could increase the scale, pace, and rigor of its efforts to eliminate deforestation and the degradation of intact forests in its supply chains."

313. Since then, P&G's own shareholders (including dozens of descendants of the founders of P&G) have criticized P&G's lack of initiative (let alone progress) in developing an actionable plan. For example, in their September 8, 2023, letter to shareholders, which was filed with the SEC, the P&G descendants wrote that: "the company has delivered weak and internally inconsistent policy and issued statements that obfuscate the continued risk associated with its procurement of forest commodities, leaving the company's actions to address forest risk incoherent and inadequate." Moreover, the P&G descendants also concluded that: "we are deeply concerned that P&G is not effectively communicating a coherent policy regarding the highly material risks caused by supply chain deforestation and forest degradation" and that P&G has "yet to deliver a credible policy and time-bound plan to eliminate deforestation and primary forest degradation."

[83] This vote approving the resolution was all the more stunning as P&G's Board of Directors had recommended that shareholders oppose it.

314. P&G also still lacks an effective enforcement mechanism for non-compliance protocols that transparently articulate what thresholds and metrics it will use to measure compliance and non-compliance with its policies; what supplier actions would trigger supplier suspension or exclusion from the company's supply chain; and what steps a supplier would need to take to re-enter the company's supply chain. Experts agree that without these enforcement tools, any proposed deforestation or degradation mitigation measures would prove ultimately ineffective.[84]

315. As such, P&G has not taken any serious steps, or developed any actionable plan, to measure, evaluate, or improve upon its current supply chain practices.

### K. P&G has actively concealed the truth about its environmental claims from consumers.

316. P&G actively and knowingly concealed from and failed to disclose to Plaintiffs and the Class members that the Paper Products are not environmentally sustainable as described in this Complaint.

317. P&G actively and knowingly concealed and failed to disclose the Common Omissions to Plaintiffs and the Class about the true impact of the Paper Products' supply chain on the environment, as described more fully in paragraphs 11-16, *supra,* and also summarized here: (1) P&G is not protecting forests as its P&G Paper Products are made with virgin forest fiber derived from the industrial clearcutting and burning of previously untouched old-growth forests; (2) P&G is not growing forests as its replanting efforts are designed to convert these old-growth forests into industrial tree crops which are ultimately capable of reproducing but a small fraction of the original ecological value; (3) P&G is not restoring forests as its total restoration

[84] FAO/ITTO publication, https://www.fao.org/4/a0146e/A0146E04.htm.

efforts impact an area less than 1% of untouched old-growth forest lost each year to industrial logging practices; (4) a large portion of the pulp used in P&G Paper Products is *not* FSC certified at all, and even for pulp that is FSC Mix certified, that pulp actually contains very little to no FSC forest-certified material; and, (5) the Rainforest Alliance "Forest Allies" logo does not convey any type of third-party certification reflective of responsible forestry standards.

318. Despite P&G's environmental and sustainability claims, its supply chain policies and lack of enforcement procedures allowed sourcing that further contributed to Deforestation and Forest Degradation, including from Canada's boreal forest.[85] The 2020 Shareholder Resolution requested that P&G issue a report on its efforts on environmental sustainability. Yet, notably, P&G's Board of Directors opposed the proposal that would have communicated P&G's efforts to measure and achieve its sustainability goals.

319. Three years later, shareholder descendants of P&G's founders publicly expressed concern over the company's lack of action and asked P&G to "deliver a credible policy and time-bound plan to eliminate deforestation, primary forest degradation, and human rights violations from its supply chains, applied at the corporate group level, and paired with a robust non-compliance protocol."[86]

320. P&G responded to the descendants' and shareholders' concern by continuing to actively conceal the truth. While P&G reiterated its commitment to environmental sustainability

---

[85] *2020 P&G Proxy Statement, Shareholder Proposals: Item 5. Shareholder Proposal – Report on Efforts to Eliminate Deforestation*, P&G, https://s1.q4cdn.com/695946674/files/doc_financials/2020/ar/PG-Bookmarked-Proxy-Statement.pdf, at 78.

[86] Letter from descendants of P&G's founders and shareholders in response to P&G response to Sept. 8, 2023 letter, dated Sept. 28, 2023, filed with the SEC, https://d18rn0p25nwr6d.cloudfront.net/CIK-0000080424/68693175-54ef-4490-9912-0998112e8e98.pdf.

and "responsible forestry sourcing practices,"[87] it continued to source from both primary forests and boreal caribou habitat.[88]

321. P&G knowingly and actively concealed the material facts because it knew consumers cared about the environment and that if they were to learn the truth about P&G's greenwashing, it would negatively affect P&G's finances. Indeed, according to the Business Operations Risks section in P&G's Form 10-K filings filed every year since at least 2013, P&G acknowledged that it "devotes significant time and resources to programs designed to protect and preserve our reputation, such as social responsibility and environmental sustainability" and that if P&G is "unable to effectively manage real or perceived issues … . our financial results could suffer."[89]

322. The knowing and active concealment of these material facts render the Products' packaging deceptive, misleading, and unfair because without full disclosure, reasonable consumers, including Plaintiffs, believe the Paper Products to be environmentally sustainable and to have environmental benefits.

323. Plaintiffs and the Class members paid a premium price based on P&G's active concealment, omissions, and misrepresentations regarding the environmental and sustainability marketing claims.

---

[87] Response from P&G to Sept. 8, 2023, letter from P&G descendants and shareholders, dated Sept. 20, 2023, filed with the SEC, https://www.sec.gov/Archives/edgar/data/80424/000008042423000078/pgcommitrespforestry.htm.

[88] Letter from descendants of P&G's founders and shareholders in response to P&G response to Sept. 8, 2023 letter, dated Sept. 28, 2023, filed with the SEC, https://d18rn0p25nwr6d.cloudfront.net/CIK-0000080424/68693175-54ef-4490-9912-0998112e8e98.pdf.

[89] P&G 2013 Form 10-K, https://www.sec.gov/Archives/edgar/data/80424/000008042413000063/fy201310kannualreport.htm.

324. The facts concealed, omitted, or not disclosed by P&G were material facts that reasonable consumers, including Plaintiffs, would have considered them when deciding whether to purchase Paper Products. Had Plaintiffs known the truth, they would not have purchased the Paper Products or paid the premium price.

**L. P&G's competitors demonstrate that more sustainable practices are possible.**

325. P&G is ceding competitive advantage to its peers for its failure to meet its no-Deforestation commitment and continued use of primary forest fiber in its tissue products. For example, P&G's competitor Kimberly-Clark has committed to halving its sourcing from natural forests by 2025. P&G was also rated below its peers by both Forest 500 and CDP Forest in terms of the strength of its commitments, reporting, and implementation in ensuring deforestation-free supply chains. Kimberly-Clark has also purchased a higher percentage of FSC-certified fiber (*i.e.*, not including Controlled Wood) than P&G in each of the last three years.

326. P&G also incorporates zero recycled materials into the manufacturing of its Paper Products, which is in significant contrast with other major tissue manufacturers such as Whole Foods 365, Trader Joe's, and Seventh Generation.

327. NRDC released *The Issue with Tissue* Sixth Edition scorecard in 2024, which shows movement among the industry's biggest players toward greater sustainability. Still, Procter & Gamble (P&G) remains stuck in the past, rejecting demands from consumers and shareholders alike to end its almost exclusive use of forest fiber for Paper Products and its other flagship tissue brands. P&G remains the only one of the three largest U.S. toilet paper producers

to earn F grades for its Charmin Toilet Paper and Puffs Tissues across all six editions of NRDC's scorecard[90]:




FACIAL TISSUE

| Brand | Grade (Score out of 600) |
|---|---|
| Green Forest | A+ (580) |
| Natural Value | A+ (580) |
| Trader Joe's | A+ (580) |
| Fluff Out | A (560) |
| Simple Truth | A (560) |
| Seventh Generation | A (551) |
| Rosey by Thrive Market | A (550) |
| Amazon Aware | B (400) |
| Bim Bam Boo | B (400) |
| Caboo | B (400) |
| Cloud Paper | B (400) |
| Grove Co. Paper | B (400) |
| Who Gives A Crap, Forest Friendly Tissues | B (400) |
| Kleenex Everyday | D (200) |
| Puffs | F (115) |
| Amazon Basics | F (100) |
| Great Value Everyday Soft | F (100) |

## V. TOLLING OF THE STATUTE OF LIMITATIONS

### A. Discovery Rule Tolling

328. Class members had no way of knowing about P&G's deception with respect to the environmental sustainability of the Paper Products supply chain. To be sure, P&G continues to this day to make the same claims that it Protect-Grow-Restore the trees in the boreal forest, and that the pulp it purchases is sustainably sourced, all while actively promoting their obsolete and misleading sustainability credentials on the packaging itself.

---

[90] The Issue with Tissue, NRDC (Sept. 16, 2024), https://www.nrdc.org/resources/issue-tissue.

329. Within the period of any applicable statutes of limitation, Plaintiffs and members of the proposed Classes could not have discovered through the exercise of reasonable diligence that P&G was concealing the conduct complained of herein and was misrepresenting the Company's true position with respect to the environmental stewardship of its Paper Products supply chain.

330. Plaintiffs and the other Class members did not discover and did not know of facts that would have caused a reasonable person to suspect that P&G was hiding from consumers material information about the environmental harm caused by its supply chains for Paper Products; nor would a reasonable and diligent investigation have disclosed this information, which was discovered by Plaintiffs only shortly before this action was filed. Nor in any event would such an investigation on the part of Plaintiffs and other Class members have disclosed that P&G valued profits over truthful marketing and compliance with law.

331. For these reasons, all applicable statutes of limitation have been tolled by operation of the discovery rule with respect to claims alleged herein.

**B. Fraudulent Concealment Tolling**

332. All applicable statutes of limitation have also been tolled by P&G's knowing and active fraudulent concealment, omissions, and suppressions and denial of the facts alleged herein throughout the period relevant to this action.

333. Instead of disclosing the environmentally devastating Paper Products supply chain, or that the quality and quantity of replanted forests was far worse than represented, P&G chose instead to tout its environmental bona fides in its Keep Forests as Forests campaign.

**C. Estoppel**

334. After consistently touting its environmental stewardship, P&G was under a continuous duty to disclose to Plaintiffs and the other Class members the true character, quality, and nature of the harvesting and replanting efforts within the Paper Products supply chain.

335. P&G knowingly, affirmatively, and actively concealed, omitted, or suppressed, or recklessly disregarded the true character, quality, and nature of the harvesting and replanting efforts within the Paper Products supply chain.

336. Based on the foregoing, P&G is estopped from relying on any statutes of limitations in defense of this action.

## VI. CLASS ALLEGATIONS

337. Plaintiffs bring this action on behalf of themselves and all those similarly situated, as a class action pursuant to the provisions of Rule 23(a), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure on behalf of themselves and the following classes. Plaintiffs seek to represent the following groups of similarly situated persons, defined as follows:

**<u>California Class</u>**
All persons who on or after January 16, 2021 purchased a P&G Paper Product in the state of California..

**<u>Connecticut Class</u>**
All persons who on or after January 16, 2021 purchased a P&G Paper Product in the state of Connecticut.

**<u>Florida Class</u>**
All persons who on or after January 16, 2021 purchased a P&G Paper Product in the state of Florida.

**<u>Georgia Class</u>**
All persons who on or after January 16, 2021 purchased a P&G Paper Product in the state of Georgia.

**<u>Illinois Class</u>**
All persons who on or after January 16, 2021 purchased a P&G Paper Product in the state of Illinois.

**Maine Class**
All persons who on or after January 16, 2021 purchased a P&G Paper Product in the state of Maine.

**Maryland Class**
All persons who on or after January 16, 2021 purchased a P&G Paper Product in the state of Maryland.

**Massachusetts Class**
All persons who on or after January 16, 2021 purchased a P&G Paper Product in the state of Massachusetts.

**Minnesota Class**
All persons who on or after January 16, 2021 purchased a P&G Paper Product in the state of Minnesota.

**New York Class**
All persons who on or after January 16, 2021 purchased a P&G Paper Product in the state of New York.

**North Carolina Class**
All persons who on or after January 16, 2021 purchased a P&G Paper Product in the state of North Carolina.

**Ohio Class**
All persons who on or after January 16, 2021 purchased a P&G Paper Product in the state of Ohio.

**Pennsylvania Class**
All persons who on or after January 16, 2021 purchased a P&G Paper Product in the state of Pennsylvania.

**Utah Class**
All persons who on or after January 16, 2021 purchased a P&G Paper Product in the state of Utah.

**Washington Class**
All persons who on or after January 16, 2021 purchased a P&G Paper Product in the state of Washington.

338. Excluded from the Class are P&G and its subsidiaries and affiliates; all persons who make a timely election to be excluded from the Class; governmental entities; and the judge to whom this case is assigned and his/her immediate family. Plaintiffs reserve the right to revise the Class definition based upon information learned through discovery.

339. Certification of Plaintiffs' claims for class-wide treatment is appropriate because Plaintiffs can prove the elements of their claims on a class-wide basis using the same evidence as would be used to prove those elements in individual actions alleging the same claims.

340. This action has been brought and may be properly maintained on behalf of themselves and the Class proposed herein under Federal Rule of Civil Procedure 23.

341. Numerosity. Federal Rule of Civil Procedure 23(a)(1): The members of the Class are so numerous and geographically dispersed that individual joinder of all Class members is impracticable. While Plaintiffs are informed and believe that annual sales of Charmin Toilet Paper and Puffs Tissues are estimated to be $3 billion and that P&G spends around $119 million each year in advertising for the Charmin brand in the United States. Class members may be notified of the pendency of this action by recognized, Court-approved notice dissemination methods, which may include U.S. Mail, email, text messages, social media, Internet postings, and/or published notice.

342. Commonality and Predominance. Federal Rule of Civil Procedure 23(a)(2) and 23(b)(3): This action involves common questions of law and fact, which predominate over any questions affecting individual Class members, including, without limitation:

a) Whether P&G engaged in the conduct alleged herein;

b) Whether P&G designed, advertised, marketed, distributed, sold, or otherwise placed Paper Products into the stream of commerce in the United States;

c) Whether P&G sources its Paper Products from the boreal forest in Canada;

d) Whether P&G made Deceptive Claims and concealed Common Omissions regarding the supply chain for Paper Products;

e) Whether P&G knew about the highly destructive industrial logging practices taking place in its supply chain for Paper Products and, if so, how long P&G has known of the issue;

f) Whether P&G knew that replanting efforts in the boreal forest are mainly for future harvesting purposes and do not recreate the same level of ecological value and carbon capture capability characteristic of the trees previously harvested and, if so, how long P&G has known of the issue;

g) Whether P&G's conduct violates consumer protection statutes, the common law of fraudulent concealment, and other laws as asserted herein;

h) Whether Plaintiffs and the other Class members overpaid for their Paper Products as a result of the fraud alleged herein;

k) Whether Plaintiffs and the other Class members are entitled to equitable and/or injunctive relief; and

j) Whether Plaintiffs and the other Class members are entitled to damages and other monetary relief and, if so, in what amount.

343. Typicality. Federal Rule of Civil Procedure 23(a)(3): Plaintiffs' claims are typical of the other Class members' claims because, among other things, all Class members were comparably injured through P&G's wrongful conduct as described above.

344. Adequacy. Federal Rule of Civil Procedure 23(a)(4): Plaintiffs are adequate Class representatives because their interests do not conflict with the interests of the other members of the Class each respectively seeks to represent; Plaintiffs have retained counsel competent and experienced in complex class action litigation; and Plaintiffs intend to prosecute this action

vigorously. The Class's interests will be fairly and adequately protected by Plaintiffs and their counsel.

345. Declaratory and Injunctive Relief. Federal Rule of Civil Procedure 23(b)(2): By representing that Paper Products are environmentally friendly via its Deceptive Claims while also concealing the Common Omissions reflecting the significant Forest Degradation that the sourcing of wood pulp for Paper Products generates, P&G has acted or refused to act on grounds generally applicable to Plaintiffs and the other members of the Class, thereby making appropriate final injunctive relief and declaratory relief, with respect to the Class as a whole.

