**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

BREANNE MAGGIO, KEVIN MCCARTHY, MELISSA LOWRY, ADAM ALZAIDI, MELISSA CUEVAS, PAMELA GIARRIZZO, CAROLE GRANT, CYNTHIA MEUSE, LATRONYA WILLIAMS, LISA KOPECKI, MICHAEL DUNN, PATRICIA DEAN, CATHERINE DUPONT, TERETTA WILLIS, SHARON BECK, DAWN VAN DER STEEG, KELLEY RIVERS, ERNEST EASTER, JUBIN KWON, ANGELA BRYANT, GIA PASCARELLI, SHANNON WEISMAN, STUART BERGMAN, BRIAN HYMAS, TRISHA NADEAU, LESLIE SULLIVAN, ROBERT TREPPER, ERIC LEMONS, SR., REBEKAH KLEMM, and NATALIA STORK, individually and on behalf of all others similarly situated,

*Plaintiffs*,

v.

THE PROCTER & GAMBLE COMPANY,

*Defendant*.

No. 2:25-MD-03157-DRC-KAJ

Honorable Douglas R. Cole

ORAL ARGUMENT REQUESTED

**NOTICE OF THE PROCTER & GAMBLE COMPANY'S MOTION TO DISMISS PLAINTIFFS' CONSOLIDATED CLASS ACTION COMPLAINT**

Now comes Defendant The Proctor & Gamble Company ("P&G"), by and through counsel, and, pursuant to Rules 8, 9(b) and 12(b)(6) of the Federal Rules of Civil Procedure, moves this Court to dismiss Plaintiffs' Consolidated Class Action Complaint (the "Mo-

tion”). Plaintiffs’ claims should be dismissed because (1) Plaintiffs’ allegations fail to satisfy Rule 8’s plausibility standard, (2) Plaintiffs’ claims are all fraud-based but are not pled with sufficient particularity to satisfy Rule 9(b), and (3) Plaintiffs fail to state a claim upon which relief can be granted. P&G’s Motion is based on this Notice of Motion and the accompanying Memorandum of Law in Support of the Motion, the Request for Judicial Notice, the Declaration of David R. Singh, any oral argument heard by the Court, and such other matters as the Court may consider.

Dated: October 30, 2025

Respectfully submitted,

*<u>/s/ Elizabeth P. Kessler</u>*
Elizabeth P. Kessler
*Trial Counsel*
JONES DAY
325 John H. McConnell Blvd, Suite 600
Columbus, OH 43215
Phone: (614) 281-3852
Email: ekessler@jonesday.com

David J. Lender (admitted *pro hac vice*)
Aaron J. Curtis (admitted *pro hac vice*)
Elaina K. Aquila (admitted *pro hac vice*)
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, NY 10153
Phone: (212) 310-8000
Email: david.lender@weil.com
aaron.curtis@weil.com
elaina.aquila@weil.com

David R. Singh (admitted *pro hac vice*)
WEIL, GOTSHAL & MANGES LLP
201 Redwood Shores Parkway
Redwood Shores, CA 94065
Phone: (650) 802-3000
Email: david.singh@weil.com

*Counsel for The Procter & Gamble Company*

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION**

BREANNE MAGGIO, KEVIN MCCARTHY, MELISSA LOWRY, ADAM ALZAIDI, MELISSA CUEVAS, PAMELA GIARRIZZO, CAROLE GRANT, CYNTHIA MEUSE, LATRONYA WILLIAMS, LISA KOPECKI, MICHAEL DUNN, PATRICIA DEAN, CATHERINE DUPONT, TERETTA WILLIS, SHARON BECK, DAWN VAN DER STEEG, KELLEY RIVERS, ERNEST EASTER, JUBIN KWON, ANGELA BRYANT, GIA PASCARELLI, SHANNON WEISMAN, STUART BERGMAN, BRIAN HYMAS, TRISHA NADEAU, LESLIE SULLIVAN, ROBERT TREPPER, ERIC LEMONS, SR., REBEKAH KLEMM, and NATALIA STORK, individually and on behalf of all others similarly situated,

*Plaintiffs*,

v.

THE PROCTER & GAMBLE COMPANY,

*Defendant*.

No. 2:25-MD-03157-DRC-KAJ

Honorable Douglas R. Cole

ORAL ARGUMENT REQUESTED

**THE PROCTER & GAMBLE COMPANY'S MEMORANDUM OF LAW
IN SUPPORT OF ITS MOTION TO DISMISS**

## TABLE OF CONTENTS

SUMMARY OF ARGUMENT ..... 1

BACKGROUND ..... 5

A. The Third-Party Forestry Companies in P&G's Supply Chain Harvest and Replant Trees in Accordance with Canada's Strict Forestry Laws ..... 5

B. The Products Are Certified by the Forest Stewardship Council ..... 9

C. P&G's Use of the Rainforest Alliance Forest Allies Logo ..... 12

D. "Keep Forests as Forests" and the "Protect-Grow-Restore" Logo ..... 13

LEGAL STANDARD ..... 15

ARGUMENT ..... 15

I. Plaintiffs Fail to Plausibly Allege Consumer Deception ..... 15

A. Plaintiffs Challenge Third-Party Suppliers' Forestry Practices Without Alleging Any Named Plaintiffs Were Actually Deceived by P&G ..... 16

B. Plaintiffs Make No Allegations Showing the "Protect-Grow-Restore" Logo Is False or Misleading ..... 18

1. *Protect:* Plaintiffs Do Not Deny that Charmin and Puffs Products Are FSC Certified and Appropriately Use the "FSC Mix" Logo ..... 21

2. *Grow:* Plaintiffs Do Not Deny that the Forestry Companies in P&G's Supply Chain Replant At Least Two Trees for Every One Harvested ..... 27

3. *Restore:* Plaintiffs Do Not Deny that P&G Has Partnered with the Arbor Day Foundation to Replant One Million Trees ..... 30

4. Plaintiffs Do Not Deny that P&G Properly Uses the Forest Allies Logo on Charmin and Puffs Packaging ..... 31

C. P&G's Statements to Investors About Its Deforestation Policies Have No Bearing on Plaintiffs' Consumer Claims ..... 33

D. Plaintiffs Fail to Establish that P&G Had Any Duty to Disclose Information About Third-Party Suppliers' Forestry Practices .................... 34

II. Plaintiffs Do Not Plead Their Claims with Sufficient Particularity ....................... 37

III. Fraudulent Concealment Is Not an Independent Cause of Action Under Many of the State Laws ........................................................................................ 39

IV. Several State False Advertising Laws Bar Class Claims ........................................ 40

V. Plaintiff Maggio's Claims Fail for Additional Reasons ............................................ 40

A. Count III of the *Maggio* Complaint Constitutes an Impermissible "Shotgun Pleading" ............................................................................... 41

B. Plaintiff Failed to Engage in an Informal Dispute Settlement Program as Required by the Mississippi Consumer Protection Act ........... 41

C. Plaintiff Cannot Maintain a Breach of Implied Warranty Claim Because There Was No Privity of Contract Between Her and P&G........... 42

D. Plaintiff's Unjust Enrichment Claim Is Duplicative .................................... 42

CONCLUSION ........................................................................................................ 43

CERTIFICATE OF SERVICE.................................................................................. 45

## TABLE OF AUTHORITIES

**Cases** **Page(s)**

*Adeghe v. Procter & Gamble Co.*,
2024 WL 22061 (S.D.N.Y. Jan. 2, 2024) .......... 37

*In re Amazon Serv. Fee Litig.*,
705 F. Supp. 3d 1255 (W.D. Wash. 2023) .......... 35

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) .......... 13

*Banque Arabe Et Internationale D'Investissement v. Maryland Nat. Bank*,
819 F. Supp. 1282 (S.D.N.Y. 1993), *aff'd*, 57 F.3d 146 (2d Cir. 1995) .......... 32

*Barton v. Delfgauw*,
2024 WL 4653226 (W.D. Wash. Nov. 1, 2024) .......... 32

*Beerman v. Tauck, Inc.*,
2021 WL 3773293 (D. Conn. Aug. 25, 2021) .......... 31

*Bell Atl. Corp. v. Twombley*,
550 U.S. 544 (2007) .......... 14

*Biczo v. Ferrara Candy Co.*,
2023 WL 2572384 (N.D. Ill. Mar. 20, 2023) .......... 3, 18

*Boghossian v. Capella Univ., LLC*,
2025 WL 934878 (S.D.N.Y. Mar. 27, 2025) .......... 33

*Bohen v. ConAgra Brands, Inc.*,
2024 WL 1254128 (N.D. Ill. 2024) .......... 23

*Brown v. Otake*,
138 A.3d 951 (Conn. App. Ct. 2016) .......... 3, 35

*In re Carrier IQ, Inc.*,
78 F. Supp. 3d 1051 (N.D. Cal. 2015) .......... 31, 32

*Chancellor v. Bank of Am. N.A.*,
2015 WL 5730103 (N.D. Ill. Sept. 29, 2015) .......... 35

*Chapin Home for the Aging v. McKimm*,
2013 WL 948110 (E.D.N.Y. Mar. 11, 2013) .......... 31

*Childress v. City of Cincinnati*,
765 F. Supp. 3d 662 (S.D. Ohio 2025) (Cole, J.) .................................................... 13

*Cole v. Keystone RV Co.*, 2021 WL 3111452 (W.D. Wash. July 22, 2021), *aff'd*,
2022 WL 4234958 (9th Cir. Sept. 14, 2022) ......................................................... 33

*Cooper as Co-Tr. of Sylvia Rubin Lifetime Tr. v. Shabshelowitz*,
2025 WL 2176070 (D. Mass. July 31, 2025) ......................................................... 33

*Corsello v. Verizon N.Y., Inc.*,
967 N.E.2d 1177 (N.Y. 2012)..................................................................... 38, 39

*In re Davol, Inc./C.R. Bard, Inc., Polypropylene Hernia Mesh Prods. Liab. Litig.*,
2022 WL 4781952 (S.D. Ohio Oct. 3, 2022) ............................................................ 4

*DiMuro v. Clinique Lab'ys, LLC*,
572 F. App'x 27 (2d Cir. 2014) ......................................................................... 35

*Dorris v. Danone Waters of Am.*,
2024 WL 4792048 (S.D.N.Y. Nov. 14, 2024).................................................. 17, 18

*Dwyer v. Allbirds, Inc.*,
598 F. Supp. 3d 137 (S.D.N.Y. 2022) .......................................................... 3, 23, 29

*Eddystone Rail Co., LLC v. Bridger Logistics, LLC*,
2022 WL 1768853 (E.D. Pa. Mar. 21, 2022) ......................................................... 33

*Fink v. Time Warner Cable*,
714 F.3d 739 (2d Cir. 2013)................................................................................ 14

*Forsher v. J.M. Smucker Co.*,
612 F. Supp. 3d 714 (N.D. Ohio 2020) ........................................................ 3, 14, 16

*Gaddy v. Corp. of President of Church of Jesus Christ of Latter-Day Saints*,
665 F. Supp. 3d 1263 (D. Utah 2023) .................................................................. 31

*Gray v. Amazon.com, Inc.*,
653 F. Supp. 3d 847 (W.D. Wash. 2023) ............................................................... 16

*Greenberg v. Life Ins. Co. of Va.*,
177 F.3d 507 (6th Cir. 1999) ................................................................................ 9

*Greer v. Strange Honey Farm, LLC*,
114 F.4th 605 (6th Cir. 2024)............................................................... 3, 33, 34, 35

*Hammerschmidt v. Gen. Motors LLC*,
583 F. Supp. 3d 1215 (D. Minn. 2022)................................................................. 31

*Hawkins v. Shimano N. Am. Bicycle Inc.*,
2024 WL 4405249 (C.D. Cal. Aug. 1, 2024) ... 33

*Healthcare Co. v. MPI Grp. LLC*,
2025 WL 2733548 (D. Utah Sept. 25, 2025) ... 33

*Hodsdon v. Mars, Inc.*,
891 F.3d 857 (9th Cir. 2018) ... 31, 33

*Ivanoff v. Walmart Inc.*,
2025 WL 2207924 (S.D. Ohio Aug. 4, 2025) ... 34

*Joan Cravens, Inc. v. Deas Constr. Inc.*,
2016 WL 9240622 (S.D. Miss. May 5, 2016) ... 37

*JSB Indus., Inc. v. Nexus Payroll Servs., Inc.*,
463 F. Supp. 2d 103 (D. Mass. 2006) ... 31

