**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

IN RE: PROCTER & GAMBLE COMPANY "PROTECT", GROW, AND RESTORE" MARKETING AND SALES PRACTICES LITIGATION

Case No. 2:25-md-03157-DRC-KAJ

Honorable Douglas R. Cole

ORAL ARGUMENT REQUESTED

# PLAINTIFFS' OPPOSITION TO DEFENDANT PROCTER & GAMBLE COMPANY'S MOTION TO DISMISS PLAINTIFFS' CONSOLIDATED CLASS ACTION COMPLAINT

**TABLE OF CONTENTS AND SUMMARY OF ARGUMENT**

**Page**

I. INTRODUCTION .......... 1

II. LEGAL STANDARD .......... 4

III. FACTUAL BACKGROUND .......... 4

A. P&G knows its consumers are willing to pay a premium for environmental assurances. .......... 4

B. P&G's "Keep Forests as Forests" Campaign relies on five Deceptive Claims to curate a misleading net impression of environmental stewardship. .......... 5

C. P&G point-of-sale messaging repeats the Deceptive Claims across all product lines. .......... 6

D. P&G misstates FSC certification structures and their relevance to the Complaint. .......... 7

IV. ARGUMENT .......... 8

A. The case P&G wants to litigate is not the case Plaintiffs filed. .......... 8

The reasonable-consumer deception inquiry is "in immediate tension with the [Rule 12] early stage of this litigation," and dismissal on deception grounds is exceedingly rare. *Boyd v. Target Corp.*, 750 F. Supp. 3d 999, 1101 (D. Minn. 2023) Dismissal should be granted only if the impressions plead are "patently implausible." *Nathan v. Whirlpool Corp.*, 492 F. Supp. 3d 747, 761 (S.D. Ohio 2020). At the Rule 12 stage, if this Court were to resolve facts in P&G's favor, only assess the technical accuracy of Plaintiffs claims, or impose P&G's preferred interpretation of what the Deceptive Claims mean, then this Court would "invert the presumptions that govern at the pleadings stage by resolving considerable factual ambiguity and complexity in [P&G's] favor." *Boyd v. Target Corp.*, 750 F. Supp. 3d at 1017. This the Court cannot do.

B. Established consumer protection law confirms the plausibility of Plaintiffs' claims. .......... 13

1. The Sixth Circuit defines the objective reasonable-consumer standard as it applies to consumer deception cases. .......... 14

Deceptive-marketing claims turn on the objective standard as to whether the advertiser's claims convey a net impression that has the capacity to deceive a reasonable consumer acting reasonably under the circumstances. *Rikos v. Procter & Gamble Co.*, 799 F.3d 497, 518 (6th Cir. 2015). Courts should evaluate the overall message or net impression conveyed to consumers at the point of sale. *ECM BioFilms, Inc. v. FTC*, 851 F.3d 599 at 610–13 (6th Cir. 2017) *See also, Dumont*

*v. Reily Foods Co.,* 934 F.3d 35 (1st Cir. 2019) (same); *Mantikas v. Kellog Co.*, 910 F.3d 633, 636–39 (2d Cir. 2018) (same); *Bell v. Publix Super Mkts., Inc.*, 982 F.3d 468, 476–79 (7th Cir. 2020) (same); *Whiteside v. Kimberly Clark Corp*., 108 F.4th 771, 780–84 (9th Cir. 2024) (same).

2. Multiple reasonable interpretations of the same advertisement foreclose dismissal ........................................................ 15

When there are competing meanings, dismissal at the pleadings stage is inappropriate: "we think it best that six jurors, rather than three judges, decide on a full record whether the challenged label 'has the capacity to mislead' reasonably acting [] consumers." *Dumont v. Reily Foods Co.*, 934 F.3d 35 (1st Cir. 2019).

3. P&G's attempt to raise the bar for the reasonable consumer conflicts with appellate authority. ........................................................ 16

Consumers are not expected to learn technical terminology to understand an advertiser's representation "as would a scientist" *ECM BioFilms*, 851 F.3d at 611–12; *see also*, *Richardson v. Edgewell Pers. Care, LLC*, 2023 WL 7130940 (2d Cir. Oct., 2023) (same). Nor must reasonable consumers "instinctively parse every front label or read every back label before placing groceries' in their carts" because consumers are "not likely to study with great diligence the contents of a complicated product package", in the grocery aisle and "possibly with a child or two in tow." *Bell*, 982 F.3d at 476. Reasonable consumers are also not expected avoid deception by conducting research by visiting websites to verify an advertiser's representations. *Della v. Colgate-Palmolive Co*., 2024 WL 457798, at *10 (N.D. Cal. Feb. 6, 2024) and *Downing v. Keurig Green Mt., Inc*., 2021 WL 2403811, at *6 (D. Mass. June 11, 2021).

4. P&G's "atomization theory" conflicts with Sixth Circuit doctrine as applied by circuit courts across the country. .......................... 19

Dissecting a packaging's messaging into discrete components is precisely the interpretive method appellate courts have rejected nationwide. *ECM BioFilms*, 851 F.3d at 610–13; *Williams v. Gerber Prods. Co*., 552 F.3d 934, 938 (9th Cir. 2008) (same). Nor can a defendant shield itself by pointing to a kernel of truth when "a series of statements can in combination be misleading." *Earth Island Inst. v. Coca-Cola Co*., 321 A.3d 654, 659 (D.C. 2024). An otherwise false advertisement is not rendered acceptable merely because a defendant's interpretation of it is not untrue. *Bell*, 982 F.3d at 478. Here, Plaintiffs challenge a unified environmental narrative embedded in P&G's marketing, and that narrative must be evaluated as consumers encounter it—in full, at the point of sale. *Whiteside*, 108 F.4th at 780–84.

5. P&G's "context cures" theory is rejected by circuit courts nationwide. ......................................................................................... 20

Courts do not permit advertisers to rely on back-panel text, fine print, or external materials websites to narrow, correct, or contradict a misleading front-label message. *Bell*, 982 F.3d at 476–79; *Mantikas*, 910 F.3d at 636-39 (same); *Dumont*, 934 F.3d at 40–41 (same). Plaintiffs plausibly allege that each front-label representation conveys broad, unqualified environmental assurances in an unambiguous way and therefore the front-label net impresson controls. *Whiteside*, 108 F.4th at 780–84.

6. The FTC Green Guides reinforce Plaintiffs' deception theory. .......... 22

The FTC's Green Guides reinforce the same principles that govern judicial analysis in this context. These Guides are given "great weight" as the FTC's expertise "is often in a better position than are courts to determine when a practice is 'deceptive." *ECM BioFilms*, 851 F.3d at 605, 608–13. P&G's unqualified Protect-Grow-Restore messaging, and its certification-style FSC and Forest Allies seals, convey environmental benefits that Plaintiffs plausibly allege P&G cannot substantiate.

C. Plaintiffs plausibly plead that the Deceptive Claims mislead reasonable consumers. .......... 24

1. "Protect": P&G's unqualified forest-protection claim is misleading. .......... 24

P&G's "Protect" message is false and misleading, as it conveys to a reasonable consumer that P&G safeguards forests, and sources fiber in a manner consistent with genuine stewardship. This impression is false. *ECM BioFilms*, 851 F.3d at 608-13. Unqualified environmental-benefit claims are deceptive where the real-world systems in which the product operates do not meaningfully deliver the promised benefit. *Della*, 2024 WL 457798, at *8–11.

2. "Grow": P&G's "two trees regrown" claim is disingenuous and lacks required substantiation. .......... 29

P&G's "Grow" representation falsely communicates to a reasonable consumer that P&G's practices contribute to an increase in forested land with similar ecological benefits or promote meaningful ecological regrowth. *Whiteside*, 108 F.4th at 781–84; 16 C.F.R. §§ 260.2, 260.3(a)–(c), 260.4(d); *Rawson v. ALDI Inc*., 2022 WL 1556395, at *3 (N.D. Ill. May 17, 2022). P&G has an obligation to substantiate all reasoanble interpretation of its Grow messaging via competent and reliable scientific evidence, but has so far been able to do so. *ECM BioFilms*, 851 F.3d at 612–13.

3. "Restore": P&G's forest restoration messaging overstates environmental benefits. .......... 34

P&G's "Restore" representation falsely communicates to a reasonable consumer a message of broad forest restoration. Such sweeping environmental assurances operate as general environmental-benefit claims that convey broad, substantive environmental advantages that must be substantiated. *ECM BioFilms,* 851 F.3d at 608-13. Also, literal accuracy does not cure a misleading net impression where the marketing message implies broad environmental improvement that materially exceeds the underlying fact.; *Bell*, 982 F.3d. at 479; *Whiteside*, 108 F.4th at 783; *Earth Island Inst*., 321 A.3d at 669–74.

4. FSC Logo: P&G's use of an unqualified certification seal reinforces its misleading net impression. .......... 36

P&G Paper Products include a large, unqualified, FSC logo on the front of each package that functions as an unqualified general environmental-benefit claim. *Whiteside*, 108 F.4th at 780–

82. Plaintiffs' allegations plausibly state that P&G's unqualified and unambiguous front-panel FSC logo is misleading and cannot be cured by small-print qualifying marks not found on the front label. Reasonable consumers also understand that an unqualified FSC logo can plausibly imply that all of the wood pulp in the P&G Paper Product package was harvested using environmentally sustainable practices that do not permit industial clearcutting and burning. *Whiteside*, 108 F.4th at 781–84; *Martirosyan v. 9199-4467 Quebec, Inc.*, 2025 WL 2995047, at *5 (C.D. Cal. July 16, 2025).

5. Forest Allies Logo: P&G's symbol implies independent audit and evaluation when there is none. .................................................. 39

The Forest Allies logo is deceptively misleading because as it is nearly identical to the prior Rainforest Alliance Certified seal. It is an issue of fact whether consumers would reasonably interpret the Forest Allies logo as carrying the same core message of independent environmental vetting. *Koh v. S.C. Johnson & Son, Inc*., 2010 WL 94265 at *2 (N.D. Cal. Jan. 5, 2010).

6. Omissions: P&G fails to disclose material facts necessary to prevent deception. ..................................................................... 40

a. Common Omissions reinforce the deception of the Deceptive Claims. ........................................................................ 40

The Complaint identifies five Common Omissions and also explains why the absence of these disclosures strengthens the deception of the Deceptive Claims. These Common Omissions are precisely the kind that courts treat as materially misleading when paired with affirmative environmental claims. *Whiteside*, 108 F.4th at 781–85.

b. P&G has a duty to disclose the Common Omissions........................................................................... 42

Courts recognize that a duty to disclose can arise in the context of a transaction and/or where a party makes partial representations to the counterparty but withholds other material facts. *See* Appendix C (chart collecting cases on duty to disclose).

D. P&G's reliance, materiality, and exposure claims are unsupported. .................... 44

Reliance is either not required or is satisfied where the representation is material and conveyed through a uniform vehicle such that all class members were likely exposed to the same deceptive message. *Rikos*, 799 F.3d at 518. The main question for all the state subclasses is whether P&G's Deceptive Claims have the capacity, tendency, or likelihood to mislead a reasonable consumer.

E. P&G's Rule 9(b) arguments fail. ......................................................................... 45

Claims such as those brought by Plaintiffs here are not subject to Rule 9(b). *McKinney v. Microsoft Corp.*, 2011 WL 13228141, at *14 (S.D. Ohio 2011). To the extent that Rule 9(b) were to apply, Plaintiffs satisfy even the Rule 9(b) standard with detailed descriptions and images

identifying the who, what, when, where, and how of the product purchased and deception. *Whiteside*, 108 F.4th at 786; *Dumont*, 934 F.3d at 38–39.

F. P&G's remaining arguments are either premature or incorrect. ........................... 49

1. State law permits fraudulent concealment claims. ................................... 49

P&G only challenges fraudulent concealment claims under the state laws of Connecticut, Illinois, Massachusetts, Michigan, Minnesota, and Pennsylvania. However, its arguments are not supported by relevant state law. *See, e.g.*, *Tr. of Twin City Bricklayers Fringe Ben. Funds v. Super. Waterproofing, Inc.*, 450 F.3d 324, 331 (8th Cir. 2006); *Marcum v. Columbia Gas Transmission, LLC*, 423 F. Supp. 3d 115, 121 (E.D. Pa. 2019); *Moore v. Pendavinji*, 260 N.E.3d 111, 120–21 (Ill. Ct. App. 2024); *Titan Ins. Co. v. Hyten*, 817 N.W.2d 562, 569 (Mich. 2012).