346. Superiority. Federal Rule of Civil Procedure 23(b)(3): A class action is superior to any other available means for the fair and efficient adjudication of this controversy and no unusual difficulties are likely to be encountered in the management of this class action. The damages or other financial detriment suffered by Plaintiffs and the other Class members are relatively small compared to the burden and expense that would be required to individually litigate their claims against P&G, so it would be impracticable for Class members to individually seek redress for P&G's wrongful conduct. Even if Class members could afford individual litigation, the court system could not. Individualized litigation creates potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and the court system. By contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

# VII. CLAIMS FOR RELIEF

## A. Claims brought on behalf of the California Class

### COUNT I
### VIOLATION OF THE CALIFORNIA CONSUMERS LEGAL REMEDIES ACT
### (Cal. Civ. Code § 1750, *et seq.*)

347. Plaintiffs Alzaldi, Cuevas, and McCarthy incorporate by reference all preceding allegations as though fully set forth herein.

348. Plaintiffs Alzaldi, Cuevas, and McCarthy bring this Count on behalf of themselves and the California Class.

349. California's Consumers Legal Remedies Act ("CLRA"), Cal. Civ. Code § 1750, *et seq*., proscribes "unfair methods of competition and unfair or deceptive acts or practices undertaken by any person in a transaction intended to result or which results in the sale or lease of goods or services to any consumer."

350. P&G Paper Products are "goods" as defined in Cal. Civ. Code § 1761(a).

351. Plaintiffs and the other California Class members are "consumers" as defined in Cal. Civ. Code § 1761(d), and Plaintiffs, the other California Class members, and Defendant are "persons" as defined in Cal. Civ. Code § 1761(c).

352. In purchasing P&G Paper Products, Plaintiffs and the other California Class members were deceived by Defendant's marketing of P&G Paper Products as environmentally sustainable products, and obtaining money from Plaintiffs and California Class members, while also failing to disclose the Common Omissions, which are described in paragraphs 11-16, *supra*, and summarized here:

- P&G Paper Products are made with virgin forest fiber derived from the industrial clearcutting and burning of previously untouched old-growth forests;

- P&G replanting efforts are designed to convert these old-growth forests into industrial tree crops which are ultimately capable of reproducing but a small fraction of the original ecological value;
- P&G is not restoring forests as its total restoration efforts impact an area less than 1% of untouched old-growth forest lost each year to industrial logging practices;
- A large portion of the pulp used in P&G Paper Products is *not* FSC certified at all, and even for pulp that is FSC Mix certified, that pulp actually contains very little to no FSC forest-certified material;
- The Rainforest Alliance "Forest Allies" logo does not convey any type of third-party certification reflective of responsible forestry standards;
- Defendant's continuing violations of federal guidance on environmental marketing claims, e.g., the FTC Green Guides; and
- Defendant's continuing violations of other California laws, including Cal. Civ. Code §§ 1709, 1710, and 1750, *et seq*., and Cal. Com. Code § 2313.

353. Defendant's conduct, as described hereinabove, was and is in violation of the CLRA. Defendant's conduct violates at least Cal. Civ. Code § 1770(a)(16) (representing that goods have been supplied in accordance with a previous representation when they have not).

354. Plaintiffs and the other California Class members have suffered injury in fact and actual damages resulting from Defendant's material omissions and/or misrepresentations because they paid an inflated purchase price for P&G Paper Products.

355. Defendant knew, should have known, or was reckless in not knowing of the material omissions and/or misrepresentations.

356. The facts concealed and omitted by Defendant to Plaintiffs and the other California Class members are material in that a reasonable consumer would have considered them to be important in deciding whether to purchase P&G Paper Products or pay a lower price. Had Plaintiffs and the other California Class members known about the material omissions and/or misrepresentations they would not have purchased P&G Paper Products or would not have paid the prices they paid in fact.

357. Plaintiffs have provided P&G with notice of its violations of the CLRA pursuant to Cal. Civ. Code § 1782(a). The notice was transmitted to P&G on January 13, 2025. Additionally, on May 12, 2025, Plaintiff McCarthy sent Defendant a pre-suit notice letter.

358. Plaintiffs and the other California Class members' injuries were proximately caused by P&G's fraudulent and deceptive business practices.

359. Therefore, Plaintiffs and the other California Class members are entitled to equitable relief and will amend this action and seek monetary relief under the CLRA.

**COUNT II**
**VIOLATION OF THE CALIFORNIA UNFAIR COMPETITION LAW**
**(Cal. Bus. & Prof. Code § 17200, *et seq*.)**

360. Plaintiffs Alzaldi, Cuevas, and McCarthy incorporate by reference all preceding allegations as though fully set forth herein.

361. Plaintiffs Alzaldi, Cuevas, and McCarthy bring this Count on behalf of themselves and the California Class.

362. California's Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code § 17200, *et seq*., proscribes acts of unfair competition, including "any unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising."

363. P&G's conduct, as described herein, was and is in violation of the UCL in at least the following ways:

A. By knowingly and intentionally concealing from Plaintiffs and the other California Class members that (1) P&G is not protecting forests as its Paper Products are made with virgin forest fiber derived from the industrial clearcutting and burning of previously untouched old-growth forests; (2) P&G is not growing forests as its replanting efforts are designed to convert these old-growth forests into industrial tree crops which are ultimately capable of reproducing but a small fraction of the original ecological value; (3) P&G's is not restoring forests as its total restoration efforts impact an area less than 1% of untouched old-growth forest lost each year to industrial logging practices; (4) a large portion of the pulp used in P&G Paper Products is *not* FSC certified at all, and even for pulp that is FSC Mix certified, that pulp actually contains very little to no FSC forest-certified material; and (5) the Rainforest Alliance "Forest Allies" logo does not convey any type of third-party certification reflective of responsible forestry standards;

B. By violating federal guidance, such as the FTC Green Guides; and

C. By violating other California laws, including Cal. Civ. Code §§ 1709, 1710, and 1750, *et seq.*, and Cal. Com. Code § 2313.

364. P&G's omissions, concealment, and/or misrepresentations alleged herein caused Plaintiffs and the other California Class members to make their P&G Paper Product purchases. Absent those omissions and/or misrepresentations, Plaintiffs and the other California Class members would not have purchased P&G Paper Products or would not have purchased P&G Paper Products at the prices they paid. Accordingly, Plaintiffs and the other California Class

members have suffered injury in fact, including lost money or property, as a result of P&G's misrepresentations and omissions.

365. Plaintiffs seek to enjoin further unlawful, unfair, and/or fraudulent acts or practices by P&G under Cal. Bus. & Prof. Code § 17200.

366. Plaintiffs request that this Court enter such orders or judgments as may be necessary to enjoin P&G from continuing its unfair, unlawful, and/or deceptive practices and to restore to Plaintiffs and members of the California Class any money it acquired by unfair competition, including restitution and/or restitutionary disgorgement, as provided in Cal. Bus. & Prof. Code § 17203 and Cal. Civ. Code § 3345; and for such other relief set forth below.

**COUNT III**
**VIOLATION OF THE CALIFORNIA FALSE ADVERTISING LAW**
**(Cal. Bus. & Prof. Code § 17500, *et seq*.)**

367. Plaintiffs Alzaldi, Cuevas, and McCarthy incorporate by reference all preceding allegations as though fully set forth herein.

368. Plaintiffs Alzaldi, Cuevas, and McCarthy bring this Count on behalf of themselves and the California Class.

369. Cal. Bus. & Prof. Code § 17500 states: "It is unlawful for any … corporation … with intent directly or indirectly to dispose of real or personal property … to induce the public to enter into any obligation relating thereto, to make or disseminate or cause to be made or disseminated … from this state before the public in any state, in any newspaper or other publication, or any advertising device, … or in any other manner or means whatever, including over the Internet, any statement … which is untrue or misleading, and which is known, or which by the exercise of reasonable care should be known, to be untrue or misleading."

370. P&G has violated Cal. Bus. & Prof. Code § 17500 because the omissions and/or misrepresentations regarding the environmental sustainability of P&G Paper Products as set forth in this Complaint were material and likely to deceive a reasonable consumer.

371. Plaintiffs and the other California Class members have suffered an injury in fact, including the loss of money or property, as a result of P&G's unfair, unlawful, and/or deceptive practices. In purchasing P&G Paper Products, Plaintiffs and the other California Class members relied on the omissions and/or misrepresentations of P&G with respect to environmental sustainability of P&G Paper Products. P&G's representations turned out not to be true because P&G Paper Product's supply chain relies on industrial logging practices that are destroying primary forests and P&G has improperly used various third-party logos, seals, and certifications. Had Plaintiffs and the other California Class members known this, they would not have purchased P&G Paper Products and/or paid as much for these products. Accordingly, Plaintiffs and the other California Class members overpaid for their P&G Paper Products and did not receive the benefit of their bargain.

372. All of the wrongful conduct alleged herein occurred, and continues to occur, in the conduct of P&G's business. P&G's wrongful conduct is part of a pattern or generalized course of conduct that is still perpetuated and repeated, both in the State of California and nationwide.

373. Plaintiffs, individually and on behalf of themselves and the other California Class members, request that this Court enter such orders or judgments as may be necessary to enjoin P&G from continuing its unfair, unlawful, and/or deceptive practices and to restore to Plaintiffs and the other California Class members any money P&G acquired by unfair competition, including restitution and/or restitutionary disgorgement, and for such other relief set forth below.

**COUNT IV**
**FRAUDULENT CONCEALMENT**
**(Based on California Law)**

374. Plaintiffs Alzaldi, Cuevas, and McCarthy incorporate by reference all preceding allegations as though fully set forth herein.

375. Plaintiffs Alzaldi, Cuevas, and McCarthy bring this Count on behalf of themselves and the California Class.

376. P&G intentionally concealed and suppressed material facts regarding its P&G Paper Products. These material facts included that (1) P&G is not protecting forests as its P&G Paper Products are made with virgin forest fiber derived from the industrial clearcutting and burning of previously untouched old-growth forests; (2) P&G is not growing forests as its replanting efforts are designed to convert these old-growth forests into industrial tree crops which are ultimately capable of reproducing but a small fraction of the original ecological value; (3) P&G is not restoring forests as its total restoration efforts impact an area less than 1% of untouched old-growth forest lost each year to industrial logging practices; (4) a large portion of the pulp used in P&G Paper Products is *not* FSC certified at all, and even for pulp that is FSC Mix certified, that pulp actually contains very little to no FSC forest-certified material; and (5) the Rainforest Alliance "Forest Allies" logo does not convey any type of third-party certification reflective of responsible forestry standards.

377. Despite the 2020 Shareholder Resolution and clear desire by the shareholders and investors that P&G change its sourcing practices and eliminate deforestation and forest degradation and P&G's public commitment to environmental sustainability and responsible forestry sourcing practices, the company continued to source from primary forests and boreal caribou habitat, material facts it concealed from Plaintiffs and the California Class.

378. P&G voluntarily represented that its P&G Paper Products were environmentally sustainable via its Deceptive Claims. Therefore P&G had a duty to also disclose the Common Omissions (which contradict the specific Claims as well as the net impression created by all the Claims) so as to render those Claims not misleading. P&G also knew that the Deceptive Claims were false and misleading when P&G made them.

379. The knowing and active concealment of the material facts render the Products' packaging deceptive, misleading, and unfair because without full disclosure, Plaintiffs and the California Class believed the P&G Paper Products to be environmentally sustainable and to have environmental benefits.

380. P&G's omissions, concealment, misrepresentations, and other deceptive conduct were likely to deceive or cause misunderstanding and did in fact deceive Plaintiffs and the California Class with respect to the environmental and sustainability claims.

381. P&G intended that Plaintiffs and the California Class rely on its omissions, concealment, misrepresentations, and other deceptive conduct as alleged herein regarding the environmental and sustainability claims when purchasing the P&G Paper Products.

382. P&G's omissions, concealment, and/or misrepresentations alleged herein did cause Plaintiffs and the other California Class members to make their P&G Paper Product purchases. Plaintiffs were unaware of these material facts, and had P&G communicated these material facts to consumers, Plaintiffs and the other California Class members would not have purchased P&G Paper Products or would not have purchased P&G Paper Products at the prices they paid. Accordingly, Plaintiffs and the other California Class members have suffered injury in fact, including lost money or property, as a result of P&G's misrepresentations and omissions.

383. Accordingly, P&G is liable to Plaintiffs and the other California Class members for damages in an amount to be proven at trial, including but not limited to, benefit-of-the-bargain damages, restitution and/or diminution of value.

384. P&G's acts were done wantonly, maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiffs' and other California Class members' rights and the representations that P&G made to them, in order to enrich P&G. P&G's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

**COUNT V**
**VIOLATION OF THE ENVIRONMENTAL MARKETING CLAIMS ACT**
**(Cal. Bus. & Prof. Code §§ 17580.5 and 17580(a))**

385. Plaintiffs Alzaidi, Cuevas, and McCarthy incorporate by reference all preceding allegations as though fully set forth herein.

386. This Count is brought by Plaintiffs Alazaidi, Cuevas, and McCarthy on behalf of themselves and the California Class.

387. Defendant's conduct constitutes a violation of California's Environmental Marketing Claims Act ("EMCA"). The EMCA states that "it is unlawful for any person to make any untruthful, deceptive, or misleading environmental marketing claim, whether explicit or implied. For the purpose of this section, environmental marketing claims shall include any claims contained in the Guides for the use of Environmental Marketing Claims published by the Federal Trade Commission." Cal. Bus. & Prof. Code § 17580.5 and § 17580(a).

388. As outlined in the Green Guides, the FTC has determined that unqualified general environmental benefit claims such as "sustainable" are "likely [to] convey that the product … has specific and far-reaching environmental benefits and may convey that the item … has no

negative environmental impact."[91] For that reason, the FTC has admonished companies not to use unqualified claims such as "sustainable" due to its determination that "it is highly unlikely that marketers can substantiate all reasonable interpretations of these claims."[92]

389. Pursuant to the EMCA, "[a]ny person who represents in advertising or on the label or container of a consumer good that the consumer good that it manufactures or distributes is not harmful to, or is beneficial to, the natural environment, through use of such terms as 'environmental choice,' 'ecologically friendly,' 'earth friendly,' 'environmentally friendly,' 'ecologically sound,' 'environmentally sound,' 'environmentally safe,' 'ecologically safe,' 'environmentally lite,' 'green product,' or any other like term … shall maintain in written form in its records all of the following information and documentation supporting the validity of the representation: (1) The reasons the person believes the representation to be true[;] (2) Any significant adverse environmental impacts directly associated with the production, distribution, use, and disposal of the consumer good[;] (3) Any measures that are taken by the person to reduce the environmental impacts directly associated with the production, distribution, and disposal of the consumer good[;] and (4) Violations of any federal, state, or local permits directly associated with the production or distribution of the consumer good."

390. Defendant's Deceptive Claims are of unqualified statements of environmental benefit because they lead reasonable consumers to believe that Defendant's sourcing practices do not cause environmental harm when the opposite is true. More specifically:

---

[91] *Guides for the use of environmental marketing claims*, Federal Trade Commission, https://www.ftc.gov/sites/default/files/attachments/press-releases/ftc-issues-revised-green-guides/greenguides.pdf (last visited July 24, 2025).

[92] *Id.*

A. P&G is not protecting forests as P&G Paper Products are made with virgin forest fiber derived from the industrial clearcutting and burning of previously untouched old-growth forests;

B. P&G is not growing or regrowing forests, as P&G replanting efforts are designed to convert these old-growth forests into industrial tree crops which are ultimately capable of reproducing but a small fraction of the original ecological value;

C. P&G is not restoring forests as its total restoration efforts impact an area less than 1% of untouched old-growth forest lost each year to industrial logging practices;

D. A large portion of the pulp used in P&G Paper Products is not FSC certified at all, and even for pulp that is FSC Mix certified, that pulp actually contains very little to no FSC forest-certified material;

E. The Rainforest Alliance "Forest Allies" logo does not convey any type of third-party certification reflective of responsible forestry standards;

F. Defendant's continuing violations of federal guidance on environmental marketing claims, e.g., the FTC Green Guides; and

G. Defendant's continuing violations of other California laws, including Cal. Civ. Code §§ 1709, 1710, and 1750, *et seq*., and Cal. Com. Code § 2313.

### B. Claims brought on behalf of the Connecticut Class

**COUNT VI**
**VIOLATION OF THE CONNECTICUT UNFAIR TRADE PRACTICES ACT**
**(Conn. Gen. Stat. § 42-110A, *et seq*.)**

391. Plaintiffs Bergman and Pascarelli hereby incorporate by reference all preceding allegations as though fully set forth herein.