*Katz v. Mich.*,
1989 WL 62196 (W.D. Mich. Mar. 13, 1989) ... 31

*Kitchen Winners NY Inc. v. Rock Fintek LLC*,
668 F. Supp. 3d 263 (S.D.N.Y. 2023) ... 34

*Kurimski v. Shell Oil Co.*,
2022 WL 2913742 (S.D. Fla. June 30, 2022) ... 25

*Kwintkiewicz v. Bentley Motors, Inc.*,
2011 WL 1336576 (D. Md. Apr. 7, 2011) ... 31

*La Barbera v. Ole Mexican Foods Inc.*,
2023 WL 4162348 (C.D. Cal. May 18, 2023) ... 26

*La Rosa v. SPD Swiss Precision Diagnostics GmbH*,
2025 WL 841687 (2d Cir. Mar. 18, 2025) ... 38

*Lee v. Can. Goose US, Inc.*,
2021 WL 2665955 (S.D.N.Y. June 29, 2021) ... 23, 24, 29

*Lee v. Ohio Educ. Ass'n*,
951 F.3d 386 (6th Cir. 2020) ... 37

*Lizama v. H&M Hennes & Mauritz LP*,
2023 WL 3433957 (E.D. Mo. May 12, 2023) ... 27, 30

*Maggio v. Procter & Gamble*,
No. 1:25-cv-02667 (S.D.N.Y. filed Mar. 31, 2025) ... 4, 36, 38, 39

*Maple v. Costco Wholesale Corp.*,
2013 WL 11842009 (E.D. Wash. Aug. 1, 2013) .......... 8

*Martin v. BioLab, Inc.*,
2008 WL 11322914 (N.D. Ga. Mar. 31, 2008) .......... 33

*Mass. Laborers' Health & Welfare Fund v. Philip Morris, Inc.*,
62 F. Supp. 2d 236 (D. Mass. 1999) .......... 25

*Mayberry v. Bristol-Myers Squibb Co.*,
2009 WL 5216968 (D.N.J. Dec. 30, 2009) .......... 37

*McGinity v. Procter & Gamble Co.*,
69 F.4th 1093 (9th Cir. 2023) .......... 21, 22

*McGrain v. C.R. Bard, Inc.*,
551 F. Supp. 3d 529 (E.D. Pa. 2021) .......... 35

*Mier v. CVS Pharmacy, Inc.*,
2024 WL 121880 (C.D. Cal. Jan. 10, 2024), *aff'd*, 2025 WL 1905109 (9th Cir. July 10, 2025) .......... 18

*Miller v. Gen. Motors, LLC*,
773 F. Supp. 3d 461 (E.D. Mich. 2025) .......... 32

*Montgomery v. Kraft Foods Glob., Inc.*,
822 F.3d 304 (6th Cir. 2016) .......... 8

*Moore v. Trader Joe's Co.*,
4 F.4th 874 (9th Cir. 2021) .......... 26

*Myers v. Starbucks Corp.*,
2020 WL 13302437 (C.D. Cal. July 29, 2020) .......... 23, 29, 30

*A.G. ex rel. N.G. v. Cmty. Ins. Co.*,
363 F.Supp.3d 834 (S.D. Ohio 2019) .......... 11

*In re Natera Prenatal Testing Litig.*,
664 F. Supp. 3d 995 (N.D. Cal. 2023) .......... 34

*Niedner v. Ortho-McNeil Pharm., Inc.*,
58 N.E.3d 1080 (Mass. App. Ct. 2016) .......... 35

*Old Town Util. & Tech. Park, LLC v. Consol. Edison, Sols., Inc.*,
2019 WL 4784603 (D. Me. Sept. 30, 2019) .......... 31

*Palmer v. Apple Inc.*,
2016 WL 1535087 (N.D. Cal. Apr. 15, 2016) ........................................................ 34

*Perona v. Volkswagen of Am., Inc.*,
684 N.E.2d 859 (Ill. App. Ct. 1997)........................................................................ 33

*Peskin v. Peachtree Inv. Sols., LLC*,
2023 WL 7457555 (N.D. Ga. Sept. 27, 2023)........................................................ 31

*Polygon Nw. Co. LLC v. La. Pac. Corp.*,
2012 WL 2504873 (W.D. Wash. June 28, 2012) .................................................. 32

*Ratcliff v. Am. Honda Motor Co, Inc.*,
2018 WL 3542865 (M.D.N.C. July 23, 2018) ........................................................ 31

*Republic Bank & Trust Co. v. Bear Stearns & Co., Inc.*,
683 F.3d 239 (6th Cir. 2012) ................................................................. 31, 33, 34

*Richards v. Cook*,
314 P.3d 1040 (Utah App. 2013) ........................................................................... 32

*Sanchez v. Walmart Inc.*,
733 F. Supp. 3d 653 (N.D. Ill. 2024) ..................................................................... 24

*Sarr v. BEF Foods, Inc.*,
2020 WL 729883 (E.D.N.Y. Feb. 13, 2020)............................................................ 26

*Smith v. Respiro, LLC*,
2025 WL 1883817 (N.D. Ill. July 8, 2025) ............................................................ 31

*Sokolow v. Damico*,
2019 WL 7188563 (S.D. Fla. Dec. 26, 2019) ......................................................... 31

*Song v. Champion Petfoods USA, Inc.*,
2020 WL 7624861 (D. Minn. Dec. 22, 2020), *aff'd*, 27 F.4th 1339
(8th Cir. 2022)........................................................................................................ 32

*Sorkin v. Kroger Co.*,
2024 WL 3673719 (N.D. Ill. Aug. 6, 2024).......................................... 16, 17, 25, 26

*Taylor v. S. Farm Bureau Cas. Co.*,
954 So. 2d 1045 (Miss. Ct. App. 2007) ................................................................. 37

*Thornberg v. State Farm Fire & Cas. Co.*,
2015 WL 3612550 (D. Minn. June 9, 2015), *aff'd*, 638 F. App'x 578
(8th Cir. 2016)........................................................................................................ 35

*Tomasella v. Nestle USA, Inc.*,
962 F.3d 60 (1st Cir. 2020) .......... 18

*Universal Bearing Co. v. Baker Bearing Co.*,
2013 WL 1211463 (E.D. Mich. Mar. 25, 2013) .......... 35

*Vaglica v. Reckitt Benckiser LLC*,
699 F. Supp. 3d 200 (E.D.N.Y. 2023) .......... 38

*Vitort v. Kroger Co.*,
2023 WL 3143690 (9th Cir. Apr. 28, 2023) .......... 16

*Warren v. Coca-Cola Co.*,
670 F. Supp. 3d 72 (S.D.N.Y. Apr. 21, 2023) .......... 19

*Waste Mgmt., Inc. v. Danis Indus. Corp.*,
2004 WL 5345389 (S.D. Ohio Feb. 24, 2004) .......... 31

*West v. Sambazon, Inc.*,
750 F. Supp. 3d 356 (S.D.N.Y. 2024) .......... 24, 26, 29

*Whiteside v. Kimberly Clark Corp.*,
108 F.4th 771 (9th Cir. 2024) .......... 17

*Wisniewski v. Diocese of Belleville*,
943 N.E. 2d 43 (Ill. App. Ct. 2011) .......... 35

*Woods v. Sharkin*,
192 N.E.3d 1174 (Ohio Ct. App. 2022) .......... 14

*Wysong Corp. v. APN, Inc.*,
889 F.3d 267 (6th Cir. 2018) .......... 17

*XP Glob., Inc. v. AVM, L.P.*,
2016 WL 6679427 (S.D. Fla. Nov. 14, 2016) .......... 32

*Zachmann v. Coleman Co. Inc.*,
2022 WL 161480 (S.D.N.Y. Jan. 18, 2022) .......... 38

*Zahora v. Orgain LLC*,
2021 WL 5140504 (N.D. Ill. Nov. 4, 2021) .......... 17

**Statutes**

16 C.F.R. § 260.2 .......... 27

16 C.F.R. § 260.4(c) .......... 27

Ala. Code § 8-19-10(f) ..... 4, 36

Ark. Code § 4-88-113(f)(1)(B) ..... 36

Ga. Code § 10-1-399(a) ..... 36

La. Rev. Stat. Ann. § 51:1409(A) ..... 36

Mont. Code Ann. § 30-14-133(1) ..... 36

S.C. Code § 39-5-140 ..... 36

Tenn. Code § 47-18-109(a)(1) ..... 36

**SUMMARY OF ARGUMENT**

Allowing Plaintiffs' false advertising claims against The Procter & Gamble Company ("P&G") to proceed would be unprecedented. P&G makes statements on its Charmin and Puffs packaging about the forestry practices of its third-party suppliers and then goes further and explains precisely what it means by those statements. Plaintiffs do not dispute that P&G does exactly what it says in those statements. Instead, Plaintiffs allege P&G's statements communicate something dramatically different than what P&G actually says and then argue P&G fails to uphold promises it did not make. If plaintiffs could manufacture a false advertising claim by ignoring what a company actually says and instead assert that the statements must mean something else, then no false advertising case could ever be dismissed at the motion-to-dismiss stage. But the law does not permit plaintiffs to misread ordinary words or invent unreasonable interpretations. The pleading standard requires more: Plaintiffs must allege facts showing it is plausible that the statements P&G actually makes are false or misleading. They have not and cannot do so here, so their case should be dismissed.

In reality, Plaintiffs' actual grievance is not about false advertising. Rather, Plaintiffs disagree with the forestry practices of third-party wood pulp suppliers in P&G's supply chain, despite the fact that these practices are carefully regulated by the Canadian government and compliance is certified by independent third-party organizations such as the Forest Stewardship Council ("FSC"). Plaintiffs would prefer that P&G's suppliers use different forestry practices or that P&G source its wood pulp in different ways, but Plaintiffs' personal preferences do not make P&G's statements about its suppliers' practices

false or misleading. A false advertising lawsuit against P&G is not the appropriate vehicle to address Plaintiffs' concerns about existing forestry standards.

As previewed above, Plaintiffs attempt to shoehorn their grievances about forestry practices into false advertising claims by alleging that P&G deceives consumers through its use of the phrases, "Keep Forests as Forests" and "Protect-Grow-Restore," despite acknowledging that P&G explains exactly what these statements mean. *See* Compl. ¶¶ 6, 244.[1] But nowhere in their complaint do Plaintiffs allege that P&G does not deliver on these claims. *First*, Plaintiffs do not dispute that Charmin products are third-party certified by the FSC, or that P&G uses the "FSC Mix" logo on its packaging in accordance with the FSC's rules (the "Protect" prong). *See id.* ¶¶ 14, 244. *Second*, Plaintiffs do not dispute that the forestry companies in P&G's supply chain replant two trees for every one that they harvest (the "Grow" prong). *See id.* ¶¶ 6, 305. *Third*, Plaintiffs do not dispute that P&G has partnered with the Arbor Day Foundation to replant one million trees in areas affected by natural disasters (the "Restore" prong). *See id.* ¶ 6.

Plaintiffs' false advertising claims also rely heavily on P&G's use of certain third-party logos on Charmin and Puffs packaging. But Plaintiffs do not allege that P&G is misusing the logos that appear on Charmin and Puffs products, or that the products fail to meet the independent third-party organizations' requirements for using them. Rather, Plaintiffs merely disagree with the standards the independent organizations set for using

[1] References to "Compl. ¶ ___" refer to paragraphs of the Consolidated Class Action Complaint, ECF No. 16 at PageID 50-293.

the logos. But as courts throughout the country have repeatedly found, mere disagreement with external standards and requirements (in this case, forestry standards adopted and overseen by the Canadian government and the FSC) does not and cannot establish false advertising. If Plaintiffs have concerns with these standards, they should petition the relevant third parties to change them—not bring meritless false advertising claims against P&G for complying with the existing standards.

Ultimately, Plaintiffs' claims against P&G fail for several reasons: *First*, Plaintiffs fail to plausibly allege that they were actually deceived by any statements by P&G—let alone that "a significant portion of the general consuming public or of targeted consumers, acting reasonably in the circumstances, could be misled." *Forsher v. J.M. Smucker Co.*, 612 F. Supp. 3d 714, 723 (N.D. Ohio 2020) (citation omitted). Plaintiffs' "critiques of the methodology" of the certifying bodies are "not enough" to render P&G's statements false or misleading. *Dwyer v. Allbirds, Inc.*, 598 F. Supp. 3d 137, 153 (S.D.N.Y. 2022). Moreover, P&G directly explains what the "Keep Forests as Forests" campaign and the "Protect-Grow-Restore" logo mean. And Plaintiffs do not allege that any of those explanations are actually false. Instead, Plaintiffs attempt to ignore P&G's explanations in favor of their own "unreasonable or fanciful interpretations." *Biczo v. Ferrara Candy Co.*, 2023 WL 2572384, at *2 (N.D. Ill. Mar. 20, 2023) (citation omitted). That is not how false advertising claims work. *See infra* Section I.