2. P&G's investor statements confirm the materiality of Plaintiffs' claims. ........................................................................ 50

V. CONCLUSION ......................................................................................... 51

## TABLE OF AUTHORITIES

**Page(s)**

### CASES

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) ... 4

*Bechtel v. Fitness Equip. Servs., LLC*,
339 F.R.D. 462 (S.D. Ohio 2021) ... 40

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007) ... 4, 24

*Bell v. Publix Super Mkts., Inc.*,
982 F.3d 468 (7th Cir. 2020) ... *passim*

*Biczo v. Ferrara Candy Co.*,
2023 WL 2572384 (N.D. Ill. Mar. 20, 2023) ... 32

*Bohen v. ConAgra Brands, Inc.*,
2024 WL 1254128 (N.D. Ill. Mar. 25, 2024) ... *passim*

*Boyd v. Target Corp.*,
750 F. Supp. 3d 999 (D. Minn. 2024) ... *passim*

*Brenner v. Procter & Gamble Co.*,
2016 WL 8192946 (C.D. Cal. Oct. 20, 2016) ... 17, 21

*Brook v. Sanofi-Aventis U.S., LLC*,
2014 WL 7272243 (S.D. Ohio Dec. 18, 2014) ... 47

*Bruce v. Home Depot, U.S.A., Inc.*,
308 F. Supp. 2d 72 (D. Conn. 2004) ... 45

*Bush v. Rust-Oleum Corp.*,
2024 WL 308263 (N.D. Cal. Jan. 26, 2024) ... 23

*Cole v. Keystone RV Co.*,
2021 WL 3111452 (W.D. Wash. July 22, 2021) ... 43

*Cole v. Keystone RV Co.*,
2022 WL 4234958 (9th Cir. Sept. 14, 2022) ... 43

*Davis v. Angelcare USA, LLC*,
727 F. Supp. 3d 99 (D. Conn. 2024) ... 2, 15, 19, 46

*Della v. Colgate-Palmolive Co.*,
2024 WL 457798 (N.D. Cal. Feb. 6, 2024) ... *passim*

*Dorris v. Danone Waters of Am.*,
2024 WL 4792048 (S.D.N.Y. Nov. 14, 2024) ........................................................................22

*Downing v. Keurig Green Mt., Inc.*,
2021 WL 2403811 (D. Mass. June 11, 2021) ..................................................................17, 22, 23

*Dumont v. Reily Foods Co.*,
934 F.3d 35 (1st Cir. 2019) ........................................................................................ *passim*

*Dwyer v. Allbirds, Inc.*,
598 F. Supp. 3d 137 (S.D.N.Y. 2022)...........................................................................................41

*Earth Island Inst. v. Coca-Cola Co.*,
321 A.3d 654 (D.C. 2024) ........................................................................................................19, 35

*ECM BioFilms, Inc. v. FTC*,
851 F.3d 599 (6th Cir. 2017) ..................................................................................... *passim*

*In re Equifax, Inc., Customer Data Sec. Breach Litig.*,
362 F. Supp. 3d 1295 (N.D. Ga. 2019) .........................................................................................45

*Estep v. Combs*,
366 F. Supp. 3d 863 (E.D. Ky. 2018) ...........................................................................................46

*Forsher v. J.M. Smucker Co.*,
612 F. Supp. 3d 714 (N.D. Ohio 2020)...........................................................................................32

*Frank v. Dana Corp.*,
547 F.3d 564 (6th Cir. 2008) .......................................................................................................46

*GEICO Corp. v. Autoliv, Inc.*,
345 F. Supp. 3d 799 (E.D. Mich. 2018)..........................................................................................45

*Greene v. Gerber Prods. Co.*,
262 F. Supp. 3d 38 (E.D.N.Y. 2017) .............................................................................................45

*Greer v. Strange Honey Farm, LLC*,
114 F.4th 605 (6th Cir. 2024) .......................................................................................................46

*GridKor, LLC v. Collins*,
2025 WL 2301190 (E.D. Pa. Aug. 8, 2025) ....................................................................................49

*Hawes v. Macy's Inc.*
346 F. Supp. 3d 1086 (S.D. Ohio 2018) .........................................................................................40

*Iverson v. Johnson Gas Appliance Co.*,
172 F.3d 524 (8th Cir. 1999) .......................................................................................................49

*Koh v. S.C. Johnson & Son, Inc.*,
2010 WL 94265 (N.D. Cal. Jan. 6, 2010) ........................................................20, 28, 38, 39

*Lee v. Canada Goose US, Inc.*,
2021 WL 2665955 (S.D.N.Y. July 29, 2021) ...........................................................................28

*Lizama v. H&M Hennes & Mauritz LP*,
2023 WL 3433957 (E.D. Mo. May 12, 2023) ..........................................................................34

*M&D, Inc. v. W.B. McConkey*,
585 N.W.2d 33 (Mich. Ct. App. 1998) ..................................................................................50

*Mantikas v. Kellogg Co.*,
910 F.3d 633 (2d Cir. 2018)............................................................................................ *passim*

*Martirosyan v. 9199-4467 Quebec, Inc.*,
2025 WL 2995047 (C.D. Cal. July 16, 2025).....................................................21, 22, 37, 46

*McCullough v. World Wrestling Ent., Inc.*,
172 F. Supp. 3d 528 (D. Conn. 2016)......................................................................................50

*McGinity v. Procter & Gamble Co.*,
69 F.4th 1093 (9th Cir. 2023) ..................................................................................................38

*McKinney v. Microsoft Corp.*,
2011 WL 13228141 (S.D. Ohio May 12, 2011) ......................................................................45

*Mier v. CVS Pharm., Inc.*,
2024 WL 121880 (C.D. Cal. Jan. 10, 2024) ............................................................................28

*Moore v. Pendavinji*,
260 N.E.3d 111 (Ill. Ct. App. 2024) .......................................................................................49

*Moore v. Trader Joe's Co.*,
4 F.4th 874 (9th Cir. 2021) ...............................................................................................18, 33

*Myers v. Starbucks Corp.*,
2020 WL 13302437 (C.D. Cal. July 29, 2020).........................................................................28

*Nathan v. Whirlpool Corp.*,
492 F. Supp. 3d 747 (S.D. Ohio 2020) ............................................................................ *passim*

*Perdue v. Hy-Vee, Inc.*,
455 F. Supp. 3d 749 (C.D. Ill. 2020) .......................................................................................45

*Pullman v. Alpha Media Publ., Inc.*,
2013 WL 1286144 (S.D.N.Y. Mar. 28, 2013) ..........................................................................51

*Rawson v. ALDI Inc.*,
2022 WL 1556395 (N.D. Ill. May 17, 2022) ........ *passim*

*Richardson v. Edgewell Pers. Care, LLC*,
2023 WL 7130940 (2d Cir. Oct. 30, 2023) ........ 15, 16

*Rikos v. Procter & Gamble Co.*,
799 F.3d 497 (6th Cir. 2015) ........ *passim*

*Sorkin v. Kroger Co.*,
2024 WL 3673719 (N.D. Ill. Aug. 6, 2024) ........ 32

*Stolzoff v. Waste Sys. Int'l, Inc.*,
792 N.E.2d 1031 (Mass. Ct. App. 2003) ........ 50

*Titan Ins. Co. v. Hyten*,
817 N.W.2d 562 (Mich. 2012) ........ 50

*Trs. of Twin City Bricklayers Fringe Ben. Funds v. Superior Waterproofing, Inc.*,
450 F.3d 324 (8th Cir. 2006) ........ 49

*West v. Sambazon, Inc.*,
750 F. Supp. 3d 356 373 (S.D.N.Y. 2024) ........ 29

*Whiteside v. Kimberly-Clark Corp.*,
108 F.4th 771 (9th Cir. 2024) ........ *passim*

*Williams v. Gerber Prods. Co.*,
552 F.3d 934 (9th Cir. 2008) ........ 19, 21, 43

*Zahora v. Orgain LLC*,
2021 WL 5140504 (N.D. Ill. Nov. 4, 2021) ........ 32

**STATUTES**

15 U.S.C. § 45 ........ 6

Ga. Code Ann. § 10-1-390, *et seq.* ........ 49

**COURT RULES**

Fed. R. Civ. P. 8 ........ 3, 48

Fed. R. Civ. P. 9 ........ *passim*

Fed. R. Civ. P. 12 ........ *passim*

## OTHER AUTHORITIES

16 C.F.R. § 260.2 ....................................................................................................30

16 C.F.R. § 260.3(a)–(c) ...................................................................12, 30, 33, 36

16 C.F.R. § 260.4(b) ................................................................................................12

16 C.F.R. § 260.4(d) ................................................................................................30

16 C.F.R. § 260.6(c)(e) ............................................................................................20

# I. INTRODUCTION

This case is about truth in marketing. In order to charge consumers more for everyday tissue products, Defendant Procter & Gamble ("P&G") presented its Charmin and Puffs Paper Products as environmentally responsible through a coordinated set of prominent messages: P&G's "Protect-Grow-Restore" logo and forest imagery; the "Keep Forests as Forests" marketing slogan; and certification-style logos signaling third-party environmental endorsements. A reasonable consumer encountering this unified presentation at point-of-sale could reasonably believe that P&G's messages convey that P&G safeguards, replenishes, and restores ecologically significant forests like the Canadian boreal. But Plaintiffs' Complaint[1] reveals P&G's charade for what it is; alleging that in reality, P&G supports the clearcutting and burning of old-growth forests and replacing them with monoculture tree farms with only a fraction of ecological value. Deceptive advertising cases of this kind overwhelmingly survive Rule 12 scrutiny by federal courts across the country, all relying on well-settled consumer-protection principles.

Nevertheless, P&G seeks dismissal[2] while warning that allowing this litigation to proceed would be "unprecedented". Mot. at 1. Not so. Appellate courts across the country, notably led by this Circuit, apply a uniform and well-settled framework for deceptive-marketing claims. First, courts apply an objective reasonable-consumer standard in assessing deception. *Rikos v. Procter & Gamble Co.*, 799 F.3d 497, 518–19 (6th Cir. 2015). Second, the inquiry turns on the net impression conveyed by the challenged representations, rather than the meaning of isolated words and phrases. *ECM BioFilms, Inc. v. FTC*, 851 F.3d 599, 610–12 (6th Cir. 2017). District courts

[1] Unless otherwise noted, all capitalized terms have the meanings assigned in the Consolidated Class Action Complaint (ECF No. 16) ("Complaint"), and all paragraph citations ("¶") refer to that Complaint. All internal citations have been omitted unless specified otherwise.

[2] The Procter & Gamble Company's Memorandum of Law in Support of its Motion to Dismiss ("Motion" or "Mot."). ECF No. 18.

across the country apply these two principles routinely in multistate consumer class actions. *See*, *e.g.*, *Davis v. Angelcare USA, LLC*, 727 F. Supp. 3d 99 (D. Conn. 2024); *Bohen v. ConAgra Brands, Inc.*, 2024 WL 1254128, at *6–7 (N.D. Ill. Mar. 25, 2024); *Nathan v. Whirlpool Corp.*, 492 F. Supp. 3d 747, 759–61 (S.D. Ohio 2020). Together, these Sixth Circuit decisions and their uniform application across the state subclasses foreclose on the narrow, technical parsing of P&G's marketing that P&G urges this Court to undertake (which is perhaps why P&G omits *Rikos* and *ECM BioFilms* entirely from its Motion).

Nor do the rest of P&G's contentions have any merit. For example, appellate authority is clear that unqualified environmental assurances, like the ones in P&G's "Keep Forests as Forests" marketing campaign, are uniquely likely to mislead consumers and therefore must be substantiated with reliable evidence. *Whiteside v. Kimberly-Clark Corp.*, 108 F.4th 771, 781–84 (9th Cir. 2024). Nor can literal truths or technical accuracy shield a message whose overall impression is deceptive. *Mantikas v. Kellogg Co.*, 910 F.3d 633, 636–39 (2d Cir. 2018). Courts further hold that marketers cannot rescue a misleading headline claim by hiding behind fine print or external websites. *Bell v. Publix Super Mkts., Inc.*, 982 F.3d 468, 476–478 (7th Cir. 2020) ("[t]he district court's dismissal erred by departing from the Rule 12(b)(6) standard and attributing to ordinary supermarket shoppers a mode of interpretation more familiar to judges trying to interpret statutes in the quiet of their chambers"). And most importantly, courts are overwhelmingly uniform in holding that whether a representation misleads presents a quintessential question of fact. *Boyd v. Target Corp.*, 750 F. Supp. 3d 999, 1011–14 (D. Minn. 2024) (collecting cases).

Against this settled backdrop, P&G's Motion simply overreaches. It struggles to reframe this litigation as a referendum over forestry policy rather than a straightforward challenge to the representations P&G itself elected to present to consumers. P&G also urges the Court to parse

marketing elements in isolation, disregard visual context and placement, and treat explanatory materials on websites or in foreign regulatory filings as dispositive. P&G further refuses to construe the Complaint in a light most favorable to Plaintiffs—a point underscored by its effort to inject more than 200 pages of extrinsic materials through "judicial notice" to rewrite the Complaint to its liking.[3] As explained below, each of P&G's tactics contradict settled consumer deception law and basic federal pleading practice.

P&G's remaining arguments fare no better. Its contention that no duty to disclose arises absent a fiduciary relationship ignores the well-established principle that such a duty arises when a party makes partial representations while omitting material qualifying facts (exactly as the Complaint alleges). Its Rule 9(b) challenge is equally misplaced, as these consumer-protection claims are generally evaluated under Rule 8, and in any event, the Complaint alleges the who, what, when, where, and why with specificity. And tellingly, P&G declines to reveal what information is lacking to enable it to effectively defend the present litigation.

Consumer-protection law exists to safeguard the integrity of the marketplace by holding companies accountable for misleading consumers. At this stage, the Court's task is modest but vital: accept well-pled allegations as true, draw reasonable inferences in Plaintiffs' favor, and decline to resolve factual disputes or consider extrinsic evidence. Plaintiffs have alleged what courts nationwide, and this Circuit in particular, require at this early threshold. P&G has misled consumers through prominently displayed, unqualified environmental claims that lack substantiation and contradict plausible facts and reasonable interpretations. Under controlling precedent applied by courts nationwide, P&G's motion should be denied in its entirety.

---

[3] *See*, The Procter & Gamble Company's Request for Judicial Notice in Support of its Motion to Dismiss (ECF No. 20); Decl. of David R. Singh in Support of P&G's Motion to Dismiss Consolidated Class Action Complaint (ECF No. 19), collectively P&G's Request for Judicial Notice or "P&G RJN".

## II. LEGAL STANDARD

P&G's motion disregards the Rule 12(b)(6) requirement that the Court accept all well-pleaded allegations as true and draw all reasonable inferences in plaintiffs' favor. To survive dismissal, a complaint must allege facts sufficient "to raise a right to relief above the speculative level" and "to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 570 (2007); *see also Ashcroft v. Iqbal*, 556 U.S. 662, 678–79 (2009). A claim is plausible where the facts alleged allow the Court to draw a reasonable inference of liability. *Id.* at 678. Courts within the Sixth Circuit apply these principles with particular force in deceptive-marketing cases, holding that dismissal is appropriate only where the plaintiff's theory is "patently implausible" from the face of the complaint. *Nathan*, 492 F. Supp. 3d at 761. The question is not whether plaintiffs will ultimately prevail, but whether their allegations permit more than the mere possibility of misconduct. *Id.* At this stage, plausibility—not proof—governs the Court's analysis.

## III. FACTUAL BACKGROUND

### A. P&G knows its consumers are willing to pay a premium for environmental assurances.

Consumers increasingly seek out products they believe minimize environmental harm and are willing to pay a premium for products they believe were manufactured sustainably. ¶¶ 4–5. Experts have calculated this price premium to be around 10-12%. ¶ 230. Accordingly, companies have responded by developing sustainability-themed marketing to command higher prices, deepen brand loyalty, and differentiate their goods from lower-cost competitors. ¶¶ 4–10.

P&G has embraced this marketing playbook. The Complaint alleges that P&G not only knows that its environmental stewardship claims are material to consumers, but it also cites to P&G's own documents which acknowledge that its "sustainability message" measurably increases key performance indicators like likeability, purchase intent, and price. ¶¶ 233–234. So, P&G

created the "Keep Forests as Forests" marketing campaign, which deploys uniform packaging representations to consistently position its Paper Products as an environmentally sustainable choice. ¶ 242. P&G also spends considerable resources to maintain a "Sustainability Promise" website because it knows these claims are material to consumers. ¶¶ 262–268. And by doing so, the Complaint alleges that P&G has been able to collect from consumers an additional $300 million per year (or $1.2 billion over the class period) than it would have without these false and misleading representations. ¶¶ 231–267.