392. This Count is brought by Plaintiffs Bergman and Pascarelli on behalf of themselves and the Connecticut Class.

393. The Connecticut Unfair Trade Practices Act (Connecticut UTPA) provides: "No person shall engage in unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." Conn. Gen. Stat. § 42-110b(a).

394. Defendant is a "person" within the meaning of Conn. Gen. Stat. § 42-110a(3).

395. Defendant's challenged conduct occurred in "trade" or "commerce" within the meaning of Conn. Gen. Stat. § 42-110a(4).

396. Plaintiffs and Connecticut Class members are entitled to recover their actual damages, punitive damages, and attorneys' fees pursuant to Conn. Gen. Stat. § 42-110g.

397. Defendant acted with reckless indifference to another's rights, or wanton or intentional violation of another's rights and otherwise engaged in conduct amounting to a particularly aggravated, deliberate disregard for the rights and safety of others. Therefore, punitive damages are warranted.

**COUNT VII**
**FRAUDULENT CONCEALMENT**
**(Based on Connecticut Law)**

398. Plaintiffs Bergman and Pascarelli incorporate by reference all preceding allegations as though fully set forth herein.

399. Plaintiffs Bergman and Pascarelli bring this Count on behalf of themselves and the Connecticut Class.

400. P&G intentionally concealed and suppressed material facts regarding its P&G Paper Products. These material facts included that (1) P&G is not protecting forests as its P&G Paper Products are made with virgin forest fiber derived from the industrial clearcutting and burning of previously untouched old-growth forests; (2) P&G is not growing forests as its replanting efforts are designed to convert these old-growth forests into industrial tree crops which are ultimately capable of reproducing but a small fraction of the original ecological value; (3) P&G is not restoring forests as its total restoration efforts impact an area less than 1% of untouched old-growth forest lost each year to industrial logging practices; (4) a large portion of the pulp used in P&G Paper Products is *not* FSC certified at all, and even for pulp that is FSC Mix certified, that pulp actually contains very little to no FSC forest-certified material; and (5) the Rainforest Alliance "Forest Allies" logo does not convey any type of third-party certification reflective of responsible forestry standards.

401. Despite the 2020 Shareholder Resolution and clear desire by the shareholders and investors that P&G change its sourcing practices and eliminate deforestation and forest degradation and P&G's public commitment to environmental sustainability and responsible forestry sourcing practices, the company continued to source from primary forests and boreal caribou habitat, material facts it concealed from Plaintiffs and the Connecticut Class.

402. P&G voluntarily represented via the Deceptive Claims that its P&G Paper Products were environmentally sustainable and was therefore required to make a full and fair disclosure under Connecticut law. P&G therefore had a duty to disclose the Common Omissions

in order to make the Deceptive Claims not misleading. P&G also knew that these representations were false when made.

403. The knowing and active concealment of the material facts render the Products' packaging deceptive, misleading, and unfair because without full disclosure, Plaintiffs and the Connecticut Class believed the P&G Paper Products to be environmentally sustainable and to have environmental benefits.

404. P&G's omissions, concealment, misrepresentations, and other deceptive conduct were likely to deceive or cause misunderstanding and did in fact deceive Plaintiffs and the Connecticut Class with respect to the environmental and sustainability claims.

405. P&G intended that Plaintiffs and the Connecticut Class rely on its omissions, concealment, misrepresentations, and other deceptive conduct as alleged herein regarding the environmental and sustainability claims when purchasing the P&G Paper Products.

406. P&G's omissions, concealment, and/or misrepresentations alleged herein did cause Plaintiffs and the other Connecticut Class members to make their P&G Paper Product purchases. Plaintiffs were unaware of these material facts, and had P&G communicated these material facts to consumers, Plaintiffs and the other Connecticut Class members would not have purchased P&G Paper Products, or would not have purchased P&G Paper Products at the prices they paid. Accordingly, Plaintiffs and the other Connecticut Class members have suffered injury in fact, including lost money or property, as a result of P&G's misrepresentations and omissions.

407. Accordingly, P&G is liable to Plaintiffs and the other Connecticut Class members for damages in an amount to be proven at trial, including but not limited to, benefit-of-the-bargain damages, restitution and/or diminution of value.

408. P&G's acts were done wantonly, maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiffs' and other Connecticut Class members' rights and the representations that P&G made to them, in order to enrich P&G. P&G's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

## C. Claims brought on behalf of the Florida Class

### COUNT VIII
### VIOLATION OF THE FLORIDA'S UNFAIR & DECEPTIVE TRADE PRACTICES ACT
### (Fla. Stat. § 501.201, *et seq.*)

409. Plaintiffs Rivers and van der Steeg hereby incorporate by reference all preceding allegations as though fully set forth herein.

410. Plaintiffs Rivers and van der Steeg bring this Count on behalf of themselves and the Florida Class.

411. The Florida Unfair and Deceptive Trade Practices Act ("FUDTPA") prohibits "[u]nfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce." Fla. Stat. § 501.204(1).

412. Plaintiffs and the Florida Class members are "consumers" within the meaning of the FUDTPA, Fla. Stat. § 501.203(7).

413. Defendant engaged in "trade or commerce" within the meaning of Fla. Stat. § 501.203(8).

414. In the course of business, Defendant willfully failed to disclose and actively concealed its environmentally devastating industrial logging practices as discussed herein. Defendant also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression, or omission of any material

fact with intent that others rely upon such concealment, suppression, or omission, in connection with the sale of P&G Paper Products. These practices were in violation of the FUDTPA.

415. Defendant's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Plaintiffs and the other Florida Class members, about the true environmental impact of P&G Paper Products.

416. Defendant intentionally and knowingly misrepresented material facts about P&G Paper Product supply chains with intent to mislead Plaintiffs and the Florida Class.

417. Defendant knew or should have known that their conduct violated the FUDTPA.

418. Defendant was required to disclose the omissions as they were contrary to their representations that P&G Paper Products were environmentally sustainable products. Defendant was also under a duty to disclose because it:

a. Possessed exclusive knowledge that P&G Paper Products did not have the environmental benefits and attributes it advertised;

b. Intentionally concealed the foregoing from Plaintiffs and the Florida Class; and/or

c. Made incomplete representations about P&G Paper Product's supply chain while purposefully withholding material facts from Plaintiffs and the Florida Class that contradicted these representations.

419. P&G's omissions and/or misrepresentations about P&G Paper Product's supply chain sustainability practices are material to Plaintiffs and the Florida Class.

420. Plaintiffs and Florida Class members suffered ascertainable loss caused by Defendant's misrepresentations and its concealment of and failure to disclose material information about the environmental impact of P&G Paper Product supply chains. Plaintiffs and Florida Class members who purchased P&G Paper Products would have paid less for the Paper Products or would not have purchased at all but for P&G's violations of the FUDTPA.

421. Defendant's violations present a continuing risk to Plaintiffs as well as to the general public. Defendant's unlawful acts and practices complained of herein affect the public interest.

422. As a direct and proximate result of Defendant's violations of the FUDTPA, Plaintiffs and the Florida Class have suffered injury-in-fact and/or actual damage.

423. Plaintiffs and Florida Class members are entitled to recover their actual damages under Fla. Stat. § 501.211(2) and attorneys' fees under Fla. Stat. § 501.2105(1).

424. Plaintiffs also seek an order enjoining Defendant's unfair and/or deceptive acts or practices, punitive damages, and attorneys' fees, and any other just and proper relief available under the FUDTPA.

**COUNT IX**
**FRAUDULENT CONCEALMENT**
**(Based on Florida Law)**

425. Plaintiffs Rivers and van der Steeg incorporate by reference all preceding allegations as though fully set forth herein.

426. Plaintiffs Rivers and van der Steeg bring this Count on behalf of themselves and the Florida Class.

427. P&G intentionally concealed and suppressed material facts regarding its P&G Paper Products. These material facts included that (1) P&G is not protecting forests as its P&G Paper Products are made with virgin forest fiber derived from the industrial clearcutting and burning of previously untouched old-growth forests; (2) P&G is not growing forests as its replanting efforts are designed to convert these old-growth forests into industrial tree crops which are ultimately capable of reproducing but a small fraction of the original ecological value; (3) P&G is not restoring forests as its total restoration efforts impact an area less than 1% of untouched old-growth forest lost each year to industrial logging practices; (4) a large portion of

the pulp used in P&G Paper Products is *not* FSC certified at all, and even for pulp that is FSC Mix certified, that pulp actually contains very little to no FSC forest-certified material; and (5) the Rainforest Alliance "Forest Allies" logo does not convey any type of third-party certification reflective of responsible forestry standards.

428. Despite the 2020 Shareholder Resolution and clear desire by the shareholders and investors that P&G change its sourcing practices and eliminate deforestation and forest degradation and P&G's public commitment to environmental sustainability and responsible forestry sourcing practices, the company continued to source from primary forests and boreal caribou habitat, material facts it concealed from Plaintiffs and the Florida Class.

429. P&G voluntarily represented via the Deceptive Claims that its P&G Paper Products were environmentally sustainable and was therefore required to make a full and fair disclosure under Florida law. P&G therefore had a duty to disclose the Common Omissions in order to make the Deceptive Claims not misleading. P&G also knew that these representations were false when made.

430. The knowing and active concealment of the material facts render the Products' packaging deceptive, misleading, and unfair because without full disclosure, Plaintiffs and the Florida Class believed the P&G Paper Products to be environmentally sustainable and to have environmental benefits.

431. P&G's omissions, concealment, misrepresentations, and other deceptive conduct were likely to deceive or cause misunderstanding and did in fact deceive Plaintiffs and the Florida Class with respect to the environmental and sustainability claims.

432. P&G intended that Plaintiffs and the Florida Class rely on its omissions, concealment, misrepresentations, and other deceptive conduct as alleged herein regarding the environmental and sustainability claims when purchasing the P&G Paper Products.

433. P&G's omissions, concealment, and/or misrepresentations alleged herein did cause Plaintiffs and the other Florida Class members to make their P&G Paper Product purchases. Plaintiffs were unaware of these material facts, and had P&G communicated these material facts to consumers, Plaintiffs and the other Florida Class members would not have purchased P&G Paper Products or would not have purchased P&G Paper Products at the prices they paid. Accordingly, Plaintiffs and the other Florida Class members have suffered injury in fact, including lost money or property, as a result of P&G's misrepresentations and omissions.

434. Accordingly, P&G is liable to Plaintiffs and the other Florida Class members for damages in an amount to be proven at trial, including but not limited to, benefit-of-the-bargain damages, restitution and/or diminution of value.

435. P&G's acts were done wantonly, maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiffs' and other Florida Class members' rights and the representations that P&G made to them, in order to enrich P&G. P&G's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

**D. Claims brought on behalf of the Georgia Class**

**COUNT X**
**VIOLATION OF THE GEORGIA FAIR BUSINESS PRACTICES ACT**
**(Ga. Code Ann. § 10-1-390, *et seq*.)**

436. Plaintiff Bryant hereby incorporates by reference all preceding allegations as though fully set forth herein.

437. This Count is brought by Plaintiff Bryant on behalf of residents of Georgia who are members of the Class.

438. The Georgia Fair Business Practices Act ("Georgia FBPA") declares "[u]nfair or deceptive acts or practices in the conduct of consumer transactions and consumer acts or practices in trade or commerce" to be unlawful, Ga. Code. Ann. § 101-393(b), including, but not limited to, "representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have," "[r]epresenting that goods or services are of a particular standard, quality, or grade … if they are of another," and "[a]dvertising goods or services with intent not to sell them as advertised," Ga. Code. Ann. § 10-1-393(b).

439. Plaintiff and Georgia Class members are "consumers" within the meaning of Ga. Code. Ann. § 10-1-393(b).

440. Defendant are engaged in "trade or commerce" within the meaning of Ga. Code. Ann. § 10-1-393(b).

441. Plaintiff is entitled to recover damages and exemplary damages (for intentional violations) pursuant to Ga. Code. Ann. § 10-1-399(a).

442. Plaintiff also seeks an order enjoining Defendant's unfair, unlawful, and/or deceptive practices, attorneys' fees, and any other just and proper relief available under the Georgia FBPA pursuant to Ga. Code. Ann. § 10-1-399.17.

443. On January 15, 2025, Plaintiffs sent letters complying with Ga. Code Ann. § 10-1-399(b) to P&G. Because P&G failed to remedy their unlawful conduct within the requisite time period, Plaintiffs seek all damages and relief to which they are entitled.

**COUNT XI**
**FRAUDULENT CONCEALMENT**
**(Based on Georgia Law)**

444. Plaintiff Bryant incorporates by reference all preceding allegations as though fully set forth herein.

445. Plaintiff Bryant brings this Count on behalf of himself and the Georgia Class.

446. P&G intentionally concealed and suppressed material facts regarding its P&G Paper Products. These material facts include: (1) P&G is not protecting forests as its P&G Paper Products are made with virgin forest fiber derived from the industrial clearcutting and burning of previously untouched old-growth forests; (2) P&G is not growing forests as its replanting efforts are designed to convert these old-growth forests into industrial tree crops which are ultimately capable of reproducing but a small fraction of the original ecological value; (3) P&G is not restoring forests as its total restoration efforts impact an area less than 1% of untouched old-growth forest lost each year to industrial logging practices; (4) a large portion of the pulp used in P&G Paper Products is *not* FSC certified at all, and even for pulp that is FSC Mix certified, that pulp actually contains very little to no FSC forest-certified material; and (5) the Rainforest Alliance "Forest Allies" logo does not convey any type of third-party certification reflective of responsible forestry standards.

447. Despite the 2020 Shareholder Resolution and clear desire by the shareholders and investors that P&G change its sourcing practices and eliminate deforestation and forest degradation and P&G's public commitment to environmental sustainability and responsible forestry sourcing practices, the company continued to source from primary forests and boreal caribou habitat, material facts it concealed from Plaintiff and the Georgia Class.

448. P&G voluntarily represented via the Deceptive Claims that its P&G Paper Products were environmentally sustainable and was therefore required to make a full and fair

disclosure under Georgia law. P&G therefore had a duty to disclose the Common Omissions in order to make the Deceptive Claims not misleading. P&G also knew that these representations were false when made.

449. The knowing and active concealment of the material facts render the Products' packaging deceptive, misleading, and unfair because without full disclosure, Plaintiff and the Georgia Class believed the P&G Paper Products to be environmentally sustainable and to have environmental benefits.

450. P&G's omissions, concealment, misrepresentations, and other deceptive conduct were likely to deceive or cause misunderstanding and did in fact deceive Plaintiff and the Georgia Class with respect to the environmental and sustainability claims.

451. P&G intended that Plaintiff and the Georgia Class members rely on its omissions, concealment, misrepresentations, and other deceptive conduct as alleged herein regarding the environmental and sustainability claims when purchasing the P&G Paper Products.

452. P&G's omissions, concealment, and/or misrepresentations alleged herein did cause Plaintiff and the other Georgia Class members to make their P&G Paper Product purchases. Plaintiff was unaware of these material facts, and had P&G communicated these material facts to consumers, Plaintiff and the other Georgia Class members would not have purchased P&G Paper Products or would not have purchased P&G Paper Products at the prices they paid. Accordingly, Plaintiff and the other Georgia Class members have suffered injury in fact, including lost money or property, as a result of P&G's misrepresentations and omissions.

453. Accordingly, P&G is liable to Plaintiff and the other Georgia Class members for damages in an amount to be proven at trial, including but not limited to, benefit-of-the-bargain damages, restitution and/or diminution of value.

454. P&G's acts were done wantonly, maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiff's and other Georgia Class members' rights and the representations that P&G made to them, in order to enrich P&G. P&G's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

### E. Claims brought on behalf the Illinois Class

**COUNT XII**
**VIOLATION OF THE ILLINOIS CONSUMER FRAUD AND DECEPTIVE BUSINESS PRACTICES ACT**
**(815 ILCS 505/1, *et seq*. and 720 ILCS 295/1A)**

455. Plaintiffs Dean, Grant, and Williams incorporate by reference all preceding allegations as though fully set forth herein.

456. Plaintiffs Dean, Grant, and Williams bring this Count on behalf of themselves and the Illinois Class.

457. The Illinois Consumer Fraud and Deceptive Business Practices Act ("Illinois CFA") prohibits "unfair or deceptive acts or practices, including, but not limited to, the use of employment of any deception, fraud, false pretense, tales promise, misrepresentation or the concealment, suppression or omission of any material fact, with intent that others rely upon the concealment, suppression or omission of such material fact … in the conduct of trade or commerce … whether any person has in fact been misled, deceived, or damaged thereby." 815 ILCS 505/2.