*Second*, nearly all of Plaintiffs' claims are subject to Rule 9(b)'s heightened pleading standard—but Plaintiffs do not allege any of their claims with the detail required under Rule 8, let alone the particularity required for fraud-based claims under Rule 9(b). *See*

*Greer v. Strange Honey Farm, LLC*, 114 F.4th 605, 614 (6th Cir. 2024). Plaintiffs vaguely allege that they "saw and relied on" advertisements that were "substantially similar" to the ones in the complaint. *E.g.*, Compl. ¶ 22. But Plaintiffs do not specify which ads they allegedly viewed, when they viewed the ads, how they understood those particular ads, or how the ads misled them. *See infra* Section II.

*Third*, fraudulent concealment is not an independent cause of action under the laws of Connecticut, Illinois, Massachusetts, Michigan, Minnesota, and Pennsylvania. *E.g.*, *Brown v. Otake*, 138 A.3d 951, 955 (Conn. App. Ct. 2016). The Court should dismiss Plaintiffs' fraudulent concealment claims under those states' laws for this reason as well. *See infra* Section III.

*Fourth*, the false advertising statutes of Alabama, Arkansas, Georgia, Louisiana, Montana, South Carolina, and Tennessee only permit consumers to bring individual actions. *E.g.*, Ala. Code § 8-19-10(f). The Court should therefore dismiss Plaintiffs' class action claims under those states' laws for this reason as well. *See infra* Section IV.

*Fifth*, the Consolidated Class Action Complaint omits various claims raised in the original complaint in one of the underlying New York actions, *Maggio v. Procter & Gamble*, No. 1:25-cv-02667 (S.D.N.Y. filed Mar. 31, 2025), and because the Consolidated Class Action Complaint "serves as the operative administrative complaint for MDL purposes," Compl. ¶ 20, Plaintiffs have abandoned those claims. If the Court concludes that any of the omitted claims remain, however, the Court should dismiss them because they suffer from several additional defects. *See infra* Section VI.

The Court should dismiss all of Plaintiffs' claims with prejudice.[2]

## BACKGROUND[3]

P&G is a leading producer of high-quality consumer goods, including Charmin toilet paper and Puffs facial tissues. *See* Compl. ¶¶ 2, 226. When lumber is harvested to make various products for other industries, the byproduct or scrap from that process is used to make wood pulp. P&G then buys that wood pulp, which would otherwise go to waste, and uses it to make Charmin and Puffs products. *Id.* ¶ 274 n.59. The third-party suppliers in turn source that wood pulp byproduct from forestry companies that harvest and regrow trees. *See id.* ¶¶ 263, 267. In sourcing wood pulp, P&G works with a network of independent, third-party suppliers that are committed to sustainable forestry practices, and P&G uses wood pulp that is sourced in accordance with applicable laws and regulations established by the Canadian government and certified by third-party entities.

### A. The Third-Party Forestry Companies in P&G's Supply Chain Harvest and Replant Trees in Accordance with Canada's Strict Forestry Laws

Plaintiffs allege that P&G sources wood pulp used to make Charmin products from "Canada's boreal forest," "one of the last untouched old-growth forests left on Earth." *Id.*

---

[2] Because the Consolidated Class Action Complaint "incorporates the previous complaints from the seven related actions and serves as the operative administrative complaint for MDL purposes," Compl. ¶ 20, the Court should also dismiss all of the individual complaints in the underlying actions. *See, e.g.*, *In re Davol, Inc./C.R. Bard, Inc., Polypropylene Hernia Mesh Prods. Liab. Litig.*, 2022 WL 4781952, at *1 (S.D. Ohio Oct. 3, 2022) (granting 12(b)(6) motion following transfer to the Court as part of an MDL).

[3] Most of the facts in this motion come from Plaintiffs' complaint or the documents it incorporates by reference and are accepted as true (except where contradicted by judicially noticeable facts) solely for purposes of this motion. P&G concurrently files a Request for Judicial Notice, which sets forth the basis for the Court to consider additional documents in connection with this Motion to Dismiss.

¶ 2. P&G does not own the land or harvest wood.[4] Rather, "[t]he majority of Canada's forest land, about 94%, is publicly owned and managed by provincial, territorial and federal governments." Declaration of David R. Singh ("Singh Decl.") Ex. 1 (*Forest Land Ownership*, Gov't of Canada, https://natural-resources.canada.ca/forest-forestry/sustainable-forest-management/forest-land-ownership (last updated Sept. 8, 2025)).

"Canada's forest laws are among the strictest in the world." Singh Decl. Ex. 2 (*Canada's Forest Laws*, Gov't of Canada, https://natural-resources.canada.ca/forest-forestry/sustainable-forest-management/canada-s-forest-laws (last updated Apr. 4, 2025).[5] These laws, which govern harvesting and replanting of trees in public forests, are "based on sustainable forest management principles," "developed in consultation with the public, industries and other interested parties," and "grounded in scientific research and analysis." *Id.* As a result, Canada's "forests are healthy, productive and thriving," and "[a]t 0.02% of its forested area, deforestation in Canada is among the world's lowest." Singh Decl. Ex. 3 (*Deforestation in Canada: Key Myths and Facts*, Gov't of Canada, https://natural-resources.canada.ca/forest-forestry/insects-disturbances/deforestation-canada-key-myths-facts (last updated Sept. 11, 2025)). Plaintiffs do not allege that P&G or its suppliers engage in any practices that are inconsistent with the Canadian government's strict requirements. Rather, Plaintiffs allege that P&G's third-party suppliers do not comply

[4] And as noted above, lumber is actually harvested to make products for other companies. P&G just buys wood pulp made from the leftover scrap.

[5] *See, e.g.*, Timber Regulations, SOR/94-118 (Can.) (dictating that "no person shall cut and remove timber in a forest area except under the authority of a permit issued by a forestry officer … or an agreement entered into with the Minister").

with Plaintiffs' own preferences on how forests should be managed and how paper products should be produced, such as increasing "reliance on recycled fibers" and engaging in different "replanting efforts." *See, e.g.*, Compl. ¶¶ 284, 312.

"In Canada, forest management planning is one of the primary tools used to ensure that the country's publicly owned forests remain healthy and vibrant and are managed sustainably." Singh Decl. Ex. 4 (*Forest Management Planning*, Gov't of Canada, https://natural-resources.canada.ca/forest-forestry/sustainable-forest-management/forest-management-planning (last updated Sept. 8, 2025)). Any forestry company that wishes to harvest on public lands in Canada must prepare a forest management plan and submit it for government approval. *Id.* "By law, governments must first approve forest management plans and authorize the proposed harvesting before any trees are felled." Singh Decl. Ex. 2 (*Canada's Forest Laws*).

Forest companies generally must develop forest management plans with input from an array of stakeholders, including "environmental groups," "Aboriginal peoples," "government agencies," and "community representatives." Singh Decl. Ex. 4 (*Forest Management Planning*). The Canadian government also requires that forest management plans include measures to "ensure a suitable and sustainable landscape containing year-round caribou habitat." *See, e.g.*, Singh Decl. Ex. 5 (*Forest Management Guidelines for the Conservation of Woodland Caribou: A Landscape Approach*, Gov't of Ontario (1999), https://docs.ontario.ca/documents/2813/guide-woodland-caribou.pdf). And "[e]ven after a forest management plan is approved," provincial and territorial governments "closely monitor forest companies to ensure they comply with the plans," "track the timber that is

removed from the tenured lands," and "ensure that the companies meet the regeneration standards after harvest." Singh Decl. Ex. 4 (*Forest Management Planning*).

"According to laws, regulations and policies in place across Canada, all areas harvested on public land must be reforested, either by replanting or through natural regeneration." Singh Decl. Ex. 3 (*Deforestation in Canada*). The third-party forestry companies in P&G's supply chain replant two trees for each one they harvest. *See* Compl. ¶ 244. Plaintiffs allege those forestry companies sometimes "spray chemical herbicides like aerial glyphosate spray … to intentionally eliminate all growth other than just a handful of tree species." *Id.* ¶ 283. But Plaintiffs fail to mention that most Canadian provinces require these "herbicides (particularly glyphosate) to ensure effective and efficient regeneration, which in turn contributes to overall sustainable forest management." Singh Decl. Ex. 6 (D.G. Thompson & D.G. Pitt, *Frequently Asked Questions (FAQs) on the Use of Herbicides in Canadian Forestry*, Canadian Forest Service Technical Note No. 112 (2011), https://publications.gc.ca/collections/collection_2011/rncan-nrcan/Fo123-1-112-eng.pdf).

While Plaintiffs may not prefer the use of herbicides, the Canadian Forest Service explains that herbicides are "necessary to control competing vegetation following harvesting in forestry" because "numerous pioneer plant species (*e.g.*, Canada blue-joint grass, raspberry, trembling aspen), which are well-adapted to disturbed sites and open growing conditions, easily outcompete newly planted crop tree seedlings (e.g., spruce and pine species) for nutrients, light, water and growing space." *Id.* "Similar to what happens in the home garden, reduced crop growth or outright crop failure will occur if weeds are not controlled effectively." *Id.*

### B. The Products Are Certified by the Forest Stewardship Council

"The Forest Stewardship Council ('FSC') is a third-party organization that administers a forest certification program." Compl. ¶ 6. As Plaintiffs explain, "[c]ompanies who work with the FSC are entitled to display various FSC logos to reflect the company's commitment to various levels of responsible forest management." *Id.* ¶ 245. Plaintiffs allege that P&G relies on the FSC's "controlled wood" and "chain of custody" designations, and therefore, "P&G should display the FSC Mix logo" on its product packaging. *Id.* ¶ 295. Plaintiffs' screenshots of the Charmin and Puffs packaging show that P&G does exactly that—it uses the "FSC Mix" logo "*on the back and bottom* part of the packaging":




*See id.*; *see also* Singh Decl. Ex. 8 (photos of Charmin and Puffs packaging).[6]

According to the FSC, "[a]ny business that holds an FSC certificate"—including one that satisfies the "FSC Mix" requirements—"commits to the strictest standards currently

---

[6] The Charmin packaging is incorporated by reference into the complaint because it "refers extensively" to the packaging and "[t]he packaging and label in fact form[] the very basis of Plaintiff[s'] claims." *Maple v. Costco Wholesale Corp.*, 2013 WL 11842009, at *3 (E.D. Wash. Aug. 1, 2013); *accord Montgomery v. Kraft Foods Glob., Inc.*, 822 F.3d 304, 309 (6th Cir. 2016) ("The complaint referred to these packaging-label photos, making them a cognizable part of the record.").

governing responsible forest management to be able to sell products with an FSC label." Singh Decl. Ex. 9 (*FSC Mix Label and Controlled Wood*, Forest Stewardship Council, https://fsc.org/en/cw (last visited Oct. 30, 2025)).[7] The "FSC Mix" logo means that "[t]he product is made with a mixture of materials from FSC-certified forests, recycled materials, and/or FSC-controlled wood." Compl. ¶ 288 (screenshot). The FSC further clarifies that, "[w]hile controlled wood doesn't come from FSC-certified forests, it mitigates the risk of the material originating from unacceptable sources." *Id.* This graphic from the FSC explains what each of the FSC designations and accompanying logos mean:




[7] The FSC's requirements are incorporated by reference into the complaint because the complaint cites and extensively refers to them. *See, e.g.*, Compl. ¶¶ 188-90; *see Greenberg v. Life Ins. Co. of Va.*, 177 F.3d 507, 514 (6th Cir. 1999) ("[A] document … may still be considered part of the pleadings" when it "is referred to in the complaint and is central to the plaintiff's claim." (citations omitted)).

Singh Decl. Ex. 10 (*What's in a Label?*, Forest Stewardship Council, https://fsc.org/en/label (last visited Oct. 30, 2025)).

Plaintiffs also allege that "[t]he unqualified FSC logo is prominently and unambiguously printed on the front" of Charmin and Puffs packaging. Compl. ¶¶ 246, 249. The FSC's rules allow this. They state that "[a]dditional FSC logos or reference to FSC may be used" (including the standalone FSC logo) "when the on-product label" (in this case, the "FSC Mix" label) "is visible to the consumer (i.e. the label is accessible without damaging the sales packaging)." Singh Decl. Ex. 7 (Forest Stewardship Council, Requirements for Use of the FSC Trademarks by Certificate Holders § 4.5 (2021), https://connect.fsc.org/document-centre/documents/resource/225). As Plaintiffs acknowledge, the "FSC Mix" logo is visible to the consumer without damaging the sales packaging. Compl. ¶ 295. The "FSC Mix" logo also appears right next to other logos that Plaintiffs challenge in their complaint, such as the Rainforest Alliance's Forest Allies logo, so it is clear that Plaintiffs were capable of seeing the "FSC Mix" logo. Compl. ¶ 295 (screenshot).