**B. P&G's "Keep Forests as Forests" Campaign relies on five Deceptive Claims to curate a misleading net impression of environmental stewardship.**

P&G's "Keep Forests as Forests" marketing campaign presents consumers with a unified message of environmental stewardship. ¶¶ 2432-243. As the Complaint explains, P&G's marketing campaign deploys recurring imagery—including the Protect-Grow-Restore iconography—the prominent FSC logo, and Rainforest Alliance seal, to signal to consumers that purchasing Charmin and Puffs products help protect forests, expand the forest canopy, and restore damaged ecosystems. ¶¶ 6–7, 114–116, 260-261. P&G's "Keep Forests as Forests" campaign centers on five Deceptive Claims and how they work together to create a false net impression of environmental stewardship. The five Deceptive Claims are: (1) P&G Protects Forests; (2) P&G Grows or Regrows Trees (and Forests); (3) P&G Restores Forests; (4) P&G's use of the unqualified FSC logo on the front of the package to imply that all the wood fiber used in the Paper Products was sourced via sustainable harvesting methods; and (5) P&G's use of the misleading Rainforest Alliance Forest Allies seal to imply third-party certification. ¶¶ 6, 101–114, 164–165. Plaintiffs allege that a reasonable consumers' net impression of the five Deceptive Claims is that P&G safeguards forests, increases forest canopy in the areas it harvests, and remediates ecological harm elsewhere. ¶¶ 6–7, 114–116. Plaintiffs also plead that some of P&G's narrower statements

such as "we only use FSC-certified wood pulp", "for every tree used two trees are planted" and "we are helping to plant one million trees" are also deceptive, as they are false and/or unsubstantiated. ¶ 6. The Complaint reinforces the plausibility of Plaintiffs' net impression of a reasonable consumer by pointing to the similarities between P&G's claims and those previously deemed deceptive by the Federal Trade Commission ("FTC") and published in the Green Guides. ¶¶ 237–241, 303–310. Developed by the FTC, the "Guides for the Use of Environmental Marketing Claims"—or more colloquially as the FTC "Green Guides"—these publications are designed to help marketers avoid making environmental marketing claims that are unfair or deceptive under Section 5 of the FTC Act, 15 U.S.C. § 45. *See also* Appendix A (chart showing Green Guide violations for each of the Deceptive Claims).

Plaintiffs also allege that the five Deceptive Claims are untrue and misleading because P&G omits the following Common Omissions: (1) P&G sources its wood pulp from suppliers who employ industrial logging practices (such as clearcutting and burning) which do not protect the forest in any sense—they actually destroy the forest (¶ 11); (2) P&G's "two for one" replanting efforts are actually designed to convert the old-growth forests into industrial tree farms with only a fraction of their ecological value (¶ 12); (3) P&G's forest restoration efforts are negligible as they represent less than 1% of boreal forest harvested every year (¶ 13); (4) about 30% of wood pulp sourced by P&G has no FSC certification at all (¶ 14); and, (5) P&G's use of the Rainforest Alliance Forest Allies logo implies certification when in fact there is none (¶ 15).

**C. P&G point-of-sale messaging repeats the Deceptive Claims across all product lines.**

P&G repeats the Deceptive Claims across *all* P&G Paper Product packaging, retail displays, and digital product listings—thereby ensuring that all consumers encounter the same environmental messaging at point-of-sale regardless of the purchase channel. ¶¶ 107–114. The

Complaint also establishes that the "Protect-Grow-Restore" logo, the FSC logo, and the Rainforest Alliance logo are each uniformly printed on all P&G Paper Products. ¶ 244.

Each individual Plaintiff identifies which P&G Paper Product they purchased, the approximate timeframe, and via which store (*e.g.*, ¶ 22). The Complaint also alleges that at time of purchase each Plaintiff saw and was exposed to the Protect-Grow-Restore claims, the unqualified FSC and Rainforest Alliance logos, and associated forest imagery via uniform point-of-sale representations created by P&G that are substantially similar to the pictures included in the Complaint[4] (*e.g.*, ¶ 23). Plaintiffs also describe their belief, based on P&G's representations, that the Products were less harmful to the environment than competing brands. *Id.* Plaintiffs further allege that nothing on P&G's packaging or point-of-sale messages discloses the Common Omissions or otherwise qualifies, corrects, or limits these representations in a manner a reasonable consumer would see and/or understand (*e.g.*, ¶ 24). Plaintiffs also allege they were deceived by P&G into thinking that P&G had a viable method for substantially mitigating or neutralizing the harm its Paper Products' supply chain causes to the environment, when in truth, P&G Paper Products are fundamentally unsustainable (*e.g.*, ¶¶ 25–27). Plaintiffs further plead that they would not have purchased—or would have paid less for—the Products if P&G had disclosed the truth about the fiber sourcing practices in its supply chain (e.g. ¶ 25).

**D. P&G misstates FSC certification structures and their relevance to the Complaint.**

The Complaint explains that the Forest Stewardship Council ("FSC") administers different certification levels—"FSC 100%," "FSC Mix," and "FSC Controlled Wood"—which each reflect

[4] Plaintiffs do not plead that the Charmin Sustainability Promise website is a point-of-sale representation or that they reviewed the website prior to purchase. *E.g.*, ¶ 23. Plaintiffs inclusion of references to the Charmin Sustainability Promise website in the Complaint are to demonstrate that P&G understands environmental claims to be material to reasonable consumers. ¶¶ 262–267.

how much of a product's wood content comes from responsibly managed forests. ¶ 288. Plaintiffs also state that P&G qualifies only for the "FSC Mix" level of certification which means that the wood pulp is derived from a mix of certified and Controlled Wood sources. *Id.* The Complaint also establishes that the term "Controlled Wood" is a highly technical industry term which means the wood fiber was sourced from areas where clearcutting and burning is allowed. *Id.*

In its motion to dismiss, P&G mischaracterizes Plaintiffs' claims as demanding that its products meet the FSC's highest certification level ("FSC 100%") or alleging that consumers are "confused" about FSC categories. Mot. at 22-24. Plaintiffs do not demand that P&G alter its FSC certification aims, nor are confused about the FSC categories. ¶¶ 288–294. Instead, Plaintiffs seek to ensure that P&G's labels clearly communicate the level of FSC certification that P&G maintains for its wood pulp. More specifically, Plaintiffs claim that P&G's use of the unqualified FSC logo on the front of packaging—alongside statements like "100% FSC certified"—creates a misleading net impression that all wood pulp is certified and sourced from FSC-certified forests. *Id.* In reality, however, according to P&G's own corporate documents only about 70% of P&G's pulp is certified to any FSC level at all. ¶ 291 The remainder is certified by two completely separate entities: the Sustainability Forest Institute ("SFI") and the Programme for the Endorsement of Forest Certification ("PEFC"), which have been investigated by the FTC and Canada's Competition Bureau (Canada's federal law enforcement agency) for misleading logging practices. ¶¶ 291–294.

## IV. ARGUMENT

### A. The case P&G wants to litigate is not the case Plaintiffs filed.

P&G's Motion opens with a warning: that unless this Court adopts its preferred interpretation of every fact, every pleading presumption, and every marketing statement, then "no false advertising case could ever be dismissed at the motion-to-dismiss stage." Mot. at 1. This framing badly misrepresents both the nature of Plaintiffs' allegations and the governing legal

standard in the Sixth Circuit and beyond. Indeed, the Sixth Circuit itself has described numerous false-advertising suits just like this one as the sort of matters courts "routinely" confront. *Rikos*, 799 F.3d at 507-08. P&G is, however, right about only one point: courts are usually reluctant to dismiss these cases at the pleading stage, and for sound reasons. The questions P&G invites the Court to resolve—what consumers understood, how they reacted to P&G's labeling, and whether the claims were misleading—are factual issues that require, at minimum, a developed record. As explained by the court in *Boyd*, 750 F. Supp. 3d at 1011, the reasonable-consumer inquiry "is in immediate tension with the [Rule 12] early stage of this litigation," and dismissal on deception grounds is exceedingly rare. Indeed, if this Court were to only assess the technical accuracy or P&G's preferred interpretation of what their claims mean it would "invert the presumptions that govern at the pleading stage by resolving considerable factual ambiguity and complexity in [P&G's] favor." *Boyd*, 750 F. Supp. 3d at 1017. This the Court should not do.

Illustrating the problems with its Motion, P&G also devotes much of its effort towards shoehorning 200 pages of extraneous "facts" involving foreign forestry policy regulations, supply-chain complexity, extrinsic website materials, and industry certifications. *See, e.g.*, Mot. at 5-14. But none of this informs the Rule 12 inquiry.[5] The question before the Court is not whether P&G's supply chain complies with foreign regulations or private trademark agreements. Instead, the question is what message P&G's marketing conveyed to reasonable consumers at point-of-sale—and whether that message was misleading. But before the Court can begin its Rule 12 assessment, Plaintiffs must correct P&G's misstatements and clarify what this case is truly about.

---

[5] Indeed, P&G's request that this Court parse through almost 200 pages of self-selected documents via the doctrine of "judicial notice" belies its position that this case can be resolved at the pleadings stage. ECF No. 20.

***This case concerns point-of-sale consumer deception—and not Canada's forestry policy.*** P&G caricatures Plaintiffs' allegations as "vague complaints about the forestry practices that are allegedly used by P&G's third-party suppliers." Mot. at 16 (citing nothing). To be clear the Complaint does not challenge Canadian forestry policy nor does it seek to force third-party suppliers to adopt any Plaintiffs' "preferences." *Id.* at 7. Instead, it alleges that P&G's *own* marketing representations—printed on its *own* packaging and displayed at point-of-sale in order to command a price premium for its *own* products—systematically mislead consumers into believing that P&G Paper Products are environmentally responsible, when they most certainly are not. ¶¶ 6, 11–15, 271–303.

The Sixth Circuit has made clear that environmental-benefit claims are evaluated by the overall message they communicate to ordinary consumers. *See*, § IV.B.1. And in applying that standard, courts are to presume a reasonable consumer is also acting under real-world conditions "walking down the [] aisle in a grocery store, possibly with a child or two in tow." *Whiteside*, 108 F.4th at 782. As a result, circuit courts place no expectation that reasonable consumers "study with great diligence the contents of a complicated product package" at point-of sale and also refrain from imposing burdens such as scrutinizing fine print, deciphering technical or scientific terminology, or consulting multiple external websites merely to avoid being misled. *Id.* at 779; *see also*, § IV.B.3.

***P&G's technical reframing of what the Deceptive Claims imply to reasonable consumers is not dispositive.*** P&G's Motion attempts to shrink Plaintiffs' Complaint into three narrow and self-serving interpretations: (1) Charmin products are third-party certified by the FSC, and/or that P&G uses the "FSC Mix" logo on its packaging in accordance with FSC rules; (2) forestry companies in P&G supply chain replant two trees for everyone that they harvest; and (3) P&G has

partnered with the Arbor Day Foundation to replant one million trees in areas affected by natural disasters. Mot. at 2. P&G also announces that "Plaintiffs cannot ignore the explanations that P&G provided in favor of their own preferred interpretation" and unilaterally declares Plaintiffs' FTC-backed interpretations as "fanciful." Mot. at 20. P&G is wrong. As explained in *Bell*, 982 F.3d at 476–79, and consistent with the First, Second, and Ninth Circuits, courts should not adopt a defendant's preferred interpretation of its own marketing at the pleadings stage where the challenged representation is susceptible to more than one reasonable reading. When reasonable consumers could understand a claim in multiple plausible ways, the existence of those competing interpretations precludes dismissal and prevents a court from limiting consumers to the defendant's chosen construction: "if a plaintiff's interpretation of a challenged statement is *not* facially illogical, implausible, or fanciful, then a court may *not* conclude that it is nondeceptive as a matter of law [and instead] it is for a panel of 'jurors, rather than three judges, [to] decide on a full record." *Id.* at 493 (Kanne, J., concurring); *see also*, § IV.B.2.

***P&G's atomization theory squarely conflicts with the Sixth Circuit's Net Impression Rule.*** P&G next tries to defend each component of its marketing in isolation, arguing that particular words, seals, or phrases are literally true when parsed one by one. Mot. at 21-33. But this approach is squarely at odds with *ECM BioFilms*, which instructs courts to "examine[] the overall net impression of an ad" to determine what the claim conveys to consumers. 851 F.3d at 610. This net impression framework has been applied universally in consumer-deception cases in the First, Second, Seventh, and Ninth Circuits. *See*, § IV.B.1. P&G also invokes compliance with trademark-licensing rules to argue that use of the FSC and Forest Allies marks cannot mislead consumers. *See, e.g.*, Mot. at 31. But this ignores well-settled caselaw and FTC guidance explaining that certification-style markings can communicate to consumers that an independent body has vetted

or endorsed particular attributes of the product, even if the advertiser claims otherwise. *See*, § IV.B.4.

Similarly, P&G repeatedly splits hairs of the Deceptive Claims to assert that "Plaintiffs do not deny" various facts, but P&G's disingenuous framings mischaracterize the pleadings. Mot. at 21-33. Plaintiffs expressly allege that P&G's sourcing practices contradict the environmental assurances conveyed by its marketing, including the use of Controlled Wood and industrial logging methods like logging and burning. ¶¶ 6, 11–15, 271–303. Therefore, the Complaint does not concede the truth or sufficiency of P&G's representations—instead it challenges their net impression, P&G's ability to substantiate them, and the misleading nature of their collective presentation.

***P&G's "context cures" theory fails as a matter of law.*** P&G also contends that whatever impression its front-label messaging conveys is cured by back-panel qualifiers, technical jargon, programmatic definitions, and/or website materials. Mot. at 19. But this argument is foreclosed by settled doctrine. *Whiteside*, 108 F.4th at 780–84, holds that unqualified environmental-benefit representations must be evaluated on the front of the package only. And even for qualified claims, black letter law forecloses on P&G's ability to use any back-label fine print or website disclosure to narrow, correct, or contradict a misleading net impression. Instead, back-label fine print should confirm the veracity of what is printed on the front label. *See*, § IV.B.5.