458. P&G is a "person" as that term is defined in 815 ILCS 505/1(c).

459. Plaintiffs and Illinois Class members are "consumers" as that term is defined in 815 ILCS 505/1(e).

460. 815 Ill. Comp. Stat. Ann. 505/2 provides that "in construing this section consideration shall be given to the interpretations of the Federal Trade Commission and the federal courts relating to Section 5(a) of the Federal Trade Commission Act."

461. P&G's packaging misled and deceived reasonable consumers because P&G omitted, suppressed, and concealed that its P&G Paper Products were not environmentally beneficial, while representing environmentally beneficial quality and characteristics. P&G's communications on its P&G Paper Product packaging demonstrate the misleading nature of the material omissions, concealments, and suppression of material facts about its environmentally degrading manufacturing practices.

462. Based on the net impression given by the packaging communications and misrepresentations and omissions, reasonable consumers would be misled by P&G Paper Product's true environmental impact based on net impression of labels. Based on the net impression of the packaging, no reasonable consumer could expect or understand that P&G Paper Products were manufactured using environmentally degrading practices.

463. Pursuant to 815 ILCS 505/10a(a), Plaintiffs seek monetary relief against P&G in the amount of actual damages as well as punitive damages because P&G acted with fraud and/or malice and/or was grossly negligent, and concealed, suppressed, and omitted material information.

464. Plaintiffs also seek an order enjoining P&G's unfair and/or deceptive acts or practices, attorneys' fees, and any other just and proper relief available under 815 ILCS 505/1, *et seq.*

**COUNT XIII**
**FRAUD BY CONCEALMENT**
**(Based on Illinois Law)**

465. Plaintiffs Dean, Grant, and Williams incorporate by reference all preceding allegations as though fully set forth herein.

466. Plaintiffs Dean, Grant, and Williams bring this Count on behalf of themselves and the Illinois Class.

467. P&G intentionally concealed and suppressed material facts regarding its P&G Paper Products. These material facts include: (1) P&G is not protecting forests as its P&G Paper Products are made with virgin forest fiber derived from the industrial clearcutting and burning of previously untouched old-growth forests; (2) P&G is not growing forests as its replanting efforts are designed to convert these old-growth forests into industrial tree crops which are ultimately capable of reproducing but a small fraction of the original ecological value; (3) P&G is not restoring forests as its total restoration efforts impact an area less than 1% of untouched old-growth forest lost each year to industrial logging practices; (4) a large portion of the pulp used in P&G Paper Products is *not* FSC certified at all, and even for pulp that is FSC Mix certified, that pulp actually contains very little to no FSC forest-certified material; and (5) the Rainforest Alliance "Forest Allies" logo does not convey any type of third-party certification reflective of responsible forestry standards.

468. Despite the 2020 Shareholder Resolution and clear desire by the shareholders and investors that P&G change its sourcing practices and eliminate deforestation and forest degradation and P&G's public commitment to environmental sustainability and responsible forestry sourcing practices, the company continued to source from primary forests and boreal caribou habitat, material facts it concealed from Plaintiffs and the Illinois Class.

469. P&G voluntarily represented via the Deceptive Claims that its P&G Paper Products were environmentally sustainable and was therefore required to make a full and fair disclosure under Illinois law. P&G therefore had a duty to disclose the Common Omissions in order to make the Deceptive Claims not misleading. P&G also knew that these representations were false when made.

470. The knowing and active concealment of the material facts render the Products' packaging deceptive, misleading, and unfair because without full disclosure, Plaintiffs and the Illinois Class believed the P&G Paper Products to be environmentally sustainable and to have environmental benefits.

471. P&G's omissions, concealment, misrepresentations, and other deceptive conduct were likely to deceive or cause misunderstanding and did in fact deceive Plaintiffs and the Illinois Class with respect to the environmental and sustainability claims.

472. P&G intended that Plaintiffs and the Illinois Class rely on its omissions, concealment, misrepresentations, and other deceptive conduct as alleged herein regarding the environmental and sustainability claims when purchasing the P&G Paper Products.

473. P&G's omissions, concealment, and/or misrepresentations alleged herein did cause Plaintiffs and the other Illinois Class members to make their P&G Paper Product purchases. Plaintiffs were unaware of these material facts, and had P&G communicated these material facts to consumers, Plaintiffs and the other Illinois Class members would not have purchased P&G Paper Products or would not have purchased P&G Paper Products at the prices they paid. Accordingly, Plaintiffs and the other Illinois Class members have suffered injury in fact, including lost money or property, as a result of P&G's misrepresentations and omissions.

474. Accordingly, P&G is liable to Plaintiffs and the other Illinois Class members for damages at an amount to be proven at trial, including but not limited to, benefit-of-the-bargain damages, restitution and/or diminution of value.

475. P&G's acts were done wantonly, maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiffs' and other Illinois Class members' rights and the representations that P&G made to them, in order to enrich P&G. P&G's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

**F. Claims brought on behalf of the Maine Class**

**COUNT XIV**
**VIOLATION OF THE MAIN UNFAIR TRADE PRACTICES ACT**
**(Me. Rev. Stat. Ann. tit. 5, § 205-A, *et seq.*)**

476. Plaintiff Sullivan hereby incorporates by reference all proceeding allegations as set forth herein.

477. This Count is brought by Plaintiff Sullivan on behalf of herself and the Maine Class.

478. The Maine Unfair Trade Practices Act ("Maine UTPA") makes unlawful "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce … ." Me. Rev. Stat. Ann. tit. 5, § 207.

479. Defendant, Plaintiff, and Maine Class members are "persons" within the meaning of Me. Rev. Stat. Ann. tit. § 5, 206(2).

480. Defendant is engaged in "trade" or "commerce" within the meaning of Me. Rev. Stat. Ann. tit. § 5, 206(3).

481. Pursuant to Me. Rev. Stat. Ann. tit. 5, § 213, Plaintiff seeks an order enjoining Defendant's unfair and/or deceptive acts or practices.

482. On January 13, 2025, Plaintiffs sent a letter complying with Me. Rev. Stat. Ann. tit. 5, § 213(1-A) to P&G. Because P&G failed to remedy their unlawful conduct within the requisite time period, Plaintiffs seek all damages and relief to which they are entitled.

**COUNT XV**
**FRAUDULENT CONCEALMENT**
**(Based on Maine Law)**

483. Plaintiff Sullivan hereby incorporates by reference all proceeding allegations as though fully set forth herein.

484. This Count is brought by Plaintiff Sullivan on behalf of herself and the Maine Class.

485. P&G intentionally concealed and suppressed material facts regarding its P&G Paper Products. These material facts include: (1) P&G is not protecting forests as its P&G Paper Products are made with virgin forest fiber derived from the industrial clearcutting and burning of previously untouched old-growth forests; (2) P&G is not growing forests as its replanting efforts are designed to convert these old-growth forests into industrial tree crops which are ultimately capable of reproducing but a small fraction of the original ecological value; (3) P&G is not restoring forests as its total restoration efforts impact an area less than 1% of untouched old-growth forest lost each year to industrial logging practices; (4) a large portion of the pulp used in P&G Paper Products is *not* FSC certified at all, and even for pulp that is FSC Mix certified, that pulp actually contains very little to no FSC forest-certified material; and (5) the Rainforest Alliance “Forest Allies” logo does not convey any type of third-party certification reflective of responsible forestry standards.

486. Despite the 2020 Shareholder Resolution and clear desire by the shareholders and investors that P&G change its sourcing practices and eliminate deforestation and forest degradation and P&G’s public commitment to environmental sustainability and responsible

forestry sourcing practices, the company continued to source from primary forests and boreal caribou habitat, material facts it concealed from Plaintiff and the Maine Class.

487. P&G voluntarily represented via the Deceptive Claims that its P&G Paper Products were environmentally sustainable and was therefore required to make a full and fair disclosure under Maine law. P&G therefore had a duty to disclose the Common Omissions in order to make the Deceptive Claims not misleading. P&G also knew that these representations were false when made.

488. The knowing and active concealment of the material facts render the Products' packaging deceptive, misleading, and unfair because without full disclosure, Plaintiff and the Maine Class believed the P&G Paper Products to be environmentally sustainable and to have environmental benefits.

489. P&G's omissions, concealment, misrepresentations, and other deceptive conduct were likely to deceive or cause misunderstanding and did in fact deceive Plaintiff and the Maine Class with respect to the environmental and sustainability claims.

490. P&G intended that Plaintiff and the Maine Class rely on its omissions, concealment, misrepresentations, and other deceptive conduct as alleged herein regarding the environmental and sustainability claims when purchasing the P&G Paper Products.

491. P&G's omissions, concealment, and/or misrepresentations alleged herein did cause Plaintiff and the other Maine Class members to make their P&G Paper Product purchases. Plaintiff was unaware of these material facts, and had P&G communicated these material facts to consumers, Plaintiff and the other Maine Class members would not have purchased P&G Paper Products or would not have purchased P&G Paper Products at the prices they paid. Accordingly,

Plaintiff and the other Maine Class members have suffered injury in fact, including lost money or property, as a result of P&G's misrepresentations and omissions.

492. Accordingly, P&G is liable to Plaintiff and the other Maine Class members for damages in an amount to be proven at trial, including but not limited to, benefit-of-the-bargain damages, restitution and/or diminution of value.

493. P&G's acts were done wantonly, maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiff's and other Maine Class members' rights and the representations that P&G made to them, in order to enrich P&G. P&G's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

### G. Claims brought on behalf of the Maryland Class

**COUNT XVI**
**VIOLATION OF THE MARYLAND CONSUMER PROTECTION ACT**
**(Md. Code, Com. Law § 13-101, *et seq*.)**

494. Plaintiff Weisman hereby incorporates by reference all preceding allegations as though fully set forth herein.

495. This Count is brought by Plaintiff Weisman on behalf of herself and the Maryland Class.

496. The Maryland Consumer Protection Act ("Maryland CPA") provides that a person may not engage in any unfair or deceptive trade practice in the sale or lease of any consumer good, including "failure to state a material fact if the failure deceives or tends to deceive;" "false or misleading representation[s] of fact which concern[] … [t]he reason of or the existence or amount of a price reduction;" and "[d]eception, fraud, false pretense, false premise, misrepresentation, or knowing concealment, suppression, or omission of any material fact with

the intent that a consumer rely on the same," Md. Code, Com. Law § 13-301, regardless of whether the consumer is actually deceived or damaged, Md. Code, Com. Law § 13-302.

497. Defendant, Plaintiff, and Maryland Class members are "persons" within the meaning of Md. Code, Com. Law § 13-101(h).

498. Pursuant to Md. Code, Com. Law § 13-408, Plaintiff seeks actual damages, attorneys' fees, and any other just and proper relief available under the Maryland CPA.

**COUNT XVII**
**FRAUDULENT CONCEALMENT**
**(Based on Maryland Law)**

499. Plaintiff Weisman incorporates by reference all preceding allegations as though fully set forth herein.

500. Plaintiff Weisman brings this Count on behalf of herself and the Maryland Class.

501. P&G intentionally concealed and suppressed material facts regarding its P&G Paper Products. These material facts include: (1) P&G is not protecting forests as its P&G Paper Products are made with virgin forest fiber derived from the industrial clearcutting and burning of previously untouched old-growth forests; (2) P&G is not growing forests as its replanting efforts are designed to convert these old-growth forests into industrial tree crops which are ultimately capable of reproducing but a small fraction of the original ecological value; (3) P&G is not restoring forests as its total restoration efforts impact an area less than 1% of untouched old-growth forest lost each year to industrial logging practices; (4) a large portion of the pulp used in P&G Paper Products is *not* FSC certified at all, and even for pulp that is FSC Mix certified, that pulp actually contains very little to no FSC forest-certified material; and (5) the Rainforest Alliance "Forest Allies" logo does not convey any type of third-party certification reflective of responsible forestry standards.

502. Despite the 2020 Shareholder Resolution and clear desire by the shareholders and investors that P&G change its sourcing practices and eliminate deforestation and forest degradation and P&G's public commitment to environmental sustainability and responsible forestry sourcing practices, the company continued to source from primary forests and boreal caribou habitat, material facts it concealed from Plaintiff and the Maryland Class.

503. P&G voluntarily represented via the Deceptive Claims that its P&G Paper Products were environmentally sustainable and was therefore required to make a full and fair disclosure under Maryland law. P&G therefore had a duty to disclose the Common Omissions in order to make the Deceptive Claims not misleading. P&G also knew that these representations were false when made.

504. The knowing and active concealment of the material facts render the Products' packaging deceptive, misleading, and unfair because without full disclosure, Plaintiff and the Maryland Class believed the P&G Paper Products to be environmentally sustainable and to have environmental benefits.

505. P&G's omissions, concealment, misrepresentations, and other deceptive conduct were likely to deceive or cause misunderstanding and did in fact deceive Plaintiff and the Maryland Class with respect to the environmental and sustainability claims.

506. P&G intended that Plaintiff and the Maryland Class rely on its omissions, concealment, misrepresentations, and other deceptive conduct as alleged herein regarding the environmental and sustainability claims when purchasing the P&G Paper Products.

507. P&G's omissions, concealment, and/or misrepresentations alleged herein did cause Plaintiff and the other Maryland Class members to make their P&G Paper Product purchases. Plaintiff was unaware of these material facts, and had P&G communicated these

material facts to consumers, Plaintiff and the other Maryland Class members would not have purchased P&G Paper Products or would not have purchased P&G Paper Products at the prices they paid. Accordingly, Plaintiff and the other Maryland Class members have suffered injury in fact, including lost money or property, as a result of P&G's misrepresentations and omissions.

508. Accordingly, P&G is liable to Plaintiff and the other Maryland Class members for damages in an amount to be proven at trial, including but not limited to, benefit-of-the-bargain damages, restitution and/or diminution of value.

509. P&G's acts were done wantonly, maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiff's and other Maryland Class members' rights and the representations that P&G made to them, in order to enrich P&G. P&G's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

**H. Claim brought on behalf of the Massachusetts Class**

**COUNT XVIII**
**VIOLATION OF THE MASSACHUSETTS GENERAL LAW CHAPTER 93(A)**
**(Mass. Gen. Laws Ch. 93A § 1, *et seq*.)**

510. Plaintiffs Giarrizzo and Meuse hereby incorporate by reference all preceding allegations as though fully set forth herein.

511. This Count is brought by Plaintiffs Giarrizzo and Meuse on behalf of residents of Massachusetts who are members of the class.

512. Massachusetts law (the "Massachusetts Act") prohibits "unfair or deceptive acts or practices in the conduct of any trade or commerce." Mass. Gen. Laws ch. 93A, § 2.

513. Defendant, Plaintiffs, and the Massachusetts Class members are "persons" within the meaning of Mass. Gen. Laws ch. 93A, § 1(a).

514. P&G engaged in "trade" or "commerce" within the meaning of Mass. Gen. Laws ch. 93A, § 1(b).

515. Pursuant to Mass. Gen. Laws ch. 93A, § 9, Plaintiffs will seek monetary relief measured as the greater of (a) actual damages in an amount to be determined at trial and (b) statutory damages in the amount of $25 for each plaintiff. Because P&G's conduct was committed willfully and knowingly, Plaintiffs are entitled to recover, for each plaintiff, up to three times actual damages, but no less than two times actual damages.

516. Plaintiffs also seek an order enjoining P&G's unfair and/or deceptive acts or practices, punitive damages, and attorneys' fees, costs, and any other just and proper relief available under the Massachusetts Act.

517. On January 13, 2025, Plaintiffs sent a letter complying with Mass. Gen. Laws ch. 93A, § 9(3). Because P&G failed to remedy its unlawful conduct within the requisite time period, Plaintiffs seek all damages and relief to which they are entitled.