Plaintiffs nevertheless complain that P&G's third-party suppliers allegedly do not meet the requirements for a *different* FSC certification—the "FSC 100%" certification, which requires that "[a]ll materials used come from responsibly managed, FSC-certified forests." *Id.* ¶ 288 (screenshot). Plaintiffs do not—and cannot—allege that P&G uses the "FSC 100%" logo anywhere on Charmin or Puffs packaging or in its advertising for Charmin or Puffs products. And Plaintiffs do not allege that they had any familiarity with the FSC certification requirements or corresponding logos such that they would be confused about what the generic FSC logo meant. Again, Plaintiffs' apparent grievance is not that

P&G misuses the "FSC Mix" label, but that Plaintiffs' would prefer P&G meet the requirements of the "FSC 100%" certification.

### C. P&G's Use of the Rainforest Alliance Forest Allies Logo

In 2021, the Rainforest Alliance launched its Forest Allies initiative and created the Forest Allies logo. Compl. ¶¶ 299-300. The Forest Allies initiative is "a community of practice focused on protecting, restoring, and enabling responsible management of tropical forests." Singh Decl. Ex. 11 (*Using Our Logo and Seal*, Rainforest Alliance, https://www.rainforest-alliance.org/business/marketing-sustainability/using-our-logo-and-seal/ (last updated Dec. 11, 2024)).[8] As the Rainforest Alliance explains, organizations that are part of its "Forest Allies initiative and are actively meeting the requirements of Forest Allies membership can use this label on FSC certified products meeting eligibility criteria, and in promotional materials or other communications that promote membership in Rainforest Alliance's Forest Allies initiative and related activities." Singh Decl. Ex. 11 (*Using Our Logo and Seal*). Plaintiffs acknowledge that P&G properly uses the "'Forest Allies' seal on its packaging," but take issue with the Rainforest Alliance's practices, complaining that the Forest Allies logo "has no certification process." Compl. ¶¶ 15, 299, 301.

Historically, the Rainforest Alliance allowed businesses to display a different seal on Rainforest Alliance-certified products, namely, the Rainforest Alliance Certified seal, which "indicated that a product had met rigorous sustainability standards." Compl. ¶ 298.

[8] The complaint incorporates this website by reference because it cites and provides a link to the website. Compl. ¶ 301 & n.80; *see A.G. ex rel. N.G. v. Cmty. Ins. Co.*, 363 F.Supp.3d 834, 839 n.2 (S.D. Ohio 2019) (considering a website at motion to dismiss stage because it was "referred to in the Complaint and [was] central to Plaintiff's claim").

Plaintiffs acknowledge that, "[i]n 2016, P&G began sourcing pulp from Forest Stewardship forests certified by the Rainforest Alliance and started featuring the 'Rainforest Alliance Certified' seal on Charmin packages." *Id.* ¶ 297. According to Plaintiffs, the "Rainforest Alliance no longer directly certifies businesses against responsible forestry standards." *Id.* ¶ 298. But as the Rainforest Alliance explains on its website, the legacy Rainforest Alliance Certified seal is "slowly being phased out," and "[f]or a smooth roll-out," the Rainforest Alliance "planned [a] careful timeline for products transitioning from using the legacy marks." Singh Decl. Ex. 11 (*Using Our Logo and Seal*). As a result, consumers "may still see the legacy Rainforest Alliance Certified seal … on product packaging." *Id.*

### D. "Keep Forests as Forests" and the "Protect-Grow-Restore" Logo

Plaintiffs allege that P&G makes false or misleading statements to consumers about its third-party suppliers' forestry practices. Plaintiffs' claims center around the "Keep Forests as Forests" campaign and the "Protect-Grow-Restore" logo that appears on Charmin and Puffs packaging and marketing materials:




Singh Decl. Ex. 8 (photos of Charmin and Puffs packaging); *see* Compl. ¶¶ 249, 253.

Plaintiffs allege that a "key part of the Keep Forests as Forests campaign is the three promises P&G makes to consumers via the Protect-Grow-Restore logo." *Id.* ¶ 244.

*First*, Plaintiffs allege that, for its "Protect" promise, "P&G claims to only source pulp certified by the FSC." *Id.* ¶ 6 (Plaintiffs do not deny that Charmin and Puffs products are certified by the FSC. *See id.* ¶ 295.) *Second*, Plaintiffs allege that, "[f]or its 'Grow' promise, P&G promises that for every tree used by P&G, at least two are regrown in its place." *Id.* ¶ 244. (Plaintiffs do not deny that P&G's suppliers replant at least two trees for every tree they harvest. *See id.* ¶ 283.) *Third*, Plaintiffs allege that, "[f]or its 'Restore' promise, P&G touts its partnership with the Arbor Day Foundation to plant one million trees in forests affected by natural disasters." *Id.* ¶ 244. (Plaintiffs do not deny that P&G has partnered with the Arbor Day Foundation to plant one million trees. *See id.* ¶ 286.)

Without explaining their reasoning, Plaintiffs claim all of these truthful statements are "misleading" because they supposedly "create a net impression that P&G is taking measurable steps towards minimizing, neutralizing, or even reversing the environmental impact of harvesting wood pulp for use in P&G Paper Products," while the wood pulp used to make Charmin products is supposedly "harvested by suppliers who employ industrial logging practices (such as clearcutting and burning)." *Id.* ¶¶ 7, 11, 12. Although they do not describe what harvesting practices they *thought* P&G's suppliers used based on P&G's advertising (if they thought about P&G's suppliers' harvesting practices at all), Plaintiffs allege that if they had known about the harvesting practices that P&G's suppliers allegedly use, they "would not have purchased the products or would have paid less for them." *Id.* Plaintiffs' purport to bring these claims on behalf of "[a]ll persons who on or after January 16, 2021 purchased a P&G Paper Product" in fifteen states. *Id.* ¶ 337.

## LEGAL STANDARD

Rule 12(b)(6) requires dismissal of a complaint that lacks "sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation omitted). The court must disregard the complaint's conclusory allegations and legal conclusions and determine whether the remaining "well-pleaded factual allegations" suggest that the plaintiff has a plausible—as opposed to merely conceivable—claim for relief. *Id.* at 679. "All told, at the motion to dismiss stage, courts play an important gatekeeper role, as they ensure that claims rise beyond the level of speculation before submitting defendants to the potential rigors (and the costs) of the discovery process." *Childress v. City of Cincinnati*, 765 F. Supp. 3d 662, 679 (S.D. Ohio 2025) (Cole, J.) (citation omitted).

## ARGUMENT

### I. Plaintiffs Fail to Plausibly Allege Consumer Deception

Rule 8 requires plaintiffs to include enough facts "to raise a right to relief above a speculative level." *Bell Atl. Corp. v. Twombley*, 550 U.S. 544, 545 (2007). Moreover, to bring a false advertising claim, Plaintiffs "must establish that [P&G's] allegedly deceptive advertisements were likely to mislead a reasonable consumer acting reasonably under the circumstances." *Fink v. Time Warner Cable*, 714 F.3d 739, 741 (2d Cir. 2013); *see also Grgat v. Giant Eagle, Inc.*, ¶ 18, 135 N.E.3d 846, 851 (Ohio Ct. App. 2019); Exhibit A (chart of reasonable consumer standards for Plaintiffs' false advertising claims). "This requires more than a mere possibility that Defendant's label 'might conceivably be misunderstood by some few consumers viewing it in an unreasonable manner.'" *Forsher*, 612 F. Supp. 3d at 723 (citation omitted). Plaintiffs must plausibly allege that "a significant portion of the

general consuming public or of targeted consumers, acting reasonably in the circumstances, could be misled." *Id.* (citation omitted). By a similar token, to bring fraud-based common law claims like fraudulent concealment, Plaintiffs must plead that their reliance on the defendant's alleged misrepresentations is "justifiable" and reasonable under the surrounding circumstances. *Woods v. Sharkin*, 192 N.E.3d 1174, 1194 (Ohio Ct. App. 2022); *see also* Exhibit B (chart of reasonable reliance standards for each of Plaintiffs' fraudulent concealment claims). Plaintiffs' own allegations demonstrate that P&G's statements are true and would not mislead a reasonable consumer.

### A. Plaintiffs Challenge Third-Party Suppliers' Forestry Practices Without Alleging Any Named Plaintiffs Were Actually Deceived by P&G

Plaintiffs' allegations are not based on any actual consumer deception, but rather on vague complaints about the forestry practices that are allegedly used by P&G's third-party suppliers. The amended complaint does not contain *any* allegations that the named Plaintiffs—let alone a significant portion of the general consuming public or targeted consumers—were actually deceived in the manner Plaintiffs' lawyers argue in the amended complaint. The amended complaint contains no allegations whatsoever about any advertisements or other statements the named Plaintiffs allegedly viewed or relied upon before purchasing Charmin products, or what the named Plaintiffs understood those specific advertisements and statements to mean. Instead, Plaintiffs vaguely allege that they "saw and relied on the Deceptive Claims contained on the packaging of the Paper Products" that "were substantially similar to the examples included in … this Complaint," and "understood that the purchase of a P&G Paper Product represented a more environmentally responsible choice compared to other, cheaper, tissue paper brands." *E.g.*, Compl. ¶¶ 29,

30. But they never explain *why* they believed Charmin and Puffs products were "a more environmentally responsible choice" than other brands or what forestry practices they believed P&G's third-party suppliers were using.

For example, Plaintiffs' complaint argues that P&G leads consumers to believe that its suppliers are "replacing the specific boreal forest areas logged with replanting activities that will eventually recreate the same ecological value that was present before P&G's harvesting occurred." *Id.* ¶ 283. But Plaintiffs never allege that P&G says anything at all about the Canadian boreal forest or about recreating the same ecological conditions that were present in that forest before harvesting. And Plaintiffs never allege that they—or any other consumers—actually believed P&G's suppliers were recreating the same conditions that originally existed in the boreal forest. Indeed, no reasonable consumer would believe that P&G's suppliers can replicate the exact same conditions in the exact same locations where harvesting occurred by replanting new trees in place of older ones. It obviously takes time for forests to regrow and regenerate after trees are harvested.

"Words don't mean whatever we want them to mean, and [a] plaintiff cannot sue based on every fanciful idea that springs to mind after reading the label." *Sorkin v. Kroger Co.*, 2024 WL 3673719, at *5 (N.D. Ill. Aug. 6, 2024) (citation omitted and quotation marks omitted). If plaintiffs could defeat a motion to dismiss simply by alleging that they understood an advertisement to mean something different than what it actually said, then courts would never be able to dismiss a false advertising claim at the pleadings stage. That is obviously not how the law works. And while Plaintiffs may prefer that P&G take different approaches to producing Charmin and Puffs products—such as "increas[ing] its

reliance on recycled fibers" and engaging in different "replanting efforts"—those preferences do not change the meaning of the words P&G actually says. Compl. ¶¶ 24, 313.

Accordingly, Plaintiffs fail to allege any facts showing that a significant portion of reasonable consumers would be deceived in the manner Plaintiffs' lawyers assert. *See Forsher*, 612 F. Supp. 3d at 723 (plaintiff failed "to allege an objective, commonly-understood definition of 'natural,' or that reasonable consumers would find 'natural' deceptive in this context"); *Gray v. Amazon.com, Inc.*, 653 F. Supp. 3d 847, 858 (W.D. Wash. 2023) (statements were not "'likely to mislead a reasonable consumer' in the manner alleged by Plaintiffs, and therefore are not deceptive" (citation omitted)); *Vitort v. Kroger Co.*, 2023 WL 3143690, at *2 (9th Cir. Apr. 28, 2023) (a "just fruit" label was "not likely to mislead a significant portion of reasonable grocery shoppers" into thinking there were no added sweeteners where the label did "not expressly or impliedly say anything about the sugar content of the product, nor would a reasonable consumer interpret it as doing so").