***P&G misstates the law governing unqualified environmental claims.*** Under the FTC's Green Guides, unqualified environmental claims are presumed deceptive because they convey broad assurances without clear, prominent, and understandable limitations. *See* 16 C.F.R. §§ 260.3(a)–(c), 260.4(b). And because the FTC deems unqualified claims at "highest risk" for misleading reasonable consumers, advertisers must substantiate all reasonable interpretations of

such claims before making them. *Id.* § 260.2. Circuit courts across the country have also adopted this framework. *See*, § IV.B.6.

Plaintiffs allege that each of P&G's five Deceptive Claims is unqualified, but P&G insists in a conclusory fashion that its messaging is properly qualified. But P&G's assertion is not credible, as none of P&G's representations include the kind of clear, prominent, and understandable limitations located near the claim.

| Unqualified Claim | Qualified Version (which does not exist on P&G packaging) |
|---|---|
| P&G "Protects Forests" by only using FSC-certified pulp. | P&G protects forests by sourcing some pulp from suppliers certified by the Forest Stewardship Council (FSC); not all our pulp is FSC-certified, and certification does not guarantee protection from industrial logging practices. |
| "For every tree used, at least two are regrown." | For every tree harvested, suppliers plant two new trees, typically fast-growing conifers of different species in managed plantations; replanting does not replicate the biodiversity or ecological value of the old-growth forests P&G harvests for its wood pulp. |
| "Restores forests by helping to plant one million trees." | In partnership with the Arbor Day Foundation, P&G supports tree planting in areas affected by natural disasters; restoration efforts are not linked to areas harvested for P&G products, and represent less than 1% of annual boreal forest loss. |
| Unasterisked and generic FSC logo on front of packaging. | FSC Mix logo on front of packaging with the following information nearby: Product contains a mix of FSC-certified material, recycled material, and/or controlled wood. Not all pulp is sourced from FSC-certified forests. |
| Forest Allies seal used without explanation. | Forest Allies is a Rainforest Alliance initiative supporting forest communities; it does not certify or audit P&G's supply chain or forest sourcing practices. |

**B. Established consumer protection law confirms the plausibility of Plaintiffs' claims.**

P&G's Motion insists that Plaintiffs' claims are "unprecedented" and "fanciful." Mot. at 1, 20. The law says otherwise. Beginning with the Sixth Circuit and extending across other circuit courts, the nation's consumer-deception doctrine is settled and uniform: courts look to the *net impression* created by the challenged representations, apply an objective *reasonable consumer*

standard to that impression without additional burdens or areas of sophistication. Appellate courts also require advertisers to either provide clear and prominent qualifications or substantiate all reasonable interpretations of their claims before they speak. Under that established framework, the Complaint is not an outlier like P&G contends; instead, Plaintiffs' allegations represent a straightforward application of ordinary consumer-protection principles to unqualified environmental marketing materials.

**1. The Sixth Circuit defines the objective reasonable-consumer standard as it applies to consumer deception cases.**

Two Sixth Circuit decisions supply the central doctrinal anchor for this litigation. In *Rikos*, 799 F.3d 497, the court held that deceptive-marketing claims turn on whether the advertising would be material to or likely to deceive a reasonable consumer. And in *ECM BioFilms*, 851 F.3d at 608–613, the Sixth Circuit instructed courts to assess the net impression of false advertising claims, and reasoned that liability attaches when reasonable consumers can draw environmental inferences from an unqualified biodegradable claim that are broader than the "scientific" interpretation provided by the company. *ECM BioFilms* also reaffirms that advertisers must substantiate all reasonable interpretations conveyed by their environmental messaging and that courts should give "great weight" to the FTC's expertise, including its Green Guides, in identifying what those inferences are and determining the substantiation required. *Id*. at 613–15.

That Sixth Circuit framework has become the national template. The Seventh Circuit expressly recognized this cross-circuit alignment when instructing courts to assess labels as a whole and from the perspective of ordinary shoppers. *Bell*, 982 F.3d at 476–79 (collecting cases from the First, Second, and Ninth Circuits). As did the Ninth Circuit in *Whiteside*, 108 F.4th at 781 n.3 ("[o]ur position is consistent with that of our sister circuits" and collecting holdings from the First, Second, and Seventh Circuits).

District courts also follow this approach. In a highly analogous case involving consumer-protection statutes from 14 states, the District of Minnesota recently denied dismissal because plaintiffs plausibly alleged that the marketing program's core representations could mislead an objective reasonable consumer across all states. *Boyd*, 750 F. Supp. 3d at 1011–14. As did the District of Connecticut in a case involving consumer deception claims from Connecticut, California, New York, Illinois, Florida, North Carolina, amongst others. *See*, *Davis*, 727 F. Supp. 3d at 135–36. District courts handling multistate class actions closer to home are also in accord. *See, e.g.*, *Nathan*, 492 F. Supp. 3d at 759–61 (sustaining consumer deception claims based on an objective standard from Ohio, Illinois, Maryland, New York, and Virginia); *Bohen*, 2024 WL 1254128, at *5–7 (allowing ICFA and VCPA deception theories to proceed).

Placed against that backdrop, Plaintiffs' theories are not an expansion of consumer-protection law; they are a direct application of the Sixth Circuit's own doctrine, reinforced by parallel holdings in the First, Second, Seventh, and Ninth Circuits.

**2. Multiple reasonable interpretations of the same advertisement foreclose dismissal.**

Appellate authority is clear that ordinary consumers can have multiple reasonable interpretations as to the meaning of a defendant's advertisement. *See*, *Dumont v. Reily Foods Co.*, 934 F.3d 35, 40–41 (1st Cir. 2019) (discussion of several reasonable interpretations arising from the same label); *Bell*, 982 F.3d at 477, 494 (same). In *Richardson v. Edgewell Pers. Care, LLC*, 2023 WL 7130940, at *3–4 (2d Cir. Oct. 30, 2023), the Second Circuit found that a "Reef Friendly" label was plausibly misleading because consumers could reasonably interpret it to mean the product was not harmful to marine reef ecosystems, even though the company had proposed a narrower interpretation of it claims. The reasons for not adopting a defendant's interpretation wholesale at the pleading stage when other plausible interpretations exist is obvious: "a rule that

immunized any ambiguous label so long as it is susceptible to one non-deceptive interpretation 'would validate highly deceptive advertising.'" *Bell*, 982 F.3d at 476–79 (quoting the Second Circuit holding in *Mantikas*, 910 F.3d at 638). As such circuit courts nationwide have adopted the same approach when multiple reasonable interpretation exist: "we think it best that six jurors, rather than three judges, decide on a full record whether the challenged label 'has the capacity to mislead' reasonably acting [] consumers." *Dumont*, 934 F.3d at 41; *see also*, *Bell*, 982 F.3d at 478 (concurring with the First Circuit in *Dumont* and citing additional cases from the Second and Ninth Circuits). This approach aligns with the Sixth Circuit's holding in *ECM BioFilms* when it declined to adopt defendants' "scientific" understanding of its claims when assessing reasonableness under consumer deception principles. 851 F.3d at 611.

Thus, when an advertisement could plausibly convey multiple reasonable interpretations, courts should not defer simply to the defendant's proffered version of what its claims convey to reasonable consumers. *See, e.g.*, *Boyd*, 750 F. Supp. 3d at 1011–13 (finding that "Target Clean" branding plausibly conveyed a misleading impression of environmental responsibility despite defendant's contention that the court interpret the term via its own "proprietary" meaning).

**3. P&G's attempt to raise the bar for the reasonable consumer conflicts with appellate authority.**

P&G repeatedly attempts to reengineer the reasonable-consumer standard into a regime where purchasers must behave like certification auditors: expecting reasonable consumers to study forestry-management taxonomies, decode FSC program architecture, locate and absorb website disclosures, and reconcile those materials with its "Keep Forests as Forests" message. *See, e.g.* Mot. at 9-10 (quoting at length information from its own websites, specific subsections from FSC's Use of FSC Trademarks by Certificate Holders Agreement, and other technical agreements). No

court applying established consumer-protection doctrine, let alone any of the circuit courts, has imposed anything close to this burden on ordinary consumers.

The controlling law once again begins with the Sixth Circuit. In *ECM BioFilms*, the court held that liability turns on the "public's impression" of what biodegradability means because that impression "is the only true measure of deceptiveness." 851 F.3d at 611–12. The court rejected ECM's assertion that consumers must adopt a scientific or technical understanding of biodegradability, explaining that "the scientific validity of a consumer's belief is not the standard for reasonableness" and that consumers "may be 'unaware of the…meanings' of such terms" and still act reasonably. *Id*. at 611. Critically, the Sixth Circuit confirmed that consumers are not expected to bring specialized knowledge to bear: "average consumers" might not understand a representation "as would a scientist," and that is irrelevant to liability. *Id*. at 611–612. The Second Circuit in *Richardson* is also in agreement, explaining: "a reasonable consumer cannot be expected to know the universe of chemicals harmful to coral reefs such that she could discern from an ingredient list describing the product's contents in scientific terminology whether a product is [deceptive or not]." 2023 WL 7130940, at *3–4.

District courts say the same thing. *Brenner v. Procter & Gamble Co.*, 2016 WL 8192946, at *5 (C.D. Cal. Oct. 20, 2016) reasoned that a reasonable consumer is simply an "ordinary consumer" and "not one who is '"versed in the art of inspecting and judging a product, in the process of its preparation or manufacture."' Similarly, *Downing v. Keurig Green Mt., Inc.*, 2021 WL 2403811, at *6 (D. Mass. June 11, 2021) held that consumers are not expected to "check locally"—despite defendant printing this burden on its label—and analyze recycling infrastructure to determine if the term "recyclable" was deceptive. *Della v. Colgate-Palmolive Co.*, 2024 WL 457798, at *23–24 (N.D. Cal. Feb. 6, 2024) equally rejected a defendant's argument that a proper

qualification could be found on its website, observing that "courts are generally reluctant to charge a reasonable consumer with the obligation of reviewing product websites or other written product materials before purchasing the product" and collecting numerous cases with identical holdings.

In contrast, P&G's argument depends on an implausible premise: that ordinary shoppers must parse technical terminology and hunt for obscure qualifiers in order to avoid being deceived. Their theory would require consumers to locate fine-print disclosures on the back corner of a Charmin or Puffs package; to know that "FSC Mix" permits substantial non-FSC inputs; to understand the industry term "Controlled Wood," including its association with clearcut and burned sources; and to detect minute differences among Rainforest Alliance logos and then research whether the organization's audit and certification program remains operative. Nothing in the case law imposes that level of attentiveness on purchasers of everyday household goods.

P&G's reliance on *Moore v. Trader Joe's Co.*, 4 F.4th 874 (9th Cir. 2021), is misplaced. As the Ninth Circuit in *Whiteside* explains, *Moore* involved consumers of Manuka honey, a "niche, specialty product" whose buyers are "undoubtedly more likely to exhibit a higher standard of care." *Whiteside*, 108 F.4th at 782 (describing its previous analysis in *Moore*). In characterizing *Moore's* holdings, the *Whiteside* court emphasized that specialty-product consumers may "study [labels] with … diligence," but reaffirmed that ordinary consumers shopping for "everyday items" are not. *Id*. Plaintiffs allege exactly that ordinary-consumer context here. The Protect-Grow-Restore iconography, the unqualified FSC seal, and the Forest Allies logo convey broad assurances of environmental protection and restoration for a routine household product. This is all that is required under Rule 12.

### 4. P&G's "atomization theory" conflicts with Sixth Circuit doctrine as applied by circuit courts across the country.

P&G's next strategy is to disaggregate its messaging—one word from "Protect," one clause from "Grow," one image from "Restore," one FSC symbol, etc …—and then defend each fragment in isolation contending that it is technically accurate. Mot. at 2. That is not the law.

The Sixth Circuit clearly foreclosed P&G's atomization theory in *ECM BioFilms*, 851 F.3d at 610, when it instructed courts to "examin[] the overall net impression of an ad" to assess consumer deception. Other circuits apply the same rule. The Ninth Circuit's decision in *Williams v. Gerber Prods. Co.*, 552 F.3d 934, 938 (9th Cir. 2008), cited by numerous circuit courts nationwide, remains foundational: literally accurate components do not immunize a misleading overall message, and courts must evaluate the label as a whole. The Second Circuit adopted the same logic in *Mantikas*, 910 F.3d at 637, rejecting attempts to disassemble front-label claims into separate truthful propositions. Environmental-marketing cases reinforce this rule with particular force. In *Whiteside*, 108 F.4th at 780–84, the court rejected Kimberly-Clark's attempt to defend "plant-based" and "biodegradable" claims by isolating narrow definitions detached from the overall context of imagery, color palette, and packaging design. Instead the circuit court evaluated the representations as an integrated message. And the District of Columbia Court of Appeals in *Earth Island Inst. v. Coca-Cola Co.*, 321 A.3d 654, 659 (D.C. 2024), held that "a series of statements can in combination be misleading even when, taken individually, they fall short of that."

District courts have followed suit. *Bohen*, 2024 WL 1254128, at *6, *Della*, 2024 WL 457798, at *8–11, and *Davis*, 727 F. Supp. 3d at 140 all treat sustainability slogans, imagery as unified messaging that cannot be disassembled into atomized components. Likewise, *Rawson v. ALDI Inc.*, 2022 WL 1556395, at *3–4 (N.D. Ill. May 17, 2022) held that "Simple. Sustainable. Seafood." conveyed broad, unsubstantiated sustainability assurances.

As for certifications and seals, courts consistently hold that they can materially shape a reasonable consumer's perception of whether a product has been subject to independent audit and evaluation, even if the company intended to use the seal or certification for other purposes. For example, in *Koh v. S.C. Johnson & Son, Inc.*, 2010 WL 94265, at *2–3 (N.D. Cal. Jan. 6, 2010), the court concluded that the "Greenlist" seal on a plastic bottle could reasonably be interpreted as an independent environmental endorsement even though the advertiser claimed it simply symbolized the company's participation in a voluntary program. *Koh's* holding is reinforced by similar guidance published in the FTC Green Guides "third party certification does not eliminate a marketer's obligation to ensure that it has substantiation for all claims reasonably communicated by the certification" and that "to avoid deception, marketers should use clear and prominent qualifying language that clearly conveys that the certification or seal refers only to specific and limited benefits." 16 C.F.R. § 260.6(c)(e).