**COUNT XIX**
**FRAUD BY CONCEALMENT**
**(Based on Massachusetts Law)**

518. Plaintiffs Giarrizzo and Meuse incorporate by reference all preceding allegations as though fully set forth herein.

519. Plaintiffs Giarrizzo and Meuse bring this Count on behalf of themselves and the Massachusetts Class.

520. P&G intentionally concealed and suppressed material facts regarding its P&G Paper Products. These material facts include: (1) P&G is not protecting forests as its P&G Paper Products are made with virgin forest fiber derived from the industrial clearcutting and burning of previously untouched old-growth forests; (2) P&G is not growing forests as its replanting efforts are designed to convert these old-growth forests into industrial tree crops which are ultimately

capable of reproducing but a small fraction of the original ecological value; (3) P&G is not restoring forests as its total restoration efforts impact an area less than 1% of untouched old-growth forest lost each year to industrial logging practices; (4) a large portion of the pulp used in P&G Paper Products is *not* FSC certified at all, and even for pulp that is FSC Mix certified, that pulp actually contains very little to no FSC forest-certified material; and (5) the Rainforest Alliance "Forest Allies" logo does not convey any type of third-party certification reflective of responsible forestry standards.

521. Despite the 2020 Shareholder Resolution and clear desire by the shareholders and investors that P&G change its sourcing practices and eliminate deforestation and forest degradation and P&G's public commitment to environmental sustainability and responsible forestry sourcing practices, the company continued to source from primary forests and boreal caribou habitat, material facts it concealed from Plaintiffs and the Massachusetts Class.

522. P&G voluntarily represented via the Deceptive Claims that its P&G Paper Products were environmentally sustainable and was therefore required to make a full and fair disclosure under Massachusetts law. P&G therefore had a duty to disclose the Common Omissions in order to make the Deceptive Claims not misleading. P&G also knew that these representations were false when made.

523. The knowing and active concealment of the material facts render the Products' packaging deceptive, misleading, and unfair because without full disclosure, Plaintiffs and Massachusetts Class believed the P&G Paper Products to be environmentally sustainable and to have environmental benefits.

524. P&G's omissions, concealment, misrepresentations, and other deceptive conduct were likely to deceive or cause misunderstanding and did in fact deceive Plaintiffs and the Massachusetts Class with respect to the environmental and sustainability claims.

525. P&G intended that Plaintiffs and the Massachusetts Class rely on its omissions, concealment, misrepresentations, and other deceptive conduct as alleged herein regarding the environmental and sustainability claims when purchasing the P&G Paper Products.

526. P&G's omissions, concealment, and/or misrepresentations alleged herein did cause Plaintiffs and the other Massachusetts Class members to make their P&G Paper Product purchases. Plaintiffs were unaware of these material facts, and had P&G communicated these material facts to consumers, Plaintiffs and the other Massachusetts Class members would not have purchased P&G Paper Products or would not have purchased P&G Paper Products at the prices they paid. Accordingly, Plaintiffs and the other Massachusetts Class members have suffered injury in fact, including lost money or property, as a result of P&G's misrepresentations and omissions.

527. Accordingly, P&G is liable to Plaintiffs and the other Massachusetts Class members for damages in an amount to be proven at trial, including but not limited to, benefit-of-the-bargain damages, restitution and/or diminution of value.

528. P&G's acts were done wantonly, maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiffs' and other Massachusetts Class members' rights and the representations that P&G made to them, in order to enrich P&G. P&G's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

## I. Claim brought on behalf of the Michigan Class

### COUNT XX
### VIOLATION OF THE MICHIGAN CONSUMER PROTECTION ACT
### (Mich. Comp. Laws § 445.903, *et seq*.)

529. Plaintiff Nadeau hereby incorporates by reference all preceding allegations as though fully set forth herein.

530. This Count is brought by Plaintiff Nadeau on behalf of himself and the Michigan Class.

531. The Michigan Consumer Protection Act ("Michigan CPA") prohibits "[u]nfair, unconscionable, or deceptive methods, acts, or practices in the conduct of trade or commerce," including "[m]aking false or misleading statements of fact concerning the reasons for, existence of, or amounts of price reductions;" "[f]ailing to reveal a material fact, the omission of which tends to mislead or deceive the consumer, and which fact could not reasonably be known by the consumer;" "charging the consumer a price that is grossly in excess of the price at which similar property or services are sold;" "[m]aking a representation of fact or statement of fact material to the transaction such that a person reasonably believes the represented or suggested state of affairs to be other than it actually is;" or "[f]ailing to reveal facts that are material to the transaction in light of representations of fact made in a positive manner." Mich. Comp. Laws § 445.903(1).

532. Plaintiff and Michigan Class members are "person[s]" within the meaning of the Mich. Comp. Laws § 445.902(1)(d).

533. Defendant is a "person" engaged in "trade or commerce" within the meaning of the Mich. Comp. Laws § 445.902(1)(d) and (g).

534. Plaintiff seeks injunctive relief to enjoin Defendant from continuing its unfair and deceptive acts; monetary relief against Defendant measured as the greater of (a) actual damages in an amount to be determined at trial and (b) statutory damages in the amount of $250 for each

plaintiff; reasonable attorneys' fees; and any other just and proper relief available under Mich. Comp. Laws § 445.911.

535. Plaintiff also seeks punitive damages because Defendant carried out despicable conduct with willful and conscious disregard for the rights and safety of others. Defendant maliciously and egregiously misrepresented the environmental sustainability of P&G Paper Product. Defendant's conduct constitutes malice, oppression, and fraud warranting punitive damages.

**COUNT XXI**
**FRAUDULENT CONCEALMENT**
**(Based on Michigan Law)**

536. Plaintiff Nadeau incorporates by reference all preceding allegations as though fully set forth herein.

537. Plaintiff Nadeau brings this Count on behalf of himself and the Michigan Class.

538. P&G intentionally concealed and suppressed material facts regarding its P&G Paper Products. These material facts include: (1) P&G is not protecting forests as its P&G Paper Products are made with virgin forest fiber derived from the industrial clearcutting and burning of previously untouched old-growth forests; (2) P&G is not growing forests as its replanting efforts are designed to convert these old-growth forests into industrial tree crops which are ultimately capable of reproducing but a small fraction of the original ecological value; (3) P&G is not restoring forests as its total restoration efforts impact an area less than 1% of untouched old-growth forest lost each year to industrial logging practices; (4) a large portion of the pulp used in P&G Paper Products is *not* FSC certified at all, and even for pulp that is FSC Mix certified, that pulp actually contains very little to no FSC forest-certified material; and (5) the Rainforest Alliance "Forest Allies" logo does not convey any type of third-party certification reflective of responsible forestry standards.

539. Despite the 2020 Shareholder Resolution and clear desire by the shareholders and investors that P&G change its sourcing practices and eliminate deforestation and forest degradation and P&G's public commitment to environmental sustainability and responsible forestry sourcing practices, the company continued to source from primary forests and boreal caribou habitat, material facts it concealed from Plaintiffs and the Michigan Class.

540. P&G voluntarily represented via the Deceptive Claims that its P&G Paper Products were environmentally sustainable and was therefore required to make a full and fair disclosure under Michigan law. P&G therefore had a duty to disclose the Common Omissions in order to make the Deceptive Claims not misleading. P&G also knew that these representations were false when made.

541. The knowing and active concealment of the material facts render the Products' packaging deceptive, misleading, and unfair because without full disclosure, Plaintiffs and the Michigan Class believed the P&G Paper Products to be environmentally sustainable and to have environmental benefits.

542. P&G's omissions, concealment, misrepresentations, and other deceptive conduct were likely to deceive or cause misunderstanding and did in fact deceive Plaintiffs and the Michigan Class with respect to the environmental and sustainability claims.

543. P&G intended that Plaintiffs and the Michigan Class rely on its omissions, concealment, misrepresentations, and other deceptive conduct as alleged herein regarding the environmental and sustainability claims when purchasing the P&G Paper Products.

544. P&G's omissions, concealment, and/or misrepresentations alleged herein did cause Plaintiffs and the other Michigan Class members to make their P&G Paper Product purchases. Plaintiffs were unaware of these material facts, and had P&G communicated these

material facts to consumers, Plaintiffs and the other Michigan Class members would not have purchased P&G Paper Products or would not have purchased P&G Paper Products at the prices they paid. Accordingly, Plaintiffs and the other Michigan Class members have suffered injury in fact, including lost money or property, as a result of P&G's misrepresentations and omissions.

545. Accordingly, P&G is liable to Plaintiffs and the other Michigan Class members for damages in an amount to be proven at trial, including but not limited to, benefit-of-the-bargain damages, restitution and/or diminution of value.

546. P&G's acts were done wantonly, maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiffs' and other Michigan Class members' rights and the representations that P&G made to them, in order to enrich P&G. P&G's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

**J. Claims brought on behalf of the Minnesota Class**

**COUNT XXII**
**VIOLATION OF MINNESOTA UNIFORM DECEPTIVE TRADE PRACTICES ACT**
**(Minn. Stat. § 325D.43-.48)**

547. Plaintiff DuPont incorporates by reference all preceding allegations as though fully set forth herein.

548. Plaintiff DuPont brings this Count on behalf of herself and the Minnesota Class.

549. The Minnesota Uniform Deceptive Trade Practices Act ("MUDTPA"), Minn. Stat. §§ 325D.43-.48, prohibits deceptive trade practices in a person's business, vocation, or occupation. *See* Minn. Stat. §§ 325D.44, subd. 1.

550. Defendant advertised, offered, or sold goods or services in Minnesota and therefore engaged in business directly or indirectly affecting the people of Minnesota.

551. Defendant willingly engaged in deceptive trade practices, in violation of the MUDTPA, by making the Deceptive Claims and failing to disclose the Common Omissions, and other deceptive and unfair conduct.

552. By engaging in deceptive trade practices in the course of its business, directly or indirectly affecting the people of Minnesota, Defendant violated Minn. Stat. § 325D.44, including the following provisions:

a) Representing that its goods and services had characteristics, uses, qualities, and benefits that they did not have, in violation of Minn. Stat. § 325D.44, subd. 1(5);

b) Representing that goods and services are of a particular standard or quality when they are of another, in violation of Minn. Stat. § 325D.44, subd. 1 (7);

c) Engaging in other conduct which similarly creates a likelihood of confusion or misunderstanding, in violation of Minn. Stat. § 325D.44, subd. 1, (13); and

d) Defendant's continuing violations of federal guidance on environmental marketing claims, e.g., the FTC Green Guides.

553. Defendant's deceptive practices the Deceptive Claims and concealment of the following Common Omissions: (1) not protecting forests as its Paper Products are made with virgin forest fiber derived from the industrial clearcutting and burning of previously untouched old-growth forests; (2) not growing forests as its replanting efforts are designed to convert these old-growth forests into industrial tree crops which are ultimately capable of reproducing but a small fraction of the original ecological value; (3) not restoring forests as its total restoration efforts impact an area less than 1% of untouched old-growth forest lost each year to industrial logging practices; (4) that a large portion of the pulp used in P&G Paper Products is *not* FSC

certified at all, and even for pulp that is FSC Mix certified, that pulp actually contains very little to no FSC forest-certified material; and (5) the Rainforest Alliance "Forest Allies" logo does not convey any type of third-party certification reflective of responsible forestry standards

554. The pattern described was likely to deceive or cause misunderstanding and did in fact deceive Plaintiff and the Minnesota Class with respect to the Paper Products' quality, standards, and suitability for use.

555. The Deceptive Claims and Common Omissions were material facts in that Plaintiff, the Minnesota Class, and any reasonable consumer would have considered them in deciding whether to purchase the Paper Products. Had Plaintiff and the Minnesota Class known about the Common Omissions and/or the Paper Products did not have the quality as advertised by Defendant, they would not have purchased the Paper Products or paid the premium price.

556. Defendant intended to mislead Plaintiff and the Minnesota Class and induce them to rely on Defendant's Deceptive Claims and Common Omissions, even though Plaintiff and the Minnesota Class were unaware that the Deceptive Claims were misleading and not true without also disclosing the Common Omissions.

557. Defendant's Deceptive Claims and Common Omissions, and other deceptive conduct, did in fact, cause Plaintiff and the Minnesota Class to purchase the Paper Products and they would not have bought and/or paid the price paid if Defendant had revealed the truth about the Paper Products' quality, standards, and suitability for use.

558. Defendant's conduct as described herein occurred repeatedly in its trade or business and were capable of deceiving a substantial portion of the consuming public.

559. Had Defendant disclosed to Plaintiff and the Minnesota Class the Deceptive Claims and Common Omissions, Defendant would have been unable to justify the purchase differentiation and premium price charged to consumers.

560. P&G voluntarily represented via the Deceptive Claims that its P&G Paper Products were environmentally sustainable and was therefore required to make a full and fair disclosure under Minnesota law. P&G therefore had a duty to disclose the Common Omissions in order to make the Deceptive Claims not misleading. P&G also knew that these representations were false when made.

561. Defendant's unlawful conduct is continuing, with no indication it intends to cease this fraudulent course of conduct. As a direct and proximate result of Defendant's conduct, Plaintiff and the Minnesota Class suffered actual damages by: (1) paying a premium price; (2) purchasing Paper Products they would not have purchased; and/or (3) receiving Paper Products that were worth less based on the true environmental impact by Defendant in manufacturing the Paper Products.

562. As explained above, Plaintiff and the Minnesota Class have repeatedly purchased tissue products and would like to purchase tissue products in the future but are likely to experience future harm as Defendant's representations cannot be trusted.

563. Pursuant to Minn. Stat. § 8.31, subd. 3a and § 325D.45, Plaintiff and the Minnesota Class seek actual damages, injunctive and declaratory relief, attorneys' fees, costs, and any other just and proper relief available thereunder for Defendant's violations of the MUDTPA.

**COUNT XXIII**
**VIOLATION OF MINNESOTA DECEPTIVE TRADE PRACTICES ACT; ENVIRONMENTAL MARKETING CLAIMS**
**(Minn. Stat. § 325E.41, *et seq.*)**

564. Plaintiff DuPont incorporates by reference all preceding allegations as though fully set forth herein.

565. Plaintiff DuPont brings this Count on behalf of herself and the Minnesota Class.

566. Defendant offered the Paper Products for sale or distribution in Minnesota.

567. Defendant violated Minn. Stat. § 325E.41 by making the Deceptive Claims, which were deceptive and misleading without also disclosing the Common Omissions. The Deceptive Claims are also inconsistent with the standards and examples contained within the Green Guides as described in § IV.I., *supra,* which includes the following:

A. Failing to ensure its environmental claims are supported by a reasonable basis and that all reasonable interpretations of its claims are truthful and not misleading;

B. Overstating the beneficial environmental manufacturing processes supposedly utilized;

C. Overstating environmental attributes associated with the Paper Products;

D. Misrepresenting the general environmental benefits of the Paper Products and making unqualified general environmental benefit claims; and

E. Deceptively representing the endorsement and/or certification by third parties.

568. The Deceptive Claims and Common Omissions made by Defendant were material facts in that Plaintiff, the Minnesota Class, and any reasonable consumer would have considered them in deciding whether to purchase the Paper Products. Had Plaintiff and the Minnesota Class

known the Paper Products did not have the quality or characteristics as advertised by Defendant, they would not have purchased the Paper Products or paid the price they paid.

569. Defendant made these material misrepresentations and omissions to induce reasonable consumers to purchase its P&G Paper Products.

570. Defendant knew or should have known the Deceptive Claims and Common Omissions were misleading to reasonable consumers and in violation of the FTC Green Guides.

571. Defendant intended to mislead Plaintiff and the Minnesota Class and induce them to rely on Defendant's Deceptive Claims and Common Omissions, even though Plaintiff and the Minnesota Class were unaware that the Deceptive Claims were misleading and not true without also disclosing the Common Omissions.

572. Defendant's Deceptive Claims and Common Omissions, and other deceptive conduct, did in fact, cause Plaintiff and the Minnesota Class to purchase the Paper Products and they would not have bought and/or paid the price paid if Defendant had revealed the truth about the Paper Products' quality, standards, and suitability for use.

573. Defendant's conduct described herein occurred repeatedly in its trade or business and was capable of deceiving a substantial portion of the consuming public.

574. Defendant violated Minn. Stat. § 325E.41 by making misrepresentations on its packaging that violated the Green Guides.

575. Defendant was under a duty to disclose the Common Omissions because Defendant undertook the disclosure of information about the P&G Paper Products that violated the Green Guides.

576. Defendant failed to discharge its duty to disclose the Common Omissions.

577. The Deceptive Claims and Common Omissions not disclosed by Defendant were material facts in that Plaintiff, the Minnesota Class, and any reasonable consumer would have considered them in deciding whether to purchase the P&G Paper Products. Had Plaintiff and the Minnesota Class known the truth, they would not have purchased the P&G Paper Products or paid the premium price.