### B. Plaintiffs Make No Allegations Showing the "Protect-Grow-Restore" Logo Is False or Misleading

Plaintiffs' complaint is premised on vague and conclusory allegations that P&G's advertisements create "a net impression" that P&G is "minimizing, neutralizing, or even reversing the environmental impact of harvesting wood pulp." Compl. ¶ 7. Remarkably, however, Plaintiffs' 234-page complaint *does not contain a single statement* in which P&G represents that it has that kind of "environmental impact." A reasonable consumer cannot ignore the labels' actual wording or "read into the label what is simply not there." *Zahora v. Orgain LLC*, 2021 WL 5140504, at *4 (N.D. Ill. Nov. 4, 2021); *accord Sorkin*, 2024 WL

3673719, at *4 (plaintiffs cannot "impute meaning that is not fairly derived from the labeling itself" (citation omitted)). That is precisely what Plaintiffs do in this case. Plaintiffs' entire case is based on statements P&G never makes and Plaintiffs' own fanciful interpretations of the statements P&G does make.

The Protect-Grow-Restore logo on Charmin and Puffs packaging refers consumers to a website where P&G explains precisely what those words mean. *Id.* ¶¶ 248-49, 253; Singh Decl. Ex. 12 (*Sustainability*, Charmin, https://www.charmin.com/en-us/sustainability (last visited Oct. 30, 2025)); Singh Decl. Ex. 13 (*Puffs Sustainability Promise*, Puffs, https://puffs.com/en-us/experience-main-section/sustainability (last visited Oct. 30, 2025)). The labels on the Charmin and Puffs packaging expressly tell consumers that they can "learn how [P&G] helps to protect, grow and restore trees at Charmin.com" or "Puffs.com/learnmore." Compl. ¶¶ 248-49, 253. And Plaintiffs' own allegations are based, in large part, on the statements P&G makes on the website. This instruction to visit the Charmin website "puts a consumer on notice that there are qualifications or caveats, making it unreasonable to assume" the Protect-Grow-Restore logo alone provides all the information the consumer needs. *See Whiteside v. Kimberly Clark Corp.*, 108 F.4th 771, 785 (9th Cir. 2024). In such a circumstance, "a reasonable consumer would be expected to look beyond the … label to learn more about the representation and consult other additional information available." *Dorris v. Danone Waters of Am.*, 2024 WL 4792048, at *4 (S.D.N.Y. Nov. 14, 2024); *see also Wysong Corp. v. APN, Inc.*, 889 F.3d 267, 271 (6th Cir. 2018).

In *Dorris*, the court considered whether a reasonable consumer would be misled by a front label on an Evian water bottle stating the bottle was "carbon neutral." 2024 WL

4792048 at *1. The "back label … provided the consumer with a link to Evian's website to learn more," and the website gave "a fuller explanation of what 'carbon neutral' means." *Id.* at *4. The court concluded that, "when confronted with an unfamiliar or ambiguous term on the front label," "a reasonable consumer would have inquired further and consulted the additional information available." *Id.* at *5.

Likewise, here, the label "prompted a reasonable consumer to learn more" on the Charmin or Puffs websites. *Id.* at *6; *see also Tomasella v. Nestle USA, Inc.*, 962 F.3d 60, 82 (1st Cir. 2020) (concluding that website disclosures mitigate concerns over unethical omissions at the point of sale and that to hold otherwise would require disclosures on product packaging that would be too lengthy). In fact, P&G *directed* consumers to its websites to "learn how" it "helps to protect, grow and restore trees." Compl. ¶¶ 248-49, 253. Put differently, P&G specifically told consumers where they could go if they wanted to know what the "Protect-Grow-Restore" logo meant. And that disclosure was even more conspicuous than the disclosure in *Dorris*, where the product's *back label* provided a link to information clarifying a claim on the *front label*. *See Dorris*, 2024 WL 4792048, at *5.

Plaintiffs cannot ignore the explanations that P&G provided in favor of their own preferred interpretation. *See Mier v. CVS Pharmacy, Inc.*, 2024 WL 121880, at *8 (C.D. Cal. Jan. 10, 2024) ("Plaintiff Mier's misunderstanding of the label only makes sense if the Court or a consumer were to ignore the statement on the back label."), *aff'd*, 2025 WL 1905109 (9th Cir. July 10, 2025); *Biczo*, 2023 WL 2572384, at *2 ("Where plaintiffs base deceptive advertising claims on unreasonable or fanciful interpretations of labels or other advertising, dismissal on the pleadings may well be justified."). A plaintiff "is not 'entitled

to take a fleeting glimpse at the front of a product label, home in on the one word that confirms her hopes about the product and ignore the other words, and then sue to recover the purchase price when she eventually learns that the product is what the label, read in its entirety, says it is.'" *Warren v. Coca-Cola Co.*, 670 F. Supp. 3d 72, 84 (S.D.N.Y. Apr. 21, 2023) (citation omitted).

The Charmin and Puffs websites clearly explain the promises underlying the "Protect-Grow-Restore" logo—as does the complaint—and Plaintiffs do not deny that those promises are true.

#### 1. *Protect:* Plaintiffs Do Not Deny that Charmin and Puffs Products Are FSC Certified and Appropriately Use the "FSC Mix" Logo

Plaintiffs claim that P&G misleads consumers by displaying the "FSC logo in a prominent location on the front of the package" and claiming that "100% of its wood pulp is FSC-certified." Compl. ¶ 14. To start, no Plaintiff alleges that he or she relied on—or misunderstood—the FSC logo in purchasing Charmin or Puffs. And Plaintiffs do not dispute that the Charmin and Puffs products are FSC certified—albeit not with the specific certifications Plaintiffs would prefer. *Id.* ¶ 295. Indeed, Plaintiffs acknowledge that "[c]ompanies who work with the FSC are entitled to display various FSC logos to reflect the company's commitment to various levels of responsible forest management." *Id.* ¶ 245. The "FSC 100%" certification means that "[a]ll materials used come from responsibly managed, FSC-certified forests." *Id.* ¶ 288 (screenshot). A different certification level—the "FSC Mix" certification—means that "[t]he product is made with a mixture of materials from FSC-certified forests, recycled materials, and/or FSC-controlled wood." *Id.* (screenshot). And Plaintiffs acknowledge that, "[w]hile controlled wood doesn't come from FSC-

certified forests, it mitigates the risk of material originating from unacceptable sources." *Id.* (screenshot). The complaint also admits that companies like P&G that allegedly use "controlled wood" are permitted to "display the FSC Mix" logo. *Id.* ¶ 295.

Nevertheless, Plaintiffs allege that the FSC logo "on the front package of P&G Paper Products unambiguously conveys to a reasonable consumer a net impression that *all* the pulp used to manufacture P&G Paper Products is not only FSC certified, but also derived from FSC-certified forests." *Id.* ¶ 6. Not so. As just explained, the "FSC Mix" logo that P&G uses on its products allows P&G to use "*a mixture of materials* from FSC-certified forests, recycled materials, and/or FSC-controlled wood," and the FSC clearly explains that "controlled wood doesn't come from FSC-certified forests." *Id.* ¶ 288 (screenshot).

Thus, Plaintiffs' allegation that P&G's suppliers source wood pulp from forests that are not "FSC-certified" does not render P&G's use of the "FSC Mix" logo—or its statements that it "us[es] pulp certified by the Forest Stewardship Council"—false or misleading because the applicable certification does not require all wood pulp to come from FSC-certified forests. *See* Compl. ¶¶ 267, 288, 290. Indeed, Plaintiffs appear to be referring to a *different* FSC certification than the one P&G uses on its products—the "FSC 100%" certification—which requires that "[a]ll materials used come from responsibly managed, FSC-certified forests." *Id.* ¶ 288. But Plaintiffs do not make a single allegation that P&G uses the "FSC 100%" logo on Charmin packaging (because P&G doesn't). And Plaintiffs' suggestions that Charmin and Puffs do not meet the requirements of the "FSC 100%" certification do not

render P&G's use of a *different* FSC logo (which P&G is authorized to use) false or misleading.[9]

Plaintiffs further allege that P&G misleads consumers by displaying "a large unqualified FSC logo in a clear and prominent place on the *front* of Paper Products packaging, while displaying the FSC Mix logo in much smaller font *on the back and bottom part* of the packaging." Compl. ¶ 295. But Plaintiffs make allegations about other images on the Charmin and Puffs packaging, such as the Forest Allies logo, that appear directly next to this "FSC Mix" logo and are similar in size to the "FSC Mix" logo. *See* Compl. ¶ 295 (screenshot). Therefore, Plaintiffs cannot plausibly allege that they did not see the "FSC Mix" logo when viewing other images they claim were deceptive as well. *See, e.g.*, *id.* ¶ 31.

Moreover, use of a generic FSC logo is accurate because Charmin meets the standards for the "FSC Mix" certification, and even if Plaintiffs could establish any ambiguity, the "FSC Mix" logo on the back of the Charmin packaging clarifies the meaning of the FSC logo displayed on the front. *See id.* Where "a front label is ambiguous, the ambiguity can be resolved by reference to the back label." *McGinity v. Procter & Gamble Co.*, 69 F.4th 1093, 1099 (9th Cir. 2023). Most consumers would not know what the acronym "FSC" means just by looking at those letters or the FSC logo and would not believe that it implies

---

[9] Plaintiffs also make conclusory allegations that "a substantial portion of the pulp used in P&G Paper Products is *not* FSC certified at all." *Id.* ¶ 14. But Plaintiffs appear to be conflating wood pulp from "FSC-*certified forests*" with wood pulp that is "FSC certified." *See id.* ¶ 295 (emphasis added). As Plaintiffs' complaint shows, "FSC-controlled wood" "doesn't come from FSC-certified forests," but it is still certified by the FSC. *Id.* ¶ 288 (screenshot). And the fact that P&G relies on the "FSC Mix" designation—which "allow[s] the use of … non-FSC-*certified forest* material" (*i.e.*, controlled wood)—does not show that P&G uses wood pulp that is not certified by the FSC at all. *Id.* ¶ 295 (emphasis added).

a particular certification level. In fact, Plaintiffs do not allege that they were familiar with the various FSC certification levels or understood what the "FSC 100%" certification meant such that they would be confused by the standalone FSC logo. And because the standalone FSC logo on the front of the product does not specify a particular certification level, a reasonable consumer would necessarily have required more information before concluding that the FSC logo on the front of the Charmin packaging was making an "affirmative promise." *Id.* at 1097-98. The "FSC Mix" logo on the back of the Charmin packaging makes clear that the product satisfies the criteria for FSC Mix certification—a fact that Plaintiffs admit in their complaint. Compl. ¶¶ 288, 295.

Further, the FSC's own rules allow P&G to display the standalone FSC logo on the front of the Chamin packaging, as long as the back of the packaging shows the "FSC Mix" logo. The FSC's rules state that "[a]dditional FSC logos or reference to FSC may be used" (including the standalone FSC logo) "when the on-product label" (*i.e.*, the "FSC Mix" label) "is visible to the consumer (i.e. the label is accessible without damaging the sales packaging)." Singh Decl. Ex. 7 (Requirements for Use of the FSC Trademarks by Certificate Holders § 4.5). Thus, it would be unreasonable for a consumer to believe that Charmin and Puffs products satisfy the "FSC 100%" certification standards simply because an "unqualified FSC logo" appears on the front of the packaging. *See McGinity*, 69 F. 4th at 1099.[10] Moreover, Plaintiffs' complaints about the size of the FSC logo on the back of the

[10] Plaintiffs also allege that third-party retailers' websites state that "all our pulp is 100% FSC certified," and Plaintiffs incorrectly assert that P&G controls the "'product detail' and 'thumbnail' information" on these retailers' websites. Compl. ¶¶ 250, 251. But even assuming the truth of these assertions for purposes of this motion, P&G's pulp undisputedly

Charmin and Puffs packaging are also contrary to the FSC's own requirements. The FSC clearly dictates the minimum size for labels displaying the FSC logo. Singh Decl. Ex. 7 (Requirements for Use of the FSC Trademarks by Certificate Holders § 8.5). And Plaintiffs do not allege that the Charmin packaging fails to comply with those requirements.