**5. P&G's "context cures" theory is rejected by circuit courts nationwide.**

P&G's fallback argument is that whatever message its front-label messaging conveys is neutralized by back-panel qualifiers, website explanations and undefined technical jargon. *See*, *e.g.*, Mot. at 30. P&G also asserts that a back-label disclosure can even *contradict* the information from the net impression and/or front-facing label. Mot. at 23. But P&G's theories are incompatible with binding Sixth Circuit precedent and the nationally uniform doctrine. Courts do not permit advertisers to rely on back-panel text, fine print, or external materials to correct or contradict a misleading front-label message.

The controlling rule across all relevant circuits is that the front-label net impression governs. For example, in *Mantikas*, 910 F.3d at 637–38, the Second Circuit rejected the argument that back-panel disclosures could cure a misleading front-label message, explaining that "a reasonable consumer should not be expected to consult the Nutrition Facts panel on the side of the

box to correct misleading information set forth in large bold type on the front of the box" because an allegedly misleading statement must be evaluated "in light of its context on the product label or advertisement as a whole." The First Circuit is also explicit on the same point: in *Dumont*, 934 F.3d at 40, it held that the deception question is whether the front label "had the capacity to mislead consumers, acting reasonably under the circumstances," and recognized that a consumer might "see no need to search the fine print on the back of the package." As does the Ninth Circuit in *Williams*, 552 F.3d at 939–40 ("[w]e do not think that the FDA requires an ingredient list so that manufacturers can mislead consumers and then rely on the ingredient list to correct those misinterpretations.") and *Whiteside*, 108 F.4th at 782, (consumers are not "expected to look beyond misleading representations on the front of the box to discover the truth from the ingredient list in small print on the side of the box"). The Seventh Circuit also reaches the same conclusion. In *Bell*, 982 F.3d at 476, the circuit court held that "an accurate fine-print list of ingredients does not foreclose as a matter of law a claim that an ambiguous front label deceives reasonable consumers." The court also reasoned that "it's simply a stretch to say that a consumer's reading of a statement is implausible as a matter of law just because fine print elsewhere on the label could clarify an ambiguity that a reasonable consumer might not have even noticed in the first place" and cautioned that if such arguments prevailed, "fine print could save virtually any deceptive slogan claiming purity." *Id*. at 483–84.

District courts have consistently adopted this message. In *Brenner*, 2016 WL 8192946, at *3, the court reasoned that "[d]efendant's argument implies that any reasonable consumer who was allegedly misled by a 'natural' label would, without question, research every ingredient [] to check for synthetic or potentially harmful chemicals before making a purchase" and that "[this] Court cannot adopt such a sweeping proposition as a matter of law." *Martirosyan v. 9199-4467*

*Quebec, Inc.*, 2025 WL 2995047, at *5–6 (C.D. Cal. July 16, 2025) also rejects efforts to rely on back-panel qualifiers or external materials to cure misleading sustainability claims. And *Della*, 2024 WL 457798, at *10 and *Downing*, 2021 WL 2403811, at *6 both confirm that consumers are not required to visit websites, study program criteria, or interpret technical disclosures to correct the front-label takeaway.

The only outlier cited by P&G in this otherwise uniform authority is *Dorris v. Danone Waters of Am.*, 2024 WL 4792048, at *2 (S.D.N.Y. Nov. 14, 2024). But this distinguishable because the court in *Dorris* presumed that the term "carbon neutral" was not a general environmental benefit claim. This was because the "carbon neutral" was printed on the front of the package with a single footprint and (unlike here) there were no other environmental representations or imagery on the package to suggest that the defendant was making any type of environmental claim. Here, Plaintiffs allege that the collective impact of the five Deceptive Claims work together to deceive consumers about the nature and extent of P&G's environmental stewardship.

At bottom, there is no requirement consumers must "instinctively parse every front label or read every back label before placing groceries in their carts" to avoid deception. *Bell*, 982 F.3d at 476–79. Nor does the law expect consumers to act as technical auditors in the grocery aisle; instead, it expects advertisers to avoid creating misleading impressions in the first place.

**6. The FTC Green Guides reinforce Plaintiffs' deception theory.**

The FTC's Green Guides reinforce the same principles that govern judicial analysis in this context: environmental claims must be evaluated by their net impression; unqualified general environmental-benefit statements are at the highest risk of misleading consumers; and advertisers must substantiate all reasonable interpretations, including implied ones. ¶¶ 237-241. These interpretive rules are not novel or equate to bureaucratic red tape. Instead, the Green Guides reinforce the standards courts already apply and provide expert confirmation of how consumers

understand environmental representations. And yet, P&G fails to substantively address the considerable caselaw that exists where both circuit and district courts use the Green Guides to help assess what is deceptive to a reasonable consumer.[6]

The Sixth Circuit has given the Green Guides "great weight" when evaluating environmental-benefit claims, treating them as authoritative evidence of ordinary consumer perception. *ECM BioFilms*, 851 F.3d at 605. And other courts nationwide rely on the Green Guides for the same reason. In *Della*, 2024 WL 457798, at *8–11, the court treated the Green Guides as probative of how consumers understand recycling and sustainability claims and rejected the argument that technical qualifiers or infrastructure limitations could cure a misleading headline message. *Rawson*, 2022 WL 1556395, at *3–5, likewise applied the Green Guides' net-impression framework to sustainability slogans. And *Downing*, 2021 WL 2403811, at *6–8, relied on the Green Guides in concluding that reasonable consumers are entitled to rely on unqualified environmental claims without consulting secondary materials. Many other courts from across the country routinely turn to the Green Guides to help assess deception and the reasonable interpretation for marketing claims. *See also*, *Boyd*, 750 F. Supp. 3d at 1017; *Whiteside*, 108 F.4th at 778; *Rawson*, 2022 WL 1556395 at *3; *Bush v. Rust-Oleum Corp.*, 2024 WL 308263 at *2 (N.D. Cal. Jan. 26, 2024); *Della*, 2024 WL 457798, at *24.

Because the Green Guides articulate the same objective principles that federal courts already apply—net impression, prominence of qualifications, and substantiation of all reasonable interpretations—they reinforce, rather than expand, the governing doctrine. As explained in the section below, Plaintiffs' allegations all fall squarely within those principles.

[6] P&G's only reference to the Green Guides is on page 27 where it P&G asserts in a conclusory fashion that it complies with the Green Guides as it clearly defined the basis for its representations. But P&G is wrong. *See*, IV.A.; IV.C.2; Appendix A.

### C. Plaintiffs plausibly plead that the Deceptive Claims mislead reasonable consumers.

A complaint need only provide a short, plain statement of the claim that "give[s] the defendant fair notice of what the … claim is and the grounds upon which it rests." *Twombly*, 550 U.S. at 555 (internal punctuation omitted). Here, the Complaint does just that by clearly identifying the specific representations included in the Deceptive Claims, articulating the misleading impression they create, explaining why that impression is false, and backing up the plausibility of those allegations using citations from the FTC Green Guides.

P&G's front-label representations communicate a net impression of environmental stewardship. P&G does not deny that the "Protect-Grow-Restore" logo, the "Keep Forests as Forests" slogan, forest imagery, and two certification-like symbols appear prominently across all Charmin and Puffs products. And under the reasonable-consumer and net impression standards, these coordinated elements must be evaluated together. When so viewed, Plaintiffs plausibly allege that P&G conveys five Deceptive Claims and withholds the Common Omissions from consumers that would prevent those claims from being misleading.

Each of P&G's challenges to the "Protect-Grow-Restore" platform, the FSC seal, the Forest Allies symbol, and the undisclosed qualifying facts turns on a basic reframing error: P&G asks the Court to evaluate its marketing through its own technical, programmatic lens rather than the perspective of a reasonable consumer at the point-of-sale. Under *Rikos* and *ECM BioFilms*, that approach is impermissible. Where, as here, Plaintiffs plausibly allege that P&G's representations communicate environmental assurances that are broader than the underlying reality, these claims must proceed past the pleadings stage.

#### 1. "Protect": P&G's unqualified forest-protection claim is misleading.

P&G asserts that Plaintiffs do not plausibly allege that P&G's "Protects" claim is deceptive. Mot. at 16. But Plaintiffs precisely allege that P&G's "Protect" message is false and

misleading. The statement "Charmin Protects Forests," presented through the "Protect-Grow-Restore" logo and reinforced by prominent forest imagery, broadly conveys the net impression that P&G safeguards forests from environmental harm and sources fiber in a manner consistent with genuine stewardship. ¶¶ 6, 244, 285–287. The message also conveys that P&G affirmatively takes steps to "protect" significant forests like the Canadian boreal and is committed to "keep" that forest as an intact ecosystem, and not merely as a commercial timber supply. Below are some examples of this "Protect" messaging:




FSC™ Certified

We only use pulp certified by the Forest Stewardship Council® and support FSC® in their work to increase adoption of FSC products. These standards ensure that we are protecting wildlife and contributing to thriving local communities.




Plaintiffs plausibly allege that this impression is false because P&G Paper Products rely on virgin fiber harvested through industrial practices—such as clearcutting and slash burning—that do not "protect" significant forests, like the Canadian boreal, in any meaningful sense. ¶ 11. The Complaint also details that suppliers' logging methods materially degrade intact forest landscapes, reduce biodiversity, and undermine the ecological characteristics consumers understand the forests to possess. Below is an example of a forest that P&G ostensibly "Protects":



The Sixth Circuit has long held that when a marketer makes an unqualified environmental claim, the advertiser must substantiate all reasonable interpretations of that message and cannot

retreat to a narrower, litigation-tailored definition of what it supposedly meant. *ECM BioFilms*, 851 F.3d at 608–13. That rule applies with full force here. Plaintiffs allege that P&G's industrial sourcing—including clearcutting, slash burning, and degradation of old-growth forest landscapes—does not "protect" forests in any meaningful or real-world sense. ¶ 11. The Complaint also includes documentation of P&G's real-world impact on the boreal forest. *Id.*

Other courts addressing sustainability messaging reach the same conclusion. In *Rawson*, 2022 WL 1556395, at *3–4, the court treated an environmental slogan paired with certification imagery as an unqualified claim requiring substantiation. Similarly, in *Della*, 2024 WL 457798, at *22, the court held that unqualified environmental-benefit claim that toothpaste tubes were "recyclable" was deceptive when the real-world recycling systems were unable to properly sort and recycle them and they ended up in a landfill. Plaintiffs allege precisely that mismatch: P&G's Protect claim promises stewardship, while its sourcing practices allegedly inflict the opposite (*i.e.*, ecological harm).

Plaintiffs further allege that P&G makes a specific factual claim at the point-of-sale: that "we only use pulp certified by the Forest Stewardship Council" and that "all our pulp used is 100% FSC certified." ¶¶ 9, 252, 290. Plaintiffs plausibly allege these representations are false. They are false because P&G's own 2021 Forestry Practices Report[7] states that "the availability of FSC-certified pulp [in Canada] is insufficient to meet the demands of our industry," and that P&G's internal target for 2022 was only "75%" FSC-certified pulp, with a plan to reach "100%" by 2030. ¶ 291 n.70. The Report also acknowledges that P&G continues to rely on non-FSC certification

[7] After the initiation of this lawsuit, P&G removed the March 2021 Forestry Practices Report from its website, rendering the hyperlink Plaintiffs provided at note 70 of the Complaint inactive. Attached for the Court's convenience is a copy of P&G's March 2021 Forest Practices Report. The text cited by Plaintiffs at ¶ 291 can be found on page 8. *See*, Ex. 1 to the Decl. of Catherine Y.N. Gannon in Opp. To P&G MTD. ECF No. 27-1.

bodies such as SFI and PEFC. § III.D. These admissions cannot be reconciled with P&G's point-of-sale representations that all pulp used in its tissue products is FSC certified.

Still, P&G asserts that Plaintiffs' "Protect" claim may not proceed because "Plaintiffs do not dispute that Charmin and Puffs products are FSC certified." Mot. at 21-22. But Plaintiffs plead precisely those facts by including in the Complaint that P&G's own corporate documents show that 30% of its wood pulp has *no* FSC certification at all. ¶¶ 293–294. Plaintiffs also plead that the non-FSC wood pulp is certified instead by other certification bodies, like SFI, who are currently under federal investigation for lax environmental policies. § III.D. So P&G's characterization, that Plaintiffs do not dispute that its wood pulp is 100% FSC certified and are simply quibbling about the level of FSC certification, misses the mark entirely.

Next, P&G takes great pains to explain that its back-label FSC Mix logo and website disclosures can cure an unambiguous and unqualified FSC logo on the front of P&G Paper Products. Mot. at 23-24. But P&G's "context cures" theory for unambiguous/asterisks terms on front-facing labels is not good law. *See*, § IV.B.5. And even if review of the back label was still appropriate to resolve deception at the pleading stage, it is highly plausible that a reasonable consumer would not understand that the industry term "FSC Mix" allows for wood pulp harvested from industrial logging practices like burning and clear cutting of old-growth forests. *See*, § IV.B.3, *supra.* And, at this stage of the proceedings, this Court must review the net impression and any of its reasonable meanings from the perspective of an ordinary consumer—and not defer to a defendant's interpretation as the *only* reasonable one. *See*, *Boyd*, 750 F. Supp. 3d at 1013 (rejecting defendant's "insist[ance] that Target Clean can only be understood as a kind of proprietary representation, embodying *only* its own exact terms and conditions and communicating nothing more") (emphasis in original); *see also*, § IV.B.2.

P&G also suggests repeatedly that it can avoid liability for consumer deception simply by demonstrating that it complies with FSC's trademark use agreement. Mot. at 24-26. But this Court is required to assess deception via the net impression received by a reasonable consumer and therefore whether P&G complies with its trademark use agreement with FSC is irrelevant. *See*, § IV.B.1. Moreover, both district courts and the FTC Green Guides warn that a marketer's use of an environmental certification or seal of approval (like FSC's) likely conveys that the product offers a general environmental benefit and that consumers may understand the seal differently than what the seal expressly implies. To avoid deception "marketers should use clear and prominent qualifying language [near the seal or certification] that clearly conveys that the certification or seal refers only to specific and limited benefits." ¶ 240 (quoting FTC Green Guides § 260.4). *See also*, *Koh*, 2010 WL 94265, at *2 (consumers more likely to infer environmental endorsement from third-party seals and certifications).