578. Defendant's unlawful conduct continues, with no indication that it intends to cease this fraudulent course of conduct.

579. As a direct and proximate result of Defendant's conduct, Plaintiff and the Minnesota Class suffered actual damages by: (1) paying a premium price; (2) purchasing P&G Paper Products they would not have purchased; and/or (3) receiving P&G Paper Products that were worth less.

580. Plaintiff and the members of the Minnesota Class would not have purchased P&G Paper Products at all, or would have paid less, had they known that P&G Paper Products do not conform to the packaging.

581. Pursuant to Minn. Stat. § 8.31, subd. 3a, and § 325E.41, Plaintiff and the Minnesota Class seek actual damages, injunctive and declaratory relief, attorneys' fees, costs, and any other just and proper relief available thereunder for Defendant's violations of the Minn. Stat. § 325E.41.

**COUNT XXIV**
**VIOLATION OF MINNESOTA FALSE STATEMENT IN ADVERTISING ACT**
**(Minn. Stat. § 325F.67)**

582. Plaintiff DuPont incorporates by reference all preceding allegations as though fully set forth herein.

583. Plaintiff DuPont brings this Count on behalf of herself and the Minnesota Class.

584. Defendant offered the Paper Products for sale or distribution in Minnesota and Plaintiff and the Minnesota Class purchased the Paper Products sold by Defendant.

585. The Paper Products are "goods" and Plaintiff and the Minnesota Class, as well as Defendant, are "persons" within the meaning of the False Statement in Advertising Act ("FSAA").

586. Defendant violated Minn. Stat. § 325F.67 by making untrue, deceptive, or misleading representations or statements about the Paper Products' quality, standards, suitability for use, and certain environmental benefits.

587. Defendant knew or should have known the Deceptive Claims and Common Omissions were misleading to reasonable consumers, including Plaintiff and the Minnesota Class.

588. Defendant knew or should have known the Paper Products did not have the quality, standards, or suitability of use as advertised by Defendant.

589. Defendant intended to mislead Plaintiff and the Minnesota Class and induce them to rely on Defendant's Deceptive Claims and Common Omissions, even though Plaintiff and the Minnesota Class were unaware that the Deceptive Claims were misleading and not true as the Common Omissions were not disclosed.

590. Defendant's Deceptive Claims and Common Omissions, and other deceptive conduct, did in fact, cause Plaintiff and the Minnesota Class to purchase the Paper Products and they would not have bought and/or paid the premium paid if Defendant had revealed the truth about the Paper Products' quality, standards, and suitability for use. The facts mispresented, concealed, omitted, or not disclosed by Defendant were material facts in that Plaintiff, the Minnesota Class, and any reasonable consumer would have considered them in deciding whether

to purchase the P&G Paper Products. Had Plaintiff and the Minnesota Class known the truth, they would not have purchased the Paper Products or paid the premium price.

591. Because Defendant voluntarily represented the Paper Products as having certain qualities, standards, and character, it was required to make a full and fair disclosure under Minnesota law. Defendant had a duty to disclose the Common Omissions in order to make the Deceptive Claims not misleading. Defendant failed to discharge its duty to disclose the Common Omissions.

592. Plaintiff and the Minnesota Class have suffered injuries caused by Defendant's misleading and deceptive conduct because they were induced to purchase a product that they would not otherwise have purchased; and because they paid a premium price for merchandise that was not of the quality, standards, or character advertised.

593. This claim serves a public benefit of informing Minnesota consumers that the Paper Products (and Defendant's manufacturing processes) do not have the quality, standards, and character as advertised by Defendant, and seeks to prevent Defendant from continuing to make such misleading, deceptive, or false statements and representations when selling the Paper Products to Minnesota consumers.

594. As a direct and proximate result of Defendant's conduct, Plaintiff and the Minnesota Class suffered actual damages by: (1) paying a premium price; (2) purchasing Paper Products they would not have purchased; and/or (3) receiving Paper Products that were worthless.

595. Pursuant to Minn. Stat. § 8.31, subd. 3a, and § 325F.67, Plaintiff and the Minnesota Class seek actual damages, injunctive and declaratory relief, attorneys' fees, costs, and any other just and proper relief available thereunder for Defendant' violations of the FSAA.

## COUNT XXV
## VIOLATION OF MINNESOTA PREVENTION OF CONSUMER FRAUD ACT
## Minn. Stat. § 325F.68-70

596. Plaintiff DuPont incorporates by reference all preceding allegations as though fully set forth herein.

597. Plaintiff DuPont brings this Count on behalf of herself and the Minnesota Class.

598. Plaintiff and the Minnesota Class, as well as Defendant, are "persons" within the meaning of the Minnesota Prevention of Consumer Fraud Act ("MPCFA").

599. Defendant violated Minn. Stat. § 325F.68 by making untrue, deceptive, or misleading representations or statements to consumers, including Plaintiff and the Minnesota Class, about the Paper Products' quality, standards, character, suitability for use, and certain environmental benefits at the point of sale, on its website, and on the Paper Products' packaging.

600. Defendant knew or should have known the Deceptive Claims and Common Omissions were misleading to reasonable consumers, including Plaintiff and the Minnesota Class.

601. Defendant knew or should have known the Paper Products did not have the quality, standards, or suitability of use as advertised by Defendant.

602. Defendant intended to mislead Plaintiff and the Minnesota Class and induce them to rely on Defendant's Deceptive Claims and Common Omissions when purchasing the Paper Products, unaware of the undisclosed or misrepresented material facts.

603. Defendant's Deceptive Claims and Common Omissions did, in fact, cause Plaintiff and the Minnesota Class to purchase the Paper Products they would not have bought and/or pay premiums they would not have paid if Defendant had told them the truth about the Paper Products' quality, standards, and suitability for use.

604. The Deceptive Claims and Common Omissions not disclosed by Defendant were material facts in that Plaintiff, the Minnesota Class, and any reasonable consumer would have considered them in deciding whether to purchase the P&G Paper Products. Had Plaintiff and the Minnesota Class known the truth, they would not have purchased the Paper Products or paid the price they paid.

605. Defendant did not provide Plaintiff and the Minnesota Class with the Common Omissions or any other additional information to clarify the misleading, deceptive, or untrue statements or representations.

606. Defendant possessed special knowledge of material facts that were not disclosed to Plaintiff and the Minnesota Class regarding the Paper Products' true quality, standards, character, and suitability for use, as well as, the negative environmental impact created by Defendant's manufacturing practices.

607. Because Defendant voluntarily represented the Paper Products as having certain qualities, standards, and character, it was required to make a full and fair disclosure under Minnesota law. Defendant had a duty to disclose the material facts as additional information in order to make the Deceptive Claims not misleading. Defendant failed to discharge its duty to disclose the Common Omissions.

**COUNT XXVI**
**FRAUDULENT CONCEALMENT**
**(Based on Minnesota Law)**

608. Plaintiff DuPont incorporates by reference all preceding allegations as though fully set forth herein.

609. Plaintiff DuPont brings this Count on behalf of herself and the Minnesota Class.

610. Defendant knowingly and intentionally made misleading and deceptive representations and concealed and suppressed material facts regarding the Paper Products'

quality, standards, character, suitability for use, and environmental benefits, including: (1) P&G is not protecting forests as its P&G Paper Products are made with virgin forest fiber derived from the industrial clearcutting and burning of previously untouched old-growth forests; (2) P&G is not growing forests as its replanting efforts are designed to convert these old-growth forests into industrial tree crops which are ultimately capable of reproducing but a small fraction of the original ecological value; (3) P&G is not restoring forests as its total restoration efforts impact an area less than 1% of untouched old-growth forest lost each year to industrial logging practices; (4) a large portion of the pulp used in P&G Paper Products is *not* FSC certified at all, and even for pulp that is FSC Mix certified, that pulp actually contains very little to no FSC forest-certified material; and (5) the Rainforest Alliance "Forest Allies" logo does not convey any type of third-party certification reflective of responsible forestry standards.

611. Defendant knew or should have known the Deceptive Claims and Common Omissions were misleading to reasonable consumers, including Plaintiff and the Minnesota Class.

612. Defendant knew or should have known the Paper Products did not have the quality, standards, or suitability of use as advertised by Defendant.

613. Defendant intended to mislead Plaintiff and the Minnesota Class and induce them to rely on Defendant's the Deceptive Claims and Common Omissions when purchasing the Paper Products, unaware of the undisclosed or misrepresented material facts.

614. Plaintiff and the Minnesota Class were misled and did, in fact, rely on the Deceptive Claims and Common Omissions, and other deceptive conduct when purchasing the Paper Products.

615. The Deceptive Claims and Common Omissions not disclosed by Defendant were material facts in that Plaintiff, the Minnesota Class, and any reasonable consumer would have considered them in deciding whether to purchase the Paper Products. Had Plaintiff and the Minnesota Class known the truth, they would not have purchased the Paper Products or paid less.

616. Defendant did not provide Plaintiff and the Minnesota Class with any other additional information to clarify the misleading, deceptive, or untrue statements or representations.

617. Defendant possessed special knowledge of material facts that were not disclosed to Plaintiff and the Minnesota Class regarding the Paper Products' true quality, standards, character, and suitability for use.

618. Defendant's unlawful conduct continues, with no indication that it intends to cease this fraudulent course of conduct.

619. Because Defendant voluntarily represented the Paper Products as having certain qualities, standards, and character, it was required to make a full and fair disclosure under Minnesota law. Defendant had a duty to disclose the Common Omissions in order to make the misrepresentations, including the Deceptive Claims not misleading. Defendant failed to discharge its duty to disclose the Common Omissions.

620. Accordingly, P&G is liable to Plaintiff and the other Minnesota Class members for damages in an amount to be proven at trial, including but not limited to, benefit-of-the-bargain damages, restitution and/or diminution of value.

621. P&G's acts were done wantonly, maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiff's and the Minnesota Class members' rights and the representations that P&G made to them, in order to enrich P&G. P&G's conduct

warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

### K. Claims brought on behalf of the New York Class

**COUNT XXVII**
**VIOLATION OF NEW YORK GENERAL BUSINESS LAW §§ 349-350**
**(N.Y. Gen. Bus. Law §§ 349-350)**

622. Plaintiffs Beck, Maggio, and Willis hereby incorporate by reference all preceding allegations as though fully set forth herein.

623. This Count is brought by Plaintiffs Beck, Maggio, and Willis on behalf of themselves and the New York Class.

624. New York General Business Law ("New York GBL") makes unlawful "[d]eceptive acts or practices in the conduct of any business, trade or commerce." N.Y. Gen. Bus. Law § 349.

625. Plaintiffs and New York Class members are "persons" within the meaning of N.Y. Gen. Bus. Law § 349(h).

626. Defendant is a "person," "firm," "corporation," or "association" within the meaning of N.Y. Gen. Bus. Law § 349.

627. Defendant's deceptive acts and practices, which were intended to mislead consumers who purchased P&G Paper Products, was conduct directed at consumers.

628. Because Defendant's willful and knowing conduct caused injury to Plaintiffs, Plaintiffs seek recovery of actual damages or $50, whichever is greater; discretionary treble damages up to $1,000; punitive damages; reasonable attorneys' fees and costs; an order enjoining Defendant's deceptive conduct; and any other just and proper relief available under N.Y. Gen. Bus. Law § 349.

**COUNT XXVIII**
**FRAUDULENT CONCEALMENT**
**(Based on New York Law)**

629. Plaintiffs Beck, Maggio, and Willis incorporate by reference all preceding allegations as though fully set forth herein.

630. Plaintiffs Beck, Maggio, and Willis bring this Count on behalf of themselves and the New York Class.

631. P&G intentionally concealed and suppressed material facts regarding its P&G Paper Products. These material facts include: (1) P&G is not protecting forests as its P&G Paper Products are made with virgin forest fiber derived from the industrial clearcutting and burning of previously untouched old-growth forests; (2) P&G is not growing forests as its replanting efforts are designed to convert these old-growth forests into industrial tree crops which are ultimately capable of reproducing but a small fraction of the original ecological value; (3) P&G is not restoring forests as its total restoration efforts impact an area less than 1% of untouched old-growth forest lost each year to industrial logging practices; (4) a large portion of the pulp used in P&G Paper Products is *not* FSC certified at all, and even for pulp that is FSC Mix certified, that pulp actually contains very little to no FSC forest-certified material; and (5) the Rainforest Alliance "Forest Allies" logo does not convey any type of third-party certification reflective of responsible forestry standards.

632. Despite the 2020 Shareholder Resolution and clear desire by the shareholders and investors that P&G change its sourcing practices and eliminate deforestation and forest degradation and P&G's public commitment to environmental sustainability and responsible forestry sourcing practices, the company continued to source from primary forests and boreal caribou habitat, material facts it concealed from Plaintiffs and the New York Class.

633. P&G voluntarily represented via the Deceptive Claims that its P&G Paper Products were environmentally sustainable and was therefore required to make a full and fair disclosure under New York law. P&G therefore had a duty to disclose the Common Omissions in order to make the Deceptive Claims not misleading. P&G also knew that these representations were false when made.

634. The knowing and active concealment of the material facts render the Products' packaging deceptive, misleading, and unfair because without full disclosure, Plaintiffs and the New York Class believed the P&G Paper Products to be environmentally sustainable and to have environmental benefits.

635. P&G's omissions, concealment, misrepresentations, and other deceptive conduct were likely to deceive or cause misunderstanding and did in fact deceive Plaintiffs and the New York Class with respect to the environmental and sustainability claims.

636. P&G intended that Plaintiffs and the New York Class rely on its omissions, concealment, misrepresentations, and other deceptive conduct as alleged herein regarding the environmental and sustainability claims when purchasing the P&G Paper Products.

637. P&G's omissions, concealment, and/or misrepresentations alleged herein did cause Plaintiffs and the other New York Class members to make their P&G Paper Product purchases. Plaintiffs were unaware of these material facts, and had P&G communicated these material facts to consumers, Plaintiffs and the other New York Class members would not have purchased P&G Paper Products or would not have purchased P&G Paper Products at the prices they paid. Accordingly, Plaintiffs and the other New York Class members have suffered injury in fact, including lost money or property, as a result of P&G's misrepresentations and omissions.

638. Accordingly, P&G is liable to Plaintiffs and the other New York Class members for damages in an amount to be proven at trial, including but not limited to, benefit-of-the-bargain damages, restitution and/or diminution of value.

639. P&G's acts were done wantonly, maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiffs' and other New York Class members' rights and the representations that P&G made to them, in order to enrich P&G. P&G's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

## L. Claims brought on behalf of the North Carolina Class

### COUNT XXIX
### VIOLATION OF THE NORTH CAROLINA UNFAIR AND DECEPTIVE ACTS AND PRACTICES ACT
### (N.C. Gen. Stat. § 75-1.1 *et seq.*)

640. Plaintiff Trepper hereby incorporates by reference all preceding allegations as though fully set forth herein.

641. This Count is brought by Plaintiff Trepper on behalf of himself and the North Carolina Class.

642. P&G engaged in commerce within the meaning of the N.C. Gen. Stat. § 75-1.1(b).

643. North Carolina's Unfair and Deceptive Acts and Practices Act ("North Carolina Act") broadly prohibits "unfair or deceptive acts or practices in or affecting commerce. N.C. Gen. Stat. § 75-1.1(a).

644. In the course of its business, P&G concealed the Common Omissions as described herein and otherwise engaged in activities with a tendency or capacity to deceive. P&G also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, concealment, suppression or omission of any material fact with intent that

other rely upon such concealment, suppression or omission, in connection with the sale of P&G Paper Products.

645. P&G's actions describe herein occurred in the conduct of trade or commerce, specifically the manufacture, marketing, and sale of P&G Paper Products to Plaintiff and the North Carolina Class.

646. By failing to disclose the Common Omissions, P&G engaged in unfair and deceptive business practices in violation of the North Carolina Act.

647. The Deceptive Claims and the Common Omissions would be material to a reasonable consumer, such as the North Carolina Class, and it is material to Plaintiff.

648. P&G's deceptive act or practices described herein were likely to deceive or mislead a reasonable consumer acting reasonably under the circumstances, such as Plaintiff and the North Carolina Class, and did in fact deceive and mislead Plaintiff.

649. Plaintiff and the North Carolina Class members could not have reasonably discovered the existence of the Common Omissions during the Class Period.