In an effort to bolster their flimsy allegations, Plaintiffs attack the certifying entities P&G allegedly uses to verify its compliance with the FSC's certification requirements. To be clear, the FSC relies on "certifiers" who are "independent of FSC and the companies they are auditing" to "assess forest management and chain of custody operations using the FSC standards." Singh Decl. Ex. 14 (*Become Certified*, Forest Stewardship Council, https://us.fsc.org/en-us/certification/become-certified (last visited Oct. 30, 2025)). Plaintiffs allege that P&G "relies on wood pulp certifications from … the Sustainable Forestry Initiative … and the Programme for the Endorsement of Forest Certification," which have purportedly "been criticized as weak and ineffective." *Id.* ¶¶ 292, 294. Relegated to footnotes is who contends this: Greenpeace, not a government body or regulatory agency. *See id.* ¶ 295 nn.72-73. Regardless, those are merely "critiques of the methodology" of the certifying body, "which is not enough to render plausible the allegation that Defendant made a materially misleading statement when it allegedly described its" products as complying with such certification. *Dwyer*, 598 F. Supp. 3d at 153. P&G's use of the FSC logo serves "exactly its purpose"—it shows Charmin and Puffs products are FSC-certified. *See Bohen*

---

is all FSC certified, and Plaintiffs never allege that they reviewed or relied on these particular statements on these particular retailers' websites. This shortcoming in Plaintiffs' allegations underscores their failure to satisfy the particularity requirements of Rule 9(b). *See infra* Section II.

*v. ConAgra Brands, Inc.*, 2024 WL 1254128, at *7 (N.D. Ill. 2024). "That label is not a lie." *See id.* (rejecting false advertising claim where plaintiffs did "not allege that [defendant] violated [the third-party certification] standards or that the … certification on the packaging [was] inaccurate" and instead argued that "those standards authorize or overlook unsustainable fishing practices").

Where, as here, Plaintiffs do not "allege that [P&G's] statements regarding compliance, regulation, or licensing are inaccurate, and instead argue[] that compliance, regulation, and licensing are . . . insufficient and unsatisfactory by some accounts," that allegation "does not render [P&G's] representations as to compliance false or misleading." *Lee v. Can. Goose US, Inc.*, 2021 WL 2665955, at *6 (S.D.N.Y. June 29, 2021); *accord Myers v. Starbucks Corp.*, 2020 WL 13302437, at *5 (C.D. Cal. July 29, 2020) (dismissing claims that "Mars's use of the Rainforest Alliance seal creates a misleading impression of ethical labor practices and sustainability" where plaintiff alleged the third-party organization "runs a business-friendly certification . . . that lacks social and environmental standards and is poorly enforced" (citation omitted)); *West v. Sambazon, Inc.*, 750 F. Supp. 3d 356, 372 (S.D.N.Y. 2024) (dismissing claims where the "allegations are, at their core, challenging the sufficiency of the standards of the certification, with which Defendant states that they are complying" (citation omitted)); *Sanchez v. Walmart Inc.*, 733 F. Supp. 3d 653, 671 (N.D. Ill. 2024) ("Plaintiff takes issue with MSC's sustainability representation because it certifies fisheries that engage in unsustainable practices, but Walmart's representation remains true—the product meets the Council's standards.").

In *Lee*, the plaintiff argued that "Canada Goose's proclaimed compliance with [external humane trapping] standards [was] misleading because 'these standards themselves authorize inhumane trapping practices.'" 2021 WL 2665955, at *6. The court rejected that argument. As the court explained, "[t]hat the relevant standards may nonetheless be inhumane or inadequate does not render Defendants' representations as to compliance false or misleading." *Id.* The same is true in this case. Plaintiffs may believe the requirements of the "FSC Mix" certification do not sufficiently protect the Canadian boreal forest and may prefer different requirements, but their dissatisfaction with those standards does not render P&G's representations false or misleading.

### 2. *Grow:* Plaintiffs Do Not Deny that the Forestry Companies in P&G's Supply Chain Replant At Least Two Trees for Every One Harvested

Plaintiffs claim that P&G misleads consumers by stating that "for every tree used by P&G, at least two are regrown in its place." Compl. ¶ 244. Yet Plaintiffs do not actually allege that this statement is false. To the contrary, Plaintiffs acknowledge that the forestry companies in P&G's supply chain replant the trees they harvest. *See id.* ¶ 283. And Plaintiffs do not even explain how this statement supposedly misled them (if it did at all).

Plaintiffs' real complaint seems to be that third-party forestry companies in P&G's supply chain do not "recreate" "untouched old-growth forest[s]" with "the same ecological value that was present before P&G's harvesting occurred." *Id.* But this seeks to transform P&G's "Grow" prong into something different than what it actually is. It's also implausible. Plaintiffs do not allege facts plausibly establishing that a reasonable consumer who sees the "Protect-Grow-Restore" logo on a package of Charmin or Puffs stops to think about the methods suppliers use to replant trees. Even if a consumer did stop to ponder the

issue, no reasonable consumer would think that the forestry companies in P&G's supply chain are replanting trees in the Canadian boreal forest in a way that replicates the exact same biodiversity that existed before harvesting. This would be impossible.

Again, Plaintiffs "cannot sue based on every fanciful idea that springs to mind after reading the label." *Sorkin*, 2024 WL 3673719, at *45 (citation omitted); *see also, e.g.*, *Kurimski v. Shell Oil Co.*, 2022 WL 2913742, at *7 (S.D. Fla. June 30, 2022) (dismissing FDUTPA claim because "Plaintiff's claim of deception is premised on her own unreasonable assumptions, which is not sufficient to show probable, not possible, deception of consumers acting reasonably in the circumstances" (citations and quotation marks omitted) (emphasis removed)); *Mass. Laborers' Health & Welfare Fund v. Philip Morris, Inc.*, 62 F. Supp. 2d 236, 243 (D. Mass. 1999) ("Reliance cannot be deemed reasonable when the alleged misrepresentation is preposterous or palpably false, or when minimal investigation would have revealed the truth." (citations omitted)). Otherwise, false advertising claims could never be dismissed at the motion-to-dismiss stage.

Plaintiffs also assert that the forestry companies in P&G's supply chain sometimes "spray chemical herbicides like aerial glyphosate spray … to intentionally eliminate all growth other than just a handful of tree species most valuable for logging." Compl. ¶ 283. As an initial matter, to the extent the forestry companies use herbicides, they do so because it is required by the Canadian government and meant to help regenerate the tree species that were present before the harvesting occurred. Singh Decl. Ex. 6 (Canadian Forest Service Technical Note No. 112). Even setting that aside, however, a mere allegation that forestry companies do not always replant trees in precisely the manner that

Plaintiffs would prefer does not render P&G's statements false. *See, e.g.*, *Sorkin*, 2024 WL 3673719, at *4. P&G does not tell consumers that the forestry companies in its supply chain replant trees without using herbicides or that they regenerate forests with exactly the same biodiversity that existed before trees were cut down. Any reasonable consumer would understand that P&G cannot make that promise.

Indeed, "[a] reasonable consumer would not understand" P&G's statements about replanting trees "as promising something that is impossible." *Moore v. Trader Joe's Co.*, 4 F.4th 874, 883-84 (9th Cir. 2021) (affirming district court's dismissal of false advertising claims due to the "sheer implausibility of Plaintiffs' alleged interpretation"); *accord Sarr v. BEF Foods, Inc.*, 2020 WL 729883, at *11 (E.D.N.Y. Feb. 13, 2020) ("to the extent that the plaintiffs' claims arise out of any of these implausible [interpretations of defendant's product label], they are dismissed"). P&G's statements are not rendered "false and deceptive merely because [they] will be unreasonably misunderstood by an insignificant and unrepresentative segment of the class of persons to whom the representation is addressed." *West*, 750 F. Supp. 3d at 373 (citation omitted); *accord La Barbera v. Ole Mexican Foods Inc.*, 2023 WL 4162348, at *8 (C.D. Cal. May 18, 2023).

Plaintiffs further allege that P&G's advertising violates the "Green Guides"—guidelines issued by the Federal Trade Commission "to help marketers avoid making environmental claims that are unfair or deceptive"—because P&G supposedly "conveys to reasonable consumers that the company offsets the environmental harm of harvesting wood pulp by replacing the ecological value of the forests it exploits." Compl. ¶¶ 237, 305. P&G's packaging and websites say no such thing. They never indicate that the forestry

companies in P&G's supply chain are replicating the exact conditions that existed before trees were harvested. Instead, the packaging and websites use "clear and prominent qualifying language that limits the claim to a specific benefit" in accordance with the Green Guides. 16 C.F.R. § 260.4(c). The websites clearly state that, when P&G says it is committed to helping "Keep Forests as Forests," it means that "for every tree used, at least two are regrown in its place." Compl. ¶¶ 6, 244 (screenshot). P&G complies with the Green Guides because it has "clearly defined the basis" for its representations and has thus "substantiated and qualified" them. *See Lizama v. H&M Hennes & Mauritz LP*, 2023 WL 3433957, at *8 (E.D. Mo. May 12, 2023) (defendant complied with the Green Guides).

Plaintiffs also allege that P&G's statements about replanting trees violate the Green Guides because "P&G provides no verifiable evidence to support its promise of regrowing two trees for each one harvested." *See* Compl. ¶ 305. But Plaintiffs merely allege that P&G "does not *disclose* how or where regrowth occurs, how it is verified, or whether the trees survive to maturity to restore the ecological value lost." *Id.* (emphasis added). Plaintiffs insist P&G therefore violates Section 260.2 of the FTC Green Guides (16 C.F.R. § 260.2). But the Green Guides do not require companies to disclose to consumers how they verify the information underlying their environmental claims. The Green Guides simply indicate that marketers should have "a reasonable basis" for their claims, which "often requires competent and reliable scientific evidence." 16 C.F.R. § 260.2. Plaintiffs do not (and cannot in good faith) allege that P&G lacks a reasonable basis for its claims.

### 3. *Restore:* Plaintiffs Do Not Deny that P&G Has Partnered with the Arbor Day Foundation to Replant One Million Trees

Plaintiffs allege that P&G misleads consumers by "tout[ing] its partnership with

the Arbor Day Foundation to plant one million trees in forests affected by natural disasters," even though "P&G's total 5-years-long promise to replant one million trees represents less than 1% of boreal forest lost to industrial logging practices each year." Compl. ¶¶ 286, 306. Plaintiffs do not deny that P&G has, in fact, partnered with the Arbor Day Foundation to plant one million trees. The percentage of the boreal forest has nothing to do with P&G's statement and is unlikely to even cross the mind of a reasonable consumer. Plaintiffs' claim regarding the alleged "Restore" promise fails.

#### 4. Plaintiffs Do Not Deny that P&G Properly Uses the Forest Allies Logo on Charmin and Puffs Packaging

Plaintiffs acknowledge that Charmin and Puffs products only display the Rainforest Alliance's Forest Allies logo, which they readily admit "does not convey any type of third-party certification reflective of responsible forestry standards." Compl. ¶ 270. And Plaintiffs do not deny that P&G is allowed to use this Forest Allies logo. Nevertheless, Plaintiffs claim the Forest Allies logo is "nearly identical" to the previous Rainforest Alliance Certified seal and therefore "likely deceptive and misleading to consumers." *Id* ¶¶ 300-01. But Plaintiffs do not allege that they were familiar with the prior Rainforest Alliance Certified seal when they allegedly purchased the Charmin and Puffs products, or that the Forest Allies logo misled them into believing the products were certified by the Rainforest Alliance. *See id.* ¶¶ 22-225. Plaintiffs thus fail to plead that they personally were confused by the Forest Allies logo. Moreover, as Plaintiffs admit, P&G is one of "two founding members of the Rainforest Alliance Forest Allies program." Compl. ¶ 302. Thus, P&G has partnered closely with the Rainforest Alliance and has worked to promote its

mission. There is nothing misleading about advertising P&G's involvement with and support for the Rainforest Alliance on Charmin and Puffs packaging.

Plaintiffs also allege that P&G misled consumers by showing the Rainforest Alliance Certified seal in a YouTube video that was previously posted on the Charmin Sustainability Promise website, even though the seal has allegedly "been obsolete for years." Compl. ¶¶ 264 & n.47, 297. Plaintiffs further claim that P&G's use of the Rainforest Alliance Certified seal in the video on the Charmin website "overstate[d] the environmental attribute or benefit of using Paper Products and therefore violate[d]" the FTC Green Guides. *Id.* ¶ 308. But Plaintiffs do not allege that they watched the YouTube video, saw the Rainforest Alliance Certified seal in the video, or relied on it in purchasing Charmin or Puffs products. *See id.* ¶¶ 22-225. And Plaintiffs do not allege that a reasonable consumer would be likely to see the Rainforest Alliance Certified seal—let alone that a reasonable consumer would be deceived by it. In fact, the Rainforest Alliance Certified seal was not prominently shown on the Charmin homepage or even on the Charmin Sustainability Promise webpage. Instead, as Plaintiffs' own complaint shows, the seal appeared only briefly on a single slide in a YouTube video that was posted on the Charmin Sustainability Promise webpage. *Id.* ¶¶ 264 & n.47, 297 (screenshot of YouTube video posted on Charmin website). Moreover, the Rainforest Alliance website that Plaintiffs cite in their complaint explains that consumers "may still see the legacy Rainforest Alliance Certified seal … on product packaging" because the legacy seal is "slowly being phased out." Singh Decl. Ex. 11 (*Using Our Logo and Seal*).