Finally, P&G's cited cases do not help. Mot. at 26-27. As explained above, *Whiteside* expressly overrules *McGinity's* previous holding that a back-label disclosure can cure an unambiguous and unasterisked front-label disclosure (the exact types Plaintiffs plead here). *See*, § IV.B.5. Similarly, *Mier v. CVS Pharm.*, *Inc.*, 2024 WL 121880 (C.D. Cal. Jan. 10, 2024), involved an asterisked claim on the front label and therefore distinguishable from here. P&G's other cases are also inapposite. *Lee v. Canada Goose US, Inc.*, 2021 WL 2665955 (S.D.N.Y. July 29, 2021), challenged a "responsibly sourced" statement that was expressly qualified and tethered to a disclosed, specific standard consumers could understand. And *Myers v. Starbucks Corp.*, 2020 WL 13302437, at *2 (C.D. Cal. July 29, 2020), involved a candy product where the defendant's statement "we buy cocoa from Rainforest Alliance Certified TM farms" led the plaintiff to believe that the defendant's suppliers did not employ child labor or forced labor—even though the

packaging contained no statements about labor practices at all. And *West v. Sambazon, Inc.*, 750 F. Supp. 3d 356 373 (S.D.N.Y. 2024), assessed a deception theory where the packaging contained a "Fair for Life" logo where the plaintiff failed to explain the "certification meant anything in particular, let alone that they guarantee no child labor or unfair labor practices ever enter the supply chain." Importantly, none of these cases involved a situation like this one, where an FSC Mix seal is embedded within a cohesive branding campaign to communicate a sweeping environmental message that P&G takes active steps to "Keep Forests as Forests". Whether P&G's five Deceptive Claims misleads reasonable consumers is a fact question inappropriate for resolution on Rule 12.

**2. "Grow": P&G's "two trees regrown" claim is disingenuous and lacks required substantiation.**

P&G claims that the Complaint makes no allegations that P&G's "Grow" claim is deceptive. Mot. at 27. The Complaint states P&G's "Grow" representation, presented through the "Protect-Grow-Restore" logo and reinforced by imagery of lush, intact forests, communicates to a reasonable consumer that P&G is not merely replenishing trees it uses in its supply chain, but also replacing the ecological benefit lost during P&G's harvests. This message also suggests that any environmental harm associated with harvesting is offset through restorative practices that rebuild the ecological integrity of the forest. ¶ 244. Below are some examples of this "Grow" messaging:







Plaintiffs further allege that P&G pairs this broad restorative message with a specific factual representation: "for every tree used by P&G, at least two are regrown in its place." ¶ 6.

Plaintiffs plead that this "two trees" claim is presented as a core environmental assurance—part of a narrative suggesting that ecological value lost through harvesting is replaced in a meaningful way. ¶¶ 237, 244, 305. Plaintiffs also plead that P&G's practices convert previously intact primary forests like the Canadian boreal forests into industrial tree farms designed for future industrial harvests and with a fraction of the original ecological value. ¶¶ 87–101, 129–130. Below is a picture of one of the tree farms that P&G helps "Grow".



Courts recognize that such restoration-themed messaging functions as an unqualified general environmental-benefit claim, implying substantive environmental advantages tied to the product. *Whiteside*, 108 F.4th at 781–84 (general environmental-benefit messages inherently convey broad assurances that must be substantiated); *Rawson*, 2022 WL 1556395, at *3 (sustainability slogan conveyed broad, unsubstantiated environmental benefits). The Green Guides confirm the same principle: unqualified general environmental-benefit statements are presumptively deceptive unless the advertiser can substantiate all reasonable interpretations through competent and reliable scientific evidence. 16 C.F.R. §§ 260.2, 260.3(a)–(c), 260.4(d).

P&G also argues that their "Grow" representation—stating that "for every tree used by P&G, at least two are regrown in its place"—is not misleading because Plaintiffs do not dispute the literal truth of the statement. Mot. at 12. They further contend that Plaintiffs' allegations simply reflect dissatisfaction with certain forestry "practices" rather than actionable deception. *Id.* First,

P&G is wrong that Plaintiffs do not dispute that P&G plants two trees for every tree used. Mot. at 27. The Complaint includes ample allegations about P&G's lack of substantiation for this claim. ¶ 305. And, tellingly, P&G still fails to substantiate this claim in any of the almost 200 pages it appended to the P&G RJN. *See*, ECF No. 20 (citing nothing substantiating the claim). But more importantly, P&G's argument attempts to sidestep its very real substantiation requirements under binding Sixth Circuit authority. *See*, Mot. at 30 where P&G asserts that the "Green Guides do not require companies to disclose to consumers how they verify the information underlying their environmental claims. The Green Guides simply indicate that marketers should have "a reasonable basis" for their claims, which "often requires competent and reliable scientific evidence." But in *ECM BioFilms*, 851 F.3d at 612–13, the Sixth Circuit upheld the FTC's finding that ECM's "biodegradable" claims were deceptive because the company lacked substantiation for the broad environmental benefits reasonably inferred by consumers. Thus, even if P&G contends that it can avoid sharing its substantiation claims to consumers "how they verify the information underlying their environmental claims", Sixth Circuit precedent prevents P&G from evading its substantiation obligation entirely.

Second, even assuming that P&G can adequately substantiate its claims, courts across jurisdictions have consistently held that literal truths do not immunize a statement from being misleading. *See*, § IV.B.4. The Complaint amply alleges that P&G's "Grow" claim, even if technically accurate in isolation, contributes to a broader marketing narrative—"Protect-Grow-Restore" and "Keep Forests as Forests"—that implies meaningful environmental restoration and stewardship. ¶¶ 6, 283–285 Plaintiffs plausibly allege that P&G's replanting efforts are converting old-growth forests into monoculture tree farms and this is enough to survive dismissal.

Third, P&G argues that no reasonable consumer would believe that replanting trees instantly replicates "exactly" the biodiversity of old-growth forests. Mot. at 27-28. But such a narrow interpretation is not what Plaintiffs have plead. Instead, Plaintiffs plausibly allege that consumers interpret P&G's "Grow" message to mean that P&G's practices help regenerate forests in a meaningful way. ¶¶ 6, 283–285. Plaintiffs also allege that P&G supply chain's use of herbicides, monoculture replanting, and failure to restore biodiversity contradict this impression. And where multiple reasonable interpretations exist, this Court must deny dismissal. § IV.B.2.

Nor do P&G's "fanciful interpretation" cases carry any weight. Mot. at 18, 20, 27, 29-30. This is because none of the cited cases involved unqualified environmental-benefit claims, third-party certification seals, or highly coordinated sustainability narratives like Plaintiffs have plead here. For example, *Biczo v. Ferrara Candy Co*., 2023 WL 2572384, at *2 (N.D. Ill. Mar. 20, 2023), applied the "fanciful interpretation" rule to an ordinary candy-labeling claim, not to a coordinated environmental-marketing campaign using unqualified ecological assurances and certification imagery. Similarly, P&G's other cases were routine food-label cases where plaintiffs tried to load narrow terms with unsupported idiosyncratic meanings. *See*, *Sorkin v. Kroger Co*., 2024 WL 3673719, at *5–6 (N.D. Ill. Aug. 6, 2024) (dismissing case when plaintiff's reading of "farm fresh eggs" implied cage-free, pasture-raised hens, even though the label made no representation about animal-welfare conditions); *Forsher v. J.M. Smucker Co*., 612 F. Supp. 3d 714, 724 (N.D. Ohio 2020) (dismissing "natural"-labeling claims as impermissibly speculative where plaintiff alleged only that the product might contain sugar possibly derived from GMO beets, without pleading that it actually contained any genetically modified material); *Zahora v. Orgain LLC*, 2021 WL 5140504, at *5 (N.D. Ill. Nov. 4, 2021) (dismissing claims where plaintiff alleged "vanilla bean flavor" implied that flavor would not come from artificial flavors).

*Moore v. Trader Joe's*, 4 F.4th 874 (9th Cir. 2021) is also of no use here as in *Whiteside* the Ninth Circuit distinguished *Moore* as an outlier consumer deception case due to the sophistication and specialized knowledge of Manuka honey purchasers: "consumers of Manuka honey, a niche, specialty product, are undoubtedly more likely to exhibit a higher standard of care than 'a parent walking down the dairy aisle in a grocery store, possibly with a child or two in tow,' who is 'not likely to study with great diligence the contents of a complicated product package.'" *Whiteside*, 108 F.4th at 782. In cases involving everyday products, the Ninth Circuit explained that "consumers [] are not expected to study labels with the same diligence as consumers of specialty products." *Id*. *See also*, § IV.B.3. Here, Plaintiffs plead that they have no specialized knowledge as to how P&G Paper Products are made (*e.g.*, ¶ 27), nor does P&G assert that Charmin and Puffs are "niche product[s]" marketed to a small, sophisticated class of customers. Moreover, Plaintiffs' net impression and reasonable interpretations are not idiosyncratic one-offs; they are plausible allegations supported with FTC expert guidance published via the Green Guides. ¶¶ 303–311.

Finally, P&G conclusory asserts that it complies with the Green Guides as it claims it has clearly defined the basis for its representations. Mot. at 29. P&G is wrong, as its "Keep Forests as Forests" campaign violates several provisions of the Green Guides. *See* Appendix A; ¶¶ 248–261. For example, P&G ignores § 260.3(a) of the Green Guides which requires that any disclosures and qualifications be "clear, prominent, and understandable", and located in "close proximity to the qualified claim." As the Complaint shows, there are no qualifications found on the packaging for P&G Paper Products, let alone clear, prominent and understandable ones. § IV.A. P&G also omits how it complies with § 260.3(a), which requires all qualifications to be understandable, when it uses the industry term "Controlled Wood". ¶ 295. P&G also doesn't discuss how its "Restore" promise overstates an environmental benefit in the same way as Example 1 of § 260.3(c). ¶¶ 240,

306. As such, P&G's reliance on *Lizama v. H&M Hennes & Mauritz LP*, 2023 WL 3433957, at *8 (E.D. Mo. May 12, 2023) is misplaced because, unlike here, H&M made no unqualified environmental benefit claims. Moreover, in *Lizama*, H&M expressly included approximate percentages (*i.e.*, 50% or more sustainable materials), while here P&G does not provide this specificity of information anywhere at point-of-sale. Plaintiffs' "Grow" claims may continue.

**3. "Restore": P&G's forest restoration messaging overstates environmental benefits.**

P&G states that Plaintiffs have failed to allege that P&G's restore claim is deceptive. Mot. at 30. P&G's "Restore" representation, presented as part of the "Protect-Grow-Restore" logo and reinforced with imagery of lush forest landscapes, communicates to a reasonable consumer a message of broad ecological restoration—suggesting that P&G's practices produce meaningful forest recovery or environmental improvement beyond the areas it harvests. ¶¶ 6, 244, 286. Below are some examples of the "Restore" message:




As pled, the "Restore" message conveys an ecosystem-level benefit of "forest restoration", not a narrow operational detail or a limited environmental attribute. ¶¶ 6, 286–287. Courts consistently hold that such sweeping environmental assurances operate as unqualified general environmental-benefit claims that must be substantiated. *Whiteside*, 108 F.4th at 781–84.

Even assuming the "Restore" message is read narrowly as referring only to P&G's partnership with the Arbor Day Foundation to plant one million trees, Plaintiffs plausibly allege this narrower interpretation is still misleading and remain unsubstantiated. The Complaint alleges

that planting one million trees represents "the equivalent of one percent of boreal forest harvested every year in Canada," a disparity that materially alters the overall impression of meaningful forest restoration conveyed at the point-of-sale. ¶ 13; *see also* ¶¶ 286–287, 306, 309. Courts routinely hold that literal accuracy does not cure a misleading net impression where the marketing message implies broad environmental improvement that materially exceeds the underlying fact. § IV.B.4. For example, *Earth Island Inst.*, 321 A.3d at 669–74, the court reversed dismissal of claims based on Coca-Cola's sustainability messaging, holding that a series of statements—even if individually vague or aspirational—could mislead consumers when viewed in combination. The court emphasized that "[w]hen companies market their products in ways that actually deceive their consumers, they cannot take shelter in having told no literal falsehoods." *Id.* at 669. Similarly, the Seventh Circuit articulated the same in *Bell*, 982 F.3d. at 479 (observing "the law has long recognized that even literally true claims may deceive" and collecting cases). As did the Ninth Circuit in *Whiteside*, 108 F.4th at 783 when it explained: the "law prohibits not only false statements, but also true statements that have a tendency to mislead."

District courts have adopted the same view: *Della*, 2024 WL 457798, at *8–11 (recyclability statement misleading where real-world conditions contradicted the environmental message); *Bohen*, 2024 WL 1254128, at *8 (allegations that sustainability labeling overstated real world environmental benefit sufficient to survive dismissal). These cases reinforce that the question is not whether the defendant can point to a kernel of literal truth, but whether the overall impression communicated to consumers is misleading.

And yet P&G insists that its "Restore" representations—highlighting P&G's partnership with the Arbor Day Foundation to plant one million trees—is not misleading because the statement is factually accurate and the scale of the replanting effort is irrelevant to consumer perception.

Plaintiffs have already addressed why P&G's lack of substantiation belies Sixth Circuit precedent, even if one assumes that P&G's "Restore" claim is literally accurate. *See*, § IV.C.2. And § 260.3(a)-(b) and § 260.3(c) (Example 3) of the Green Guides explain that even a technically accurate statement—such as a rug made with "50% more recycled content than before"—is nevertheless deceptive when it implies an environmental improvement materially greater than the underlying fact supports. P&G's "Restore" messaging presents the same structural problem. By invoking the language of "forest restoration" while conducting tree-planting on a scale equivalent to roughly one percent of annual boreal forest loss, P&G communicates a sweeping ecological benefit that must be substantiated with competent and reliable scientific evidence of actual forest restoration. Plaintiffs allege P&G does not possess such evidence, and P&G also points to none in the 200 pages of documents it appended in the P&G RJN. ECF No. 20 (citing nothing). Accepting Plaintiffs' well-pled allegations as true, the "Restore" claim is plausibly deceptive and must proceed.