650. P&G knew or should have known its conduct violated the North Carolina Act.

651. P&G knew or should have known about the Common Omissions.

652. As alleged above, P&G made material statements about the environmental sustainability of its supply chain that were either false or misleading.

653. P&G owed Plaintiff and the North Carolina Class a duty to disclose the Common Omissions because P&G: (a) possessed exclusive knowledge of the Common Omissions; (2) intentionally concealed the Common Omissions from Plaintiff; (3) made incomplete representations via the Deceptive Claims.

654. P&G's deceptive acts and practices alleged herein directly and proximately caused actual damages and ascertainable monetary loss to Plaintiff and the North Carolina Class. Because P&G omitted the Common Omissions, Plaintiff and North Carolina Class members were deprived of the benefit of their bargain as their P&G Paper Products were worth less than what they would have been had the Common Omissions been revealed by P&G. Had Plaintiff and the North Carolina Class members been aware of the Common Omissions they would either have not bought a P&G Paper Products or would have paid less for them.

655. P&G's violations of the North Carolina Act present continuing risk and harm to Plaintiff, the North Carolina Class, and the public.

656. P&G is liable to Plaintiff and the North Carolina Class for damages in amounts to be proven at trial, actual damages, an order enjoining P&G's unlawful acts, costs of Court, attorney's fees, and any other just and proper relief available under the North Carolina Act.

**COUNT XXX**
**FRAUDULENT CONCEALMENT**
**(Based on North Carolina Law)**

657. Plaintiff Trepper incorporates by reference all preceding allegations as though fully set forth herein.

658. Plaintiff Trepper brings this Count on behalf of himself and the North Carolina Class.

659. P&G intentionally concealed and suppressed material facts regarding its P&G Paper Products. These material facts include: (1) P&G is not protecting forests as its P&G Paper Products are made with virgin forest fiber derived from the industrial clearcutting and burning of previously untouched old-growth forests; (2) P&G is not growing forests as its replanting efforts are designed to convert these old-growth forests into industrial tree crops which are ultimately capable of reproducing but a small fraction of the original ecological value; (3) P&G is not

restoring forests as its total restoration efforts impact an area less than 1% of untouched old-growth forest lost each year to industrial logging practices; (4) a large portion of the pulp used in P&G Paper Products is *not* FSC certified at all, and even for pulp that is FSC Mix certified, that pulp actually contains very little to no FSC forest-certified material; and (5) the Rainforest Alliance "Forest Allies" logo does not convey any type of third-party certification reflective of responsible forestry standards.

660. Despite the 2020 Shareholder Resolution and clear desire by the shareholders and investors that P&G change its sourcing practices and eliminate deforestation and forest degradation and P&G's public commitment to environmental sustainability and responsible forestry sourcing practices, the company continued to source from primary forests and boreal caribou habitat, material facts it concealed from Plaintiff and the North Carolina Class.

661. P&G voluntarily represented via the Deceptive Claims that its P&G Paper Products were environmentally sustainable and was therefore required to make a full and fair disclosure under North Carolina law. P&G therefore had a duty to disclose the Common Omissions in order to make the Deceptive Claims not misleading. P&G also knew that these representations were false when made.

662. The knowing and active concealment of the material facts render the Products' packaging deceptive, misleading, and unfair because without full disclosure, Plaintiff and the North Carolina Class believed the P&G Paper Products to be environmentally sustainable and to have environmental benefits.

663. P&G's omissions, concealment, misrepresentations, and other deceptive conduct were likely to deceive or cause misunderstanding and did in fact deceive Plaintiff and the North Carolina Class with respect to the environmental and sustainability claims.

664. P&G intended that Plaintiff and the North Carolina Class rely on its omissions, concealment, misrepresentations, and other deceptive conduct as alleged herein regarding the environmental and sustainability claims when purchasing the P&G Paper Products.

665. P&G's omissions, concealment, and/or misrepresentations alleged herein did cause Plaintiff and the other North Carolina Class members to make their P&G Paper Product purchases. Plaintiff was unaware of these material facts, and had P&G communicated these material facts to consumers, Plaintiff and the other North Carolina Class members would not have purchased P&G Paper Products or would not have purchased P&G Paper Products at the prices they paid. Accordingly, Plaintiff and the other North Carolina Class members have suffered injury in fact, including lost money or property, as a result of P&G's misrepresentations and omissions.

666. Accordingly, P&G is liable to Plaintiff and the other North Carolina Class members for damages in an amount to be proven at trial, including but not limited to, benefit-of-the-bargain damages, restitution and/or diminution of value.

667. P&G's acts were done wantonly, maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiff's and other North Carolina Class members' rights and the representations that P&G made to them, in order to enrich P&G. P&G's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

**M. Claims brought on behalf of the Ohio Class**

**COUNT XXXI**
**VIOLATION OF THE OHIO CONSUMER SALES PRACTICES ACT**
**(Ohio Rev. Code Ann. § 1345.01, *et seq.*)**

668. Plaintiffs Klemm and Stork hereby incorporate by reference all preceding allegations as though fully set forth herein.

669. This claim is brought by Plaintiffs Klemm and Stork on behalf of themselves and the Ohio Class.

670. The Ohio Consumer Sales Practices Act ("Ohio CSPA"), Ohio Rev. Code Ann. § 1345.02, broadly prohibits unfair or deceptive acts or practices in connection with a consumer transaction. Specifically, and without limitation of the broad prohibition, the Ohio CSPA prohibits suppliers from representing that "a specific price advantage exists, if it does not." Ohio Rev. Code Ann. § 1345.02.

671. Defendant is a "supplier" as that term is defined in Ohio Rev. Code Ann. § 1345.01(C) as it manufactured and placed into trade the P&G Paper Products which Plaintiffs and members of the Ohio Class purchased.

672. Plaintiffs and Ohio Class members purchased P&G Paper Products for personal, family, or household use and are therefore "consumers" as that term is defined in Ohio Rev. Code Ann. § 1345.01(D), and their purchases of P&G Paper Products is a "consumer transaction" within the meaning of Ohio Rev. Code Ann. § 1345.01(A).

673. Defendant's actions, as set forth above, occurred in the conduct of trade and commerce.

674. In the course of its business, Defendant concealed the Common Omissions as described herein and otherwise engaged in activities with a tendency or capacity to deceive. Defendant also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of P&G Paper Products.

675. The Ohio CSPA notes that it is deceptive for Defendant to state that Paper Products have "sponsorship, approval, performance characteristics, accessories, uses or benefits that [they] do not have." Ohio Rev. Code Ann. § 1345.02(B)(1).

676. But for Defendant's Deceptive Claims and Common Omissions, Plaintiffs and the Ohio Class members would not have purchased P&G Paper Products or would have paid substantially less for them.

677. Plaintiffs and Ohio Class members were uniformly exposed to Defendant's Deceptive Claims and Common Omissions because Defendant supplied the Paper Products packaging and other point-of-sale materials to retailers like Amazon, Kroger, Costco, and others. These Deceptive Claims and Common Omissions are misleading and deceptive for the reasons described herein.

678. Defendant's Deceptive Claims and Common Omissions regarding P&G Paper Products are material to a reasonable consumer for the reasons described herein and were designed to affect consumer decisions and conduct.

679. Defendant understood and intended, or should have understood and intended, that the Deceptive Claims and Common Omissions would influence consumer behavior. Defendant also understood that its failure to include the necessary explanatory information regarding these statements were material to the price at which consumers purchased Paper Products.

680. Defendant also understands, or should have understood, it has an obligation to avoid misleading the public regarding P&G Paper Products.

681. Because the information underlying the Deceptive Claims and Common Omissions could not be found in a location to which a consumer had reasonable access,

consumers could not have reasonably avoided the losses caused by the Deceptive Claims and Common Omissions.

682. Defendant's Deceptive Claims and Common Omissions on the P&G Paper Products packaging, and its point of sale materials, constitute unfair methods of competition and unfair and/or deceptive acts or practices in the conduct of trade or commerce for P&G Paper Products sales to consumers.

683. Defendant's acts and practices directly, foreseeably, and proximately caused Plaintiff and the Ohio Class members to suffer an injury-in-fact and/or actual damages, as described above. As a result, Plaintiffs and Ohio Class members suffered an ascertainable loss when they chose to purchase a P&G Paper Product and/or paid a premium for Paper Products above and beyond what they should have paid, and provided Defendant more in revenues from the sale of P&G Paper Products that it should have received absent its false and misleading representations. Plaintiffs and Ohio Class members were also deprived of the benefit of their bargain since the P&G Paper Products are worth less than they would have been absent Defendant's deceptive and unfair practices.

684. Defendant's acts and practices offend public policy as established by statute and case law.

685. Defendant's acts and practices are immoral, unethical, oppressive, and unscrupulous.

686. Defendant's conduct substantially injured actual and potential consumers, the public and competition in Ohio and each of the other states where P&G Paper Products were sold.

687. Defendant's conduct materially affected material information regarding its products to consumers nationwide and in each state where P&G Paper Products were sold. Defendant's conduct thus improperly distorted the information available to the public regarding P&G Paper Products.

688. Defendant's actions caused consumers, Plaintiffs, and Ohio Class members to choose to purchase and/or overpay for P&G Paper Products. These injuries are not outweighed by any countervailing benefits, or any other legally cognizable benefit, to consumers or competition.

689. Plaintiffs specifically do not allege herein a claim for violation of Ohio Rev. Code Ann. § 1345.72.

690. Defendant was on notice before the filing of this suit that its conduct in misleading consumers about the characteristics of P&G Paper Products was a violation of the Ohio CSPA and was committed after the decisions containing these determinations were made available for public inspection under division (A)(3) of O.R.C. § 1345.05. *See Brown v. Lyons*, PIF No. 10000304, 332 N.E.2d 380, 384 (C.P. 1974) (concluding that defendant violated the Ohio CSPA by misleading customers about the quality of appliances); *Brown v. Spears*, PIF No. 10000403, Warren M.C. No. 8897, 1979 WL 52451, at *2 (Aug. 20, 1979) (finding "as a matter of law, that where a defendant supplier violates 15 U.S.C. §2303, his act in doing so is inherently and necessarily a violation of O.R.C. 1345.02(A)."); *Cartwright v. Beverly Hills Floors, Inc.*, PIF No. 10003088, 2013-Ohio-2266, ¶ 17 (7th Dist.) (when manufacturer "knowingly commits a breach, the breach is likely also an unfair and deceptive act."); *Mason v. Mercedes-Benz USA, LLC*, PIF No. 10002382, 2005-Ohio-4296 (8th Dist.); *Khouri v. Lewis*, PIF No. 10001995, Cuyahoga C.P. No. 342098, 2001 WL 36171616 (May 18, 2001); *Fribourg v. Vandemark*, PIF

No. 10001874, 1999 WL 552741 (12th Dist. July 26, 1999); *Brandt v. Spitzer Buick*, PIF No. 10001065, Parma M.C. No. 89-CV-I-858 (Nov. 17, 1989) (judgment related to failure to deliver advertised environmental protection package); *State ex rel. DeWine v. Volkswagen AG*, PIF No. 3286, Franklin C.P. No. 16CV009944 (Feb. 1, 2017) (judgment related to vehicle emissions that exceed EPA-complaint levels); *State ex rel. Yost v. Robert Bosch GmbH*, PIF No. 3398, Franklin C.P. No. 19CV000293 (Feb. 25, 2019) (judgment related to emissions control software); *State ex rel. Fisher v. Advanced Automotive Techs., Inc.*, PIF No. 10001279, Franklin C.P. No. 91CVH021633 (Sep. 12, 1991) (judgment related to advertisements that represented product would reduce emissions).

691. Defendant was also on notice before the filing of this suit that its conduct in misleading consumers about the characteristics of P&G Paper Products and not clearly and conspicuously disclosing any material exclusions, reservations, limitations, modifications, or conditions was a violation Ohio Admin. Code § 109:4-3-02. As a result of the foregoing wrongful conduct, Plaintiffs and Ohio Class members have been damaged in an amount to be proven at trial, and seek all just and proper remedies, including, but not limited to, actual and statutory damages, an order enjoining Defendant's deceptive and unfair conduct, treble damages, court costs, and reasonable attorneys' fees, pursuant to Ohio Rev. Code Ann. § 1345.09, *et seq*. Plaintiffs also seek punitive damages against Defendant because Defendant's conduct was egregious. Defendant's Deceptive Claims and Common Omissions create a net impression to a reasonable consumer that P&G Paper Products represent a more sustainable choice than other, less expensive, brands of tissue products. Due to Defendant's conduct, Plaintiffs and millions of other Ohio Class members unknowingly supported the clearcutting and industrial logging and subsequent destruction of Canada's boreal forest.

**COUNT XXXII**
**FRAUDULENT CONCEALMENT**
**(Based on Ohio Law)**

692. Plaintiffs Klemm and Stork hereby incorporate by reference all preceding allegations as though fully set forth herein.

693. Plaintiffs Klemm and Stork bring this Count on behalf of themselves and the Ohio Class.

694. P&G intentionally concealed and suppressed Common Omissions regarding its P&G Paper Products. These Common Omissions include: (1) P&G is not protecting forests as its P&G Paper Products are made with virgin forest fiber derived from the industrial clearcutting and burning of previously untouched old-growth forests; (2) P&G is not growing forests as its replanting efforts are designed to convert these old-growth forests into industrial tree crops which are ultimately capable of reproducing but a small fraction of the original ecological value; (3) P&G is not restoring forests as its total restoration efforts impact an area less than 1% of untouched old-growth forest lost each year to industrial logging practices; (4) a large portion of the pulp used in P&G Paper Products is *not* FSC certified at all, and even for pulp that is FSC Mix certified, that pulp actually contains very little to no FSC forest-certified material; and (5) the Rainforest Alliance "Forest Allies" logo does not convey any type of third-party certification reflective of responsible forestry standards.

695. Despite the 2020 Shareholder Resolution and clear desire by the shareholders and investors that P&G change its sourcing practices and eliminate deforestation and forest degradation and P&G's public commitment to environmental sustainability and responsible forestry sourcing practices, the company continued to source from primary forests and boreal caribou habitat, material facts it concealed from Plaintiffs and the Ohio Class.

696. P&G voluntarily represented via the Deceptive Claims that its P&G Paper Products were environmentally sustainable and was therefore required to make a full and fair disclosure under Ohio law. P&G therefore had a duty to disclose the Common Omissions in order to make the Deceptive Claims not misleading. P&G also knew that these representations were false when made.

697. The knowing and active concealment of the material facts render the Products' packaging deceptive, misleading, and unfair because without full disclosure, Plaintiffs and the Ohio Class believed the P&G Paper Product to be environmentally sustainable and to have environmental benefits.

698. P&G's omissions, concealment, misrepresentations, and other deceptive conduct were likely to deceive or cause misunderstanding and did in fact deceive Plaintiffs and the Ohio Class with respect to the environmental and sustainability claims.

699. P&G intended that Plaintiffs and the Ohio Class rely on its omissions, concealment, misrepresentations, and other deceptive conduct as alleged herein regarding the environmental and sustainability claims when purchasing the P&G Paper Products.

700. P&G's Deceptive Claims and Common Omissions alleged herein did cause Plaintiffs and the other Ohio Class members to make their P&G Paper Product purchases. Plaintiffs were unaware of the Common Omissions, and had P&G communicated the Common Omissions to consumers, Plaintiffs and the other Ohio Class members would not have purchased P&G Paper Products or would not have purchased P&G Paper Products at the prices they paid. Accordingly, Plaintiffs and the other Ohio Class members have suffered injury in fact, including lost money or property, as a result of P&G's Deceptive Claims and Common Omissions.

701. Accordingly, P&G is liable to Plaintiffs and the other Ohio Class members for damages in an amount to be proven at trial, including but not limited to, benefit-of-the-bargain damages, restitution and/or diminution of value.

702. P&G's acts were done wantonly, maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiffs' and other Ohio Class members' rights and the representations that P&G made to them, in order to enrich P&G. P&G's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

**N. Claims brought on behalf of the Pennsylvania Class**

**COUNT XXXIII**
**VIOLATION OF THE PENNSYLVANIA UNFAIR TRADE PRACTICES AND CONSUMER PROTECTION LAW**
**(73 Pa. Cons. Stat. § 201-1, *et seq*.)**

703. Plaintiffs Easter and Kwon hereby incorporate by reference all preceding allegations as though fully set forth herein.