P&G cannot be faulted for using logos that the Rainforest Alliance created and allowed P&G to use on its products. Once again, Plaintiffs are taking issue with the certifying body that allowed P&G to use the logos on its products, but Plaintiffs' complaints about that body's policies are not sufficient to render P&G's statements false or misleading. *See, e.g.*, *West*, 750 F. Supp. 3d at 372; *Can. Goose*, 2021 WL 2665955, at *6; *Dwyer*, 598 F. Supp. 3d at 153. In a similar case, a court dismissed claims that a candy company's "use of the Rainforest Alliance seal creates a misleading impression of ethical labor practices and sustainability," even though the plaintiff alleged the Rainforest Alliance "runs a business-friendly certification . . . that lacks social and environmental standards and is poorly enforced." *Myers*, 2020 WL 13302437, at *5. The court held that the candy company's use of the seal was not misleading because the company did "not make any claims about the labor practices of its suppliers or the scope of the Rainforest Alliance program." *Id.* And "Plaintiff's 'false impression' theory cannot cure her failure to identify a specific, affirmative misrepresentation." *Id.* So too here. Plaintiffs do not allege that P&G makes any claims about the scope of the Forest Allies initiative, and Plaintiffs' claims that the Forest Allies logo gives consumers a false impression cannot cure their failure to identify a specific, affirmative representation that is false or misleading. Thus, P&G's appropriate and compliant use of the Forest Allies logo is not misleading to a reasonable consumer.

### C. P&G's Statements to Investors About Its Deforestation Policies Have No Bearing on Plaintiffs' Consumer Claims

Plaintiffs also claim that P&G makes misleading statements about its commitment to "no deforestation in its supply chain," but the only examples Plaintiffs point to are statements from "investor relations" reports and webpages. *See* Compl. ¶¶ 281, 312. This is a

consumer case, not an investor case. Thus, it is unclear (and never alleged) how online, off-package statements to investors have any bearing on Plaintiffs' claims whatsoever. Indeed, Plaintiffs do not allege that they viewed or relied on statements in P&G's investor relations materials when deciding whether to purchase Charmin or Puffs. *Id.* ¶¶ 22-225. Even if they did, it is implausible that a significant portion of consumers would review P&G's investor relations materials before deciding whether to purchase Charmin or Puffs. Moreover, Plaintiffs admit that P&G's investor relations materials use a recognized "technical definition of Deforestation" and make clear how P&G is using the term. *Id.* ¶ 281. While Plaintiffs may disagree with P&G's policy, it is not misleading. *See Lizama*, 2023 WL 3433957, at *8 (defendant complied with the Green Guides where it "clearly defined the basis" for its representations).

### D. Plaintiffs Fail to Establish that P&G Had Any Duty to Disclose Information About Third-Party Suppliers' Forestry Practices

Plaintiffs also argue that "P&G omits critical facts to materially mislead consumers as to the true impact of … P&G's supply chain on one of the earth's last untouched old-growth forests." Compl. ¶ 10. To that end, they attempt to recharacterize the true statements discussed above as "Common Omissions" about third-party suppliers' forestry practices that P&G supposedly should have disclosed to consumers. *Id.* ¶¶ 10-16. For example, with respect to the "Grow" promise, Plaintiffs allege that "P&G fails to disclose that, in reality, its suppliers are replanting single-species conifers, evenly spaced, and with even ages." *Id.* ¶ 283. But even assuming these allegations are true (they are not), an omission is only actionable when it is "grounded in a duty to disclose." *Republic Bank & Trust Co. v. Bear Stearns & Co., Inc.*, 683 F.3d 239, 254-55 (6th Cir. 2012) (citation omitted); *accord*

*Hodsdon v. Mars, Inc.*, 891 F.3d 857, 861 (9th Cir. 2018).

Plaintiffs cannot establish that P&G had a duty to disclose information to consumers about its third-party suppliers' forestry practices. Indeed, in many jurisdictions, a duty to disclose "arises primarily where there is a fiduciary or other similar relationship of trust and confidence." *Waste Mgmt., Inc. v. Danis Indus. Corp.*, 2004 WL 5345389, at *10 (S.D. Ohio Feb. 24, 2004).[11] Here, there was no such fiduciary or other similar relationship between P&G and Plaintiffs, and therefore no duty of disclosure. In some jurisdictions, "the general duty to disclose material facts arises only when the facts are known to the seller but not easily discoverable by the buyer." *Polygon Nw. Co. LLC v. La. Pac. Corp.*, 2012 WL 2504873, at *6 (W.D. Wash. June 28, 2012).[12] P&G had no such duty because

[11] *See also, e.g.*, *In re Carrier IQ, Inc.*, 78 F. Supp. 3d 1051, 1112 (N.D. Cal. 2015); *Beerman v. Tauck, Inc.*, 2021 WL 3773293, at *4 (D. Conn. Aug. 25, 2021); *Sokolow v. Damico*, 2019 WL 7188563, at *3 (S.D. Fla. Dec. 26, 2019); *Peskin v. Peachtree Inv. Sols., LLC*, 2023 WL 7457555, at *19 (N.D. Ga. Sept. 27, 2023); *Smith v. Respiro, LLC*, 2025 WL 1883817, at *8 (N.D. Ill. July 8, 2025); *Old Town Util. & Tech. Park, LLC v. Consol. Edison, Sols., Inc.*, 2019 WL 4784603, at *8 (D. Me. Sept. 30, 2019); *Kwintkiewicz v. Bentley Motors, Inc.*, 2011 WL 1336576, at *3 (D. Md. Apr. 7, 2011); *JSB Indus., Inc. v. Nexus Payroll Servs., Inc.*, 463 F. Supp. 2d 103, 107 (D. Mass. 2006); *Katz v. Mich.*, 1989 WL 62196, at *4 (W.D. Mich. Mar. 13, 1989); *Hammerschmidt v. Gen. Motors LLC*, 583 F. Supp. 3d 1215, 1220-21 (D. Minn. 2022); *Chapin Home for the Aging v. McKimm*, 2013 WL 948110, at *3 (E.D.N.Y. Mar. 11, 2013); *Ratcliff v. Am. Honda Motor Co, Inc.*, 2018 WL 3542865, at *3 (M.D.N.C. July 23, 2018), *report and recommendation adopted*, 2018 WL 3849911 (M.D.N.C. Aug. 13, 2018); *DeSimone v. U.S. Claims Servs*., Inc., 2020 WL 1164794, at *3 (E.D. Pa. Mar. 11, 2020); *Gaddy v. Corp. of President of Church of Jesus Christ of Latter-Day Saints*, 665 F. Supp. 3d 1263, 1291 (D. Utah 2023); *Barton v. Delfgauw*, 2024 WL 4653226, at *6 (W.D. Wash. Nov. 1, 2024).

[12] *See also, e.g.*, *In re Carrier IQ*, 78 F. Supp. 3d at 1124; *XP Glob., Inc. v. AVM, L.P.*, 2016 WL 6679427, at *4 (S.D. Fla. Nov. 14, 2016); *Song v. Champion Petfoods USA, Inc.*, 2020 WL 7624861, at *11 (D. Minn. Dec. 22, 2020), *aff'd,* 27 F.4th 1339 (8th Cir. 2022); *Banque Arabe Et Internationale D'Investissement v. Maryland Nat. Bank,* 819 F. Supp. 1282, 1290 (S.D.N.Y. 1993), *aff'd*, 57 F.3d 146 (2d Cir. 1995); *Miller v. Gen. Motors, LLC*, 773 F. Supp. 3d 461, 505 (E.D. Mich. 2025) (discussing Pennsylvania law); *Richards v. Cook*, 314 P.3d 1040, 1043 (Utah App. 2013).

the forestry practices that P&G allegedly should have disclosed were easily discoverable by consumers.

In fact, Plaintiffs' own complaint relies almost entirely on publicly available sources of information that enabled them to discover the alleged forestry practices that they claim P&G should have disclosed. The following examples make this clear: *First*, Plaintiffs' complaint cites a 2015 report from Greenpeace that "criticized" certain wood pulp certifications. Compl. ¶ 294 & n.72. *Second*, Plaintiffs allege that, in October 2019, "the National Resources Defense Council ('NRDC') protested a P&G shareholder meeting to urge the company to stop sourcing its wood pulp from Canada's boreal forest and instead increase its reliance on recycled fibers." Compl. ¶ 312. At the time, the NRDC also published articles about Charmin on its website asserting that, "[i]n much of the boreal[,] efforts to replant are not proving successful at replicating forests that resemble the biodiverse, carbon rich ancient forests that were clearcut."[13] *Third*, Plaintiffs allege that, in October 2020, "67% of P&G shareholders voted in favor of" a resolution put forward by Green Century Equity Fund that called on the company to report on how and whether it can eliminate deforestation and intact forest degradation. Compl. ¶ 312.

Because this information was "posted on a public website" and readily available to the public, it was "easily discoverable had Plaintiffs chosen to look for [it]." *Cole v. Keystone RV Co.*, 2021 WL 3111452, at *4 (W.D. Wash. July 22, 2021), *aff'd*, 2022 WL 4234958 (9th

[13] Singh Decl. Ex. 15 (Shelley Vinyard & Jennifer Skene, *Unrolling Charmin's Sustainability Claims*, NRDC (Mar. 12, 2019), https://www.nrdc.org/bio/shelley-vinyard/unrolling-charmins-sustainability-claims).

Cir. Sept. 14, 2022).[14] Therefore, P&G had no duty to disclose additional information about third-party forestry companies' replanting practices, and absent a duty to disclose, Plaintiffs cannot maintain an omissions case against P&G. *See, e.g.*, *Hodsdon*, 891 F.3d at 864-65 (affirming dismissal of omission claim where the allegedly false impression created by the Rainforest Alliance seal did not trigger a duty to disclose use of child labor in supply chain). Plaintiffs' claims against P&G should be dismissed.

## II. Plaintiffs Do Not Plead Their Claims with Sufficient Particularity

Under Rule 9(b), a party "alleging fraud . . . must state with particularity the circumstances constituting fraud." Fed. R. Civ. P. 9(b). This means the complaint must "specify the 'who, what, when, where, and how' of the alleged fraud." *Greer*, 114 F.4th at 614 (citation omitted). In other words, "the plaintiff must: (1) point to a particular allegedly fraudulent statement; (2) identify who made the statement; (3) plead when and where the statement was made; and (4) explain what made the statement fraudulent." *Republic Bank*, 683 F.3d at 253. Further, even when a plaintiff claims to have been misled by alleged omissions, the plaintiff must still "specify *which* specific advertisements or statements he personally saw." *Palmer v. Apple Inc.*, 2016 WL 1535087, at *3 (N.D. Cal. Apr. 15, 2016). And the plaintiff must plead "(1) precisely what was omitted; (2) who should

[14] *See also, e.g.*, *Hawkins v. Shimano N. Am. Bicycle Inc.,* 2024 WL 4405249, at *6 (C.D. Cal. Aug. 1, 2024); *Martin v. BioLab, Inc.*, 2008 WL 11322914, at *6 (N.D. Ga. Mar. 31, 2008); *Perona v. Volkswagen of Am., Inc.*, 684 N.E.2d 859, 867 (Ill. App. Ct. 1997); *Cooper as Co-Tr. of Sylvia Rubin Lifetime Tr. v. Shabshelowitz*, 2025 WL 2176070, at *12 (D. Mass. July 31, 2025); *Boghossian v. Capella Univ., LLC*, 2025 WL 934878, at *9 (S.D.N.Y. Mar. 27, 2025); *Eddystone Rail Co., LLC v. Bridger Logistics, LLC*, 2022 WL 1768853, at *6 (E.D. Pa. Mar. 21, 2022); *Healthcare Co. v. MPI Grp. LLC*, 2025 WL 2733548, at *10 (D. Utah Sept. 25, 2025).

have made a representation; (3) the content of the alleged omission and the manner in which the omission was misleading; and (4) what [defendant] obtained as a consequence of the alleged fraud." *Republic Bank*, 683 F.3d at 256.