**4. FSC Logo: P&G's use of an unqualified certification seal reinforces its misleading net impression.**

P&G contends that its use of the FSC logo is not deceptive to consumers. Mot. at 21. The Complaint shows that all P&G Paper Products uniformly include a large, unqualified, FSC logo on the front of each package. Importantly, this front-label logo does ***not*** have an asterisk, qualifier or any type of limiting language. ¶¶ 246–247 at n.36. An example of this is shown below:



The Ninth Circuit's decision in *Whiteside*, 108 F.4th at 764, is directly on point and confirms Plaintiffs' theory. *Whiteside* holds that when a front-label representation appears complete and unambiguous (*i.e.*, no asterisk), then the court must evaluate according to the following principles. First, the court examines the net impression that is formed at the moment the consumer encounters the claim on the front of the package, and back-panel material cannot narrow, contradict, or reinterpret that message. *Id.* at 780–82. Here, the unqualified FSC logo operates exactly like the unasterisked "plant-based" and "biodegradable" statements that were deemed unqualified and ultimately held deceptive in *Whiteside*. As the Ninth Circuit clarified, an unqualified environmental assurance appearing at the point-of-sale conveys a broad message about environmental performance and must be substantiated for all reasonable interpretations. The Ninth Circuit also explained that a reasonable consumer could interpret a representation on the front of the label saying that a product is made with a certain attribute, and there is no asterisk or any type of clear and prominent qualification nearby, then a reasonable consumer could plausibly assume that the entire product is made with that attribute. *Id.* at 781–84. *See also*, *Martirosyan*, 2025 WL 2995047, at *6 (citing *Whiteside* for support for "having found that the [unasterisked] 'Plant-based' representation can be interpreted by a reasonable consumer to mean ***entirely*** plant-based based on the alleged front-facing panel, [d]efendant cannot take away that representation by reference to the back of the packaging") (emphasis in original). Here P&G specifically chose not to place the "FSC Mix" logo on the front of the package—or any qualifier or asterisk adjacent to the unqualified FSC seal. And under *Whiteside*, the seal therefore functions as an unqualified general environmental-benefit claim that must be assessed by its front label only.

The district court cases addressing environmental seals reinforce this analysis. In *Rawson*, 2022 WL 1556395, at *3–4, the sustainability logos presented along with printed slogans (like

here) conveyed broad environmental assurances that could not be neutralized by technical definitions or adjacent seals. These decisions echo the principle recognized in *Koh*, 2010 WL 94265, at *2–4: where the court found that a proprietary "Greenlist" seal plausibly conveyed a false impression of third-party endorsement, despite the company's contention that no certification impression was ever sought.

P&G's reliance on *McGinity v. Procter & Gamble Co.*, 69 F.4th 1093 (9th Cir. 2023), is misplaced. *McGinity* involved a single front-label phrase—"Nature Fusion"—that the Ninth Circuit concluded did not make any environmental claim on its own. Because the phrase was "ambiguous at best," *id.* at 1097–98, the appellate court held that it was necessary for consumers to consult back-panel disclosures for more information. *McGinity's* rationale has no application here. The FSC logo is not ambiguous; it is a well-recognized independent certification symbol that directly conveys to consumers a message of an environmental assurance. ¶ 288. Moreover, P&G fails to explain to this Court that *Whiteside* expressly rejected the very portion of *McGinity* suggesting that back-panel disclosures may "cure" unqualified front-label environmental representations. *Compare* Mot. at 23-24 with *Whiteside*, 108 F.4th at 780–82.

Taken as true, Plaintiffs' allegations plausibly state that P&G's unqualified front-panel FSC logo conveys a misleading environmental assurance that the wood pulp used in a P&G Paper Product was not harvested via methods that would permanently destroy the forest. This net impression is contradicted by P&G's own sourcing practices and cannot be narrowed or cured by small-print qualifying marks reflecting highly technical language on the back of the package. The Court may deny P&G's request to dismiss the FSC Logo claims.

**5. Forest Allies Logo: P&G's symbol implies independent audit and evaluation when there is none.**

P&G asserts that its use of the Rainforest Alliance Forest Allies logo does not deceive reasonable consumers. Mot. at 31. P&G's use of the Forest Allies logo is deceptively misleading because it is nearly identical to the prior Rainforest Alliance Certified seal, which consumers reasonably associate with independent verification of responsible forestry practices. ¶¶ 270, 300–01. P&G reinforces that misimpression by pairing the logo with its "Protect-Grow-Restore" platform and other unqualified forest-restoration claims, creating a net impression that its products meet recognized environmental standards of an independent certifier. ¶¶ 6, 230–44, 260–70, 297–305. A comparison between the previous certification seal (left) and the current non-certification seal (right) is below.

Courts consistently treat certification-like symbols as express environmental claims. When a seal resembles a recognized third-party certification, consumers reasonably understand it as communicating an independent endorsement of environmental compliance. *See*, *Koh*, 2010 WL 94265, at *2–4 (finding plausible that a proprietary "Greenlist" seal conveyed a misleading impression of third-party environmental approval even though it was simply an internal program). And when, like here, the seal is part of a broader restorative narrative—Protect, Grow, Restore—the combined messaging plausibly conveys an even stronger impression of rigorous environmental compliance. ¶¶ 6, 230–44, 260–70, 297–305.

P&G's argument (Mot. at 31) that Plaintiffs must plead personal familiarity with the prior Rainforest Alliance logo misunderstands the reasonable-consumer standard: what a reasonable consumer, viewing the symbol in context, would understand the message to be and is that representation false and/or misleading. § IV.B.1. Plaintiffs allege that because the Forest Allies logo closely resembles the prior Rainforest Alliance Certified seal, consumers would reasonably interpret it as carrying the same core message of independent environmental vetting. ¶¶ 300–01. Whether that impression is accurate is a factual question not suitable for resolution at the pleading stage. § IV.A, IV.B.1. And courts repeatedly reject arguments that consumers are required to investigate the meaning of technical logos or internal sourcing programs to correct a misleading front-label impression. *See*, § IV.B.3. Taken as true, Plaintiffs' allegations plausibly state that P&G uses the Forest Allies logo in a manner likely to mislead a reasonable consumer into believing the product meets independently verified environmental standards. That is sufficient under controlling Sixth Circuit precedent and the nationwide consensus on environmental marketing deception.[8]

**6. Omissions: P&G fails to disclose material facts necessary to prevent deception.**

**a. Common Omissions reinforce the deception of the Deceptive Claims.**

Contrary to P&G's argument (Mot. at 34), the Complaint identifies five Common Omissions (¶¶ 11–15) and also explains why the absence of these disclosures strengthens the deception of the Deceptive Claims. These allegations are summarized below.

[8] P&G discusses its Sustainability Promise website at length. But none of the Plaintiffs have alleged that they viewed this website or saw the videos prior to purchase. *E.g.*, ¶ 23. Moreover, Plaintiffs need not show individual exposure to each piece of deceptive content at the pleadings stage. *See Hawes v. Macy's Inc.* 346 F. Supp. 3d 1086, 1091 (S.D. Ohio 2018); *see also Bechtel v. Fitness Equip. Servs., LLC*, 339 F.R.D. 462, 482 (S.D. Ohio 2021) (on Rule 12(b)(6), exposure and reliance questions are factual and cannot be resolved against plaintiffs at the pleadings stage).

First, Plaintiffs allege that P&G's "Protect" message is misleading because P&G does not disclose that the wood fiber for its tissue products is harvested through industrial clearcutting and burning practices that destroy, rather than "protect," the boreal forest. ¶ 11. Second, the "Grow" narrative omits that P&G's touted "two trees regrown" claim is unsubstantiated and, even if true, refers to short-rotation tree farming rather than ecological replacement of old-growth forest. ¶ 12. Third, P&G's "Restore" message omits that its reforestation initiative accounts for only about one percent of annual boreal forest loss, a disparity that materially alters the impression of meaningful restoration. ¶ 13. Fourth, P&G fails to disclose that its front-panel FSC seal does not mean that the wood pulp in the package is entirely FSC certified (at any level of certification). Nor does P&G disclose that for the portion that is FSC-certified, the FSC-Mix level of certification means that the wood pulp is sourced from clearcut areas with minimal safeguards. ¶ 14. Fifth, P&G fails to disclose that the Rainforest Alliance's prior certification program has been defunct for at least eight years now, and that the near-identical "Forest Allies" program logo appearing on P&G's packaging conducts no audits, certifies no boreal forests, and has no sourcing connection to P&G's products. ¶ 16.

These Common Omissions are precisely the kind that courts treat as materially misleading when paired with affirmative environmental claims. *Whiteside*, 108 F.4th at 781–85, explains that unqualified environmental messaging is actionable when the defendant withholds context necessary to prevent a misleading impression. *Rawson*, 2022 WL 1556395, at *3–4, holds that sustainability slogans are deceptive when the defendant conceals contrary environmental practices. P&G's invocation of *Dwyer v. Allbirds, Inc.*, 598 F. Supp. 3d 137 (S.D.N.Y. 2022), misfires because *Dwyer* involved a plaintiff who merely quarreled with Allbirds' choice of the Higg MSI as its life-cycle methodology—arguing, for example, that the tool failed to account for water use

or land impacts—without identifying any statement Allbirds actually made that was false. Here, in contrast, Plaintiffs challenge several of P&G's affirmative marketing claims. *See, e.g.*, ¶ 6. And unlike *Dwyer*, this case targets deceptive representations, not methodological preferences, as P&G contends.

**b. P&G has a duty to disclose the Common Omissions.**

P&G seeks to avoid any accountability for its actions by pretending that it owed no duty to disclose absent a fiduciary relationship with Plaintiffs. Mot. at 34-35. To be sure, a duty to disclose does arise in a fiduciary relationship—but that is not the only way that such a duty is triggered. As reflected in the caselaw cited in Appendix C, courts recognize that a duty to disclose can arise in the context of a transaction (such as consumer transactions detailed in the Complaint) and/or where a party makes partial representations to the counterparty but withholds other material facts. That is precisely the scheme described in the Complaint.

P&G's failure to divulge information about the unsustainable forestry practices of the third parties in its supply chain deceived consumers when considered in the context of its misleading affirmative statements that painted an overly rosy view of its sustainability efforts. P&G had a duty to correct the misunderstanding caused by its affirmative statements, regardless of any special relationship or fiduciary duty. *See* Appendix C (collecting cases holding that a duty to disclose material facts arises in analogous contexts). By seeking to confine a duty to disclose to the fiduciary context, P&G impermissibly eliminates the duties recognized by courts under both the common law and statutory consumer protection grounds.

P&G further maintains that Plaintiffs' allegations about being misled are implausible because most of the information alleged in the Complaint is publicly available. *See* Mot. at 37

(citing *Cole v. Keystone RV Co.*, 2021 WL 3111452, at *4 (W.D. Wash. July 22, 2021)).[9] This, again, construes the facts in a manner inconsistent with the allegations of the Complaint. Plaintiffs do not allege that they viewed any information before purchasing the products that would have cured the misunderstandings caused by P&G's deceptive labeling and advertising. "What matters here is how consumers actually behave—how they perceive advertising and how they make decisions." *Bell*, 982 F.3d at 481. These fundamental questions pose quintessential factual disputes: "These are matters of fact, subject to proof that can be tested at trial … ." *Id.*; *see also Nathan*, 492 F. Supp. 3d at 760-61 ("Whether a particular representation could deceive a reasonable consumer is typically a question of fact to be decided by a jury. Only in 'rare situations,' where the alleged violation is 'simply not plausible,' will a court be able to decide this issue on a motion to dismiss."); *Boyd*, 750 F. Supp. 3d at 1011 (similar).

At this stage, it is safe to assume that reasonable consumers make quick decisions based on the advertising and labeling they encounter—no one wants to turn a trip to the grocery store into an all-day due diligence affair. *See Bell*, 982 F.3d at 481 ("We doubt it would surprise retailers and marketers if evidence showed that many grocery shoppers make quick decisions that do not involve careful consideration of all information available to them."). There is no duty for consumers to search out contradictory information before purchasing a relatively inexpensive consumer good. *See id.* at 476-81 (no duty to search out contradictory information, even when that information is on the product itself); *Williams*, 552 F.3d at 939–40 (similar); *Mantikas*, 910 F.3d at 637−39 (similar regarding "whole grain" label); *Dumont*, 934 F.3d at 40-41 (similar regarding

[9] *Cole* involved the purchase of a vehicle, which unlike toilet paper, is an expensive good that reasonable consumers take time to investigate. And although *Cole* was affirmed, the court declined to address the omission theory. *See Cole v. Keystone RV Co.*, 2022 WL 4234958, at *2 (9th Cir. Sept. 14, 2022) ("We do not opine on omission-based CPA theories separate from the content of the Owner's Manual that plaintiffs advanced for the first time during oral argument on appeal.").

"hazelnut" coffee); *Nathan*, 492 F. Supp. 3d at 762–63 (similar regarding "horsepower"). Accordingly, the Court should hold that Plaintiffs have alleged both actionable misrepresentations and omissions.

**D. P&G's reliance, materiality, and exposure claims are unsupported.**

P&G acknowledges that the governing rule for a consumer-deception claim across the state subclasses is whether the challenged representations are likely to mislead a reasonable consumer acting reasonably under the circumstances. Mot. at 18. Reliance is either not required for these statutory claims or is satisfied where the representation is material and conveyed through a uniform vehicle—such as standard packaging—such that all class members were likely exposed to the same deceptive message. *See Rikos*, 799 F.3d at 518 (surveying California, Florida, Illinois, and North Carolina law). *See also*, *Boyd*, 750 F. Supp. 3d at 1011 (resolving Rule 12 challenges to consumer protection claims from 14 states including California, Florida, Illinois, Michigan, Minnesota, New York and Washington by assessing "whether Plaintiffs have pleaded facts from which the Court can infer that a reasonable consumer could have been misled by the [marketing] program and its representations"); *Nathan*, 492 F. Supp. 3d 747 (reliance and causation sufficient with plaintiff having plead they reviewed the packaging and would not have purchased the product at the price paid if the misrepresentation was revealed). Similarly, here, the main question for all the state subclasses is whether P&G's Deceptive Claims have the capacity, tendency, or likelihood to mislead. *See*, Appendix B (chart showing each state subclass either does not require reliance or applies a capacity or likelihood to deceive standard).

As such, P&G's contentions that Plaintiffs, or other class members, can only evade dismissal of the statutory fraud claims by establishing that they were personally familiar "with the various FSC certification levels" (Mot. at 11) and/or "the previous Rainforest Alliance Certified seal logo" (Mot. at 31) or individually allege which atomized aspect of the net impression actually

deceived them, are incorrect as a matter of law. *Davis*, 727 F. Supp. 3d at 144 (finding that where plaintiffs "alleged that they 'reviewed the product's labeling and packaging' [] and saw the contested claims prior to making their purchases" and "approximately when they made the purchase[s]" ultimately "placed [d]efendants on sufficient notice to respond" to the complaint and that "[w]hile it is true that significant factual context is still as yet undiscovered, such gaps are the purpose of discovery").