704. This Count is brought by Plaintiffs Easter and Kwon on behalf of themselves and the Pennsylvania Class.

705. The Pennsylvania Unfair Trade Practices and Consumer Protection Law ("Pennsylvania CPL") prohibits unfair or deceptive acts or practices, including: "[m]aking false or misleading statements of fact concerning the reasons for, existence of, or amounts of price reductions;" and "[e]ngaging in any other fraudulent or deceptive conduct which creates a likelihood of confusion or of misunderstanding." 73 Pa. Cons. Stat. § 201-2(4).

706. Defendant, Plaintiffs, and Pennsylvania Class members are "persons" within the meaning of 73 Pa. Cons. Stat. § 201-2(2).

707. Plaintiffs and the Pennsylvania Class members purchased P&G Paper Products primarily for personal, family, or household purposes within the meaning of 73 Pa. Cons. Stat. § 201-9.2.

708. All of the acts complained of herein were perpetrated by Defendant in the course of trade or commerce within the meaning of 73 Pa. Cons. Stat. § 201-2(3).

709. Defendant is liable to Plaintiffs for treble their actual damages or $100, whichever is greater, and attorneys' fees and costs. 73 Pa. Cons. Stat. § 201-9.2(a). Plaintiffs are also entitled to an award of punitive damages given that Defendant's conduct was malicious, wanton, willful, oppressive, or exhibited a reckless indifference to the rights of others.

**COUNT XXXIV**
**FRAUDULENT CONCEALMENT**
**(Based on Pennsylvania Law)**

710. Plaintiffs Easter and Kwon incorporate by reference all preceding allegations as though fully set forth herein.

711. Plaintiffs Easter and Kwon bring this Count on behalf of themselves and the Pennsylvania Class.

712. P&G intentionally concealed and suppressed material facts regarding its P&G Paper Products. These material facts include: (1) P&G is not protecting forests as its P&G Paper Products are made with virgin forest fiber derived from the industrial clearcutting and burning of previously untouched old-growth forests; (2) P&G is not growing forests as its replanting efforts are designed to convert these old-growth forests into industrial tree crops which are ultimately capable of reproducing but a small fraction of the original ecological value; (3) P&G is not restoring forests as its total restoration efforts impact an area less than 1% of untouched old-growth forest lost each year to industrial logging practices; (4) a large portion of the pulp used in P&G Paper Products is *not* FSC certified at all, and even for pulp that is FSC Mix certified, that

pulp actually contains very little to no FSC forest-certified material; and (5) the Rainforest Alliance "Forest Allies" logo does not convey any type of third-party certification reflective of responsible forestry standards.

713. Despite the 2020 Shareholder Resolution and clear desire by the shareholders and investors that P&G change its sourcing practices and eliminate deforestation and forest degradation and P&G's public commitment to environmental sustainability and responsible forestry sourcing practices, the company continued to source from primary forests and boreal caribou habitat, material facts it concealed from Plaintiffs and the Pennsylvania Class.

714. P&G voluntarily represented via the Deceptive Claims that its P&G Paper Products were environmentally sustainable and was therefore required to make a full and fair disclosure under Pennsylvania law. P&G therefore had a duty to disclose the Common Omissions in order to make the Deceptive Claims not misleading. P&G also knew that these representations were false when made.

715. The knowing and active concealment of the material facts render the Products' packaging deceptive, misleading, and unfair because without full disclosure, Plaintiffs and the Pennsylvania Class believed the P&G Paper Products to be environmentally sustainable and to have environmental benefits.

716. P&G's omissions, concealment, misrepresentations, and other deceptive conduct were likely to deceive or cause misunderstanding and did in fact deceive Plaintiffs and the Pennsylvania Class with respect to the environmental and sustainability claims.

717. P&G intended that Plaintiffs and the Pennsylvania Class rely on its omissions, concealment, misrepresentations, and other deceptive conduct as alleged herein regarding the environmental and sustainability claims when purchasing the P&G Paper Products.

718. P&G's omissions, concealment, and/or misrepresentations alleged herein did cause Plaintiffs and the other Pennsylvania Class members to make their P&G Paper Product purchases. Plaintiffs were unaware of these material facts, and had P&G communicated these material facts to consumers, Plaintiffs and the other Pennsylvania Class members would not have purchased P&G Paper Products or would not have purchased P&G Paper Products at the prices they paid. Accordingly, Plaintiffs and the other Pennsylvania Class members have suffered injury in fact, including lost money or property, as a result of P&G's misrepresentations and omissions.

719. Accordingly, P&G is liable to Plaintiffs and the other Pennsylvania Class members for damages in an amount to be proven at trial, including but not limited to, benefit-of-the-bargain damages, restitution and/or diminution of value.

720. P&G's acts were done wantonly, maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiffs' and other Pennsylvania Class members' rights and the representations that P&G made to them, in order to enrich P&G. P&G's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

## O. Claims brought on behalf of the Utah Class

### COUNT XXXV
### VIOLATION OF THE UTAH CONSUMER SALE PRACTICES ACT
### (Utah Code Ann. § 13-11-1, *et seq.*)

721. Plaintiffs Hymas and Lemons Sr. hereby incorporate by reference all preceding allegations as though fully set forth herein.

722. This Count is brought by Plaintiffs Hymas and Lemons, Sr. on behalf of themselves and the Utah Class.

723. The Utah Consumer Sales Practices Act ("Utah CSPA") makes unlawful any "deceptive act or practice by a supplier in connection with a consumer transaction," including, but not limited to, "indicat[ing] that a specific price advantage exists, if it does not." Utah Code Ann. § 13-11-4. "An unconscionable act or practice by a supplier in connection with a consumer transaction" also violates the Utah CSPA. Utah Code Ann. § 13-11-5.

724. Defendant knew, or had reason to know, that consumers would rely on Defendant's representations and omissions regarding the environmental sustainability of P&G Paper Products and chose to conceal, suppress and omit material facts required to make their environmental claims not misleading. Defendant therefore engaged in an unconscionable act within the meaning of Utah Code Ann. § 13-11-5.

725. Pursuant to Utah Code Ann. § 13-11-4, Plaintiffs seek monetary relief measured as the greater of (a) actual damages in an amount to be determined at trial and (b) statutory damages in the amount of $2,000 for each Plaintiff; reasonable attorneys' fees; and any other just and proper relief available under the Utah CSPA.

**COUNT XXXVI**
**FRAUDULENT CONCEALMENT**
**(Based on Utah Law)**

726. Plaintiffs Hymas and Lemons, Sr. incorporate by reference all preceding allegations as though fully set forth herein.

727. Plaintiffs Hymas and Lemons, Sr. bring this Count on behalf of themselves and the Utah Class.

728. P&G intentionally concealed and suppressed material facts regarding its P&G Paper Products. These material facts include: (1) P&G is not protecting forests as its P&G Paper Products are made with virgin forest fiber derived from the industrial clearcutting and burning of previously untouched old-growth forests; (2) P&G is not growing forests as its replanting efforts

are designed to convert these old-growth forests into industrial tree crops which are ultimately capable of reproducing but a small fraction of the original ecological value; (3) P&G is not restoring forests as its total restoration efforts impact an area less than 1% of untouched old-growth forest lost each year to industrial logging practices; (4) a large portion of the pulp used in P&G Paper Products is *not* FSC certified at all, and even for pulp that is FSC Mix certified, that pulp actually contains very little to no FSC forest-certified material; and (5) the Rainforest Alliance "Forest Allies" logo does not convey any type of third-party certification reflective of responsible forestry standards.

729. Despite the 2020 Shareholder Resolution and clear desire by the shareholders and investors that P&G change its sourcing practices and eliminate deforestation and forest degradation and P&G's public commitment to environmental sustainability and responsible forestry sourcing practices, the company continued to source from primary forests and boreal caribou habitat, material facts it concealed from Plaintiffs and the Utah Class.

730. P&G voluntarily represented via the Deceptive Claims that its P&G Paper Products were environmentally sustainable and was therefore required to make a full and fair disclosure under Utah law. P&G therefore had a duty to disclose the Common Omissions in order to make the Deceptive Claims not misleading. P&G also knew that these representations were false when made.

731. The knowing and active concealment of the material facts render the Products' packaging deceptive, misleading, and unfair because without full disclosure, Plaintiffs and the Utah Class believed the P&G Paper Products to be environmentally sustainable and to have environmental benefits.

732. P&G's omissions, concealment, misrepresentations, and other deceptive conduct were likely to deceive or cause misunderstanding and did in fact deceive Plaintiffs and the Utah Class with respect to the environmental and sustainability claims.

733. P&G intended that Plaintiffs and the Utah Class rely on its omissions, concealment, misrepresentations, and other deceptive conduct as alleged herein regarding the environmental and sustainability claims when purchasing the P&G Paper Products.

734. P&G's omissions, concealment, and/or misrepresentations alleged herein did cause Plaintiffs and the other Utah Class members to make their P&G Paper Product purchases. Plaintiffs were unaware of these material facts, and had P&G communicated these material facts to consumers, Plaintiffs and the other Utah Class members would not have purchased P&G Paper Products or would not have purchased P&G Paper Products at the prices they paid. Accordingly, Plaintiffs and the other Utah Class members have suffered injury in fact, including lost money or property, as a result of P&G's misrepresentations and omissions.

735. Accordingly, P&G is liable to Plaintiffs and the other Utah Class members for damages in an amount to be proven at trial, including but not limited to, benefit-of-the-bargain damages, restitution and/or diminution of value.

736. P&G's acts were done wantonly, maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiffs' and other Utah Class members' rights and the representations that P&G made to them, in order to enrich P&G. P&G's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

## P. Claims brought on behalf of the Washington Class

**COUNT XXXVII**
**VIOLATION OF THE WASHINGTON CONSUMER PROTECTION ACT**
**(Wash. Rev. Code Ann. § 19.86.010, *et seq*.)**

737. Plaintiffs Lowry, Kopecki, and Dunn ("Plaintiffs" for purposes of this section) incorporate by reference all preceding allegations as though fully set forth herein.

738. Plaintiffs Lowry, Kopecki, and Dunn bring this Count on behalf of themselves and the Washington Class.

739. The Washington Consumer Protection Act ("Washington CPA") broadly prohibits "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." Wash. Rev. Code Ann. § 19.96.010.

740. P&G committed the acts complained of herein in the course of "trade" or "commerce" within the meaning of Wash. Rev. Code Ann. § 19.96.010.

741. P&G deceptive practices, as alleged herein, are injurious to the public interest as it has the capacity to injure other persons.

742. P&G has violated portions of section 260 of the FTC Green Guides, which have been incorporated into Wash Rev. Code Ann. § 70A.455.020 and § 19.86.920.

743. P&G is liable to Plaintiffs for damages in amounts to be proven at trial, including attorneys' fees, costs, and treble damages, as well as any other remedies the Court may deem appropriate under Wash. Rev. Code Ann. § 19.86.090.

**COUNT XXXVIII**
**FRAUDULENT CONCEALMENT**
**(Based on Washington Law)**

744. Plaintiffs Lowry, Kopecki, and Dunn incorporate by reference all preceding allegations as though fully set forth herein.

745. Plaintiffs Lowry, Kopecki, and Dunn bring this Count on behalf of themselves and the Washington Class.

746. P&G intentionally concealed and suppressed material facts regarding its P&G Paper Products. These material facts include: (1) P&G is not protecting forests as its P&G Paper Products are made with virgin forest fiber derived from the industrial clearcutting and burning of previously untouched old-growth forests; (2) P&G is not growing forests as its replanting efforts are designed to convert these old-growth forests into industrial tree crops which are ultimately capable of reproducing but a small fraction of the original ecological value; (3) P&G is not restoring forests as its total restoration efforts impact an area less than 1% of untouched old-growth forest lost each year to industrial logging practices; (4) a large portion of the pulp used in P&G Paper Products is *not* FSC certified at all, and even for pulp that is FSC Mix certified, that pulp actually contains very little to no FSC forest-certified material; and (5) the Rainforest Alliance "Forest Allies" logo does not convey any type of third-party certification reflective of responsible forestry standards.

747. Despite P&G's public commitment to environmental sustainability and responsible forestry sourcing practices, the company continued to source from primary forests and boreal caribou habitat, material facts it concealed from Plaintiffs and the Washington Class.

748. P&G voluntarily represented via the Deceptive Claims that its P&G Paper Products were environmentally sustainable and was therefore required to make a full and fair disclosure under Washington law. P&G therefore had a duty to disclose the Common Omissions in order to make the Deceptive Claims not misleading. P&G also knew that these representations were false when made.

749. The knowing and active concealment of the material facts render the Products' packaging deceptive, misleading, and unfair because without full disclosure, Plaintiffs and the Washington Class believed the P&G Paper Products to be environmentally sustainable and to have environmental benefits.

750. P&G's omissions, concealment, misrepresentations, and other deceptive conduct were likely to deceive or cause misunderstanding and did in fact deceive Plaintiffs and the Washington Class with respect to the environmental and sustainability claims.

751. P&G intended that Plaintiffs and the Washington Class rely on its omissions, concealment, misrepresentations, and other deceptive conduct as alleged herein regarding the environmental and sustainability claims when purchasing the P&G Paper Products.

752. P&G's omissions, concealment, and/or misrepresentations alleged herein did cause Plaintiffs and the other Washington Class members to make their P&G Paper Product purchases. Plaintiffs were unaware of these material facts, and had P&G communicated these material facts to consumers, Plaintiffs and the other Washington Class members would not have purchased P&G Paper Products or would not have purchased P&G Paper Products at the prices they paid. Accordingly, Plaintiffs and the other Washington Class members have suffered injury in fact, including lost money or property, as a result of P&G's misrepresentations and omissions.

753. Accordingly, P&G is liable to Plaintiffs and the other Washington Class members for damages in an amount to be proven at trial, including but not limited to, benefit-of-the-bargain damages, restitution and/or diminution of value.

754. P&G's acts were done wantonly, maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiffs' and other Washington Class members' rights and the representations that P&G made to them, in order to enrich P&G. P&G's conduct

warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, individually and on behalf of members of the proposed Class, respectfully request that the Court enter judgment in their favor and against P&G, as follows:

A. Certification of the proposed Class, including appointment of Plaintiffs' counsel as Class Counsel;

B. An order temporarily and permanently enjoining P&G from continuing the unlawful, deceptive, fraudulent, and unfair business practices alleged herein;

C. Costs, restitution, damages, including punitive damages, and disgorgement in an amount to be determined at trial;

D. An order requiring P&G to pay both pre- and post-judgment interest on any amounts awarded;

E. An award of costs and attorneys' fees; and

F. Such other or further relief as may be appropriate.

## DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a jury trial of all claims so triable.

DATED: September 30, 2025

Respectfully submitted,

*/s/ Terence R. Coates*
Terence R. Coates (0088579)
MARKOVITS, STOCK & DEMARCO, LLC
119 East Court Street, Suite 530
Cincinnati, Ohio 45202
Telephone: (513) 665-3700
Facsimile: (513) 665-0219
Email: tcoates@msdlegal.com

Steve W. Berman (*pro hac vice*)
Catherine Y.N. Gannon (*pro hac vice*)
HAGENS BERMAN SOBOL SHAPIRO LLP
1301 Second Avenue, Suite 2000
Seattle, WA 98101
Telephone: (206) 623-7292
Facsimile: (206) 623-0594
Email: steve@hbsslaw.com
catherineg@hbsslaw.com

Rebecca A. Peterson (*pro hac vice*)
GEORGE FELDMAN MCDONALD, PLLC
1650 W. 82nd Street, Suite 880
Bloomington, MN 55431
Telephone: (612) 778-9595
Email: RPeterson@4-Justice.com

Kim E. Richman (*pro hac vice* forthcoming)
Jennifer Church (*pro hac vice*)
RICHMAN LAW & POLICY
1 Bridge Street, Suite 83
Irvington, NY 10533
Telephone: (914) 693-2018
Email: krichman@richmanlawpolicy.com
jchurch@richmanlawpolicy.com

*Attorneys for Plaintiffs*

**CERTIFICATE OF SERVICE**

I hereby certify that on September 30, 2025, I served the foregoing document upon counsel for all parties by filing it with the Court's electronic-filing system, in accordance with Fed. R. Civ. P. 5(b)(2)(E) and S.D. Ohio Civ. R. 5.2(b).

*/s/ Terence R. Coates*
Terence R. Coates (0088579)