All of Plaintiffs' claims are "grounded in fraud." *Greer*, 114 F.4th at 614; *Ivanoff v. Walmart Inc.*, 2025 WL 2207924, at *15 (S.D. Ohio Aug. 4, 2025) (applying Rule 9(b) to fraudulent concealment claim); *In re Natera Prenatal Testing Litig.*, 664 F. Supp. 3d 995, 1005 (N.D. Cal. 2023) (applying Rule 9(b) to "partial misrepresentation" claims). They rest on the premise that Plaintiffs purportedly were misled by P&G's statements about the sustainability of Charmin and Puffs products. *See, e.g.*, Compl. ¶¶ 16-18, 22-225, 270-302. And where, as here, a claim is "grounded in fraud," "Rule 9(b)'s pleading standard applies." *Greer*, 114 F.4th at 614.[15]

The complaint falls far short of pleading the lower requirements of Rule 8, let alone the what, where, when, and how of the alleged fraud as required by Rule 9(b). *See, e.g.*, *Ivanoff*, 2025 WL 2207924, at *35 (dismissing false advertising claims because plaintiffs' allegations did "not pass muster under Rule 9(b) or Rule 12(b)(6) scrutiny"). All of the named Plaintiffs make the exact same boilerplate allegation—that they "saw and relied on" claims that "were *substantially similar* to the examples included in § IV.E of this Complaint." *E.g.*, Compl. ¶¶ 22-23 (emphasis added). And Plaintiffs vaguely allege that the

[15] *See also* Exhibit C (chart showing cases applying Rule 9(b) standard to most of Plaintiff's false advertising claims). Courts have declined to apply Rule 9(b)'s particularity requirement to some false advertising claims, *see* Exhibit B, and warranty claims, *see Kitchen Winners NY Inc. v. Rock Fintek LLC*, 668 F. Supp. 3d 263, 301 (S.D.N.Y. 2023). But the lack of any detail about which statements Plaintiffs viewed or how they were misled fails to satisfy even the lower pleading standard of Rule 8.

claims "exposed to" them "included the Protect-Grow-Restore messaging, the FSC logo, and the RA logo." *Id.* at ¶ 23. But Plaintiffs never specify which advertisements they allegedly viewed, when they viewed the advertisements, how they understood those particular advertisements, or how the advertisements misled them.

Therefore, Plaintiffs do not adequately allege that they were deceived by P&G's statements, and their claims should be dismissed. *See, e.g.*, *Greer*, 114 F.4th at 615-16 (dismissal was proper under Rule 9(b) where complaint lacked particularity "about *why* the statements on the labels were fraudulent" and "when the allegedly fraudulent statements were made"); *DiMuro v. Clinique Lab'ys, LLC*, 572 F. App'x 27, 31 (2d Cir. 2014) ("The complaint does not allege which particular advertising claims each of the named Plaintiffs relied on when purchasing the product, so the conclusion that they did not receive what they bargained for has no ascertainable meaning."); *In re Amazon Serv. Fee Litig.*, 705 F. Supp. 3d 1255, 1266 (W.D. Wash. 2023) (dismissing claims where complaint "suffer[ed] from a lack of details about Plaintiff's own experience").

## III. Fraudulent Concealment Is Not an Independent Cause of Action Under Many of the State Laws

In addition to the reasons set forth above and below, the Court should dismiss Plaintiffs' fraudulent concealment claims in Counts VII (Connecticut), XIII (Illinois), XIX (Massachusetts), XXI (Michigan), XXVI (Minnesota), and XXXIV (Pennsylvania) because fraudulent concealment is not an independent cause of action under those states' laws.[16]

[16] *Brown*, 138 A.3d at 955; *Wisniewski v. Diocese of Belleville*, 943 N.E. 2d 43, 72–73 (Ill. App. Ct. 2011); *Chancellor v. Bank of Am. N.A.*, 2015 WL 5730103, at *5 (N.D. Ill. Sept. 29, 2015); *Niedner v. Ortho-McNeil Pharm., Inc.*, 58 N.E.3d 1080, 1087 n.7 (Mass. App. Ct. 2016); *Universal Bearing Co. v. Baker Bearing Co.*, 2013 WL 1211463, at *3 (E.D. Mich. Mar. 25, 2013); *Thornberg v. State Farm Fire & Cas. Co.*, 2015 WL 3612550, at *5 (D.

## IV. Several State False Advertising Laws Bar Class Claims

Plaintiffs separately cannot maintain putative class claims under several state false advertising statutes. The Alabama, Arkansas, Georgia, Louisiana, Montana, South Carolina, and Tennessee false advertising statutes only permit consumers to bring individual actions. *See* Ala. Code § 8-19-10(f); Ark. Code § 4-88-113(f)(1)(B); Ga. Code § 10-1-399(a); La. Rev. Stat. Ann. § 51:1409(A); Mont. Code Ann. § 30-14-133(1); S.C. Code § 39-5-140; Tenn. Code § 47-18-109(a)(1). Therefore, Plaintiffs' putative class claims under these statutes should be dismissed.[17]

## V. Plaintiff Maggio's Claims Fail for Additional Reasons

The Consolidated Class Action Complaint does not include several claims raised in the original complaint in one of the underlying actions, *Maggio v. Procter & Gamble*, No. 1:25-cv-02667 (S.D.N.Y. filed Mar. 31, 2025). Plaintiffs state that the Consolidated Class Action Complaint "serves as the operative administrative complaint for MDL purposes." Compl. ¶ 20. Plaintiffs have therefore abandoned the omitted claims. Nonetheless, if the Court concludes that any of the omitted claims remain live, the Court should dismiss them because they suffer from various other defects that warrant dismissal.

---

Minn. June 9, 2015), *aff'd*, 638 F. App'x 578 (8th Cir. 2016); *McGrain v. C.R. Bard, Inc.*, 551 F. Supp. 3d 529, 544 (E.D. Pa. 2021).

[17] Although the Consolidated Class Action Complaint does not assert claims under all of these states' false advertising statutes, the complaint in one of the underlying actions, *Maggio v. Procter & Gamble*, No. 1:25-cv-02667 (S.D.N.Y. filed Mar. 31, 2025), asserts false advertising claims under all of these laws. Therefore, to the extent the *Maggio* complaint remains legally operative (and it does not), P&G moves to dismiss those claims.

### A. Count III of the *Maggio* Complaint Constitutes an Impermissible "Shotgun Pleading"

In Count III of her complaint, Plaintiff Maggio purports to assert claims under the false advertising laws of *all fifty states* in a single count without specifying the elements of those claims or how P&G has allegedly violated the false advertising laws. Compl. ¶¶ 187-91. A pleading such as this—which does not "separate each of [the] causes of action or claims for relief into separate counts"—is often referred to as a "shotgun pleading." *Lee v. Ohio Educ. Ass'n*, 951 F.3d 386, 393 (6th Cir. 2020). "'Shotgun pleading' is especially problematic with respect to pleading numerous causes of action under a variety of state consumer protection statutes because the type and degree of protection offered by the various state laws varies extensively." *Adeghe v. Procter & Gamble Co.*, 2024 WL 22061, at *5 (S.D.N.Y. Jan. 2, 2024) (citation omitted). Plaintiff's failure to "identify the applicable state law theories of liability provides Defendant with insufficient notice of the claims against it." *Id.* (citation omitted). Thus, Count III "falls short of satisfying Rule 8's pleading requirements." *Id.* (citation omitted).

### B. Plaintiff Failed to Engage in an Informal Dispute Settlement Program as Required by the Mississippi Consumer Protection Act

"In order for a private action under the Mississippi Consumer Protection Act ('MCPA') to proceed, 'the plaintiff must have first made a reasonable attempt to resolve any claim through an informal dispute settlement program approved by the Attorney General.'" *Joan Cravens, Inc. v. Deas Constr. Inc.*, 2016 WL 9240622, at *2 (S.D. Miss. May 5, 2016) (quoting Miss. Code Ann. § 75-24-15(2)). "Compliance with this requirement is mandatory." *Mayberry v. Bristol-Myers Squibb Co.*, 2009 WL 5216968, at *6 (D.N.J. Dec. 30, 2009). Moreover, a plaintiff "cannot satisfy this prerequisite by other attempts of informal

settlement, no matter how numerous or sincere." *Joan Cravens, Inc.*, 2016 WL 9240622, at *2. "Because Plaintiff[] ha[s] not alleged that [she] utilized such programs, [her] claims under the MCPA are barred under the plain language of the statute." *Id.*; *accord Taylor v. S. Farm Bureau Cas. Co.*, 954 So. 2d 1045, 1049 (Miss. Ct. App. 2007).

### C. Plaintiff Cannot Maintain a Breach of Implied Warranty Claim Because There Was No Privity of Contract Between Her and P&G

"New York courts continue to require privity between a plaintiff and defendant with respect to claims for breach of the implied warrant[y] of merchantability ... where the only loss alleged is economic." *Zachmann v. Coleman Co. Inc.*, 2022 WL 161480, at *5 (S.D.N.Y. Jan. 18, 2022). Thus, to bring a claim for breach of implied warranty, a plaintiff "must allege privity with the defendant." *Vaglica v. Reckitt Benckiser LLC*, 699 F. Supp. 3d 200, 211 (E.D.N.Y. 2023). "A remote purchaser, such as a retail purchaser, is not in privity with a good's manufacturer." *Zachmann*, 2022 WL 161480, at *5. In this case, Plaintiff "has not alleged that [she] bought the product[s] directly from [P&G]." *See Vaglica*, 699 F. Supp. 3d at 211. To the contrary, Plaintiff alleges that she "purchased the Products … at BJ's locations … and also at Costco locations." *Maggio* Compl. ¶ 37. Moreover, Plaintiff "allege[s] only economic loss, not personal injury." *Zachman*, 2022 WL 161480, at *5; *see Maggio* Compl. ¶ 210 (alleging she "paid money for the Products"). Accordingly, Maggio has failed to state a claim for breach of implied warranty.

### D. Plaintiff's Unjust Enrichment Claim Is Duplicative

"An unjust enrichment claim is not available where it simply duplicates, or replaces, a conventional contract or tort claim." *Corsello v. Verizon N.Y., Inc.*, 967 N.E.2d

1177, 1185 (N.Y. 2012). Indeed, "New York law bars unjust enrichment claims from serving as a 'catchall cause of action to be used when others fail.'" *La Rosa v. SPD Swiss Precision Diagnostics GmbH*, 2025 WL 841687, at *4 (2d Cir. Mar. 18, 2025) (citation omitted). Maggio's unjust enrichment claims are based on the same allegedly deceptive conduct as her other claims—namely, that P&G purportedly "misrepresented the Products as environmentally friendly when the Products' supply chain contributes to forest degradation and other negative environmental consequences." *Maggio* Compl. ¶ 216. In fact, in her pre-motion letter response, Maggio admitted that her "unjust enrichment claim is based on the same set of facts as her other claims." *Maggio* ECF No. 24 at 3. Therefore, the unjust enrichment claim is duplicative of Maggio's other claims. *See, e.g.*, *Corsello*, 967 N.E.2d at 1185. "To the extent that [the other] claims succeed, the unjust enrichment claim is duplicative; if plaintiff['s] other claims are defective, an unjust enrichment claim cannot remedy the defects." *Id.* The unjust enrichment claim should be dismissed.

**CONCLUSION**

For these reasons, the Court should dismiss Plaintiffs' claims in their entirety with prejudice under Rule 12(b)(6).

Dated: October 30, 2025

Respectfully submitted,

*<u>/s/ Elizabeth P. Kessler</u>*
Elizabeth P. Kessler (61730)
*Trial Counsel*
JONES DAY
325 John H. McConnell Blvd., Suite 600
Columbus, OH 43215
Phone: (614) 281-3852
Email: ekessler@jonesday.com

David J. Lender (admitted *pro hac vice*)
Aaron J. Curtis (admitted *pro hac vice*)
Elaina K. Aquila (admitted *pro hac vice*)
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, NY 10153
Phone: (212) 310-8000
Email: david.lender@weil.com
aaron.curtis@weil.com
elaina.aquila@weil.com

David R. Singh (admitted *pro hac vice*)
WEIL, GOTSHAL & MANGES LLP
201 Redwood Shores Parkway
Redwood Shores, CA 94065
Phone: (650) 802-3000
Email: david.singh@weil.com

*Counsel for The Procter & Gamble Company*

## CERTIFICATE OF SERVICE

I hereby certify that on October 30, 2025, a copy of the foregoing was served via electronic filing in the ECF system, which will send notice of filing to all counsel of record.

Dated: October 30, 2025

*/s/ Elizabeth P. Kessler*
Elizabeth P. Kessler (61730)
*Trial Counsel*
JONES DAY
325 John H. McConnell Blvd, Suite 600
Columbus, OH 43215
Phone: (614) 281-3852
Email: ekessler@jonesday.com

*Counsel for The Procter & Gamble Company*