**E. P&G's Rule 9(b) arguments fail.**

P&G's particularity argument both misunderstands the applicability of Rule 9(b) to consumer protection and false advertising claims and, as highlighted above, takes an unduly myopic view of the Complaint. Mot. at 37-39. First, several courts have recognized that claims such as those brought by Plaintiffs here are *not* subject to Rule 9(b). *See*, *e.g.*, *McKinney v. Microsoft Corp.*, 2011 WL 13228141, at *14 (S.D. Ohio May 12, 2011) ("With this in mind, and after a review of the relevant case law, the Court agrees with Judge Gregory L. Frost's opinion in *Ferron v. Search Cactus, L.L.C.*, 2007 WL 1792332 (S.D. Ohio June 19, 2007), which held that the particularity requirement of Rule 9(b) does not apply to claims plead under the OCSPA."); *GEICO Corp. v. Autoliv, Inc.*, 345 F. Supp. 3d 799, 847 (E.D. Mich. 2018) ("squarely reject[ing]" the argument that Rule 9(b) applies to claims under Florida consumer protection law); *Bruce v. Home Depot, U.S.A., Inc.*, 308 F. Supp. 2d 72, 77 (D. Conn. 2004) (acknowledged by P&G in Ex. C to Mot.); *Greene v. Gerber Prods. Co.*, 262 F. Supp. 3d 38, 67 (E.D.N.Y. 2017) (same); *In re Equifax, Inc., Customer Data Sec. Breach Litig.*, 362 F. Supp. 3d 1295, 1335-36 (N.D. Ga. 2019) ("[T]he Court concludes that the heightened pleading standards of Rule 9(b) do not apply to these particular [unfair and deceptive trade practice] state statutes."); *Perdue v. Hy-Vee, Inc.*, 455 F. Supp. 3d 749, 769 (C.D. Ill. 2020) ("As a procedural matter, courts have held that similar

complaints alleging fraud and deceptive practices in federal court should be judged under Rule 8(a) and not the particularity requirement for fraud under Rule 9(b).").

Second, while some courts have held to the contrary, to the extent that Rule 9(b) were to apply, a plaintiff "must '(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent."' *Frank v. Dana Corp*., 547 F.3d 564, 570 (6th Cir. 2008). In the false advertising context, Plaintiffs satisfy even the Rule 9(b) standard by identifying the content of the advertising, alleging that P&G issued the advertising, explaining how the advertisement misled consumers.

P&G's Rule 9(b) argument is scattershot, relying more on quoting legal standards than grappling with Plaintiffs' Complaint. *See Estep v. Combs*, 366 F. Supp. 3d 863, 882 (E.D. Ky. 2018) ("Defendant bears the dismissal burden; it was up to Combs to take aim at specific infirmities in Plaintiff's claims."). Nevertheless, P&G appears to acknowledge that it is sufficiently identified (the "who" question) as the maker of the false advertising. On the "what" question, it fails to discuss the detailed allegations already included in the Complaint describing the misleading advertising. ¶¶ 11–18, 229–327. At most, it quibbles with language in two paragraphs about "substantially similar." ¶¶ 22–23. Given the detailed descriptions of the false advertising throughout the Complaint, and the photos depicting the false advertising, there can be no serious question about "what." *See*, *e.g.*, *Whiteside*, 108 F.4th at 786 (rejecting Rule 9(b) argument in class action for deceptive marketing: "There are indeed dozens of labels in the record because this is a putative class action, but Plaintiff's complaint sufficiently alleges the particular label she herself saw."); *Martirosyan*, 2025 WL 2995047, at *4 (rejecting defendant's 9(b) particularity challenge when "plaintiff has adequately pled which of [d]efendant's products contain the misrepresentation,

where the misrepresentation was on the product, and how the misrepresentation misleads a reasonable consumer" and collecting cases).

On the "when" and "where" questions, Plaintiffs alleged that they purchased the specific products during date ranges in particular states (and at specific stores). ¶¶ 22, 29, 36, 43, 50, 57, 64, 71, 78, 85, 92, 99, 106, 113, 120, 127, 134, 141, 148, 149, 156, 163, 170, 177, 184, 191, 198, 205, 212, 219. Although P&G seems to dispute this point, it does not discuss any of these allegations or develop its argument with any precision. *Brook v. Sanofi-Aventis U.S., LLC*, 2014 WL 7272243, at *2 n.3 (S.D. Ohio Dec. 18, 2014) ("This essentially perfunctory method of briefing fails to constitute developed arguments that this Court will consider adequately presented for disposition.").

This case is accordingly unlike *Greer v. Strange Honey Farm*, *LLC*, 114 F.4th 605, 615 (6th Cir. 2024) where the Sixth Circuit faulted the complaint for failing to answer the "why" and "when" questions. On the when question, the Sixth Circuit recognized that the complaint offered "no timeframe at all" and did not "mention[] a single specific date on which the statements were made." *Id.* at 616–17. The Complaint, by contrast, provides date ranges for the named plaintiffs and the locations where they purchased the products. ¶¶ 22, 29, 36, 43, 50, 57, 64, 71, 78, 85, 92, 99, 106, 113, 120, 127, 134, 141, 148, 149, 156, 163, 170, 177, 184, 191, 198, 205, 212, 219. Similarly, on the why question, the Sixth Circuit found that the complaint did not identify a common scheme, but rather one that could vary by bottle of honey (emphasizing that the complaint only alleged that "[s]ome" of the bottles tested revealed flaws). *Greer*, 114 F.4th at 615–16 (original emphasis). The allegations of the Complaint do not require comparable parsing—because they present a uniform greenwashing scheme that does not hinge on the testing of particular

products. ¶¶ 229–302. The "why" question is thus readily answered—consumers pay more for products they believe are sustainably sourced, and P&G knows this. ¶¶ 229–36.

Near the end of its Rule 9(b) section, P&G insists that "Plaintiffs do not adequately allege that they were deceived by P&G's statements," Mot. at 39, but it again declines to elaborate. There is good reason for that omission. The Complaint is replete with examples of how Plaintiffs and class members were deceived by P&G's marketing efforts. ¶¶ 244–302 (*e.g.* ¶ 32 "Defendant deceived and misled consumers [including Plaintiff Cuevas] into thinking that P&G's current actions represent a viable method for substantially mitigating or neutralizing the harm the Paper Products' supply chain causes to the environment [] [h]ad [P&G] disclosed the truth about its damaging environmental practices Plaintiff [Cuevas] would not have purchased the Paper Products or would have paid less for them." Indeed, the Complaint devotes almost 200 pages to chronicling the greenwashing scheme, how it was orchestrated, and how it misled consumers. P&G's failure to develop any reasoned analysis of the Rule 9(b) issue underscores the lack of substance to its argument here: "The defendants do not suggest that they required any further particularity to respond to the complaint. This is not a case, after all, in which the defendant can claim that it never made the allegedly deceptive statement. Nor is this a case in which liability turns on more precise information concerning the 'when' or the 'where.'" *Dumont*, 934 F.3d at 38–39. P&G's complaints about a lack of specificity "strike us as either irrelevant or the potential subjects of discovery." *Id.* at 39.

## F. P&G's remaining arguments are either premature or incorrect.[10]

### 1. State law permits fraudulent concealment claims.

P&G acknowledges that claims for fraudulent concealment under the laws of California, Florida, Georgia[11], Maine, Maryland, New York, North Carolina, Ohio, Utah, and Washington are viable. Mot. at 39. It only challenges fraudulent concealment claims under the state laws of Connecticut, Illinois, Massachusetts, Michigan, Minnesota and Pennsylvania. Mot. at 39. These arguments fail, which may explain why P&G neglects to develop the point beyond a conclusory paragraph.

Plaintiffs provide the following authority that supports, with various nuances between the states, fraudulent concealment claims under applicable state law: ***Minnesota***: *Trs. of Twin City Bricklayers Fringe Ben. Funds v. Superior Waterproofing, Inc.*, 450 F.3d 324, 331 (8th Cir. 2006) (MN law: "Fraudulent concealment may give rise to an independent cause of action if the plaintiff has been directly harmed as a result of the defendant's deliberate concealment of material facts."); *Iverson v. Johnson Gas Appliance Co.*, 172 F.3d 524, 529 (8th Cir. 1999) (MN law: "Fraud encompasses, among other things, theories of fraudulent misrepresentation, fraudulent concealment…"). ***Pennsylvania***: *GridKor, LLC v. Collins*, 2025 WL 2301190, at *14 (E.D. Pa. Aug. 8, 2025) (describing the elements of "a claim for fraudulent concealment under Pennsylvania law" and citing *Marcum v. Columbia Gas Transmission, LLC*, 423 F. Supp. 3d 115, 121 (E.D. Pa. 2019)). ***Illinois***: *Moore v. Pendavinji*, 260 N.E.3d 111, 120-21 (Ill. Ct. App. 2024) ("In order to state a claim for fraudulent concealment, a plaintiff must allege that the defendant concealed a

---

[10] Plaintiff Maggio addresses in a separate brief (ECF No. 28). P&G's improper attempt to seek dismissal of claims included in her original complaint filed in *Maggio v. Procter & Gamble Co.*, No. 1:25-cv-02667 (S.D.N.Y. filed Mar. 31, 2025) but are not included in this Consolidated Complaint.

[11] Plaintiff Bryant withdraws her claim under the Georgia Fair Business Practices Act (Ga. Code Ann. § 10-1-390, *et seq.*) but continues to assert her fraudulent concealment claim under Georgia law.

material fact when he was under a duty to disclose that fact to plaintiff.") (quoting *Connick v. Suzuki Motor Co., Ltd.*, 675 N.E.2d 584, 593 (Ill. 1996)). ***Michigan***: *Titan Ins. Co. v. Hyten*, 817 N.W.2d 562, 569 (Mich. 2012) ("Silent fraud has also long been recognized in Michigan."); *M&D, Inc. v. W.B. McConkey*, 585 N.W.2d 33, 40 (Mich. Ct. App. 1998) ("We agree with plaintiffs to the extent that a representation can be action or conduct and can be actionable as silent fraud if that action or conduct is intended to create a misimpression to the opposing party…"). ***Massachusetts***: *Stolzoff v. Waste Sys. Int'l, Inc.*, 792 N.E.2d 1031, 1044 (Mass. Ct. App. 2003) ("To the extent that the claim involves nondisclosure of a fact, it is actionable as fraud only when there is a duty to disclose. We have recognized a duty to disclose where (i) there is a fiduciary or other similar relation of trust and confidence, (ii) there are matters known to the speaker that he knows to be necessary to prevent his partial or ambiguous statement of the facts from being misleading, or (iii) the nondisclosed fact is basic to, or goes to the essence of, the transaction."). ***Connecticut***: *McCullough v. World Wrestling Ent., Inc.*, 172 F. Supp. 3d 528, 566 (D. Conn. 2016), *aff'd in part*, *appeal dismissed in part sub nom. Haynes v. World Wrestling Ent., Inc.*, 827 F. App'x 3 (2d Cir. 2020) ("The Court does not read *Saggese* as holding that under Connecticut law a defendant cannot be held liable for non-disclosure of publicly available facts."). Therefore, all of the state law fraudulent concealment claims should be permitted to proceed.

**2. P&G's investor statements confirm the materiality of Plaintiffs' claims.**

P&G's statements to its investors reveal important context for its broader deceptive practices and show that P&G's environmental practices are material to the company and to consumers. P&G acknowledges statements in investor relations reports and webpages about its "commitment to 'no deforestation in its supply chain,'" but suggests that, because Plaintiffs "do not allege that they viewed or relied on statements in P&G's investor relations materials," these representations shed no light on the consumer claims. Mot. at 33-34 (quoting ¶¶ 281, 312). Here,

P&G simply misapprehends the nature of these allegations. Plaintiffs do not claim that they were misled directly by these investor communications. Instead, these statements help illustrate P&G's deceptive conduct by perpetuating an unreasonably narrow definition of "deforestation"—exactly in line with its false advertising and also show that shareholders and consumers find forest health material. *See* ¶¶ 281–282, 312; *see also Pullman v. Alpha Media Publ., Inc.*, 2013 WL 1286144, at *7 (S.D.N.Y. Mar. 28, 2013), *aff'd*, 624 F. App'x 774 (2d Cir. 2015) ("Pullman's allegations touching on concealment provide background and could be relevant to her misrepresentations claims."). In a case where P&G complains about the supposed lack of specificity (in advancing a Rule 9(b) argument), it is more than a little curious to see grievances about *too* much detail.

## V. CONCLUSION

Plaintiffs do not challenge how forests are managed by the Government of Canada or attempting to force any "preferences" onto others; instead, Plaintiffs challenge how P&G is unfairly charging consumers a higher price for basic necessities based on false and misleading environmental assurances. The Complaint adequately pleads a standard consumer deception claim with sufficient particularity. P&G's motion should be denied in its entirety.

Dated: December 12, 2025

Respectfully submitted,

MARKOVITS, STOCK & DEMARCO, LLC

By: */s/ Terence R. Coates*
Terence R. Coates (0085579)
119 East Court Street, Suite 530
Cincinnati, OH 45202
Telephone: (513) 651-3700
Facsimile: (513) 665-0219
tcoates@msdlegal.com

*Proposed Interim Liaison Counsel*

Steve W. Berman (admitted *pro hac vice*)
Catherine Y.N. Gannon (admitted *pro hac vice*)
HAGENS BERMAN SOBOL SHAPIRO LLP
1301 Second Avenue, Suite 2000
Seattle, WA 98101
Telephone: (206) 623-7292
steve@hbsslaw.com
catherineg@hbsslaw.com

*Proposed Interim Lead Counsel*

Rebecca A Peterson (admitted *pro hac vice*)
GEORGE FELDMAN MCDONALD PLLC
1650 W 82nd Street, Suite 880
Bloomington, MN 55431
Telephone: (612) 778-9595
Facsimile: (888) 421-4173
rpeterson@4-justice.com

Kim E. Richman (*pro hac vice* forthcoming)
Jennifer K. Church (admitted *pro hac vice*)
RICHMAN LAW & POLICY
1 Bridge Street, Suite 83
Irvington, NY 10533
Telephone: (212) 687-8291
krichman@richmanlawpolicy.com
jchurch@richmanlawpolicy.com

*Attorneys for Plaintiffs*

**CERTIFICATE OF SERVICE**

I hereby certify that on December 12, 2025, I caused a copy of the forgoing was served via electronic filing in the CM/ECF system, which will send notice of filing to all counsel of record.

*/s/ Terence R. Coates*
Terence R. Coates (0085579)